1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

| | |
|---|---|
| ABDIQAFAR WAGAFE and MEHDI OSTADHASSAN on behalf of themselves and others similarly situated, | |
| | COMPLAINT-CLASS ACTION |
| Plaintiffs, | |
| v. | Case No: --------------- |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOHN KELLY, in his official capacity as Secretary of the U.S. Department of Homeland Security; LORI SCIALABBA, in her official capacity as Acting Director of the U.S. Citizenship and Immigration Services; MATTHEW D. EMRICH, in his official capacity as Associate Director of the Fraud Detection and National Security Directorate of the U.S. Citizenship and Immigration Services ("FDNS"); DANIEL RENAUD, in his official capacity as Associate Director of the Field Operations Directorate of the U.S. Citizenship and Immigration Services, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

## INTRODUCTION

1.      This class action lawsuit challenges the United States Citizenship and Immigration Service's ("USCIS") unlawful delay and denial of Plaintiffs' applications for citizenship and for lawful permanent residence under a secretive policy that has incorrectly blacklisted Plaintiffs as "national security concerns" and impermissibly barred them from obtaining permanent residency or citizenship despite their eligibility to do so.

2.      Plaintiff Abdiqafar Wagafe meets the statutory criteria to be naturalized as a United States citizen, and Plaintiff Mehdi Ostadhassan meets the statutory criteria to adjust his immigration status to that of a lawful permanent resident ("LPR").  However, USCIS refused to adjudicate their applications in accordance with the governing statutory criteria.  Instead, USCIS has applied impermissible ultra vires rules under a policy known as the Controlled Application Review and Resolution Program ("CARRP"), which has prevented the agency from granting Plaintiffs' applications.

3.      Plaintiffs bring this action on behalf of themselves and all others similarly situated to enjoin Defendants from applying CARRP to immigration benefit adjudications and to compel USCIS to finally—after years of waiting—adjudicate their pending applications for naturalization and LPR adjustment of status, as required by law and without regard to CARRP or any other ultra vires rules.

4.      The Constitution expressly assigns to Congress, not the executive branch, the authority to establish uniform rules of naturalization.  The Immigration and Nationality Act ("INA") sets forth those rules, along with the requirements for adjustment of status to lawful permanent residence.

5.      Since 2008, however, USCIS has used CARRP—an internal vetting policy that has not been authorized by Congress, codified, subjected to public notice and comment, or voluntarily made public in any way—to investigate and adjudicate applications the agency deems to present potential national security concerns.  CARRP prohibits USCIS field officers from approving an application with a potential national security concern, instead directing officers to deny the application or delay adjudication—often indefinitely.

6.      CARRP's definition of national security concern is far broader than the security-related ineligibility criteria for immigration applications set forth by Congress in the INA.  CARRP identifies national security concerns based on deeply-flawed and expansive government watchlists and other

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

vague and overbroad criteria that bear little, if any, relation to the statutory security-related ineligibility criteria. The CARRP definition casts a net so wide that it brands innocent, law-abiding residents, like Plaintiffs—neither of whom poses a security threat—as national security concerns on account of innocuous activity, associations, and characteristics such as national origin.

7.      Although Plaintiffs do not know the total number of people subject to CARRP at any given time, USCIS data reveals that between Fiscal Year 2008 and Fiscal Year 2012, more than 19,000 people from twenty-one Muslim-majority countries or regions were subjected to CARRP. Upon information and belief, USCIS opened nearly 42,000 CARRP cases between 2008 and 2016.

8.      Due to CARRP, USCIS has unlawfully delayed adjudication of Plaintiffs' applications, as the law requires. Both Plaintiffs have experienced an extraordinary processing delay, effectively denying them the benefit of the statutory entitlement they seek.

9.      Although USCIS has applied CARRP to Plaintiffs' attempts to naturalize and adjust status, it has not notified Plaintiffs or the class members they seek to represent that it considers them potential national security concerns, has not provided the reasons why it classified them in this way, and has not afforded them any opportunity to address and correct any basis for USCIS's concerns.

10.      Plaintiffs therefore request that the Court enjoin USCIS from applying CARRP (or any similar ultra vires policy) to their immigration applications and the applications of similarly situated individuals, and declare that CARRP violates the INA; Article 1, Section 8, Clause 4 of the United States Constitution (the Naturalization Clause); the Due Process Clause of the Fifth Amendment to the U.S. Constitution; and the Administrative Procedure Act ("APA"). At a minimum, in the alternative, if USCIS subjects an application to CARRP or similar non-statutory and sub-regulatory successor vetting policy, Plaintiffs seek an order compelling USCIS to provide notice to applicants and an opportunity to respond.[1]

---

[1] As set forth below in paragraph 41, USCIS did not make information about CARRP public, and the program only was discovered through fortuity during federal court litigation. To the extent the program has shifted in name, scope, or method, Plaintiffs may have no way to obtain that information. Thus, Plaintiffs' reference to "CARRP" incorporates any similar non-statutory and sub-regulatory successor vetting policy.

[2] These security and terrorism grounds of inadmissibility, if applicable, may bar an applicant from obtaining lawful permanent resident status, asylum, or a visa. However, they do not bar an applicant

COMPLAINT Page 2 of 25
Case No. --

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

## JURISDICTION AND VENUE

11.     Plaintiffs allege violations of the INA, the APA, and the U.S. Constitution.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331.  This Court also has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief under 5 U.S.C. § 702 and 28 U.S.C. § 1361.

12.     Venue is proper in the Western District of Washington under 28 U.S.C. §§ 1391(b) and 1391(e) because (1) Plaintiff Abdiqafar Wagafe, a lawful permanent resident of the United States, resides in this district and no real property is involved in this action; (2) a substantial part of the events giving rise to the claims occurred in this district; and (3) Plaintiffs sue Defendants in their official capacity as officers of the United States.

## PARTIES

13.     Plaintiff Abdiqafar Wagafe is a thirty-two-year-old Somali national and a lawful permanent resident of the United States.  He has lived in the United States since May 2007 and currently resides in SeaTac, Washington.  He applied for naturalization in November 2013.  Even though he satisfies all statutory criteria for naturalization, USCIS has subjected his application to CARRP, and as a result, a final decision has not been issued.

14.     Plaintiff Mehdi Ostadhassan is a thirty-three-year-old national of Iran.  He has lived in the United States since 2009 and resides in Grand Forks, North Dakota.  He applied for adjustment of status to lawful permanent resident in February 2014.  Even though he satisfies all statutory criteria for adjustment of status, USCIS subjected his application to CARRP, and as a result, a final decision has not been issued.

15.     Defendant USCIS is a component of the Department of Homeland Security ("DHS"), and is responsible for overseeing lawful immigration to the United States, adjustment of status, and naturalization of LPRs as U.S. citizens.  USCIS implements federal law and policy with respect to immigration applications, including CARRP.

16.     Defendant General John Kelly is the Secretary of DHS, the department under which USCIS and several other immigration agencies operate.  Accordingly, Secretary Kelly has supervisory responsibility

over USCIS.  Plaintiffs sue Defendant Kelly in his official capacity.

17.     Defendant Lori Scialabba is the Acting Director of USCIS.  Acting Director Scialabba establishes and implements naturalization and other immigration applications policy for USCIS and its subdivisions, including CARRP.  Plaintiffs sue Defendant Scialabba in her official capacity.

18.     Defendant Matthew D. Emrich is the Associate Director of the Fraud Detection and National Security Directorate of USCIS ("FDNS"), which is ultimately responsible for determining whether individuals or organizations filing naturalization and other immigration applications pose a threat to national security, public safety, or the integrity of the nation's legal immigration system.  Associate Director Emrich establishes and implements policy for FDNS, including CARRP.  Plaintiffs sue Defendant Emrich in his official capacity.

19.     Defendant Daniel Renaud is the Associate Director of the Field Operations Directorate of USCIS, which is responsible for and oversees the processing and adjudication of immigration applications through the USCIS field offices and the National Benefits Center.  Plaintiffs sue Defendant Renaud in his official capacity.

## LEGAL FRAMEWORK

### A.     Naturalization

20.     To naturalize as a U.S. citizen, an applicant must satisfy certain eligibility criteria under the INA and its implementing regulations.  *See generally* 8 U.S.C. §§ 1421-1458; 8 C.F.R. §§ 316.1-316.14.

21.     Applicants must prove that they are "at least 18 years of age," 8 C.F.R. § 316.2(a)(1); have "resided continuously, after being lawfully admitted" in the United States, "for at least five years"; and have been "physically present" in the United States for "at least half of that time."  8 U.S.C. § 1427(a)(1).

22.     Applicants must also demonstrate "good moral character" for the five years preceding the date of application, "attach[ment] to the principles of the Constitution of the United States, and favorabl[e] dispos[ition] toward the good order and happiness of the United States . . . ."  8 C.F.R. § 316.2(a)(7).

23.     An applicant is presumed to possess the requisite "good moral character" for naturalization unless, during the five years preceding the date of the application, they are found (1) to be a habitual drunkard, (2) to have committed certain drug-related offenses, (3) to be a gambler whose income derives

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

principally from gambling or has been convicted of two or more gambling offenses, (4) to have given false testimony for the purpose of obtaining immigration benefits; or if the applicant (5) has been convicted and confined to a penal institution for an aggregate period of 180 days or more, (6) has been convicted of an aggravated felony, or (7) has engaged in conduct such as aiding Nazi persecution or participating in genocide, torture, or extrajudicial killings.  8 U.S.C. § 1101(f)(6).

24.     The statutory and regulatory requirements set forth in paragraphs 21-22 are less stringent for certain persons who married U.S. citizens and employees of certain nonprofit organizations, in that less than five years of residency and good moral character are required.  *See generally* 8 U.S.C. § 1430; 8 C.F.R. § 319.1; 8 C.F.R. § 319.4.

25.     An applicant is barred from naturalization for national security-related reasons in circumstances limited to those codified in 8 U.S.C. § 1424, including, inter alia, if the applicant has advocated, is affiliated with any organization that advocates, or writes or distributes information that advocates, "the overthrow by force or violence or other unconstitutional means of the Government of the United States," the "duty, necessity, or propriety of the unlawful assaulting or killing of any officer . . . of the Government of the United States," or "the unlawful damage, injury, or destruction of property."

26.     Once an individual submits an application, USCIS must conduct a background investigation, *see* 8 U.S.C. § 1446(a); 8 C.F.R. § 335.1, which includes a full criminal background check by the Federal Bureau of Investigation ("FBI"), *see* 8 C.F.R. § 335.2.

27.     After completing the background investigation, USCIS must schedule a naturalization examination at which the applicant meets with a USCIS examiner for an interview.

28.     In order to avoid inordinate processing delays and backlogs, Congress has stated "that the processing of an immigration benefit application," which includes naturalization, "should be completed not later than 180 days after the initial filing of the application."  8 U.S.C. § 1571(b).  USCIS must either grant or deny a naturalization application within 120 days of the date of the examination.  8 C.F.R. § 335.3.

29.     If the applicant has complied with all requirements for naturalization, federal regulations state that USCIS "*shall* grant the application."  8 C.F.R. § 335.3(a) (emphasis added).

30.     Courts have long recognized that "Congress is given power by the Constitution to establish a

uniform Rule of Naturalization. . . .  And when it establishes such uniform rule, those who come within its provisions are entitled to the benefit thereof as a matter of right. . . ."  *Schwab v. Coleman*, 145 F.2d 672, 676 (4th Cir. 1944) (emphasis added); *see also Marcantonio v. United States*, 185 F.2d 934, 937 (4th Cir. 1950) ("The opportunity having been conferred by the Naturalization Act, there is a statutory right in the alien to submit his petition and evidence to a court, to have that tribunal pass upon them, and, if the requisite facts are established, to receive the certificate." (quoting *Tutun v. United States*, 270 U.S. 568, 578 (1926))).

31.    Once an application is granted, the applicant is sworn in as a United States citizen.

### B.    Adjustment of Status to Lawful Permanent Resident

32.    Federal law allows certain non-citizens to adjust their immigration status to that of a Lawful Permanent Resident ("LPR").

33.    Several events may trigger eligibility to adjust to LPR status, including, but not limited to, an approved petition through a family member, such as a U.S. citizen spouse, or employer.  *See*, *e.g.*, 8 U.S.C. § 1255(a); 8 C.F.R. § 245.1.

34.    In general, a noncitizen who is the beneficiary of an approved immigrant visa petition and who is physically present in the United States may adjust to LPR status if he or she "makes an application for such adjustment," was "inspected and admitted or paroled" into the United States, is eligible for an immigrant visa and admissible to the United States, and the immigrant visa is immediately available to the applicant at the time the application is filed.  8 U.S.C. §§ 1255(a)(1)-(3); 8 C.F.R. § 245.1.

35.    An adjustment applicant may be found inadmissible, and therefore ineligible to become an LPR, if certain security-related grounds apply, including, inter alia, the applicant has engaged in terrorist activity, is a representative or member of a terrorist organization, endorses or espouses terrorist activity, or incites terrorist activity.  *See* 8 U.S.C. § 1182(a)(3).  USCIS's definition of a national security concern in CARRP is significantly broader than these security-related grounds of inadmissibility set by Congress.

36.    Congress has directed USCIS to process immigration benefit applications, including for adjustment of status, within 180 days.  8 U.S.C. § 1571(b).

**FACTUAL BACKGROUND**

A.      **The Controlled Application Review and Resolution Program ("CARRP")**

37.      In April 2008, USCIS created CARRP, an agency-wide policy for identifying, processing, and adjudicating immigration applications that raise "national security concerns."

38.      Congress did not enact CARRP, and USCIS did not promulgate it as a proposed rule with the notice-and-comment procedures mandated by the APA. *See* 5 U.S.C. § 553(b)-(c).

39.      Upon information and belief, prior to CARRP's enactment, USCIS simply delayed the adjudication of many immigration applications that raised possible national security concerns, in part due to backlogs created by the FBI Name Check process (one of many security checks utilized by USCIS).

40.      Indeed, the U.S. District Court for the Western District of Washington previously certified a district class of hundreds of naturalization applicants whose cases were delayed due to FBI Name Checks, *see Roshandel v. Chertoff*, 554 F. Supp. 2d 1194 (W.D. Wash. 2008), and denied the defendants' motion to dismiss the suit, *see Roshandel*, 2008 WL 1969646 (W.D. Wash. May 5, 2008). The case resulted in a settlement where the defendants agreed to adjudicate class member applications within a specified time period. *See Roshandel*, No. C07-1739MJP, Dkt. 81 (W.D. Wash. Aug. 25, 2008).

41.      Now, in lieu of delays based on the FBI Name Check process, USCIS delays applications by applying CARRP.  Since CARRP's inception, USCIS has not made information about CARRP available to the public, except in response to Freedom of Information Act ("FOIA") requests and litigation to compel responses to those requests.  *See ACLU of Southern California v. USCIS*, No. CV 13-861 (D.D.C. filed June 7, 2013).  In fact, the program was unknown to the public, including applicants for immigration benefits, until it was discovered in litigation challenging an unlawful denial of naturalization in *Hamdi v. USCIS*, No. EDCV 10-894 VAP (DTBx), 2012 WL 632397 (C.D. Cal. Feb. 25, 2012), and then revealed in greater detail through the government's response to a FOIA request.

42.      CARRP directs USCIS officers to screen citizenship and immigration applications—including visa petitions and other applications required for adjustment of status to lawful permanent residency—

for national security concerns.

43.     If a USCIS officer determines that an application presents a national security concern, he or she will take the application off a routine adjudication track and—without notifying the applicant—place it on a CARRP adjudication track where it is subject to distinct procedures, heightened scrutiny, and, most importantly, extra-statutory criteria that result in lengthy delays and prohibit approvals, except in limited circumstances, regardless of an applicant's statutory eligibility.

### 1.     CARRP's Definition of a National Security Concern

44.     According to the CARRP definition, a national security concern arises when an individual or organization has been determined to have an articulable link—no matter how attenuated or unsubstantiated—to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act.  Those sections of the INA make inadmissible or removable any individual who, inter alia, "has engaged in terrorist activity" or is a member of a "terrorist organization." 8 U.S.C. § 1182(a)(3); 8 U.S.C. § 1227(a)(4).

45.     For the reasons described herein, an individual need not be actually suspected of engaging in any unlawful activity or joining any proscribed organization to be branded a national security concern under CARRP.

46.     CARRP distinguishes between two types of national security concerns: those ostensibly involving "Known or Suspected Terrorists" ("KSTs"), and those ostensibly involving "non-Known or Suspected Terrorists" ("non-KSTs").

47.     USCIS automatically considers an applicant a KST, and thus a national security concern, if his or her name appears in the Terrorist Screening Database, also referred to as the Terrorist Watchlist ("TSDB" or "Watchlist").  USCIS, therefore, applies CARRP to any applicant whose name appears in the TSDB.

48.     Upon information and belief, the TSDB includes approximately one million names, many of whom present no threat to the United States.

49.     The government's Watchlisting Guidance sets a very low "reasonable suspicion" standard for placement on the Watchlist.  Under the Guidance, concrete facts are not necessary to satisfy the

COMPLAINT Page **8** of **25**
Case No. --

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

reasonable suspicion standard, and uncorroborated information of questionable or even doubtful reliability can serve as the basis for blacklisting an individual. The Guidance further reveals that the government blacklists non-U.S. citizens, including LPRs, even where it cannot meet the already low reasonable suspicion standard of purported involvement with terrorist activity. The Guidance permits the watchlisting of non-citizens simply for being associated with someone else who has been watchlisted, even if there is no known involvement with that person's purportedly suspicious activity. The Guidance also states explicitly that non-citizens may be watchlisted based on information that is very limited or of suspected reliability. These extremely loose standards significantly increase the likelihood that the TSDB contains information on individuals who are neither known nor appropriately suspected terrorists.

50.     Furthermore, the Terrorist Screening Center ("TSC"), which maintains the TSDB, has failed to ensure that individuals who do not meet the Watchlist's criteria are promptly removed from the TSDB (or not blacklisted in the first place). In 2013 alone, the watchlisting community nominated 468,749 individuals to the TSDB, and the TSC rejected only approximately one percent of those nominations. Public reports also confirm that the government has nominated or retained people on government watchlists as a result of human error.

51.     The federal government's official policy is to refuse to confirm or deny any given individual's inclusion in the TSDB or provide a meaningful opportunity to challenge that inclusion. Nevertheless, individuals can become aware of their inclusion due to air travel experiences. In particular, individuals may learn that they are on the "Selectee List" or the "Expanded Selectee List," subsets of the TSDB, if their boarding passes routinely display the code "SSSS" or they are routinely directed for additional screening before boarding a flight over U.S. airspace. They may also learn of their inclusion in the TSDB if U.S. federal agents regularly subject them to secondary inspection when they enter the United States from abroad. Such individuals are also often unable to check-in for flights online or at airline electronic kiosks at the airport.

52.     Where the KST designation does not apply, CARRP instructs officers to look for indicators of a non-Known or Suspected Terrorist ("non-KST") concern.

53.     These indicators fall into three categories: (1) statutory indicators; (2) non-statutory indicators;

1    and (3) indicators contained in security check results.

2    54.    Statutory indicators of a national security concern arise when an individual generally meets the

3    definitions described in Sections 212(a)(3)(A), (B), and (F), and 237(a)(4)(A) and (B) of the INA

4    (codified at 8 U.S.C. § 1182(a)(3)(A), (B), and (F) & § 1227(a)(4)(A) and (B)), which list the security

5    and terrorism grounds of inadmissibility and removability.[2]  However, CARRP expressly defines

6    statutory indicators of a national security concern more broadly than the statute, stating the facts of the

7    case do not need to satisfy the legal standard used in determining admissibility or removability under

8    those provisions of the INA to give rise to a non-KST national security concern.

9    55.    For example, CARRP policy specifically directs USCIS officers to scrutinize evidence of

10   charitable donations to organizations later designated as financiers of terrorism by the U.S. Treasury

11   Department and to construe such donations as evidence of a national security concern, even if an

12   individual had made such donations without any knowledge that the organization was engaged in

13   proscribed activity.  Such conduct would not make an applicant inadmissible for a visa, asylum, or LPR

14   status under the statute, *see* INA § 212(a)(3)(B), 8 U.S.C. § 1182(a)(3)(B), nor does it have any bearing

15   on a naturalization application.

16   56.    Under CARRP, non-statutory indicators of a national security concern include travel through or

17   residence in areas of known terrorist activity; large scale transfer or receipt of funds; a person's

18   employment, training, or government affiliations; the identities of a person's family members or close

19   associates, such as a roommate, co-worker, employee, owner, partner, affiliate, or friend; or simply other

20   suspicious activities.

21   57.    Finally, security check results are considered indicators of a national security concern in

22   instances where, for example, the FBI Name Check produces a positive hit on an applicant's name and

23   the applicant's name is associated with a national security-related investigatory file.  Upon information

24

25   _____

     [2] These security and terrorism grounds of inadmissibility, if applicable, may bar an applicant from

26   obtaining lawful permanent resident status, asylum, or a visa.  However, they do not bar an applicant
     who is already a lawful permanent resident from naturalization, which is governed by the statutory

27   provisions specific to naturalization.  *See* 8 U.S.C. §§ 1421-1458.  The security and terrorism provisions
     may also render a non-citizen removable, *see* 8 U.S.C. § 1227(a)(4), but the government has not charged

28   Plaintiffs with removability under these provisions.

1   and belief, this indicator leads USCIS to label applicants national security concerns solely because their

2   names appear in a law enforcement or intelligence file, even if they were never the subject of an

3   investigation.  For example, an applicant's name could appear in a law enforcement file in connection

4   with a national security investigation because he or she once gave a voluntary interview to an FBI agent,

5   he or she attended a mosque that was the subject of FBI surveillance, or he or she knew or was

6   associated with someone under investigation.

7   58.     Upon information and belief, CARRP labels applicants national security concerns based on

8   vague and overbroad criteria that often turn on national origin or innocuous and lawful activities or

9   associations.  These criteria are untethered from the statutory criteria that determine whether a person is

10   eligible for the immigration status or benefit they seek, and are so general that they necessarily ensnare

11   individuals who pose no threat to the security of the United States.

**2.      Delay and Denial**

13   59.     Once a USCIS officer identifies a CARRP-defined national security concern, the application is

14   subjected to CARRP's rules and procedures that guide officers to deny such applications or, if an officer

15   cannot find a basis to deny the application, to delay adjudication as long as possible.

a)      Deconfliction

17   60.     One such procedure is called "deconfliction," which requires USCIS to coordinate with—and,

18   upon information and belief, subordinate its authority to—the law enforcement agency, often the FBI,

19   that possesses information giving rise to the supposed national security concern.

20   61.     During deconfliction, the relevant law enforcement agency has authority: to instruct USCIS to

21   ask certain questions in an interview or to issue a Request for Evidence ("RFE"); to comment on a

22   proposed decision on the benefit; and to request that USCIS deny, grant, or hold the application in

23   abeyance for an indefinite period of time.

24   62.     Upon information and belief, deconfliction allows law enforcement or intelligence agencies such

25   as the FBI to directly affect the adjudication of a requested immigration benefit, and also results in the

26   agencies conducting independent interrogations of the applicant—or the applicant's friends and family.

27   63.     Upon information and belief, USCIS often makes decisions to deny immigration applications

28   because the FBI requests or recommends the denial, not because the person is statutorily ineligible for

the benefit.

64.     The FBI often seeks to use the pending immigration application to coerce the applicant to act as an informant or otherwise provide information.

b)    <u>Eligibility Assessment</u>

65.     In addition to deconfliction, once officers identify an applicant as a national security concern, CARRP directs officers to perform an "eligibility assessment" to determine whether the applicant is eligible for the benefit sought.

66.     Upon information and belief, at this stage, CARRP instructs officers to look for any reason to deny an application so that valuable time and resources are not unnecessarily expended to investigate the possible national security concern.  Where no legitimate reason supports denial of an application subjected to CARRP, USCIS officers often utilize spurious or pretextual reasons to deny the application.

c)    <u>Internal Vetting</u>

67.     Upon information and belief, if, after performing the eligibility assessment, an officer cannot find a reason to deny an application, CARRP instructs officers to first "internally vet" the national security concern using information available in DHS systems and databases, open source information, review of the applicant's file, RFEs, and interviews or site visits.

68.     After conducting the eligibility assessment and internal vetting, USCIS officers are instructed to again conduct deconfliction to determine the position of any interested law enforcement agency.

d)    <u>External Vetting</u>

69.     If the national security concern remains and the officer cannot find a basis to deny the benefit, the application then proceeds to "external vetting."

70.     During external vetting, USCIS instructs officers to confirm the existence of the national security concern with the law enforcement or intelligence agency that possesses the information that created the concern and obtain additional information from that agency about the concern and its relevance to the individual.

71.     CARRP policy instructs USCIS officers to hold applications in abeyance for periods of 180 days to enable law enforcement agents and USCIS officers to investigate the national security concern. According to CARRP policy, the USCIS Field Office Director may extend the abeyance periods so long

1   as the investigation remains open.

2   72.      Upon information and belief, CARRP provides no outer limit on how long USCIS may hold a

3   case in abeyance, even though the INA requires USCIS to adjudicate a naturalization application within

4   120 days of examination, 8 C.F.R. § 335.3, and Congress has made clear its intent that USCIS

5   adjudicate immigration applications, including visa petitions and accompanying applications for

6   adjustment of status to lawful permanent residence, within 180 days of filing the application.  8 U.S.C. §

7   1571(b).

8                                      e)      <u>Adjudication</u>

9   73.      When USCIS considers an applicant to be a KST national security concern, CARRP policy

10  forbids USCIS adjudications officers from granting the requested benefit even if the applicant satisfies

11  all statutory and regulatory criteria.

12  74.      When USCIS considers an applicant to be a non-KST national security concern, CARRP policy

13  forbids USCIS adjudications officers from granting the requested benefit in the absence of supervisory

14  approval and concurrence from a senior level USCIS official.

15  75.      In *Hamdi*, 2012 WL 632397, when asked whether USCIS's decision to brand naturalization

16  applicant Tarek Hamdi as a national security concern affected whether he was eligible for naturalization,

17  a USCIS officer testified at deposition that "it doesn't make him statutorily ineligible, but because he is

18  a—he still has a national security concern, it affects whether or not we can approve him."  The officer

19  testified that, under CARRP, "until [the] national security concern [is] resolved, he won't get approved."

20  76.      Upon information and belief, USCIS routinely delays adjudication of applications subject to

21  CARRP when it cannot find a reason to deny the application.  When an applicant files a mandamus

22  action to compel USCIS to finally adjudicate his or her pending application, it often has the effect of

23  forcing USCIS to deny a statutorily-eligible application on pretextual grounds because CARRP prevents

24  agency field officers from granting an application involving a national security concern.

25  77.      CARRP effectively creates two substantive regimes for immigration application processing and

26  adjudication: one for those applications subject to heightened scrutiny and vetting under CARRP and

27  one for all other applications.  CARRP rules and procedures create substantive eligibility criteria that

28  indefinitely delay adjudications and unlawfully deny immigration benefits to non-citizens who are

statutorily eligible and entitled by law.

78.     At no point during the CARRP process is the applicant made aware that he or she has been labeled a national security concern, nor is the applicant ever provided with an opportunity to respond to and contest the classification.

79.     Upon information and belief, CARRP results in unauthorized adjudication delays, often lasting many years, and pre-textual denials of statutorily-eligible immigration applications.

### B.     Facts Specific To Each Plaintiff

#### Abdiqafar Wagafe

80.     Plaintiff Abdiqafar Aden Wagafe is a thirty-two-year-old Somali national who currently resides in SeaTac, Washington.

81.     Between 2001 and 2007, Mr. Wagafe lived in refugee camps and temporary refugee housing in Kenya and Ethiopia.

82.     On May 24, 2007, he moved to the United States with nine family members and was admitted as a refugee.  He has lived in the United States since then.

83.     After arriving in the United States, Mr. Wagafe briefly stayed in Minneapolis, Minnesota with his brother.  He then moved to Seattle, where his two sisters and another brother live.

84.     All of the nine family members who moved to the United States with Mr. Wagafe have become U.S. citizens.

85.     From July 2007 until February 2011, Mr. Wagafe worked for Delta Global Services until widespread layoffs left him without a job.  Since February 2011, he has worked at a Somali restaurant, which he currently co-owns and manages.

86.     On May 28, 2008, Mr. Wagafe filed an application for refugee adjustment of status to become an LPR.

87.     USCIS granted his application on November 3, 2008, retroactively granting him LPR status as of May 24, 2007, the date he was admitted to the U.S. as a refugee.  *See* 8 C.F.R. § 209.1(e).

88.     Mr. Wagafe filed his first application for naturalization on July 3, 2012.  USCIS interviewed him on October 29, 2012, but he failed the English-language portion of the exam.  USCIS interviewed Mr. Wagafe a second time on January 3, 2013, but he again failed the English writing portion of the exam.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

1    He also did not understand English sufficiently to comprehend the Oath of Allegiance.  On these bases,

2    USCIS denied his first application for naturalization on January 9, 2013.

3    89.    Mr. Wagafe has since improved his English skills significantly.

4    90.    Mr. Wagafe filed a second application for naturalization on November 8, 2013.  USCIS

5    scheduled his interview for February 25, 2014, but cancelled it on January 29, 2014 without explanation.

6    91.    Mr. Wagafe has made various inquiries concerning his case to USCIS, but he has not received an

7    explanation for the delay.  USCIS last responded to his queries in July 2015, instructing his attorney to

8    have patience and that the agency would let him know when the agency was ready to interview him.  His

9    subsequent inquiries have gone unanswered.

10   92.    Mr. Wagafe has resided continuously in the United States for at least five years preceding the

11   date of filing his application for naturalization, and has resided continuously within the United States

12   from the date of filing his application until the present.

13   93.    Mr. Wagafe has never been convicted of a crime.

14   94.    There is no statutory basis for denying his naturalization application.

15   95.    Mr. Wagafe is Muslim and regularly attends Mosque.  He also frequently sends small amounts of

16   money to his relatives in Somalia, Kenya, and Uganda.  He has been married to a woman in Uganda

17   since December 2015 and makes visits to see her.  He has been unable to bring her to the United States

18   because of the delays in his case.

19   96.    Mr. Wagafe's immigration Alien file ("A-file") makes clear that USCIS subjected his pending

20   application to CARRP.  The A-file states that a CARRP officer handled his case.  In addition, a

21   document in the A-File shows that on December 8, 2013, there was a hit on Mr. Wagafe's name in the

22   FBI Name Check and that the Name Check result contained "derogatory information."  The document

23   also states that Mr. Wagafe appears eligible for naturalization absent confirmation of national security

24   issues.  The document then states that the case is being forwarded for external vetting.

25   97.    Upon information and belief, Mr. Wagafe's naturalization application is subject to CARRP,

26   which is causing the delay in adjudication of his naturalization application, despite the fact that he is

27   statutorily entitled to naturalize.

28

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

**Mehdi Ostadhassan**

98.     Plaintiff Mehdi Ostadhassan is a thirty-three-year-old national of Iran.  He resides in Grand Forks, North Dakota.

99.     Mr. Ostadhassan moved to the United States in 2009 on a student visa and studied at the University of North Dakota.  He earned his Ph.D. in Petroleum Engineering, and, after graduation, was immediately hired by the University of North Dakota as an Assistant Professor of Petroleum Engineering.

100.     At the University of North Dakota, Mr. Ostadhassan met Bailey Bubach, a United States citizen.  In January 2014, they were married in a small religious ceremony in California, and then obtained their marriage license in Grand Forks, North Dakota.  Their first child was born in July 2016.

101.     In February 2014, Ms. Bubach filed an immigrant visa petition (USCIS Form I-130) for Mr. Ostadhassan and he concurrently filed an application to adjust status (USCIS Form I-485) based upon his marriage.

102.     Mr. Ostadhassan has never been convicted of a crime.

103.     USCIS scheduled Mr. Ostadhassan for an interview on May 19, 2014, but when he appeared for the interview, USCIS informed him that it was cancelled.

104.     USCIS rescheduled and conducted an interview almost a year and a half later, on September 24, 2015.  At that interview, a USCIS officer told Mr. Ostadhassan that the agency still could not make a decision and that it needed to complete further background and security checks.  To date, Mr. Ostadhassan is still waiting for a decision from USCIS.

105.     Mr. Ostadhassan and Ms. Bubach are Muslim and active participants in their religious community.  Each year they donate to Muslim charities in accordance with the teachings of Islam.  They are both involved in the Muslim Student Association at the University of North Dakota.  In addition, they run a Muslim Sunday School.  Mr. Ostadhassan also coordinates the Muslim Congress's Koran competition every year.

106.     Upon information and belief, USCIS considers Mr. Ostadhassan a non-KST national security concern and is subjecting him to CARRP.  USCIS may have subjected Mr. Ostadhassan's adjustment

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

application to CARRP because he has resided in and traveled through what the government considers areas of known terrorist activity—namely, Iran—and because of his donations to Islamic charities and involvement in the Muslim community.

107.    In October 2014, an FBI agent contacted Mr. Ostadhassan and asked to meet to discuss his recent trip to Iran to visit family.  Mr. Ostadhassan declined to meet with the FBI, and his lawyer informed the agent that any further communications should go through the attorney.  The FBI has not contacted Mr. Ostadhassan since.

108.    Upon information and belief, the request for a visit by the FBI was a product of CARRP's deconfliction process.

109.    Upon information and belief, Mr. Ostadhassan's application for adjustment of status is subject to CARRP, which is causing the delay in the adjudication of his application, despite the fact that he is statutorily eligible for adjustment of status.

## CLASS ACTION ALLEGATIONS

110.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action on behalf of themselves and all other similarly-situated individuals.  Plaintiffs do not bring claims for compensatory relief.  Instead, Plaintiffs seek injunctive relief broadly applicable to members of the Plaintiff Classes, as defined below.  The requirements for Rule 23 are met with respect to the classes defined below.

111.    The Naturalization Plaintiff Class is defined as:  A national class of all persons currently and in the future (1) who have an application for naturalization pending before USCIS, (2) that is subject to CARRP, and (3) that has not been adjudicated by USCIS within six months of having been filed.

112.    The Adjustment of Status Plaintiff Class is defined as:  A national class of all persons currently and in the future (1) who have an application for adjustment of status pending before USCIS, (2) that is subject to CARRP, and (3) that has not been adjudicated by USCIS within six months of having been filed.

113.    The Plaintiff Classes are each so numerous that joinder of all members is impracticable. Although Plaintiffs do not know the total number of people subject to CARRP at any given time, USCIS data reveals that between Fiscal Year 2008 and Fiscal Year 2012, more than 19,000 people from twenty-one Muslim-majority countries or regions were subjected to CARRP.  Upon information and belief,

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

between 2008 and 2016, USCIS opened 41,805 CARRP cases.

114.     This data includes individuals with pending naturalization and adjustment of status applications. For example, in March 2009, there were 1,437 adjustment of status (I-485) applications subject to CARRP that had been pending for at least six months and 1,065 naturalization (N-400) applications subject to CARRP that had been pending for at least six months.

115.     The exact number of individuals subject to CARRP at any given time fluctuates as applications are filed and USCIS applies these policies and practices to the applications.  Moreover, members of the class reside in various locations across the country.  For these and other reasons, joinder of the members of the Classes would create substantial challenges to the efficient administration of justice.  Joinder is thus impracticable here.

116.     In addition, there are questions of law and fact common to the members of the Classes. Common questions of law and fact include, but are not limited to, the following:

117.     Whether CARRP violates the INA by creating additional, non-statutory, substantive criteria that must be met prior to a grant of a naturalization and adjustment of status application;

118.     Whether CARRP violates the Uniform Rule of Naturalization, Article I, Section 8, Clause 4 of the United States Constitution by establishing criteria for naturalization not authorized by Congress;

119.     Whether CARRP violates the APA, 5 U.S.C. § 706, as final agency action that is arbitrary and capricious, contrary to constitutional law, and in excess of statutory authority;

120.     Whether CARRP constitutes a substantive rule and, as a result, Defendants violated the APA, 5 U.S.C. § 553, when they promulgated CARRP without providing a notice-and-comment period prior to implementing it;

121.     Whether Defendants' failure to give Plaintiffs notice of their classification under CARRP, a meaningful explanation of the reason for such classification, and a process by which Plaintiffs can challenge their classification violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

122.     The claims of the named Plaintiffs are typical of their respective Plaintiff Class.  Plaintiffs know of no conflict between their interests and those of the Plaintiff Class they seek to represent.  In defending their own rights, the named Plaintiffs will defend the rights of all proposed Plaintiff Class members

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

1  fairly and adequately.  The members of the Classes are readily ascertainable through notice and

2  discovery.

3  123.    Plaintiffs are represented by counsel with particular expertise in immigration and constitutional

4  law, and extensive experience in class action litigation and other complex litigation.

5  124.    Defendants have acted or refused to act on grounds generally applicable to each member of the

6  Plaintiff Classes by unlawfully applying CARRP to their immigration applications—thus applying

7  additional non-statutory, substantive requirements for naturalization and adjustment of status, and

8  causing them to have suffered and continue to suffer injury in the form of unreasonable delays and

9  denials of their applications.

10  125.    A class action is superior to other methods available for the fair and efficient adjudication of this

11  controversy because joinder of all members of the Classes is impracticable.  Absent the relief they seek

12  here, there would be no other way for the Plaintiff Class members to individually redress the wrongs

13  they have suffered and will continue to suffer.

14  **FIRST CLAIM FOR RELIEF**

15  **Immigration and Nationality Act and Implementing Regulations**

16  **(All Plaintiffs on behalf of themselves and their Plaintiff Class)**

17  126.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

18  127.    To secure naturalization and adjustment of status, an applicant must satisfy certain statutorily-

19  enumerated criteria.

20  128.    By its terms, CARRP creates additional, non-statutory, substantive adjudicatory criteria.

21  129.    Accordingly, CARRP violates 8 U.S.C. § 1427, 8 C.F.R. § 316.2, and 8 C.F.R. § 335.3, as those

22  provisions set forth the exclusive applicable statutory and regulatory criteria for a grant of naturalization.

23  130.    CARRP also violates 8 U.S.C. § 1255, 8 U.S.C. § 1159, 8 C.F.R. § 245.1, and 8 C.F.R. § 209.1,

24  as those provisions set forth the applicable statutory and regulatory criteria for individuals present in the

25  United States to adjust their status.

26  131.    Because of these violations and/or because CARRP's additional, non-statutory, substantive

27  criteria have been applied to their applications, Plaintiffs and Plaintiff Class members have suffered and

28  will continue to suffer injury in the form of unreasonable delays and unwarranted denials of their

applications for naturalization and adjustment of status.

## SECOND CLAIM FOR RELIEF

### "Uniform Rule of Naturalization"

### (Plaintiff Abdiqafar Wagafe on behalf of himself and the Naturalization Plaintiff Class)

132.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

133.    Congress has the sole power to establish criteria for naturalization, and any additional requirements not enacted by Congress are ultra vires.

134.    By its terms, CARRP creates additional, non-statutory, substantive criteria that must be met prior to a grant of a naturalization application.

135.    Accordingly, CARRP violates Article I, Section 8, Clause 4 of the United States Constitution.

136.    Because of this violation and because CARRP's additional, non-statutory, substantive criteria have been applied to their applications, Plaintiff Wagafe and Naturalization Plaintiff Class members have suffered and will continue to suffer injury in the form of unreasonable delays and unwarranted denials of their naturalization applications.

## THIRD CLAIM FOR RELIEF

### Administrative Procedure Act (5 U.S.C. § 706)

### (All Plaintiffs on behalf of themselves and their Plaintiff Class)

137.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

138.    CARRP constitutes final agency action that is arbitrary and capricious because it "neither focuses on nor relates to a [non-citizen's] fitness to" obtain the immigration benefits subject to its terms. *Judulang v. Holder*, 132 S. Ct. 476, 485 (2011).

139.    CARRP is also not in accordance with law, is contrary to constitutional rights, and is in excess of statutory authority because it violates the INA and exceeds USCIS's statutory authority to implement (not create) the immigration laws, as alleged herein.

140.    As a result of these violations, Plaintiffs and members of the Plaintiff Classes have suffered and continue to suffer injury in the form of unreasonable delays and unwarranted denials of their immigration applications.

## FOURTH CLAIM FOR RELIEF

COMPLAINT Page 20 of 25
Case No. --

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

1    **Administrative Procedure Act (Notice and Comment)**

2    **(All Plaintiffs on behalf of themselves and their Plaintiff Class)**

3    141.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

4    142.    The APA, 5 U.S.C. § 553, requires administrative agencies to provide a notice-and-comment

5    period prior to implementing a substantive rule.

6    143.    CARRP constitutes a substantive agency rule within the meaning of 5 U.S.C. § 551(4).

7    144.    Defendants failed to provide a notice-and-comment period prior to the adoption of CARRP.

8    145.    Because CARRP is a substantive rule promulgated without the notice-and-comment period, it

9    violates 5 U.S.C. § 553 and is therefore invalid.

10   146.    As a result of these violations, Plaintiffs and members of the Plaintiff Classes have suffered and

11   continue to suffer injury in the form of unreasonable delays and unwarranted denials of their

12   immigration applications.

13   **FIFTH CLAIM FOR RELIEF**

14   **Fifth Amendment (Procedural Due Process)**

15   **(All Plaintiffs on behalf of themselves and their Plaintiff Class)**

16   147.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

17   148.    Defendants' failure to give Plaintiffs and members of the Plaintiff Classes notice of their

18   classification under CARRP, a meaningful explanation of the reason for such classification, and any

19   process by which Plaintiffs can challenge their classification, violates the Due Process Clause of the

20   Fifth Amendment to the United States Constitution.

21   149.    Because of this violation, Plaintiffs and members of the Plaintiff Classes have suffered and

22   continue to suffer injury in the form of unreasonable delays and unwarranted denials of their

23   immigration applications.

24   **PRAYER FOR RELIEF**

25   WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

26       1.    Certify the case as a class action as proposed herein;

27       2.    Appoint Plaintiff Wagafe as representative of the Naturalization Plaintiff Class, and Plaintiff

28            Ostadhassan as representative of the Adjustment of Status Plaintiff Class;

3. Order Defendants to adjudicate Plaintiffs' and Class Members' applications based solely on the statutory criteria;

4. Enter a judgment declaring that (a) CARRP violates the INA and its implementing regulations; Article 1, Section 8, Clause 4 of the United States Constitution; the Fifth Amendment to the United States Constitution; and the APA; and (b) Defendants violated the APA by adopting CARRP without promulgating a rule and following the process for notice and comment by the public;

5. Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from applying CARRP to the processing and adjudication of the immigration benefit applications of Plaintiffs and other members of the proposed classes;

6. Alternatively, order Defendants to provide Plaintiffs and other members of the proposed classes with notice that they have been subjected to CARRP, the reasons for subjecting them to CARRP, and a reasonable opportunity to respond to those allegations before a neutral decisionmaker;

7. Order Defendants to rescind CARRP because they failed to follow the process for notice and comment by the public;

8. Award Plaintiffs and other members of the proposed class reasonable attorneys' fees and costs; and

9. Grant any other relief that this Court may deem fit and proper.


Respectfully submitted this 23rd day of January, 2017.

By:

s/Matt Adams
Matt Adams, WSBA No. 28287

s/Glenda M. Aldana Madrid
Glenda M. Aldana Madrid, WSBA No. 46987

Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA 98122
Telephone: (206) 957-8611
Facsimile: (206) 587-4025

COMPLAINT Page **22** of **25**
Case No. --

matt@nwirp.org
glenda@nwirp.org
s/Emily Chiang

Emily Chiang, WSBA No. 50517
ACLU of Washington Foundation
901 Fifth Avenue, Suite 630
Seattle, WA 98164
Telephone: (206) 624-2184
Echiang@aclu-wa.org

Jennifer Pasquarella (application for leave to appear *pro hac vice* forthcoming)
ACLU Foundation of Southern California
1313 W. 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5211
Facsimile: (213) 997-5297
jpasquarella@aclusocal.org

Stacy Tolchin (application for leave to appear *pro hac vice* forthcoming)
Law Offices of Stacy Tolchin
634 S. Spring St. Suite 500A
Los Angeles, CA  90014
Telephone: (213) 622-7450
Facsimile: (213) 622-7233
Stacy@tolchinimmigration.com

Trina Realmuto (application for leave to appear *pro hac vice* forthcoming)
Kristin Macleod-Ball (application for leave to appear *pro hac vice* forthcoming)
National Immigration Project
   of the National Lawyers Guild
14 Beacon St., Suite 602
Boston, MA 02108
Telephone: (617) 227-9727
Facsimile: (617) 227-5495
trina@nipnlg.org
kristin@nipnlg.org

Lee Gelernt (application for leave to appear *pro hac vice* forthcoming)

s/Hugh Handeyside

Hugh Handeyside, WSBA No. 39792
Hina Shamsi (application for leave to appear *pro hac vice* forthcoming)

American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2616
Facsimile: (212) 549-2654
lgelernt@aclu.org

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

hhandeyside@aclu.org
hshamsi@aclu.org

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611