1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ABDIQAFAR WAGAFE, MEHDI OSTADHASSAN, HANIN OMAR BENGEZI, MUSHTAQ ABED JIHAD, and SAJEEL MANZOOR, on behalf of themselves and others similarly situated, | COMPLAINT-CLASS ACTION |
| Plaintiffs, | Case No: 2:17-cv-00094-JCC |
| v. | **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| DONALD TRUMP, President of the United States; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOHN F. KELLY, in his official capacity as Secretary of the U.S. Department of Homeland Security; LORI SCIALABBA, in her official capacity as Acting Director of the U.S. Citizenship and Immigration Services; MATTHEW D. EMRICH, in his official capacity as Associate Director of the Fraud Detection and National Security Directorate of the U.S. Citizenship and Immigration Services; DANIEL RENAUD, in his official capacity as Associate Director of the Field Operations Directorate of the U.S. Citizenship and Immigration Services, | |
| Defendants. | |

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

**INTRODUCTION**

1.      This class action lawsuit seeks to stop the federal government from unconstitutionally preventing Plaintiffs, and others like them, from obtaining immigration benefits, including, but not limited to, asylum, naturalization, lawful permanent residence, and employment authorization.

2.      Plaintiff Abdiqafar Wagafe is a Somali national who, at the time this lawsuit was initiated, had waited three and a half years for a decision on his pending naturalization application despite his eligibility to naturalize as a United States citizen.  A mere five days after Plaintiffs filed their motion for class certification, the government provided Mr. Wagafe his long-awaited naturalization interview on February 22, 2017.  The government approved Mr. Wagafe's application immediately following his interview, and swore him in as a citizen of the United States of America on March 2, 2017.

3.      Plaintiff Mehdi Ostadhassan is an Iranian national who has applied for and is eligible to adjust his status to that of a lawful permanent resident.  He has waited three years for a decision on his adjustment of status application.

4.      Plaintiff Hanin Omar Bengezi is a Libyan national who has applied for and is eligible to adjust her status to that of a lawful permanent resident.  She has waited over two years for a decision on her adjustment of status application.

5.      Plaintiff Mushtaq Abed Jihad is an Iraqi national who has applied for and is eligible to naturalize as a United States citizen.  He has waited more than three and a half years for a decision on his naturalization application.

6.      Plaintiff Sajeel Manzoor is a Pakistani national who has applied for and is eligible to naturalize as a United States citizen.  He has waited more than a year for a decision on his naturalization application.

7.      All Plaintiffs identify as Muslims, are originally from Muslim-majority countries, and have resided in the United States for a significant time.  The inordinate delays they experience hold their lives in a state of limbo.  They are prevented from having certainty about their future residence in the United

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

States, from being able to freely travel overseas, from petitioning for immigration benefits for family members, and, for those seeking naturalization, from obtaining jobs available only to U.S. citizens and from voting in U.S. elections.

8.      The Constitution expressly assigns to Congress, not the executive branch, the authority to establish uniform rules of naturalization.  The Immigration and Nationality Act ("INA") sets forth those rules, along with the requirements for adjustment of status to lawful permanent residence.

9.      Despite the fact that Plaintiffs meet the statutory criteria to be naturalized as United States citizens or adjust their immigration status to that of a lawful permanent resident ("LPR"), U.S. Citizenship and Immigration Service ("USCIS") has refused to adjudicate their applications in accordance with the governing statutory criteria.  Instead, USCIS has applied impermissible ultra vires rules under a policy known as the Controlled Application Review and Resolution Program ("CARRP"), which has prevented the agency from granting Plaintiffs' applications (and, in the case of Mr. Wagafe, caused the agency to delay granting his application until this lawsuit motivated it to do so).

10.      Since 2008, USCIS has used CARRP—an internal vetting policy that has not been authorized by Congress, nor codified, subjected to public notice and comment, or voluntarily made public in any way—to investigate and adjudicate applications the agency deems to present potential national security concerns.  CARRP prohibits USCIS field officers from approving an application with an alleged potential national security concern, instead directing officers to deny the application or delay adjudication—often indefinitely.

11.      CARRP's definition of national security concern is far broader than the security-related ineligibility criteria for immigration applications set forth by Congress in the INA.  CARRP identifies national security concerns based on deeply-flawed and expansive government watchlists and other vague and overbroad criteria that bear little, if any, relation to the statutory security-related ineligibility criteria.  The CARRP definition casts a net so wide that it brands innocent, law-abiding residents, like Plaintiffs—none of whom pose a security threat—as national security concerns on account of innocuous

SECOND AMENDED COMPLAINT
Page **3** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

activity, associations, and characteristics such as national origin.

12.     Although Plaintiffs do not know the total number of people subject to CARRP at any given time, USCIS data reveals that between Fiscal Year 2008 and Fiscal Year 2012, more than 19,000 people from twenty-one Muslim-majority countries or regions were subjected to CARRP.  Upon information and belief, USCIS opened nearly 42,000 CARRP cases between 2008 and 2016.

13.     Moreover, two recent immigration Executive Orders issued by Defendant Donald Trump suggest the number of residents subjected to CARRP will expand in the coming months and years.

14.     On January 27, 2017, Defendant Trump issued Executive Order 13769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States."  82 Fed. Reg. 8977 (Feb. 1, 2017) ("First EO").

15.     Section 3 of the First EO suspended entry into the United States of citizens or nationals of Syria, Iraq, Iran, Yemen, Somalia, Sudan, and Libya, all of which are predominantly Muslim countries, for 90 days or more.  Although the First EO said nothing about suspending adjudications, USCIS determined that the EO required it to suspend adjudication or final action on *all* pending petitions, applications, or requests involving citizens or nationals of those seven countries with the exception of naturalization applications.

16.     Section 4 of the First EO further directed federal agencies to create and implement a policy of extreme vetting of all immigration benefits applications to identify individuals who are seeking to enter the country based on fraud and with the intent to cause harm or who are at risk of causing harm after admission.  Upon information and belief, any such "extreme vetting" policy would expand CARRP.

17.     After Judge James L. Robart enjoined the First EO in *Washington v. Trump*, No. 2:17-cv-141-JLR, ECF 52, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017), and the United States Court of Appeals for the Ninth Circuit denied the government's motion for stay of that order (847 F.3d 1151 (9th Cir. 2017)), Defendant Trump issued a second Executive Order on March 6, 2017.  Executive Order 13780, "Protecting the Nation From Foreign Terrorist Entry Into the United States," 82 Fed. Reg. 13209 (Mar.

SECOND AMENDED COMPLAINT
Page **4** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

9, 2017) ("Second EO").  The Second EO targets the same countries as the First EO, with the exception of Iraq, and is intended to have the same broad effect as the First EO.

18.     Like the First EO, the Second EO institutes an entry ban of 90 days or more for foreign nationals of the targeted countries, does not specify how it will apply to adjudications of pending applications, and directs federal agencies to create and implement a policy of extreme vetting for *all* immigration benefits. *See* Second EO §§ 2, 5.  Further, a memorandum issued by Defendant Trump in connection with the Second EO cautions that the implementation of "heightened screening and vetting protocols" cannot wait, and directs the government to begin implementing these procedures immediately, even while the details of the more permanent extreme vetting policy are  being developed.  Memorandum for the Secretary of State, the Attorney General, the Secretary of Homeland Security (Mar. 6, 2017) *available at* https://www.whitehouse.gov/the-press-office/2017/03/06/memorandum-secretary-state-attorney-general-secretary-homeland-security.  Accordingly, upon information and belief, the Second EO sanctions a major expansion of the existing CARRP program.

19.     Application of CARRP,[1] both on its own and as potentially expanded pursuant to the Second EO, to pending immigration applications is unlawful and unconstitutional.  The First and Second EOs reflect a preference for one religious faith over another in the adjudication of immigration applications, and, *inter alia*, discriminate against immigrants who are Muslim or are from Muslim-majority countries on the basis of their religion and country of origin.  CARRP and the "extreme vetting" program to be established under the Second EO are similarly unlawful and ultra vires.  The Constitution expressly assigns to Congress, not the executive branch, the authority to establish uniform rules of naturalization.  The INA sets forth those rules, along with the requirements for adjustment of status to lawful permanent

---

[1] As set forth below in paragraph 59, USCIS did not make information about CARRP public, and the program only was discovered through fortuity during federal court litigation.  To the extent the program has shifted in name, scope, or method, Plaintiffs may have no way to obtain that information.  Thus, Plaintiffs' reference to "CARRP" incorporates any similar non-statutory and sub-regulatory successor vetting policy, including pursuant to Sections 4 and 5 of the Second EO, as described in paragraphs 126-27 below.

SECOND AMENDED COMPLAINT
Page **5** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

resident, asylum, and all other immigration benefits.  By creating additional, non-statutory, substantive criteria for adjudicating immigration applications, CARRP and any successor "extreme vetting" program violate the INA, the Administrative Procedure Act ("APA") and the U.S. Constitution.

20.     In addition, on information and belief, and based on USCIS' interpretation of the First EO, the applications of Plaintiff Ostadhassan, Plaintiff Bengezi, and proposed class members will be unlawfully suspended due to the application of the Second EO.  Furthermore, adjudications of all Plaintiffs' and proposed class members' applications will be unlawfully subject to, and adjudicated under, CARRP or a successor "extreme vetting" program.

21.     On behalf of themselves and others similarly situated, Plaintiffs therefore request that the Court enjoin USCIS from halting adjudications of immigration benefits applications for citizens and nationals of the targeted countries pursuant to the Second EO.  They further request that the Court enjoin USCIS from applying CARRP (or any similar ultra vires policy/successor "extreme vetting" program) to their immigration applications and the applications of similarly situated individuals.

## JURISDICTION AND VENUE

22.     Plaintiffs allege violations of the INA, the APA, and the U.S. Constitution.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331.  This Court also has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief under 5 U.S.C. § 702 and 28 U.S.C. § 1361.

23.     Venue is proper in the Western District of Washington under 28 U.S.C. §§ 1391(b) and 1391(e) because (1) Plaintiff Abdiqafar Wagafe, a citizen of the United States; Plaintiff Hanin Omar Bengezi, an applicant for lawful permanent residence; Plaintiff Mushtaq Abed Jihad, a naturalization applicant; and Plaintiff Sajeel Manzoor, a naturalization applicant, reside in this district and no real property is involved in this action; (2) a substantial part of the events giving rise to the claims occurred in this district; and (3) Plaintiffs sue Defendants in their official capacity as officers of the United States.

SECOND AMENDED COMPLAINT
Page **6** of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

**PARTIES**

24.     Plaintiff Abdiqafar Wagafe is a thirty-two-year-old Somali national and former lawful permanent resident, who is now a citizen of the United States.  He has lived in the United States since May 2007 and currently resides in SeaTac, Washington.  He is Muslim.  He applied for naturalization in November 2013.  Even though he satisfied all statutory criteria for naturalization, USCIS subjected his application to CARRP, and as a result, a final decision was not issued for more than three and a half years.  Five days after Plaintiffs filed their Motion for Class Certification, on February 14, 2017, USCIS contacted Plaintiff Wagafe to inform him that it had scheduled his long-awaited naturalization interview for February 22, 2017.  At his interview, USCIS found Plaintiff Wagafe met all the statutory criteria and approved his naturalization application on the spot following the interview.  He became a U.S. citizen on March 2, 2017.

25.     Plaintiff Mehdi Ostadhassan is a thirty-three-year-old national of Iran.  He has lived in the United States since 2009 and resides in Grand Forks, North Dakota.  He applied for adjustment to lawful permanent resident status in February 2014.  He is Muslim.  Even though he satisfies all statutory criteria for adjustment of status, USCIS has suspended or will suspend adjudication of his application under the First and Second EOs, respectively, and has subjected his application to CARRP or its successor "extreme vetting" program, and, as a result, a final decision has not been issued.

26.     Plaintiff Hanin Omar Bengezi is a thirty-three-year-old national of Libya.  She has lived in the United States since December 21, 2014, and currently resides in Redmond, Washington.  After marrying a United States citizen, Ms. Bengezi applied for adjustment to lawful permanent resident status in February 2015.  She is Muslim.  Though she is a Canadian citizen and satisfies all statutory criteria for adjustment of status, USCIS has suspended or will suspend adjudication of her application under the First or Second EOs, respectively, and has subjected her application to CARRP or its successor "extreme vetting" program, and, as a result, a final decision has not been issued.

27.     Plaintiff Mushtaq Abed Jihad is a forty-four-year-old national of Iraq.  He has lived in the United

SECOND AMENDED COMPLAINT
Page **7** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

States since August 2008, and currently resides in Renton, Washington.  He is Muslim.  He applied for naturalization in July 2013.  Even though he satisfies all statutory criteria for naturalization, USCIS has subjected his application to CARRP or its successor "extreme vetting" program, and, as a result, a final decision has not been issued for more than three and a half years.

28.    Plaintiff Sajeel Manzoor is a forty-year-old national of Pakistan.  He has lived in the United States since August 2001, and currently resides in Newcastle, Washington.  He is Muslim.  He applied for naturalization in November 2015.  Even though he satisfies all statutory criteria for naturalization, USCIS has subjected his application to CARRP or its successor "extreme vetting" program, and, as a result, a final decision has not been issued for more than one year.

29.    Defendant Donald Trump is the President of the United States.  Plaintiffs sue Defendant Trump in his official capacity.

30.    Defendant USCIS is a component of the Department of Homeland Security ("DHS"), and is responsible for overseeing the adjudication of immigration benefits.  USCIS implements federal law and policy with respect to immigration benefits applications.

31.    Defendant John F. Kelly is the Secretary of DHS, the department under which USCIS and several other immigration agencies operate.  Accordingly, Secretary Kelly has supervisory responsibility over USCIS.  Plaintiffs sue Defendant Kelly in his official capacity.

32.    Defendant Lori Scialabba is the Acting Director of USCIS.  Acting Director Scialabba establishes and implements immigration benefits applications policy for USCIS and its subdivisions.  Plaintiffs sue Defendant Scialabba in her official capacity.

33.    Defendant Matthew D. Emrich is the Associate Director of the Fraud Detection and National Security Directorate of USCIS ("FDNS"), which is ultimately responsible for determining whether individuals filing applications for immigration benefits pose a threat to national security, public safety, or the integrity of the nation's legal immigration system.  Associate Director Emrich establishes and implements policy for FDNS.  Plaintiffs sue Defendant Emrich in his official capacity.

SECOND AMENDED COMPLAINT
Page 8 of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

34.     Defendant Daniel Renaud is the Associate Director of the Field Operations Directorate of USCIS, which is responsible for and oversees the processing and adjudication of immigration benefits applications through the USCIS field offices and the National Benefits Center.  Plaintiffs sue Defendant Renaud in his official capacity.

## LEGAL FRAMEWORK

### A.     Naturalization

35.     To naturalize as a U.S. citizen, an applicant must satisfy certain eligibility criteria under the INA and its implementing regulations.  *See generally* 8 U.S.C. §§ 1421-1458; 8 C.F.R. §§ 316.1-316.14.

36.     Applicants must prove that they are "at least 18 years of age," 8 C.F.R. § 316.2(a)(1); have "resided continuously, after being lawfully admitted" in the United States, "for at least five years"; and have been "physically present" in the United States for "at least half of that time," 8 U.S.C. § 1427(a)(1).

37.     Applicants must also demonstrate "good moral character" for the five years preceding the date of application, "attach[ment] to the principles of the Constitution of the United States, and favorabl[e] dispos[ition] toward the good order and happiness of the United States . . . ."  8 C.F.R. § 316.2(a)(7).

38.     An applicant is presumed to possess the requisite "good moral character" for naturalization unless, during the five years preceding the date of the application, he or she is found (1) to be a habitual drunkard, (2) to have committed certain drug-related offenses, (3) to be a gambler whose income derives principally from gambling or has been convicted of two or more gambling offenses, (4) to have given false testimony for the purpose of obtaining immigration benefits; or if the applicant (5) has been convicted and confined to a penal institution for an aggregate period of 180 days or more, (6) has been convicted of an aggravated felony, or (7) has engaged in conduct such as aiding Nazi persecution or participating in genocide, torture, or extrajudicial killings.  8 U.S.C. § 1101(f)(6).

39.     The statutory and regulatory requirements set forth in paragraphs 37-38 are less stringent for certain persons who married U.S. citizens and employees of certain nonprofit organizations, in that less

SECOND AMENDED COMPLAINT
Page **9** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

than five years of residency and good moral character are required. *See generally* 8 U.S.C. § 1430; 8 C.F.R. §§ 319.1 and 319.4.

40.     An applicant is barred from naturalization for national security-related reasons in circumstances limited to those codified in 8 U.S.C. § 1424, including, *inter alia*, if the applicant has advocated, is affiliated with any organization that advocates, or writes or distributes information that advocates, "the overthrow by force or violence or other unconstitutional means of the Government of the United States," the "duty, necessity, or propriety of the unlawful assaulting or killing of any officer . . . of the Government of the United States," or "the unlawful damage, injury, or destruction of property."

41.     Once an individual submits an application, USCIS must conduct a background investigation, *see* 8 U.S.C. § 1446(a); 8 C.F.R. § 335.1, which includes a full criminal background check by the Federal Bureau of Investigation ("FBI"), *see* 8 C.F.R. § 335.2.

42.     After completing the background investigation, USCIS must schedule a naturalization examination at which the applicant meets with a USCIS examiner for an interview.

43.     In order to avoid inordinate processing delays and backlogs, Congress has stated "that the processing of an immigration benefit application," which includes naturalization, "should be completed not later than 180 days after the initial filing of the application." 8 U.S.C. § 1571(b). USCIS must either grant or deny a naturalization application within 120 days of the date of the examination. 8 C.F.R. § 335.3.

44.     If the applicant has complied with all requirements for naturalization, federal regulations state that USCIS "*shall* grant the application." 8 C.F.R. § 335.3(a) (emphasis added).

45.     Courts have long recognized that "Congress is given power by the Constitution to establish a uniform Rule of Naturalization. . . . And when it establishes such uniform rule, those who come within its provisions are entitled to the benefit thereof as a matter of right. . . ." *Schwab v. Coleman*, 145 F.2d 672, 676 (4th Cir. 1944) (emphasis added); *see also Marcantonio v. United States*, 185 F.2d 934, 937 (4th Cir. 1950) ("The opportunity having been conferred by the Naturalization Act, there is a statutory

SECOND AMENDED COMPLAINT
Page **10** of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

right in the alien to submit his petition and evidence to a court, to have that tribunal pass upon them, and, if the requisite facts are established, to receive the certificate." (quoting *Tutun v. United States*, 270 U.S. 568, 578 (1926))).

46.     Once an application is granted, the applicant is sworn in as a United States citizen.

### B.     Adjustment of Status to Lawful Permanent Resident

47.     Federal law allows certain non-citizens to adjust their immigration status to that of a lawful permanent resident ("LPR").

48.     Several events may trigger eligibility to adjust to LPR status, including, but not limited to, an approved petition through a family member, such as a U.S. citizen spouse, or employer. *See*, *e.g.*, 8 U.S.C. § 1255(a); 8 C.F.R. § 245.1.

49.     In general, a noncitizen who is the beneficiary of an approved immigrant visa petition and who is physically present in the United States may adjust to LPR status if he or she "makes an application for such adjustment," was "inspected and admitted or paroled" into the United States, is eligible for an immigrant visa and admissible to the United States, and the immigrant visa is immediately available to the applicant at the time the application is filed. 8 U.S.C. §§ 1255(a)(1)-(3); 8 C.F.R. § 245.1.

50.     An adjustment applicant may be found inadmissible, and therefore ineligible to become an LPR, if certain security-related grounds apply, including, *inter alia*, the applicant has engaged in terrorist activity, is a representative or member of a terrorist organization, endorses or espouses terrorist activity, or incites terrorist activity. *See* 8 U.S.C. § 1182(a)(3).  USCIS's definition of a national security concern in CARRP is significantly broader than these security-related grounds of inadmissibility set by Congress.

51.     Congress has directed USCIS to process immigration benefit applications, including for adjustment of status, within 180 days. 8 U.S.C. § 1571(b).

### C.     Other Immigration Benefits

52.     Federal laws provide noncitizens living within the United States the opportunity to apply for a

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

1   myriad of other immigration benefits apart from either naturalization or adjustment of status.

2   53.   For example, persons fleeing persecution or torture may apply for asylum under 8 U.S.C. § 1158,

3   or withholding of removal, under 8 U.S.C. § 1231(b)(3).  Victims of certain crimes and trafficking who

4   have suffered serious harm and who have cooperated with law enforcement may apply for nonimmigrant

5   visas under 8 U.S.C. §§ 1101(a)(15)(T), (U).  Certain noncitizens from designated countries may apply

6   for Temporary Protected Status ("TPS") in the event of, *inter alia*, a natural disaster or political

7   upheaval in their country of origin.  8 U.S.C. § 1254a.  In addition, a significant number of noncitizens

8   within the United States are eligible for employment authorization based on either their current

9   immigration status, their employment status, or their temporary immigration status, including while

10  other applications for immigration benefits are pending.  *See generally* 8 C.F.R. § 274.12a(a)-(c).

11  54.   Every immigration benefit has enumerated statutory and/or regulatory requirements that

12  applicants must affirmatively establish to demonstrate eligibility.  In addition, each applicant generally

13  must show that they are admissible under 8 U.S.C. § 1182 and/or that any past immigration violation or

14  criminal conduct does not disqualify them for the benefit sought.  *See*, *e.g.*, 8 U.S.C., §§ 1158(b)(2)

15  (precluding asylum eligibility to individuals found to have persecuted others, to have been convicted of

16  "a particularly serious crime," or to present a danger to national security); 1231(b)(3)(B) (precluding

17  applicants from receiving withholding of removal based on national security grounds); 1254a(c)(2)(B)(i)

18  (precluding applicants from qualifying for TPS if they have been convicted of a felony or two or more

19  misdemeanors).

20  ## FACTUAL BACKGROUND

21  ### A.   The Controlled Application Review and Resolution Program ("CARRP")

22  55.   In April 2008, USCIS created CARRP, an agency-wide policy for identifying, processing, and

23  adjudicating immigration applications that raise "national security concerns."  As described below,

24  however, CARRP unlawfully imposes extra statutory rules and criteria to delay and deny applicants

25  immigration benefits to which they are entitled.

26
27
28

SECOND AMENDED COMPLAINT
Page **12** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

56.     Congress did not enact CARRP, and USCIS did not promulgate it as a proposed rule with the notice-and-comment procedures mandated by the APA.  *See* 5 U.S.C. § 553(b)-(c).

57.     Upon information and belief, prior to CARRP's enactment, USCIS simply delayed the adjudication of many immigration applications that raised possible national security concerns, in part due to backlogs created by the FBI Name Check process (one of many security checks utilized by USCIS).

58.     Indeed, the U.S. District Court for the Western District of Washington previously certified a district class of hundreds of naturalization applicants whose cases were delayed due to FBI Name Checks, *see Roshandel v. Chertoff*, 554 F. Supp. 2d 1194 (W.D. Wash. 2008), and denied the defendants' motion to dismiss the suit, *see Roshandel*, 2008 WL 1969646 (W.D. Wash. May 5, 2008).  The case resulted in a settlement in which the defendants agreed to adjudicate class member applications within a specified time period.  *See Roshandel*, No. C07-1739MJP, Dkt. 81 (W.D. Wash. Aug. 25, 2008).

59.     Now, in lieu of delays based on the FBI Name Check process, USCIS delays applications by applying CARRP.  Since CARRP's inception, USCIS has not made information about CARRP available to the public, except in response to Freedom of Information Act ("FOIA") requests and litigation to compel responses to those requests.  *See ACLU of Southern California v. USCIS*, No. CV 13-861 (D.D.C. filed June 7, 2013).  In fact, the program was unknown to the public, including applicants for immigration benefits, until it was discovered in litigation challenging an unlawful denial of naturalization in *Hamdi v. USCIS*, No. EDCV 10-894 VAP (DTBx), 2012 WL 632397 (C.D. Cal. Feb. 25, 2012), and then revealed in greater detail through the government's response to a FOIA request.

60.     CARRP directs USCIS officers to screen citizenship and immigration benefits applications for national security concerns.

61.     If a USCIS officer determines that an application presents a national security concern, he or she will take the application off a routine adjudication track and—without notifying the applicant—place it

SECOND AMENDED COMPLAINT
Page **13** of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

on a CARRP adjudication track where it is subject to distinct procedures, heightened scrutiny, and, most importantly, extra-statutory criteria that result in lengthy delays and prohibit approvals, except in limited circumstances, regardless of an applicant's statutory eligibility.

### 1. CARRP's Definition of a National Security Concern

62.     According to the CARRP definition, a national security concern arises when an individual or organization has been determined to have an articulable link—no matter how attenuated or unsubstantiated—to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the INA.  Those sections render inadmissible or removable any individual who, *inter alia*, "has engaged in terrorist activity" or is a member of a "terrorist organization."  8 U.S.C. §§ 1182(a)(3) and 1227(a)(4).

63.     For the reasons described herein, an individual need not be actually suspected of engaging in any unlawful activity or joining any proscribed organization to be branded a national security concern under CARRP.

64.     CARRP distinguishes between two types of national security concerns: those ostensibly involving "Known or Suspected Terrorists" ("KSTs"), and those ostensibly involving "non-Known or Suspected Terrorists" ("non-KSTs").

65.     USCIS automatically considers an applicant a KST, and thus a national security concern, if his or her name appears in the Terrorist Screening Database, also referred to as the Terrorist Watchlist ("TSDB" or "Watchlist").  USCIS, therefore, applies CARRP to any applicant whose name appears in the TSDB.

66.     Upon information and belief, the TSDB includes approximately one million names, many of whom present no threat to the United States.

67.     The government's Watchlisting Guidance sets a very low "reasonable suspicion" standard for placement on the Watchlist.  Under the Guidance, concrete facts are not necessary to satisfy the reasonable suspicion standard, and uncorroborated information of questionable or even doubtful

SECOND AMENDED COMPLAINT
Page **14** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

reliability can serve as the basis for blacklisting an individual.  The Guidance further reveals that the government blacklists non-U.S. citizens, including LPRs, even where it cannot meet the already low reasonable suspicion standard of purported involvement with terrorist activity.  The Guidance permits the watchlisting of noncitizens simply for being associated with someone else who has been watchlisted, even if there is no known involvement with that person's purportedly suspicious activity.  The Guidance also states explicitly that noncitizens may be watchlisted based on information that is very limited or of suspected reliability.  These extremely loose standards significantly increase the likelihood that the TSDB contains information on individuals who are neither known nor appropriately suspected terrorists.

68.     Furthermore, the Terrorist Screening Center ("TSC"), which maintains the TSDB, has failed to ensure that individuals who do not meet the Watchlist's criteria are promptly removed from the TSDB (or not blacklisted in the first place).  In 2013 alone, the watchlisting community nominated 468,749 individuals to the TSDB, and the TSC rejected only approximately one percent of those nominations.  Public reports also confirm that the government has nominated or retained people on government watchlists as a result of human error.

69.     The federal government's official policy is to refuse to confirm or deny any given individual's inclusion in the TSDB or provide a meaningful opportunity to challenge that inclusion.  Nevertheless, individuals can become aware of their inclusion due to air travel experiences.  In particular, individuals may learn that they are on the "Selectee List" or the "Expanded Selectee List," subsets of the TSDB, if their boarding passes routinely display the code "SSSS" or they are routinely directed for additional screening before boarding a flight over U.S. airspace.  They may also learn of their inclusion in the TSDB if U.S. federal agents regularly subject them to secondary inspection when they enter the United States from abroad.  Such individuals are also often unable to check-in for flights online or at airline electronic kiosks at the airport.

70.     Where the KST designation does not apply, CARRP instructs officers to look for indicators of a non-Known or Suspected Terrorist ("non-KST") concern.

SECOND AMENDED COMPLAINT
Page **15** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

71.     These indicators fall into three categories:  (1) statutory indicators; (2) non-statutory indicators; and (3) indicators contained in security check results.

72.     Statutory indicators of a national security concern arise when an individual generally meets the definitions described in Sections 212(a)(3)(A), (B), and (F), and 237(a)(4)(A) and (B) of the INA (codified at 8 U.S.C. § 1182(a)(3)(A), (B), and (F) and § 1227(a)(4)(A) and (B)), which list the security and terrorism grounds of inadmissibility and removability.[2]  However, CARRP expressly defines statutory indicators of a national security concern more broadly than the statute, stating that the facts of the case do not need to satisfy the legal standard used in determining admissibility or removability under those provisions of the INA to give rise to a non-KST national security concern.

73.     For example, CARRP policy specifically directs USCIS officers to scrutinize evidence of charitable donations to organizations later designated as financiers of terrorism by the U.S. Treasury Department and to construe such donations as evidence of a national security concern, even if an individual had made such donations without any knowledge that the organization was engaged in proscribed activity.  Such conduct would not make an applicant inadmissible for a visa, asylum, or LPR status under the statute, *see* 8 U.S.C. § 1182(a)(3)(B), nor does it have any bearing on a naturalization application.

74.     Under CARRP, non-statutory indicators of a national security concern include travel through or residence in areas of known terrorist activity; a large scale transfer or receipt of funds; a person's employment, training, or government affiliations; the identities of a person's family members or close associates, such as a roommate, co-worker, employee, owner, partner, affiliate, or friend; or simply other suspicious activities.

---

[2] These security and terrorism grounds of inadmissibility, if applicable, may bar an applicant from obtaining lawful permanent resident status, asylum, or a visa.  However, they do not bar an applicant who is already a lawful permanent resident from naturalization, which is governed by the statutory provisions specific to naturalization.  *See* 8 U.S.C. §§ 1421-1458.  The security and terrorism provisions also may render a non-citizen removable, *see* 8 U.S.C. § 1227(a)(4), but the government has not charged Plaintiffs with removability under these provisions.

SECOND AMENDED COMPLAINT
Page **16** of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

75.     Finally, security check results are considered indicators of a national security concern in instances where, for example, the FBI Name Check produces a positive hit on an applicant's name and the applicant's name is associated with a national security-related investigatory file.  Upon information and belief, this indicator leads USCIS to label applicants national security concerns solely because their names appear in a law enforcement or intelligence file, even if they were never the subject of an investigation.  For example, an applicant's name could appear in a law enforcement file in connection with a national security investigation because he or she once gave a voluntary interview to an FBI agent, he or she attended a mosque that was the subject of FBI surveillance, or he or she knew or was associated with someone under investigation.

76.     Upon information and belief, CARRP labels applicants national security concerns based on vague and overbroad criteria that often turn on national origin or innocuous and lawful activities or associations.  These criteria are untethered from the statutory criteria that determine whether a person is eligible for the immigration status or benefit they seek, and are so general that they necessarily ensnare individuals who pose no threat to the security of the United States.

**2.     Delay and Denial**

77.     Once a USCIS officer identifies a CARRP-defined national security concern, the application is subjected to CARRP's rules and procedures that guide officers to deny such applications or, if an officer cannot find a basis to deny the application, to delay adjudication as long as possible.

a)     Deconfliction

78.     One such procedure is called "deconfliction," which requires USCIS to coordinate with—and, upon information and belief, subordinate its authority to—the law enforcement agency, often the FBI, that possesses information giving rise to the supposed national security concern.

79.     During deconfliction, the relevant law enforcement agency has authority: to instruct USCIS to ask certain questions in an interview or to issue a Request for Evidence ("RFE"); to comment on a proposed decision on the benefit; and to request that USCIS deny, grant, or hold the application in

SECOND AMENDED COMPLAINT
Page **17** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

abeyance for an indefinite period of time.

80.     Upon information and belief, deconfliction allows law enforcement or intelligence agencies such as the FBI to directly affect the adjudication of a requested immigration benefit, and also results in the agencies conducting independent interrogations of the applicant—or the applicant's friends and family.

81.     Upon information and belief, USCIS often makes decisions to deny immigration benefit applications because the FBI requests or recommends the denial, not because the person is statutorily ineligible for the benefit.

82.     The FBI often seeks to use the pending immigration application to coerce the applicant to act as an informant or otherwise provide information.

<u>b)      Eligibility Assessment</u>

83.     In addition to deconfliction, once officers identify an applicant as a national security concern, CARRP directs officers to perform an "eligibility assessment" to determine whether the applicant is eligible for the benefit sought.

84.     Upon information and belief, at this stage, CARRP instructs officers to look for any reason to deny an application so that time and resources are not expended to investigate the possible national security concern.  Where no legitimate reason supports denial of an application subjected to CARRP, USCIS officers often utilize spurious or pretextual reasons to deny the application.

<u>c)      Internal Vetting</u>

85.     Upon information and belief, if, after performing the eligibility assessment, an officer cannot find a reason to deny an application, CARRP instructs officers to first "internally vet" the national security concern using information available in DHS systems and databases, open source information, review of the applicant's file, RFEs, and interviews or site visits.

86.     After conducting the eligibility assessment and internal vetting, USCIS officers are instructed to again conduct deconfliction to determine the position of any interested law enforcement agency.

<u>d)      External Vetting</u>

SECOND AMENDED COMPLAINT
Page **18** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

87.     If the national security concern remains and the officer cannot find a basis to deny the benefit, the application then proceeds to "external vetting."

88.     During external vetting, USCIS instructs officers to confirm the existence of the national security concern with the law enforcement or intelligence agency that possesses the information that created the concern and obtain additional information from that agency about the concern and its relevance to the individual.

89.     CARRP policy instructs USCIS officers to hold applications in abeyance for periods of 180 days to enable law enforcement agents and USCIS officers to investigate the national security concern. According to CARRP policy, the USCIS Field Office Director may extend the abeyance periods as long as the investigation remains open.

90.     Upon information and belief, CARRP provides no outer limit on how long USCIS may hold a case in abeyance, even though the INA requires USCIS to adjudicate a naturalization application within 120 days of examination, 8 C.F.R. § 335.3, and Congress has made clear its intent that USCIS adjudicate immigration applications, including visa petitions and accompanying applications for adjustment of status to lawful permanent residence, within 180 days of filing the application.  8 U.S.C. § 1571(b).

e)     <u>Adjudication</u>

91.     When USCIS considers an applicant to be a KST national security concern, CARRP policy forbids USCIS adjudications officers from granting the requested benefit even if the applicant satisfies all statutory and regulatory criteria.

92.     When USCIS considers an applicant to be a non-KST national security concern, CARRP policy forbids USCIS adjudications officers from granting the requested benefit in the absence of supervisory approval and concurrence from a senior level USCIS official.

93.     In *Hamdi*, 2012 WL 632397, when asked whether USCIS's decision to brand naturalization applicant Tarek Hamdi as a national security concern affected whether he was eligible for naturalization,

SECOND AMENDED COMPLAINT
Page **19** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

a USCIS officer testified that "it doesn't make him statutorily ineligible, but because he is a—he still has a national security concern, it affects whether or not we can approve him."  The officer testified that, under CARRP, "until [the] national security concern [is] resolved, he won't get approved."

94.     Upon information and belief, USCIS routinely delays adjudication of applications subject to CARRP when it cannot find a reason to deny the application.  When an applicant files a mandamus action to compel USCIS to finally adjudicate his or her pending application, it often has the effect of forcing USCIS to deny a statutorily-eligible application on pretextual grounds because CARRP prevents agency field officers from granting an application involving a national security concern.

95.     CARRP effectively creates two substantive regimes for immigration application processing and adjudication: one for those applications subject to heightened scrutiny and vetting under CARRP and one for all other applications.  CARRP rules and procedures create substantive eligibility criteria that indefinitely delay adjudications and unlawfully deny immigration benefits to noncitizens who are statutorily eligible and entitled by law.

96.     At no point during the CARRP process is the applicant made aware that he or she has been labeled a national security concern, nor is the applicant ever provided with an opportunity to respond to and contest the classification.

97.     Upon information and belief, CARRP results in unauthorized adjudication delays, often lasting many years, and pre-textual denials of statutorily-eligible immigration applications.

**B.     Executive Order of January 27, 2017**

98.     President Donald Trump campaigned for election on promises to ban Muslims from coming to the United States.

99.     On December 7, 2015, the Trump campaign issued a press release stating that "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on."  The press release is attached hereto as Exhibit A.

100.    In March 2016, Defendant Trump said, "Frankly, look, we're having problems with the Muslims,

SECOND AMENDED COMPLAINT
Page **20** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

1  and we're having problems with Muslims coming into the country." Alex Griswold, *Trump Responds to*

2  *Brussels Attacks: 'We're Having Problems with the Muslims*,' MEDIAITE, Mar. 22, 2016, *available at*

3  http://www.mediaite.com/tv/trump-responds-to-brussels-attack-were-having-problems-with-the-

4  muslims/ (last visited Feb. 1, 2017).

5  101.   On June 14, 2016, Defendant Trump promised to ban all Muslims entering this country until "we

6  as a nation are in a position to properly and perfectly screen those people coming into our country." The

7  transcript of his speech is attached hereto as Exhibit B.

8  102.   In a speech on August 15, 2016, Defendant Trump said that the United States could not

9  "adequate[ly] screen[]" immigrants because it admits "about 100,000 permanent immigrants from the

10  Middle East every year."  Defendant Trump proposed creating an ideological screening test for

11  immigration applicants, which would "screen out any who have hostile attitudes towards our country or

12  its principles—or who believe that Sharia law should supplant American law."  During the speech, he

13  referred to his proposal as "extreme, extreme vetting."  A copy of his prepared remarks is attached

14  hereto as Exhibit C.  A video link to the delivered speech is available at: https://www.c-

15  span.org/video/?413977-1/donald-trump-delivers-foreign-policy-address (quoted remarks at 50:46).

16  103.   During an August 2016 speech, Michael Flynn, who is President Trump's former National

17  Security Advisor, called Islam "a political ideology," suggesting it is not a religion, and called it "a

18  vicious cancer inside the body of 1.7 billion people on this planet and it has to be excised."  A copy of a

19  news article reporting this speech is attached hereto as Exhibit D.  A video link with clips of his speech

20  is available at: http://www.cnn.com/2016/11/22/politics/kfile-michael-flynn-august-speech/.

21  104.   On January 20, 2017, Donald Trump was inaugurated as the President of the United States.

22  105.   In his first television appearance as President, he again referred to his plan for "extreme vetting."

23  The transcript of this interview is attached hereto as Exhibit E.

24  106.   On January 27, 2017, one week after taking office, Defendant Trump signed the First EO,

25  entitled "Protecting the Nation from Foreign Terrorist Entry into the United States."  The Executive

SECOND AMENDED COMPLAINT
Page **21** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

Order is attached hereto as Exhibit F.  On information and belief, and in light of the statements by Mr. Trump and his advisors set forth above, the First EO was intended to target Muslims.

107.    Citing the threat of terrorism committed by foreign nationals, the First EO directed a variety of changes to the processing of certain immigration benefits. Most relevant to the instant action was Section 3, which fell within a section entitled "Suspension of Issuance of Visas and Other Immigration Benefits," in which President Trump ordered, in Section 3(a), an immediate "review to determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat."  In Section 3(c), the order then explained that to reduce the burden of the reviews described in Section 3(a), "immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. § 1187(a)(12), would be detrimental to the interests of the United States," and that Defendant Trump was therefore "suspend[ing] entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order."

108.    There were seven countries that fit the criteria in 8 U.S.C. § 1187(a)(12): Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen.  The populations of those countries are overwhelmingly Muslim.

109.    The First EO purported to rely on 8 U.S.C. § 1182(f) for the authority to suspend entry into the United States.

110.    On information and belief, USCIS relied on Section 3 of the First EO to subsequently suspend processing of all immigrant visas and immigration benefits applications, including *all* pending petitions, applications, or requests involving citizens or nationals of the seven targeted countries with the exception of naturalization applications.

111.    Section 4 of the First EO ordered the creation of a screening program for all immigration benefits applications, which would seek to identify individuals "who are seeking to enter the United States on a fraudulent basis with the intent to cause harm, or who are at risk of causing harm subsequent to their

SECOND AMENDED COMPLAINT
Page **22** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

admission" and "a process to evaluate the applicant's likelihood of becoming a positively contributing member of society and the applicant's ability to make contributions to the national interest."

112.   Sections 5(a) and (b) of the First EO suspended the U.S. Refugee Admissions Program in its entirety for 120 days and then, upon its resumption, directed the program to prioritize refugees who claim persecution on the basis of religious-based persecution, "provided that the religion of the individual is a minority religion in the individual's country of nationality."  Section 5(e) stated that notwithstanding the suspension of the Refugee Program, on a case-by-case basis, the United States may admit refugees "only so long as they determine that the admission of such individuals as refugees is in the national interest—including when the person is a religious minority in his country of nationality facing religious persecution."

113.   In a January 27, 2017, interview with the Christian Broadcasting Network, President Trump confirmed his intent to prioritize Christians in the Middle East for admission as refugees.  A copy of the report of this interview is attached hereto as Exhibit G (David Brody: "As it relates to persecuted Christians, do you see them as kind of a priority here?"  President Trump: "Yes.").

## C.   Executive Order of March 6, 2017

114.   On January 30, 2017, the State of Washington filed a lawsuit in this district seeking to enjoin application of the First EO.  Complaint for Declaratory and Injunctive Relief, *Washington v. Trump*, No. 2:17-cv-00141-JLR, ECF 1 (W.D. Wash. Jan. 30, 2017).  On February 3, Judge James L. Robart granted the State of Washington's motion for a temporary restraining order, which enjoined enforcement of Sections 3(a), 5(a)-(c), and 5(e) of the First EO nationwide during the pendency of the case.  Temporary Restraining Order, *Washington v. Trump*, No. 2:17-cv-00141-JLR, ECF 52, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017).  Defendant Trump subsequently lashed out at the "so-called judge" who granted the temporary restraining order, calling the court's opinion "ridiculous" and predicting it would be overturned.  Donald Trump (@realDonaldTrump), TWITTER (Feb. 4, 2017, 05:12 AM), https://twitter.com/realDonaldTrump/status/827867311054974976.  To the contrary, the Ninth Circuit

SECOND AMENDED COMPLAINT
Page **23** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

Court of Appeals— in a unanimous per curiam opinion—denied the government's motion for an emergency stay of the district court's temporary restraining order.  *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).

115.    In response to the Ninth Circuit's decision, Defendant Trump simultaneously vowed to "vigorously defend[] this lawful order [First EO]," while "going further" to "issue[] a new executive action . . . that will comprehensively protect our country."  *See* Aaron Blake, *Donald Trump's combative, grievance-filled news conference, annotated*, THE WASHINGTON POST at 5-6, 28 (Feb. 16, 2017) *available at* https://www.washingtonpost.com/news/the-fix/wp/2017/02/16/donald-trumps-grievance-filled-press-conference-annotated/?utm_term=.696842f824c0.  "Extreme vetting will be put in place," Defendant Trump promised, "and it already is in place in many places."  *Id.*  Later during the same press conference, Defendant Trump again addressed the forthcoming Second EO, noting "we can tailor the [executive] order to that [Ninth Circuit] decision and get just about everything, in some ways, more."  *Id.*

116.    That same day, the government clarified in a brief to the Ninth Circuit that "[r]ather than continuing this litigation, the President intends in the near future to rescind the [First Executive] Order and replace it with a new . . . Executive Order."  Supplemental Brief on *En Banc* Consideration at 4, *Washington v. Trump*, No. 17-35105 (9th Cir. Feb. 16, 2017).

117.    In the days that followed, Defendant Trump's senior policy advisor, Stephen Miller, confirmed that though the new executive order would have "minor technical differences," "[f]undamentally," it would achieve "the same basic policy outcome for the county."  *See Miller: New order will be responsive to judicial ruling; Rep. Don DeSantis: Congress has gotten off to a slow start* at 2 (Feb. 21, 2017), *available at* http://www.foxnews.com/transcript/2017/02/21/miller-new-order-will-be-responsive-to-judicial-ruling-rep-ron-desantis/.

118.    Similarly, White House Press Secretary Sean Spicer noted that though "the second executive order attempts to address the court's concerns that they made, the goal is obviously to maintain the way

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

that we did it the first time because we believe that the law is very clear about giving the President the authority that he needs to protect the country." *See Press Briefing by Press Secretary Sean Spicer, 2/27/2017, #17,* The White House at 26-27 (Feb. 27, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/02/27/press-briefing-press-secretary-sean-spicer-2272017-17.

119.    As promised, on March 6, 2017, Defendant Trump issued a Second EO, which espouses the same discriminatory policy and effect as the First EO.  The Second EO revoked the First EO as of its March 16, 2017 effective date.  Second EO § 13.  The Second EO is attached hereto as Exhibit I.

120.    The Second EO modifies the First EO in two relevant ways.  First, whereas the First EO banned entry into the United States for 90 days or more of foreign nationals from seven countries, the Second EO omits Iraq—bringing the number of countries affected by this entry bar down to six (Iran, Libya, Somalia, Sudan, Syria, and Yemen).  *Id.* §§ 1(f),1(g), 2(c).[3]  Second, the Second EO clarifies that the 90-day entry bar applies only to foreign nationals who: (1) are outside of the United States on the effective date of the Second EO; (2) did not have a valid visa at 5:00 p.m., eastern standard time on January 27, 2017; and (3) do not have a valid visa on the effective date of the Second EO.  *Id.* §3(a).

121.    Despite these changes, however, the same intent and effect of unlawfully discriminating against Muslim immigrants underlying the First EO similarly underlies the Second EO.  On information and belief, and in light of the statements made by Defendant Trump and his advisors set forth above, the Second EO was intended to continue the First EO's intent to target Muslims.

122.    Indeed, the Second EO retains in almost identical form the provisions from the First EO that are central to Plaintiffs' allegations in this case.

123.    Section 2(a) of the Second EO, like Section 3(a) of the First EO, instructs the Secretary of Homeland Security to "conduct a worldwide review to identify whether, and if so what, additional

---

[3] Though, as explained below in paragraph 126, this exclusion of Iraq from the 90-day entry bar is tempered by the Second EO's simultaneous provision of heightened scrutiny to applications for visas, admission or other immigration benefits made by Iraqi nationals.

SECOND AMENDED COMPLAINT
Page **25** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat." Section 2(b) specifies that the Secretary of Homeland Security shall report on the results of this review within 20 days of the effective date of the Second EO. *Compare* First EO § 3(b), *with* Second EO § 2(b).

124.    In order to "reduce investigative burdens" while this "worldwide review" is ongoing, Section 2(c) of the Second EO demands that "the entry into the United States of nationals of those six countries be suspended for 90 days." *Compare* First EO §3(c), *with* Second EO § 2(c).

125.    Moreover, if these countries do not supply the additional information identified by the Secretary of Homeland Security within 50 days of notification, the Secretary of Homeland Security "shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals" of these countries. *Compare* First EO §§ 3(d), 3(e), *with* Second EO §§ 2(d), 2(e).

126.    Notably, Section 4 of the Second EO applies heightened scrutiny to immigration applications received from Iraqi nationals. Section 4 specifies that applications for "a visa, admission, or other immigration benefit" made by Iraqi nationals must still be subjected to "thorough review" to determine whether the applicant has any connections to ISIS or any other terrorist organization or may be a terrorist or national security threat. Accordingly, though Iraqi nationals are exempted from the 90-day entry bar outlined in Section 2(c), they continue to be targeted under Section 4.

127.    Additionally, Section 5 of the Second EO demands the creation of the same "extreme vetting" program outlined in Section 4 of the First EO. The Second EO specifies that "[t]he Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall implement a program, as part of the process for adjudications, to identify individuals who seek to enter the United States on a fraudulent basis, who support terrorism, violent extremism, acts of violence toward any group or class of people within the United States, or who present a risk of causing harm

SECOND AMENDED COMPLAINT
Page **26** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

subsequent to their entry." *Compare* First EO §4(a), *with* Second EO § 5(a).  Section 5 further envisions "[t]his program shall include the development of a uniform baseline for screening and vetting standards and procedures" and applies to both admission and all "other immigration benefits."  Second EO § 5(a).

128.     Finally, Section 6 of the Second EO, like Section 5 of the First EO, "suspend[s] travel of refugees into the United States" and "suspend[s] decisions on applications for refugee status, for 120 days."  *Compare* First EO § 5(a), *with* Second EO § 6(a).  Following this 120-day suspension, "the Secretary of Homeland Security shall resume making decisions on applications for refugee status only for stateless persons and nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined that the additional procedures implemented pursuant to this subsection are adequate to ensure the security and welfare of the United States."  Second EO § 6(a).  Notably, the Second EO removed the First EO's explicit preference for refugees who claim persecution based on their ascription to a minority religion.  *Compare* First EO §§ 5(b), 5(e), *with* Second EO §§ 6(a), 6(c).  The Second EO further purports to claim that the First EO "did not provide a basis for discriminating for or against members of any particular religion," and that "[w]hile that order allowed for prioritization of refugee claims from members of persecuted religious minority groups, that priority applied to refugees from every nation, including those in which Islam is a minority religion."  Second EO § 1(b)(iv).

129.     Just hours before the Second EO was scheduled to go into effect, on March 15, 2017 the U.S. District Court for the District of Hawaii granted a nationwide temporary restraining order, blocking application of Sections 2 and 6 of the Second EO during the pendency of that legal challenge.  Order Granting Motion for Temporary Restraining Order, *Hawaii v. Trump*, No. 17-00050 DKW-KSC (D. Haw. Mar. 15, 2017).

130.     Hours later, a second federal judge in Maryland issued a nationwide preliminary injunction, blocking Section 2(c) of the Second EO from going into effect.  Memorandum Opinion, *Int'l Refugee Assistance Project v. Trump*, No. TDC-17-0361 (D. Md. Mar. 15, 2017).

SECOND AMENDED COMPLAINT
Page 27 of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

131.    No court has yet enjoined the "extreme vetting" provisions, including Sections 4 and 5, of the Second EO.

### D.    Impact of Executive Orders on Implementation of CARRP

### 1.    Ban on the Adjudication of Immigration Benefits Applications for Immigrants from the Targeted Countries

132.    After the issuance of the First EO, at least two department heads within USCIS sent internal communications barring any final action on any petition, benefits application, or requests involving citizens or nationals of Syria, Iraq, Iran, Somalia, Yemen, Sudan, and Libya.

133.    On January 28, 2017, Associate Director of Service Center Operations for USCIS, Donald Neufeld, issued instructions to Service Center directors and deputies in an email message directing the suspension of the "adjudication of all applications, petitions or requests involving citizens or nationals of the [seven] listed countries."  The email continues, "At this point there are no exceptions for any form types, to include I-90s or I-765s.  Please physically segregate any files that are impacted by this temporary hold pending further guidance."  Photographs of the internal email communication are attached hereto as Exhibit H.

134.    In another email to staff from Daniel M. Renaud, Associate Director of Field Operations for USCIS, on January 28, 2017, Mr. Renaud stated, "Effectively [sic] immediately and until additional guidance is received, you may not take final action on any petition or application where the applicant is a citizen or national of Syria, Iraq, Iran, Somalia, Yemen, Sudan, and Libya."  Alice Speri and Ryan Devereaux, *Turmoil at DHS and State Department*, THE INTERCEPT, Jan. 30, 2017, *available at* https://theintercept.com/2017/01/30/asylum-officials-and-state-department-in-turmoil-there-are-people-literally-crying-in-the-office-here/.  The email continued, "Offices are not permitted [to] make any final decision on affected cases to include approval, denial, withdrawal, or revocation.  Please look for additional guidance later this weekend on how to process naturalization applicants from one of the seven countries listed above who are currently scheduled for oath ceremony or whose N-400s have been

SECOND AMENDED COMPLAINT
Page **28** of **55**
Case No. 2:17-cv-00094-JCC

134745922.5

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

approved and they are pending scheduling of oath ceremony." *Id.*; *see also* Michael D. Shear and Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, NEW YORK TIMES (Jan. 29, 2017), *available at* https://www.nytimes.com/2017/01/29/us/politics/donald-trump-rush-immigration-order-chaos.html.

135.    On January 31, 2017, U.S. Customs and Border Protection, a subdivision of DHS, reported on its website that the First EO does not apply to pending naturalization applications and that "USCIS will continue to adjudicate N-400 applications for naturalization and administer the oath of citizenship consistent with prior practices." *Protecting the Nation from Foreign Terrorist Entry into the United States*, CBP, https://www.cbp.gov/border-security/protecting-nation-foreign-terrorist-entry-united-states.

136.    Referencing the hold on adjudications for people from the seven countries subject to the First EO, a USCIS official told The Intercept, "We know what is coming.  These cases will all be denied after significant waits."  Alice Speri and Ryan Devereaux, *Turmoil at DHS and State Department*, THE INTERCEPT, Jan. 30, 2017.

137.    This halt in USCIS adjudications took place pursuant to provisions of the First EO which also appear, in similar form, in the Second EO.  Implementation of the Second EO was enjoined before Section 2 could go into effect.  However, upon information and belief, USCIS similarly will apply the Second EO to suspend adjudication of immigration benefits to people from its six targeted countries. The application of the Second EO to USCIS immigration benefits applications will effectuate the intent of the Second EO to target Muslims.

### 2.    "Extreme Vetting" of Muslim Immigrants

138.    As described above, Section 5 of the Second EO orders the Secretary of Homeland Security, the Secretary of State, the Director of National Intelligence, and the Attorney General to "implement a program, as part of the process for adjudications, to identify individuals . . . who present a risk of causing harm."  The Second EO calls for the implementation of a "program [that] shall include the

SECOND AMENDED COMPLAINT
Page 29 of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

development of a uniform baseline for screening and vetting standards and procedures," including "a mechanism to assess whether applicants may commit, aid, or support any kind of violent, criminal, or terrorist acts after entering the United States," and "any other appropriate means for ensuring . . . a rigorous evaluation of all grounds . . . for denial of…immigration benefits."

139.    Similarly, Section 4 of the Second EO applies heightened scrutiny to immigration applications received from Iraqi nationals.  Section 4 specifies that applications for "a visa, admission, or other immigration benefit" made by Iraqi nationals must still be subjected to "thorough review" to determine whether the applicant has any connections to ISIS or any other terrorist organization or may be a terrorist or national security threat. Accordingly, though Iraqi nationals are exempted from the 90-day entry bar outlined in Section 2(c), they continue to be targeted under Section 4.

140.    In conjunction with the issuance of the Second EO, Defendant Trump published a "Memorandum for the Secretary of State, the Attorney General, the Secretary of Homeland Security" on the subject of "Implementing Immediate Heightened Screening and Vetting of Applications for Visas and Other Immigration Benefits…." March 6, 2017, *available at* https://www.whitehouse.gov/the-press-office/2017/03/06/memorandum-secretary-state-attorney-general-secretary-homeland-security.  In this memorandum, Defendant Trump cautions that "this Nation cannot delay the immediate implementation of additional heightened screening and vetting protocols and procedures for issuing visas to ensure that we strengthen the safety and security of our country."  Accordingly, he instructs the Secretary of State and the Secretary of Homeland Security, in conjunction with the Attorney General, to "implement protocols and procedures as soon as practicable that in their judgment will enhance the screening and vetting of applications for visas and all other immigration benefits."  Moreover, this implementation shall begin immediately, "[w]hile th[e] comprehensive review" ordered by Section 2 of the Second EO "is ongoing."  The memorandum also instructs government officials to "rigorously enforce all existing grounds of inadmissibility and to ensure subsequent compliance with related laws after admission."

141.    Upon information and belief, the "extreme vetting" program required by the Second EO, as

SECOND AMENDED COMPLAINT
Page **30** of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

enhanced by Defendant Trump's accompanying memorandum, will dramatically expand CARRP, an existing program USCIS has implemented since April 2008.

## B.       Facts Specific To Each Plaintiff

### Abdiqafar Wagafe

142.    Plaintiff Abdiqafar Aden Wagafe is a thirty-two-year-old Somali national who currently resides in SeaTac, Washington.

143.    Between 2001 and 2007, Mr. Wagafe lived in refugee camps and temporary refugee housing in Kenya and Ethiopia.

144.    On May 24, 2007, he moved to the United States with nine family members and was admitted as a refugee.  He has lived in the United States since then.

145.    After arriving in the United States, Mr. Wagafe briefly stayed in Minneapolis, Minnesota with his brother.  He then moved to Seattle, where his two sisters and another brother live.

146.    All of the nine family members who moved to the United States with Mr. Wagafe have become U.S. citizens.

147.    From July 2007 until February 2011, Mr. Wagafe worked for Delta Global Services until widespread layoffs left him without a job.  Since February 2011, he has worked at a Somali restaurant, which he currently co-owns and manages.

148.    On May 28, 2008, Mr. Wagafe filed an application for refugee adjustment of status to become an LPR.

149.    USCIS granted his application on November 3, 2008, retroactively granting him LPR status as of May 24, 2007, the date he was admitted to the U.S. as a refugee.  *See* 8 C.F.R. § 209.1(e).

150.    Mr. Wagafe filed his first application for naturalization on July 3, 2012.  USCIS interviewed him on October 29, 2012, but he failed the English-language portion of the exam.  USCIS interviewed Mr. Wagafe a second time on January 3, 2013, but he again failed the English writing portion of the exam. He also did not understand English sufficiently to comprehend the Oath of Allegiance.  On these bases,

SECOND AMENDED COMPLAINT
Page **31** of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

1    USCIS denied his first application for naturalization on January 9, 2013.

2    151.    Mr. Wagafe has since improved his English skills significantly.

3    152.    Mr. Wagafe filed a second application for naturalization on November 8, 2013.  USCIS

4    scheduled his interview for February 25, 2014, but cancelled it on January 29, 2014 without explanation.

5    153.    Mr. Wagafe made various inquiries concerning his case to USCIS, but did not receive any

6    explanation for the delay.  USCIS responded to his queries in July 2015, instructing his attorney to have

7    patience and that the agency would let him know when the agency was ready to interview him.  His

8    subsequent inquiries went unanswered.

9    154.    On February 14, 2017—five days after Plaintiffs filed their motion for class certification in this

10   case—a USCIS officer suddenly informed Mr. Wagafe's attorney that an interview had been scheduled

11   on his immigration application.  At the interview, which occurred on February 22, 2017, the

12   immigration officer approved Mr. Wagafe's application on the spot.  Mr. Wagafe took the oath of

13   allegiance on March 2, 2017 and became a United States citizen on that same day.  In sum, after keeping

14   his application on hold for three and a half years without explanation, the government processed and

15   approved Mr. Wagafe's application within two weeks of Plaintiffs filing for class certification.

16   155.    Mr. Wagafe resided continuously in the United States for at least five years preceding the date of

17   filing his application for naturalization, and has resided continuously within the United States from the

18   date of filing his application until the present.

19   156.    Mr. Wagafe has never been convicted of a crime.

20   157.    There is and was no statutory basis for denying his naturalization application.

21   158.    Mr. Wagafe is Muslim and regularly attends mosque.  He also frequently sends small amounts of

22   money to his relatives in Somalia, Kenya, and Uganda.  He has been married to a woman in Uganda

23   since December 2015 and makes visits to see her.  He had been unable to bring her to the United States

24   because of the delays in his case.

25   159.    Mr. Wagafe's immigration Alien file ("A-file") makes clear that USCIS subjected his pending

26

27

28

SECOND AMENDED COMPLAINT
Page **32** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

application to CARRP.  The A-file states that a CARRP officer handled his case.  In addition, a document in the A-File shows that on December 8, 2013, there was a hit on Mr. Wagafe's name in the FBI Name Check and that the Name Check result contained "derogatory information."  The document also states that Mr. Wagafe appears eligible for naturalization absent confirmation of national security issues.  The document then states that the case is being forwarded for external vetting.

160.    Upon information and belief, Mr. Wagafe's naturalization application was subject to CARRP or its successor "extreme vetting" program, which caused the delay in adjudication of his naturalization application, despite the fact that he was statutorily entitled to naturalize.

161.    Mr. Wagafe suffered significant harm due to the delay in adjudication of his naturalization application.  Although he is married to a Ugandan woman, he was unable to bring her to live with him in the United States, because, until he became a U.S. citizen, his wife did not qualify as an immediate relative, *see generally* 8 U.S.C. § 1151, and thus could not avoid the waiting list for petitions filed by lawful permanent residents on behalf of their spouses.  Subjecting Mr. Wagafe's application to CARRP also harmed his professional options and prevented him from voting in local and national elections.

**Mehdi Ostadhassan**

162.    Plaintiff Mehdi Ostadhassan is a thirty-three-year-old national of Iran.  He resides in Grand Forks, North Dakota.

163.    Mr. Ostadhassan moved to the United States in 2009 on a student visa and studied at the University of North Dakota.  He earned his Ph.D. in Petroleum Engineering, and, after graduation, was immediately hired by the University of North Dakota as an Assistant Professor of Petroleum Engineering.

164.    At the University of North Dakota, Mr. Ostadhassan met Bailey Bubach, a United States citizen.  In January 2014, they were married in a small religious ceremony in California, and then obtained their marriage license in Grand Forks, North Dakota.  Their first child was born in July 2016.

165.    In February 2014, Ms. Bubach filed an immigrant visa petition (USCIS Form I-130) for Mr.

SECOND AMENDED COMPLAINT
Page 33 of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

Ostadhassan and he concurrently filed an application to adjust status (USCIS Form I-485) based upon his marriage.

166.    Mr. Ostadhassan has never been convicted of a crime.

167.    USCIS scheduled Mr. Ostadhassan for an interview on May 19, 2014, but when he appeared for the interview, USCIS informed him that it was cancelled.

168.    USCIS rescheduled and conducted an interview almost a year and a half later, on September 24, 2015.  At that interview, a USCIS officer told Mr. Ostadhassan that the agency still could not make a decision and that it needed to complete further background and security checks.  To date, Mr. Ostadhassan is still waiting for a decision from USCIS.

169.    Mr. Ostadhassan and Ms. Bubach are Muslim and active participants in their religious community.  Each year they donate to Muslim charities in accordance with the teachings of Islam.  They are both involved in the Muslim Student Association at the University of North Dakota.  In addition, they run a Muslim Sunday School.  Mr. Ostadhassan also coordinates the Muslim Congress's Koran competition every year.

170.    Upon information and belief, USCIS considers Mr. Ostadhassan a non-KST national security concern and is subjecting him to CARRP.  USCIS may have subjected Mr. Ostadhassan's adjustment application to CARRP because he has resided in and traveled through what the government considers areas of known terrorist activity—namely, Iran—and because of his donations to Islamic charities and involvement in the Muslim community.

171.    In October 2014, an FBI agent contacted Mr. Ostadhassan and asked to meet to discuss his recent trip to Iran to visit family.  Mr. Ostadhassan declined to meet with the FBI, and his lawyer informed the agent that any further communications should go through the attorney.  The FBI has not contacted Mr. Ostadhassan since.

172.    Upon information and belief, the request for a visit by the FBI was a product of CARRP's deconfliction process.

SECOND AMENDED COMPLAINT
Page **34** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

173.     Upon information and belief, Mr. Ostadhassan's application for adjustment of status is subject to CARRP or its successor "extreme vetting" program, which has delayed the adjudication of his application, despite the fact that he is statutorily eligible for adjustment of status.

174.     As Mr. Ostadhassan is a citizen of Iran, one of the countries targeted in the First EO and Second EO, USCIS suspended adjudication of his application for adjustment of status under the First EO and, on information and belief, will suspend adjudication indefinitely under the Second EO.

175.     Mr. Ostadhassan has been significantly harmed by the delay in adjudication of his adjustment of status application.  Because of his temporary nonimmigrant status, and without an approved adjustment application, he cannot travel outside the United States.  He recently was unable to travel to Iran to introduce his U.S. citizen wife and infant to his Iranian family; his wife and child traveled to Iran without him.  He has also lost out on significant professional opportunities.  He is a college professor, and his unapproved adjustment application has prevented him from attending conferences overseas.  Due to the delay, he and his wife feel that their lives and future in the United States are suspended in limbo, not knowing whether they have a future in the United States.

### Hanin Omar Bengezi

176.     Plaintiff Hanin Omar Bengezi is a 32-year-old Libyan national and Canadian citizen who currently resides in Redmond, Washington. She is an elementary school substitute teacher.

177.     Ms. Bengezi was born in Libya.  She lived with her family in Slovenia from 1985 to 1990 and then in Libya from 1990 to 1995.

178.     Ms. Bengezi immigrated to Canada with her family in 1995, where she lived until she moved to the United States.

179.     She became a Canadian citizen in February 2012.

180.     When Ms. Bengezi attempted to visit the U.S. as a Canadian citizen in May 2012 near Buffalo, New York via the Western Hemisphere Travel Initiative, she and her accompanying family members were refused entry.

SECOND AMENDED COMPLAINT
Page **35** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

181.   In 2012, Ms. Bengezi met her current husband, who is a U.S. citizen.  Their relationship blossomed and they were engaged in December 2012.

182.   Her husband filed a Form I-129F, Petition for Alien Fiancée, with USCIS for Ms. Bengezi on February 13, 2013.

183.   USCIS approved the fiancée petition for Ms. Bengezi on May 31, 2013.

184.   On December 16, 2013, Ms. Bengezi interviewed for her K-1 Fiancée visa at the U.S. embassy in Montreal, Canada.

185.   The U.S. embassy in Montreal issued Ms. Bengezi's K-1 Fiancée visa on November 4, 2014.

186.   Ms. Bengezi came to the U.S. on December 21, 2014, and got married on January 23, 2015 in Lynnwood, Washington.

187.   On February 5, 2015, Ms. Bengezi filed for Adjustment of Status to become an LPR with USCIS.

188.   USCIS has not scheduled an adjustment of status interview for Ms. Bengezi and her husband.

189.   Ms. Bengezi has made various inquiries concerning her case to USCIS, but has not received an explanation for the delay.  USCIS last responded to her queries on December 19, 2016, informing her attorney, "We continue to work on this application and understand your client is concerned about the progress of her case. The application will be scheduled for interview when it is interview ready; we will contact [you] should we need any further information prior to scheduling."  Her subsequent inquiries have gone unanswered.

190.   Ms. Bengezi is Muslim.

191.   Ms. Bengezi has never been convicted of or arrested for a crime.

192.   There is no statutory basis for denying Ms. Bengezi's adjustment of status application.

193.   When Ms. Bengezi flies, she is required to obtain her airplane ticket at the airline counter (instead of being able to check in online), her ticket is marked "SSSS" for "Secondary Security Screening Selection," and she is required to undergo additional and unnecessary secondary screening.

SECOND AMENDED COMPLAINT
Page 36 of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

194.     When Ms. Bengezi travels through land border crossings, such as the CBP Blaine Station, she is referred to secondary inspection for screening and additional questioning.

195.     Ms. Bengezi's Canadian family members continue to be refused entry to the U.S. and denied visitor visas without explanation.

196.     USCIS's delays in adjudicating Ms. Bengezi's case, the additional scrutiny when traveling by air or when crossing the border, and the refusal to issue visitor visas to her family members make it clear that USCIS has subjected her pending application to CARRP or its successor "extreme vetting" program. This has delayed the adjudication of her application, despite the fact that she is statutorily eligible for adjustment of status.

197.     As Ms. Bengezi is a citizen of Libya, one of the countries targeted in the First EO and Second EO, USCIS suspended adjudication of her application for adjustment of status under the First EO and, on information and belief, will suspend adjudication indefinitely under the Second EO.

198.     Ms. Bengezi has been significantly harmed by the delay in adjudication of her adjustment of status application.  Because of her temporary nonimmigrant status, and without an approved adjustment application, she has had a difficult time traveling outside of the United States. This has negatively impacted her ability to visit her family. Additionally, the delay has impacted her ability to obtain full-time employment due to the need to regularly renew her employment authorization, and has also limited her ability to pursue other professional opportunities.  It has prevented her from establishing a normal life in the United States by interfering with her ability to enter into routine transactions such as, inter alia, obtaining loans and signing leases.  The delay has also caused much stress and anxiety for Ms. Bengezi, who is uncertain whether she and her husband will be allowed to live together as a family in the United States.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

**Mushtaq Abed Jihad**

199.    Plaintiff Mushtaq Abed Jihad is a 44-year-old refugee from Iraq who currently resides in Renton, Washington.

200.    In April 2005, Mr. Jihad, then a successful business owner, was abducted from one of his stores in Iraq.  He was beaten and tortured before ultimately escaping.

201.    Mr. Jihad challenged his attackers in court, which led to death threats.  Once, when leaving court, there was an attempt on his life, and he was shot.

202.    In April 2007, the day the court would decide Mr. Jihad's case against his kidnappers, Mr. Jihad and his family were again victims of a vicious attack.  As he stepped out of the front door of his house with his one-week-old son in his arms, his home was rocked by an explosion.  He lost his leg and his newborn son was killed.  In the aftermath of the explosion, the attackers also shot Mr. Jihad numerous times.  The rest of Mr. Jihad's family managed to escape the attack.

203.    Once released from the hospital where had stayed for several months following that incident, he and his family fled Iraq to Syria.  The United States eventually accepted them as refugees for resettlement.

204.    In August 2008, Mr. Jihad and his family entered the United States and resettled in the Tri-Cities area of Washington.

205.    His lawful permanent residence became effective as of the date of his arrival in the U.S.

206.    Mr. Jihad filed his N-400 Application for Naturalization on July 1, 2013.

207.    On his N-400 Application Mr. Jihad affirmatively responded that he seeks to change his surname.  He no longer wishes to use his family name because of the unrelenting negative reactions directed at him every time he is required to use his name.

208.    On July 26, 2013, Mr. Jihad completed his biometrics appointment for his naturalization application.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

209. Approximately one week after his biometrics appointment, two FBI agents and an interpreter visited Mr. Jihad. The agents questioned Mr. Jihad extensively about his history and why he had elected to change his name on his naturalization application. Multiple times Mr. Jihad attempted to correct the interpreter when he felt he was not being interpreted correctly, but the corrections were rejected.

210. In October 2013, Mr. Jihad started to feel ill and was subsequently diagnosed with leukemia.

211. Because he is not a U.S. citizen, Mr. Jihad's social security disability support terminated in 2015, after he had been present in the U.S. for more than 7 years.

212. Following his diagnosis, Mr. Jihad moved to the Seattle area due to his ongoing chemotherapy treatments and his need to support his family. His wife and four daughters still live in Richland, Washington.

213. Mr. Jihad does odd jobs between chemotherapy treatments for his leukemia in Seattle. Currently, he is a driver for Lyft.

214. Mr. Jihad has never left the U.S. since arriving and has no criminal history.

215. There is no statutory basis for denying his naturalization application.

216. USCIS has repeatedly told Mr. Jihad that his case is pending due to security checks.

217. Upon information and belief, the FBI's visit and interrogation of Mr. Jihad about his pending naturalization application is the product of CARRP's deconfliction process and indicate that USCIS has subjected his application to CARRP or its successor "extreme vetting" program. This has delayed the adjudication of his application, despite the fact that he is statutorily eligible to naturalize.

218. As Mr. Jihad is a citizen of Iraq, one of the countries targeted in the First EO, USCIS suspended adjudication of his application for adjustment of status under the First EO.

219. Mr. Jihad has been significantly harmed by the delay in adjudication of his naturalization application. With every passing day, Mr. Jihad's health and treatment are being materially harmed by USCIS's delay. His and his family's financial prospects are also being negatively affected, creating a strain on the family. The delay has also prevented him from voting in local and national elections.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

### Sajeel Manzoor

220.    Plaintiff Sajeel Manzoor is a 40-year-old Pakistani national and lawful permanent resident of the United States who currently resides with his family in Newcastle, Washington.

221.    Mr. Manzoor came to the United States on August 16, 2001 as a non-immigrant F-1 student to study for a Master of Science in Marketing Research at the University of Texas at Arlington.

222.    In 2003, Mr. Manzoor was hired by Taylor Nelson Sofres and granted his first H-1B visa.

223.    Mr. Manzoor married his wife on May 11, 2005 in Lahore, Pakistan, and has two children with her.  Both of his children are United States citizens.

224.    On January 29, 2007, Immigration and Customs Enforcement ("ICE") agents interviewed Mr. Manzoor about his employment history, travel, and contacts inside and outside of the United States.

225.    Mr. Manzoor's H-1B visa was temporarily administratively revoked while the Compliance Enforcement Unit in the National Security Investigations Division at ICE Headquarters reviewed his file.  His visa was automatically reinstated when he was found in compliance and the case was closed on or about July 3, 2007.

226.    On October 18, 2007, Mr. Manzoor applied for adjustment of status based on a business petition.

227.    On September 18, 2010, Mr. Manzoor was granted lawful permanent resident status.

228.    On November 30, 2015, Mr. Manzoor filed his N-400 Application for Naturalization.

229.    Mr. Manzoor has not been scheduled for an interview.

230.    On December 2, 2016, the Acting Field Office Director for the Seattle Field Office confirmed that Mr. Manzoor's case is still pending background checks.

231.    On December 14, 2016, the Seattle Field Office Directory confirmed that the background checks were still pending and that Mr. Manzoor's wife's naturalization case would be held until after his application was complete.

232.    Mr. Manzoor does not have a criminal history.

233.    There is no statutory basis for denying his naturalization application.

SECOND AMENDED COMPLAINT
Page **40** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

234.     Upon information and belief, USCIS's three-year delay in adjudicating his adjustment of status and ICE's National Security Investigations Division's additional scrutiny and review indicate that USCIS has subjected Mr. Manzoor's pending naturalization application to CARRP or its successor "extreme vetting" program.  This has delayed the adjudication of his application, despite the fact that he is statutorily entitled to naturalize.

235.     Mr. Manzoor has been significantly harmed by the delay in adjudication of his naturalization application.  He has not been able to travel due to fear of not being allowed back into the country, causing him to miss his grandfather's funeral and his sister-in-law's engagement, among other important family events.  Feeling that his immigration status is in limbo and that he is being discriminated against on the basis of his national origin and religion have also caused him extreme stress and anxiety.  Additionally, the delay has prevented him from voting in local and national elections.

## CLASS ACTION ALLEGATIONS

236.     Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), Plaintiffs bring this action on behalf of themselves and all other similarly-situated individuals.  Plaintiffs do not bring claims for compensatory relief.  Instead, Plaintiffs seek injunctive relief broadly applicable to members of the Plaintiff Classes, as defined below.  The requirements for Rule 23 are met with respect to the classes defined below.

237.     Plaintiffs seek to represent the following nationwide classes:

A **Muslim Ban Class** defined as:
A national class of all persons currently and in the future (1) who are in the United States, (2) have or will have an application for an immigration benefit pending before USCIS, and (3) are a citizen or national of Syria, Iran, Yemen, Somalia, Sudan, or Libya.

An **Extreme Vetting Naturalization Class** defined as:
A national class of all persons currently and in the future (1) who have or will have an application for naturalization pending before USCIS, (2) that is subject to CARRP or a successor "extreme vetting" program, and (3) that has not been or will not be adjudicated by USCIS within six months of having been filed.

An **Extreme Vetting Adjustment of Status Class** defined as:

SECOND AMENDED COMPLAINT
Page **41** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

A national class of all persons currently and in the future (1) who have or will have an application for adjustment of status pending before USCIS, (2) that is subject to CARRP or a successor "extreme vetting" program, and (3) that has not been or will not be adjudicated by USCIS within six months of having been filed.

238.     Plaintiffs Wagafe, Ostadhassan, and Bengezi are adequate class representatives of the Muslim Ban Class.  Plaintiffs Wagafe, Jihad, and Manzoor are adequate representatives of the Extreme Vetting Naturalization Class.  Plaintiffs Ostadhassan and Bengezi are adequate representatives of the Extreme Vetting Adjustment of Status Class.

239.     The Proposed Classes are each so numerous that joinder of all members is impracticable.

240.     Although Plaintiffs do not know the total number of people from the six countries targeted in the Second EO who have *pending* immigration benefits applications at any given time, publicly available USCIS data reveals that in 2015, there were 83,147 people from those six countries who were *granted* applications for naturalization, lawful permanent residence, asylum, and refugee admission.  U.S. Department of Homeland Security, Office of Immigration Statistics, 2015 Yearbook of Immigration Statistics, *available at* https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2015.pdf (showing 31,385 people granted lawful permanent residence (table 3), 30,644 granted refugee admission (table 14), 1,731 granted asylum (table 17) and 19,387 persons naturalized (table 21) from the six countries targeted by the Second EO).

241.     Similarly, although Plaintiffs do not know the total number of people subject to CARRP or any successor "extreme vetting" program at any given time, USCIS data reveals that between Fiscal Year 2008 and Fiscal Year 2012, more than 19,000 people from twenty-one Muslim-majority countries or regions were subjected to CARRP.  Upon information and belief, between 2008 and 2016, USCIS opened 41,805 CARRP cases.

242.     This data includes individuals with pending naturalization and adjustment of status applications. For example, in March 2009, there were 1,437 adjustment of status (I-485) applications subject to CARRP that had been pending for at least six months and 1,065 naturalization (N-400) applications

SECOND AMENDED COMPLAINT
Page **42** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

subject to CARRP that had been pending for at least six months.

243.   The exact number of individuals subject to the First EO or Second EO, CARRP, or any successor "extreme vetting" program at any given time fluctuates as applications are filed and USCIS applies these policies and practices to the applications.  Moreover, members of the class reside in various locations across the country.  For these and other reasons, joinder of the members of the Classes would create substantial challenges to the efficient administration of justice.  Joinder is thus impracticable here.

244.   In addition, there are questions of law and fact common to the members of the Classes.  The Muslim Ban and Extreme Vetting Adjustment of Status Class are subject to Defendants' unauthorized suspension of immigration benefits adjudications.  All classes are subject to CARRP (or a successor "extreme vetting" program).  Accordingly, common questions of law and fact include, but are not limited to, the following:

- Whether Defendants' unauthorized suspension of immigration benefits adjudications under the Second EO violates Defendants' duty to timely adjudicate immigration benefit applications authorized by the Immigration and Nationality Act;

- Whether Defendants' unauthorized suspension of immigration benefits adjudications under the First or Second EO to Plaintiff Wagafe's, Plaintiff Ostadhassan's and Plaintiff Bengezi's applications violates the Establishment Clause of the First Amendment to the United States Constitution by not pursuing a course of neutrality with regard to different religious faiths;

- Whether Defendants' unauthorized suspension of immigration benefits adjudications under the Second EO and application of CARRP (or a successor "extreme vetting" program) to Plaintiffs' applications discriminates against Plaintiffs on the basis of their country of origin and without sufficient justification, and therefore violates the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution;

- Whether Defendants' unauthorized suspension of immigration benefits adjudications under the Second EO and application of CARRP (or a successor "extreme vetting" program) to Plaintiffs' applications is substantially motivated by animus toward—and has a disparate effect on— Muslims in violation of the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution;

- Whether Defendants' unauthorized suspension of immigration benefits adjudications under the Second EO and application of CARRP (or a successor "extreme vetting" program) to Plaintiffs' applications for immigration benefits, for which they are statutorily eligible and to which they

SECOND AMENDED COMPLAINT
Page 43 of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

are legally entitled, constitutes an arbitrary denial in violation of Plaintiffs' right to substantive due process under the Fifth Amendment to the United States Constitution;

- Whether Defendants' unauthorized suspension of immigration benefits adjudications under the Second EO and application of CARRP (or a successor "extreme vetting" program) to Plaintiffs' applications violates the INA by creating additional, non-statutory, substantive criteria that must be met prior to a grant of a naturalization or adjustment of status application;

- Whether Defendants' unauthorized suspension of immigration benefits adjudications under the Second EO and application of CARRP (or a successor "extreme vetting" program) to Plaintiffs' applications violates the APA, 5 U.S.C. § 706, as final agency action that is arbitrary and capricious, contrary to constitutional law, and in excess of statutory authority;

- Whether Defendants' application of CARRP (or a successor "extreme vetting" program) to Plaintiffs' applications constitutes a substantive rule and, as a result, Defendants violated the APA, 5 U.S.C. § 553, when they promulgated CARRP without providing a notice-and-comment period prior to implementing it;

- Whether Defendants' failure to give Plaintiffs notice of their classification under CARRP (or a successor "extreme vetting" program), a meaningful explanation of the reason for such classification, and a process by which Plaintiffs can challenge their classification violates the Due Process Clause of the Fifth Amendment to the United States Constitution; and

- Whether Defendants' application of CARRP (or a successor "extreme vetting" program) to Plaintiffs Wagafe, Jihad, and Manzoor's applications violates the Uniform Rule of Naturalization, Article I, Section 8, Clause 4 of the United States Constitution by establishing criteria for naturalization not authorized by Congress.

245.   The claims of the named Plaintiffs are typical of their respective Plaintiff Classes. Plaintiffs know of no conflict between their interests and those of the Plaintiff Classes they seek to represent. In defending their own rights, the named Plaintiffs will defend the rights of all proposed Plaintiff Class members fairly and adequately. The members of the Classes are readily ascertainable through notice and discovery.

246.   Plaintiffs are represented by counsel with particular expertise in immigration and constitutional law, and extensive experience in class action and other complex litigation.

247.   Defendants have acted or refused to act on grounds generally applicable to each member of the Plaintiff Classes by applying additional non-statutory, substantive requirements for naturalization and

SECOND AMENDED COMPLAINT
Page **44** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

adjustment of status, including CARRP (or its successor "extreme vetting" program) to their immigration applications and the First EO and/or Second EO—thus causing them to have suffered and continue to suffer injury in the form of unreasonable delays and denials of their applications.

248.   A class action is superior to other methods available for the fair and efficient adjudication of this controversy because joinder of all members of the Classes is impracticable.  Absent the relief they seek here, there would be no other way for the Plaintiff Class members to individually redress the wrongs they have suffered and will continue to suffer.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Immigration and Nationality Act and the Administrative Procedure Act

### (Plaintiffs Wagafe, Ostadhassan and Bengezi on behalf of themselves and the Muslim Ban Class)

249.   Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

250.   Section 212(f) of the Immigration and Nationality, 8 U.S.C. § 1182(f), is entitled "Suspension of Entry or Imposition of Restrictions by President."  That provision authorizes the President to suspend entries or impose restrictions on entries.  That provision does not authorize the President to suspend adjudication of immigration petitions, applications, or requests of any class of persons.

251.   Defendants have interpreted the First EO and will interpret the Second EO to authorize the suspension of immigration petitions, applications, or requests involving Plaintiff Wagafe, Plaintiff Ostadhassan, Plaintiff Bengezi, and members of the Muslim Ban Class.

252.   Accordingly, Defendants will suspend adjudication of such immigration benefits petitions, applications, or requests.

253.   Defendants' actions in suspending adjudications will violate 8 U.S.C. § 1182(f) and will be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or

SECOND AMENDED COMPLAINT
Page **45** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

limitations, or short of statutory right; and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D).

## SECOND CLAIM FOR RELIEF

### Mandamus (28 U.S.C. § 1361)

**(Plaintiffs Wagafe, Ostadhassan and Bengezi on behalf of themselves and the Muslim Ban Class)**

254.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

255.    Defendants have a duty to adjudicate all immigrant benefits petitions, applications or requests authorized by the Immigration and Nationality Act, implementing regulations, or other law.

256.    The First and Second EOs do not authorize the suspension of adjudication of immigration benefits petitions, applications, or requests.

257.    Defendants have interpreted the First EO and will interpret the Second EO to authorize the suspension of immigration benefit applications for petitions, applications, or requests involving Plaintiff Wagafe, Plaintiff Ostadhassan, Plaintiff Bengezi, and members of the Muslim Ban Class.

258.    Accordingly, Defendants will suspend adjudication of immigration benefits petitions, applications, or requests.

259.    Defendants' refusal to adjudicate immigration benefits petitions, applications, or requests will violate Defendants' statutory and constitutional duty to adjudicate these matters, and to do so in a nondiscriminatory manner.

## THIRD CLAIM FOR RELIEF

### First Amendment (Establishment Clause)

**(Plaintiffs Wagafe, Ostadhassan and Bengezi on behalf of themselves and the Muslim Ban Class)**

260.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

261.    The First EO was and Second EO is intended to target a specific religious faith—Islam.  The First EO gave preference to other religious faiths—principally Christianity—and the Second EO has that intended effect when applied to Plaintiffs and members of the Muslim Ban Class. Defendants'

SECOND AMENDED COMPLAINT
Page **46** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

application of the First EO and Second EO to Plaintiffs and members of the Plaintiff Classes violates the Establishment Clause of the First Amendment to the United States Constitution by not pursuing a course of neutrality with regard to different religious faiths.

### FOURTH CLAIM FOR RELIEF

### Fifth Amendment (Procedural Due Process)

### (All Plaintiffs on behalf of themselves and the Plaintiff Classes)

262.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

263.    Defendants' failure to give Plaintiffs and members of the Extreme Vetting Naturalization and Extreme Vetting Adjustment of Status Classes notice of their classification under CARRP (or successor "extreme vetting" program), a meaningful explanation of the reason for such classification, and any process by which Plaintiffs can challenge their classification, violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

264.    Because of these violations of their constitutional rights, Plaintiffs and members of the Plaintiff Classes have suffered and continue to suffer injury in the form of unreasonable delays and unwarranted denials of their immigration applications.

### FIFTH CLAIM FOR RELIEF

### Fifth Amendment (Substantive Due Process)

### (All Plaintiffs on behalf of themselves and the Plaintiff Classes)

265.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

266.    Defendants' unauthorized and indefinite suspension of the adjudication of Plaintiffs' and the Proposed Classes' applications for immigration benefits violates their right to substantive due process under the Fifth Amendment to the United States Constitution, because Plaintiffs cannot be denied immigration benefits for which they are statutorily eligible, and to which they are entitled by law, in an arbitrary manner.

### SIXTH CLAIM FOR RELIEF

SECOND AMENDED COMPLAINT
Page **47** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

**Fifth Amendment (Equal Protection)**

**(All Plaintiffs on behalf of themselves and the Plaintiff Classes)**

267.    Plaintiffs incorporate the allegations of the proceeding paragraphs as if fully set forth herein.

268.    Defendants' indefinite suspension of the adjudication of Plaintiffs' applications for immigration benefits on the basis of their country of origin, and without sufficient justification, violates the equal protection component of the Due Process Clause of the Fifth Amendment.

269.    Additionally, Defendants' indefinite suspension of the adjudication of Plaintiff Wagafe's, Plaintiff Ostadhassan's, Plaintiff Bengezi's, and the Muslim Ban Class' applications for immigration benefits under the First and Second EOs was and is substantially motivated by animus toward—and has a disparate effect on—Muslims, which also violates the equal protection component of the Due Process Clause of the Fifth Amendment.

270.    Applying a general law in a fashion that discriminates on the basis of religion violates Plaintiffs' and the Plaintiff Classes' rights to equal protection under the Fifth Amendment Due Process Clause.

271.    The Second EO is intended and will be applied primarily to exclude individuals on the basis of their national origin and religion.

272.    Defendants have applied the First EO and will apply the Second EO with discriminatory animus and discriminatory intent in violation of the equal protection component of the Fifth Amendment.

## SEVENTH CLAIM FOR RELIEF

**Immigration and Nationality Act and Implementing Regulations**

**(Plaintiffs on behalf of themselves and the Extreme Vetting Naturalization and**

**Extreme Vetting Adjustment of Status Classes)**

273.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

274.    To secure naturalization and adjustment of status, an applicant must satisfy certain statutorily-enumerated criteria.

275.    By its terms, CARRP creates additional, non-statutory, substantive adjudicatory criteria.

SECOND AMENDED COMPLAINT
Page **48** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

276.     Accordingly, CARRP violates 8 U.S.C. § 1427, 8 C.F.R. § 316.2, and 8 C.F.R. § 335.3, as those provisions set forth the exclusive applicable statutory and regulatory criteria for a grant of naturalization.

277.     CARRP also violates 8 U.S.C. § 1255, 8 U.S.C. § 1159, 8 C.F.R. § 245.1, and 8 C.F.R. § 209.1, as those provisions set forth the applicable statutory and regulatory criteria for individuals present in the United States to adjust their status.

278.     Because of these violations and/or because CARRP's additional, non-statutory, substantive criteria have been applied to their applications, Plaintiffs and Plaintiff Class members have suffered and will continue to suffer injury in the form of unreasonable delays and unwarranted denials of their applications for naturalization and adjustment of status.

## EIGHTH CLAIM FOR RELIEF

### Administrative Procedure Act (5 U.S.C. § 706)

### (Plaintiffs on behalf of themselves and the Extreme Vetting Naturalization and

### Extreme Vetting Adjustment of Status Classes)

279.     Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

280.     CARRP constitutes final agency action that is arbitrary and capricious because it "neither focuses on nor relates to a [noncitizen's] fitness to" obtain the immigration benefits subject to its terms. *Judulang v. Holder*, 132 S. Ct. 476, 485 (2011).

281.     CARRP is also not in accordance with law, is contrary to constitutional rights, and is in excess of statutory authority because it violates the INA and exceeds USCIS's statutory authority to implement (not create) the immigration laws, as alleged herein.

282.     As a result of these violations, Plaintiffs and members of the Proposed Extreme Vetting Naturalization and Extreme Vetting Adjustment of Status Classes have suffered and continue to suffer injury in the form of unreasonable delays and unwarranted denials of their immigration applications.

## NINTH CLAIM FOR RELIEF

### Administrative Procedure Act (Notice and Comment)

SECOND AMENDED COMPLAINT
Page 49 of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

**(Plaintiffs on behalf of themselves and the Extreme Vetting Naturalization and Extreme Vetting Adjustment of Status Classes)**

283.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

284.    The APA, 5 U.S.C. § 553, requires administrative agencies to provide a notice-and-comment period prior to implementing a substantive rule.

285.    CARRP constitutes a substantive agency rule within the meaning of 5 U.S.C. § 551(4).

286.    Defendants failed to provide a notice-and-comment period prior to the adoption of CARRP.

287.    Because CARRP is a substantive rule promulgated without the notice-and-comment period, it violates 5 U.S.C. § 553 and is therefore invalid.

288.    As a result of these violations, Plaintiffs and members of the Plaintiff Classes have suffered and continue to suffer injury in the form of unreasonable delays and unwarranted denials of their immigration applications.

## TENTH CLAIM FOR RELIEF

### "Uniform Rule of Naturalization"

**(Plaintiffs Wagafe, Jihad, and Manzoor on behalf of themselves and the Naturalization Class)**

289.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

290.    Congress has the sole power to establish criteria for naturalization, and any additional requirements not enacted by Congress are ultra vires.

291.    By its terms, CARRP creates additional, non-statutory, substantive criteria that must be met prior to a grant of a naturalization application.

292.    Accordingly, CARRP violates Article I, Section 8, Clause 4 of the United States Constitution.

293.    Because of this violation and because CARRP's additional, non-statutory, substantive criteria have been applied to their applications, Plaintiffs Wagafe, Jihad, Manzoor, and the Naturalization Plaintiff Class members have suffered and will continue to suffer injury in the form of unreasonable delays and unwarranted denials of their naturalization applications.

SECOND AMENDED COMPLAINT
Page **50** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1. Certify the case as a class action as proposed herein;

2. Appoint Plaintiffs Wagafe, Ostadhassan and Bengezi as representatives of the Muslim Ban Class;

3. Appoint Plaintiffs Wagafe, Jihad, and Manzoor as representatives of the Extreme Vetting Naturalization Class;

4. Appoint Plaintiffs Ostadhassan and Bengezi as representatives of the Extreme Vetting Adjustment of Status Class;

5. Order Defendants to adjudicate the petitions, applications, or requests of Plaintiffs and members of the proposed classes;

6. Order Defendants to adjudicate Plaintiffs' and proposed class members' petitions, applications, or requests based solely on the statutory criteria;

7. Declare Sections 2(c), 4 and 5 of the Second EO contrary to the Constitution and the INA;

8. Issue an order enjoining Defendants from applying Sections 2(c), 4 and 5 to Plaintiffs and members of the proposed classes;

9. Declare that CARRP or any successor "extreme vetting" program violates the Constitution, the INA, and the APA;

10. Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from applying CARRP or any successor "extreme vetting" program to the processing and adjudication of the immigration benefit petitions, applications, or requests of Plaintiffs and members of the proposed classes;

11. Order Defendants to rescind CARRP or any successor "extreme vetting" program because they failed to follow the process for notice and comment by the public;

SECOND AMENDED COMPLAINT
Page **51** of 55
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

12. Alternatively, order Defendants to provide Plaintiffs and members of the proposed classes with notice that they have been subjected to CARRP or any successor "extreme vetting" program, the reasons for subjecting them to CARRP or any successor "extreme vetting" program, and a reasonable opportunity to respond to those allegations before a neutral decision-maker;

13. Award Plaintiffs and other members of the proposed class reasonable attorneys' fees and costs; and

14. Grant any other relief that this Court may deem fit and proper.

Respectfully submitted this 4th day of April, 2017.

By:

s/Matt Adams

s/Glenda M. Aldana Madrid

Matt Adams, WSBA No. 28287
Glenda M. Aldana Madrid, WSBA No. 46987
**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98122
Telephone: (206) 957-8611
Facsimile: (206) 587-4025
matt@nwirp.org
glenda@nwirp.org

SECOND AMENDED COMPLAINT
Page **52** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

s/Emily Chiang

Emily Chiang, WSBA No. 50517
**ACLU of Washington Foundation**
901 Fifth Avenue, Suite 630
Seattle, WA 98164
Telephone: (206) 624-2184
Echiang@aclu-wa.org

Jennifer Pasquarella (admitted *pro hac vice*)
**ACLU Foundation of Southern California**
1313 W. 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236
Facsimile: (213) 997-5297
jpasquarella@aclusocal.org

Stacy Tolchin (admitted *pro hac vice*)
**Law Offices of Stacy Tolchin**
634 S. Spring St. Suite 500A
Los Angeles, CA  90014
Telephone: (213) 622-7450
Facsimile: (213) 622-7233
Stacy@tolchinimmigration.com

Trina Realmuto (admitted *pro hac vice*)
Kristin Macleod-Ball (admitted *pro hac vice*)
**National Immigration Project**
   **of the National Lawyers Guild**
14 Beacon St., Suite 602
Boston, MA 02108
Telephone: (617) 227-9727
Facsimile: (617) 227-5495
trina@nipnlg.org
kristin@nipnlg.org

s/Hugh Handeyside

Hugh Handeyside, WSBA No. 39792
Lee Gelernt (admitted *pro hac vice*)
Hina Shamsi (admitted *pro hac vice*)
**American Civil Liberties Union Foundation**
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2616

SECOND AMENDED COMPLAINT
Page **53** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5

Facsimile: (212) 549-2654
lgelernt@aclu.org
hhandeyside@aclu.org
hshamsi@aclu.org
s/ Harry H. Schneider, Jr.
s/ Nicholas P. Gellert
s/ Kathryn Reddy
s/ David A. Perez
s/ Laura K. Hennessey
Harry H. Schneider, Jr. #9404
Nicholas P. Gellert #18041
Kathryn Reddy #42089
David A. Perez #43959
Laura K. Hennessey #47447
Attorneys for Plaintiffs
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
Email: HSchneider@perkinscoie.com
         NGellert@perkinscoie.com
         KReddy@perkinscoie.com
         DPerez@perkinscoie.com
         LHennessey@perkinscoie.com

SECOND AMENDED COMPLAINT
Page **54** of **55**
Case No. 2:17-cv-00094-JCC

134745922.5

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

## CERTIFICATE OF SERVICE

The undersigned certifies that on the dated indicated below, I caused service of the foregoing **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** via the CM/ECF system that will automatically send notice of such filing to all counsel of record herein.

DATED this 4th day of April, 2017, at Seattle, Washington.

By: s/ David A. Perez
David A. Perez, #43959
Attorneys for Plaintiffs
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
Email:     DPerez@perkinscoie.com

SECOND AMENDED COMPLAINT
Page **55** of **55**
Case No. 2:17-cv-00094-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone (206) 957-8611

134745922.5