1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ABDIQAFAR WAGAFE, *et al.*, on
behalf of themselves and others
similarly situated,

               Plaintiffs,

    v.

DONALD TRUMP, President of the
United States, *et al.*,

               Defendants.

No. 2:17-cv-00094-RAJ

**DECLARATION OF CAROL
SOBEL IN SUPPORT OF
PLAINTIFFS' MOTION FOR
SANCTIONS**

DECLARATION OF CAROL A. SOBEL

I, CAROL A. SOBEL, declare:

1.          I am an attorney admitted to practice in the State of California.  I make this declaration in support of Plaintiffs' request for an award of attorneys' fees.  The declaration is based based on facts of which I have personal knowledge.  If I were called to testify as a witness to these facts, I could and would do so competently.

2.          I was admitted to the California Bar in December 1978, following my graduation from law school in May of 1978.  For 20 years, I was employed by the ACLU Foundation of Southern California, including approximately 12 years as its First Amendment attorney.  For the last seven years prior to my departure from the ACLU, I served as a Senior Staff Counsel.  I left the ACLU to begin a private civil rights practice in late April, 1997.  Attached at Exhibit "1" is my current resumé.

3.          My billing rate for 2018 is $990 an hour.  I settled the fees in several cases in 2017, applying my 2017 rate of $975 an hour to calculate the lodestar, including the fees in *Sch uler v. County of Orange*, 8:17-cv-00259 DOC KES (C.D. Cal. 2017).  I did not file a motion for fees in 2016.  In 2014 and 2015, several courts approved my rate of $875 an hour.  In *Desertrain v. City of Los Angeles*, 754 F.3d 1147 (9th Cir. 2014), the Circuit granted the motion for fees, approved entitlement, and referred the matter to the Appellate Commissioner to determine the final award.  The parties then settled the trial court and appellate fees together with only an approximately 5 percent reduction of the appellate lodestar.  In a second case in 2015, the Circuit panel approved the full award at $875 an hour.  See *CPR for Skid Row v. City of Los Angeles*, 779 F.3d 1098 (9th Cir. 2015).

4.          In 2012, I was paid my then full rate of $795 an hour by an insurance carrier in a non-contingency case before the Hon. Dean Pregerson of the Central District of California.  *Federal Deposit Insurance Company v. Larry B Faigin,* 2:12-cv-03448-DDP-CW (C.D. Cal. 2012).  In 2010, I was awarded fees at $725 an hour in *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011 (9th Cir.

2009), a First Amendment case.  In 2009, I was awarded fees by the Central District of California at $710 an hour in *Fitzgerald v. City of Los Angeles*, 2009 U.S. Dist. LEXIS 34803 (C.D. Cal. 2009), and in *Multi-Immigrant Worker Organizing Network ("MIWON") v. City of Los Angeles*, cv 07-7032 AHM (C.D. Cal. 2009), both police misconduct cases.  In 2008, I was awarded fees at $695 an hour in *Jones v. City of Los Angeles*, cv-03-1142 R.  *See* 444 F.3d 1118 (2006), vacated per settlement 505 F.3d 1006 (9th Cir. 2007).  The fee award was affirmed on appeal. 2014 U.S. App. LEXIS 1952 (9th Cir. Jan. 31, 2014).

5.      My practice involves complex civil rights litigation, focusing primarily in the areas of the rights of homeless persons, First Amendment rights and police practices.  I have received several awards for my legal work over the years.  In 2008, I was named a California Lawyer of the Year (CLAY) for civil rights by California Lawyer Magazine and that was also named in the Top 75 Women Litigators in California by the Daily Journal Corporation.  In 2007, I received an Angel Award from California Lawyer Magazine for pro bono work.  I also was named in 2007 by the Daily Journal as one of the Top 100 Most Influential Lawyers in California. In 2013 and again in 2017, I was named one of the top women lawyers in Los Angeles. I have been named as a Superlawyer in the area of First Amendment and civil rights litigation for more than a decade.

6.      I have been qualified twice as an expert to testify at trial on issues concerning non-profit legal practice: once before the State Bar and once in Los Angeles Superior Court.  Recently, in an appeal of a fee award, the Second Appellate District noted my qualification as an expert to opine on reasonable market rates for attorney fees.  *See Jochimsen v. County of Los Angeles*, B223518 (2d Dist. June 23, 2011) (unpublished) (approving expert basis for opinion).  My declarations and the supporting evidence of reasonable market rates have been repeatedly cited favorably by federal and state courts in awarding fees.  For example, in *Nadarajah v. Holder*, 569 F.3d 906, 912-914 (9th Cir. 2009), the Ninth Circuit referenced my declaration

3

with approval in support of the ACLU's motion for fees under the Equal Access to Justice Act ("EAJA").  In *Torrance Unified School District v. Magee*, 2008 U.S. Dist. LEXIS 95074 (CD CA 2008), granting fees pursuant to the  federal IDEA statute, 20 U.S.C. §1415(i)(3)(c), the Court cited to my declaration as persuasive evidence of market rates.  In *Atkins v. Miller*, CV 01-01574 DDP (CD CA 2007), the Central District of California awarded fees to a 1975 graduate at $675 an hour, specifically citing to my declaration and that of Barry Litt to support the requested rates. Id. at pp. 8-9 and n.4.  Additional cases in which my declarations have been cited favorably include, among others, *Charlebois v. Angels Baseball LP*, SACV 10-0853 DOC (May 30, 2012); *Orantes-Hernandez v. Holder*, 713 F.Supp.2d 29, 963-964 (C.D.Cal.2010); *Hiken v. DOD*, 2013 U.S. Dist. LEXIS 118165 (N.D. Cal. Jan. 14, 2013); *Vasquez v. Rackauckas*, 2011 U.S. Dist. LEXIS 83696 (C.D. Ca. 2011); *Rauda v. City of Los Angeles*, 2010 U.S. Dist. LEXIS 138837 (C.D. Cal. 2010);  *Dugan v. County of Los Angeles*, cv-11-08145 CAS (C.D. Cal. March 3, 2014); and *Flores v. City of Westminster*, SA-CV-11-0278 DOC (C.D. Cal. Oct. 23, 2014). The most recent decision approving rates based, in part, on my declaration is *Webb v. Officer J. Ackerman*, 13-cv-01992 PLA (C.D. Cal. January 4, 2018), Doc. 180, p.5.

7. In addition, I have litigated statutory fee issues at the appellate level in several of my cases.  Most notably, I was lead counsel before the California Supreme Court in *Tipton-Whittingham v. City of Los Angeles*, 34 Cal.4th 604 (2004), the companion case to *Graham v. Daimler-Chrysler*, 34 Cal.4th 533 (2004), establishing the continued vitality of the "catalyst" fee doctrine in California courts.  I was also lead counsel in *Jones v. City of Los Angeles*, 555 Fed.Appx. 659 (2014), establishing entitlement to fees as a "prevailing party" based on the Ninth Circuit's necessary approval of a settlement that was conditioned on vacatur of the panel decision.

8. I have been asked to submit this declaration to attest to the

1  reasonableness of the fee rates requested by the counsel in this case. I am not

2  being compensated for my time in this matter.

3       9.      To prepare my declaration, I communicated with several of the

4  non-profit and civil rights attorneys involved in this litigation, including the

5  attorneys at the ACLU of Southern California and Stacy Tolchin.  I am familiar

6  with the qualifications, skills, experience and reputation of these attorneys.  I have

7  known Ms. Pasquarella since she began at the ACLU.  I have known Ms. Tolchin

8  since she joined her prior law firm in 2001, when I was co-counseling a case with

9  the firm.  I am also familiar with Matt Adams from his involvement in other

10  national litigation with the ACLU.  I reviewed background information available

11  on their respective organizational websites about the attorneys with the American

12  Immigration Council and the ACLU National Security Project to assess their

13  qualifications.  In my opinion, all are highly skilled in complex immigration law

14  and federal civil rights litigation and bring their extensive knowledge and skill in

15  this area to the litigation.

16       10.     I am informed that the following EAJA enhanced rates are being

17  sought in this case:

18

| Attorney | Firm | Graduation | 2018 | 2017 |
|----------|------|------------|------|------|
| Trina Realmuto | Am. Immig. Council | 1997 | $815.62 | $779.74 |
| Matt Adams | NW Immig. Rights | 1998 | $815.62 | $779.74 |
| Stacy Tolchin | Tolchin Immig. | 2001 | $676.85 | $646.64 |
| Jennifer Pasquarella | ACLU SoCal | 2006 | $676.85 | $646.64 |
| Hugh Handeyside | ACLU Nat.Sec.Proj | 2007 | $676.85 | $646.64 |
| Sameer Ahmed | ACLU SoCal | 2009 | $600.38 | $573.95 |
| Kristin Macleod-Ball | Am. Immig. Council | 2012 | $415.36 | $397.42 |

26       11.     It is my opinion that the rates sought are reasonable for these

27  attorneys. I have extensive experience with the methodology applied to set

28  appropriate market rates for public interest and civil rights attorneys who do not

have paying clients.   During the time that I was at the ACLU of Southern California, I prepared numerous fee motions under federal and state fee-shifting statutes for cases in which the ACLU represented the prevailing party.   I was responsible for preparing these motions in cases in which I was directly involved in the underlying litigation, as well as in cases brought by other staff attorneys and volunteer counsel for the ACLU.

12.   In this role, I obtained information on market rates through a variety of sources that I continue to use to evaluate reasonable rates each year. I review current billing rates and fees sought by, and awarded to, attorneys at large, commercial law firms to establish rates for individuals of comparable experience at public interest and civil rights firms.   The attorneys at large commercial firms handle similarly complex federal litigation and, in many instances, they are also familiar with the experience levels of various non-profit attorneys because they co-counsel cases with the public interest bar.

13.   I use rates at large firms to establish market rates for civil rights lawyers based on my understanding that billing rates by lawyers at civil rights firms and public interest organizations at rates even marginally comparable to those of attorneys who do other types of complex litigation is consistent with the decision of the U.S. Supreme Court in *Blum v. Stenson*, 465 U.S. 886, 895 (1984) ("The statute and legislative history establish that 'reasonable fees' under [42 U.S.C.] § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel").   *See also, Nadarajah v Holder,* 569 F3d at 910.

14.   To analyze reasonable market rates, I apply several additional principles.   First, when available, I look to rates awarded to the same attorneys in previous cases because I understand that such awards are strong evidence of reasonable market rates.   *See Chaudhry v. City of Los Angeles*, 751 F3d 1096, 1111 (9th Cir. 2014); *U.S. v. $28,000 in U.S. Currency*, 802 F.3d 1100, 1106 (9th

Cir. 2015); *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 976 (9th Cir. 2008). Next, I look to evidence of billing rates by attorneys engaged in similarly complex business litigation as an approved method of establishing reasonable market rates for civil rights attorneys who do not regularly bill clients on an hourly basis. This approach, approved in *Blum*, *supra*, recognizes that most civil rights attorneys take cases on a contingency basis and are not paid hourly for their services. Third, I apply the rule that the relative "simplicity" or "complexity" of a case is reflected in the efficiency of hours, not the lodestar rate of the attorney. *See Van Skike v Director, Office of Workers' Compensation Programs,* 557 F3d 1041, 1046 (9th Cir. 2009).

15.     I estimate that I review more than 100 fee motions, fee awards, and supporting declarations in the course of a year. My practice is to obtain this information from court orders in the past year awarding statutory fees or awarding fees as a discovery sanction. In addition, I subscribe to several websites that report legal news. If I read about a case where there is likely to have been a fee motion, I review the relevant court docket and obtain a copy of any fee motion, supporting declarations and fee award from public sources, including documents on PACER and state court websites.

16.     My opinion concerning the reasonableness of the rates sought in this instance is based on the fee awards described below and attached to my declaration, as well as the other documents submitted with my declaration and the rate information submitted by attorneys at co-counsel Perkins Coie.

17.     Attached at Exhibit 2 is the decision awarding EAJA fees in the district court to attorneys in *Xue Lu v. United States of America*, 638 Fed.Appx. 614 (9th Cir. 2016).   The district court approved a 2016 enhanced EAJA rate of $760 an hour for Michael Seplow. Case No. 01-cv-01758 CBM (CD CA Nov. 10, 2016), Doc. 366, p.10.

18.     Mr. Seplow is a partner in Schonbrun, Seplow, Harris & Hoffman.

I frequently co-counsel cases with this firm.  Mr. Hoffman was the legal director of the ACLU when I was a staff attorney there.  I know all of the members of the firm personally and provided a supporting fee declaration in *Xue Lu* for the original fee motion filed in 2013 and the post-appeal motion filed in 2016.  Based on my personal knowledge, I understand that Mr. Seplow is a 1990 law graduate. At the time of this award two years ago, he had 16 years of experience: 5 years less than Trina Realmuto, 4 years less than Matt Adams, and the same experience as Stacy Tolchin has now. The rate requested for Ms. Realmuto and Mr. Adams is approximately $20 below the rate approved for Mr. Seplow in 2016.  The rate sought for Stacy Tolchin is $115 below the 2016 rate approved for Mr. Seplow.

19.     In *Xue Lu*, the court also approved fees for Raya Marinova.  Based on my review of Ms. Marinova's credentials in the past, I understand she is a 2012 law graduate.  The 2016 rate approved for her is $420 an hour. Ex. 2, p.10. In 2016, Ms. Marinova had one year less experience than Kristin Macleod-Ball has now.  Ms. Macleod-Ball seeks a rate that is just slightly below the 2016 rate approved for the 2012 law graduate in *Xue Lu*.

20.     Attached at Exhibit 3 is the recent decision in *Webb v. Officer J. Ackerman*, 13-cv-09112-PLA (C.D. Cal. Jan. 4, 2018), Document 180.  In *Webb*, the Court approved the 2017 rate of $650 an hour for Elliot Tiomkin, a 2006 law graduate.  I provided a supporting fee declaration for Mr. Tiomkin, as noted in the court's opinion at p.5.  In my view, based on my professional interaction with Ms. Pasquarella and my discussions with Mr. Tiomkin and review of his credentials, Ms. Pasquarella is more skilled and experienced.  She seeks a 2017 rate that is just slightly below the rate approved for Mr. Tiomkin.  Her requested 2018 rate is only $26 above the 2017 rate approved for Mr. Tiomkin.

21.     Attached at Exhibit 4 is a true and correct copy of the Order approving EAJA fees for the ACLU of Southern California and other attorneys in *Franco-Gonzalez v. Holder*, 10-cv-02211 DMG (C.D. Cal. Oct. 8, 2015), Doc.

866.    I provided a declaration in support of the ACLU's fee motion in the case. The rates for each attorney are set out in my declaration, a true and correct copy of which is attached at Exhibit 5.  As set forth in the Court's Order, the fees were settled with a discount of slightly more than 10 percent of the hours on a total demand of approximately $11 million.

22.    In *Franco-Gonzalez*, the Court approved EAJA fees at the 2015 rate of $760 an hour for Judy London at Public Counsel.  Ex. 5, p. 5.  I know Ms. London personally and am aware that she is a classmate of Michael Seplow, the attorney  to whom EAJA fees were awarded in *Xue Lu* at the 2016 rate of $760, the same rate Ms. London received for 2015.

23.    Matt Adams was one of the attorneys to whom fees were awarded in *Franco-Gonzalez*.  His 2015 approved EAJA rate was $710 an hour.  Ex. 5, p.6. In addition, Plaintiff's motion set out the following EAJA rates for other attorneys involved in the case: Victoria Lopez, an attorney with the ACLU of Arizona, was approved at the 2015 rate of $640 an hour. Ex. 5, p.6.  Ms. Lopez graduated in 2001, the same year as Ms. Tolchin.  Her 2015 rate is $6.64 lower than Ms. Tolchin's requested 2017 rate and approximately $37 higher than Ms. Tolchin's requested 2018 enhanced EAJA rate, which amounts to an annual increase of less than 2 percent.  In my experience, this rate of increase is well below the actual increase in rates over the past three years.  In my own practice, my rate has increased by an average of 4.4 percent annually over three years.

24.    The 2015 EAJA rate in *Franco* for a 2006 and 2007 law graduate was $535. Ex. 5, p.6.  There were no attorneys in *Franco* with comparable experience to Ms. Pasquarella and Mr. Handeyside, who seek a 2018 rate of $676.85. The more apt comparison would be with the 2015 rate of Victoria Lopez, who had two years additional experience at the time than does Ms. Pasquarella now.  Ms. Lopez applied a rate of $640 an hour, which is almost identical to the 2017 rate for the 2006 and 2007 graduate in this case, and just $36 lower than the 2018 rate

for Ms. Pasquarella and Mr. Handeyside.

25.   In the same fee motion in *Franco*, the private firm received fees for 2007 law graduates at their customary billing rate of $865 an hour, approximately 60 percent above the EAJA rates for the public interest attorneys.  Ex. 5, p.6.

26.   The rate of $600 an hour, now sought for Sameer Ahmed, a 2009 law graduate, is comparable to the rate of $535 an hour sought for attorneys with eight years experience three years ago in *Franco*.  Mr. Ahmed has one additional year of experience, in addition to increase in base rates over three years.  The our years difference results in an increase of approximately 2.5 annually averaged over the four years of additional experience.  Mr. Ahmed's requested rate is approximately 30 percent below rates for comparably skilled attorneys at the commercial firm that served as co-counsel in *Franco*.  Ex. 5, p.6.

27.   Attached at Exhibit 6 is the fee award in *Nozzi v. Housing Authority of the City of Los Angeles*, Case No. 07-cv-00380-PA-FFM (C.D. Cal. Feb. 2, 2018), Doc. 331.  Because the Court does not discuss the individual rates sought in approving the request in full on a lodestar cross-check, attached at Exhibit 7 is the underlying declaration of counsel filed in 2017, setting out the individual rates and experience of each attorney.  I know each of the attorneys for whom fees were sought in *Nozzi*.  Mssrs. Litt, Estaur and Ms. Brown and I have co-counseled cases in the past and Mr. Litt and I are currently co-counsel on a class-action civil rights case pending in the Central District of California.

28.   In *Nozzi,* the 2017 rate applied for Stacy Brown, a 2006 law graduate, is $600 an hour.  Ex. 7, p. 19.  Ms. Brown had one year less experience in 2017 than Ms. Pasquarella and the same length of experience as Mr. Handeyside has now.  Based on my professional interactions with both Ms. Brown and Ms. Pasquarella, it is my opinion that Ms. Pasquarella is considerably more skilled and enjoys a reputation in the legal community as a highly experienced attorney.  The same is true of Mr. Handeyside as compared to Ms. Brown.

29.    The 2017 rate sought for Paul Hughes, then with 9 years experience, was $730 an hour.  Ex. 7, p.28.  Mr. Hughes and I are both on the Board of Directors of the National Police Accountability Project.  He is a partner in the appellate and Supreme Court practice at Mayer Brown.  It is my opinion that attorney Sameer Ahmed has comparable skill and experience.  Both are graduates of Yale Law School with federal appellate clerkships.

30.    Attached at Exhibit 8 is a set of charts with 2018 and 2017 rates for the attorneys identified in paragraph 7.  The first table sets out what I believe is the reasonable lodestar rate for each attorney in the Los Angeles legal market. Because many of the attorneys included in this motion are in the Central District of California, I began by setting out their market rates in Los Angeles. Although this motion is being filed in the Western District of Washington, the attorneys for whom fees are sought are among the most skilled immigration and civil rights attorneys in the country in my opinion, justifying the use of their home base district rates, even if they are slightly higher than the rates in the market where the case was litigated.

31.    I also included the attorneys in Boston, Washington D.C. and Seattle in this assessment. In the course of preparing fee declarations, I review national rate surveys, including the survey published annually by the National Law Journal.  Based on these rates surveys, it is my opinion that the rates in Los Angeles, Boston, and Washington D.C. are all very close.  I included Matt Adams in the same analysis because of his exceptional skill and experience in complex immigration cases.

32.    The second table in Exhibit 8 applies the rates in the Kavanaugh Laffey Matrix.  A true and correct copy of the Kavanuagh Laffey Matrix, downloaded from the website:http://laffeymatrix.com/expert.html, is attached at Exhibit 9.  It is not my practice to use any version of the Laffey Matrix because it does not sufficiently differentiate rates based on experience.  Specifically, all

versions of the Matrix set rates by groups of years and a cap at 20 years of experience. Because of the years of experience Plaintiffs' counsel have in this instance, this limitation in the Laffey analysis is minimized in this case because most of the attorneys are at the bottom of their respective category.

33. In forming my opinion on the reasonableness of the rates, I considered that the Ninth Circuit has held that the Laffey Matrix, based on Washington, D.C. rates, does not reflect local market rates in the Ninth Circuit. *See Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010) ("[J]ust because the Laffey matrix has been accepted in the District of Columbia does not mean that it is a sound basis for determining rates elsewhere, let alone in a legal market 3,000 miles away."). As Exhibit 8 demonstrates, however, the Los Angeles lodestar rates are generally consistent with the rates set out in the Kavanaugh Laffey Matrix in this instance. The rates are also comparable to the discounted pro bono rates applied by the co-counsel at Perkins Coie.

34. The third table in Exhibit 8 applies the federal Locality Pay differential to the rates in the Kavanaugh Matrix. I reviewed and downloaded the relevant cities federal Locality Pay rates from the website: https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2018/general-schedule. I reduced the rates in Table 2 by 5.6%, which is the difference between the rates for Seattle and Los Angeles. Therefore, the rates being used by counsel in this case are the Kavanaugh Laffey Matrix rates discounted for the Seattle legal market. Based on the foregoing and the attached exhibits, it is my opinion that the rates sought by this motion are reasonable rates of compensation.

I declare that the foregoing is true and correct. Executed this 27th day of March, 2018, at Los Angeles, California.

CAROL A. SOBEL

12

1

2

**CERTIFICATE OF SERVICE**

3

The undersigned certifies that on the dated indicated below, I caused service of the

4

foregoing DECLARATION OF CAROL SOBEL IN SUPPORT OF PLAINTIFFS' MOTION

5

FOR SANCTIONS via the CM/ECF system that will automatically send notice of such filing to

6

all counsel of record herein.

7

DATED this 29th day of March, 2018, at Seattle, Washington.

8

9                                    By: s/ *Laura K. Hennessey*
                                     Laura K. Hennessey, #47447
10                                   Attorneys for Plaintiffs
                                     **Perkins Coie LLP**
11                                   1201 Third Avenue, Suite 4900
                                     Seattle, WA  98101-3099
12                                   Telephone:  206.359.8000
                                     Facsimile:  206.359.9000
13                                   Email: LHennessey@perkinscoie.com

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE
(No. 17-cv-00094 RAJ) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.35.8000
Fax:  206.359.9000

# EXHIBIT 1

# CAROL A. SOBEL

725 Arizona Avenue• Suite 300 • Santa Monica, CA 90401 •
Tel. 310 393-3055 • Email carolsobellaw@gmail.com

## Employment:

| | |
|---|---|
| LAW OFFICE OF CAROL A. SOBEL | APRIL, 1997 TO PRESENT |

Solo civil rights law firm.

| | |
|---|---|
| SENIOR STAFF COUNSEL | 1990 TO APRIL, 1997 |

*ACLU Foundation of Southern California*

Responsible for conducting civil rights and civil liberties litigation in state and federal courts in California; supervise litigation by ACLU volunteer counsel and other ACLU legal staff.

| | |
|---|---|
| STAFF ATTORNEY | 1985 TO 1990 |

*ACLU Foundation of Southern Califonia*

Civil liberties litigation, primarily in the areas of Establishment Clause and Free Exercise violations, as well as other First Amendment rights.

| | |
|---|---|
| ASSOCIATE DIRECTOR | 1979 TO 1985 |

*ACLU Foundation of Southern California*
*American Civil Liberties Union of Southern California*

Under the direction of the Executive Director, responsible for administration of two non-profit organizations, including working with Boards of Directors on development of policy on civil liberties issues. Engaged in litigation and assisted Legal Director in coordination and supervision of pro bono attorneys.

| | |
|---|---|
| DEVELOPMENT DIRECTOR | 1977 TO 1979 |

*ACLU Foundation of Southern California*
*American Civil Liberties Union of Southern California*

Responsible for conducting a variety of fundraising efforts to meet a million-dollar plus annual budget for a 501(c)(3) and a 501(c)(4).

## Admitted to Practice:

| | |
|---|---|
| California Supreme Court | No vember, 1978 |
| United States Supreme Court | Sep tember, 1991 |
| Ninth Circuit Court of Appeals | August, 1986 |
| U.S.D.C. Central District of California | February, 1986 |
| U.S.D.C.  Eastern District of California | June, 1990 |

## Litigation Experience:

### Federal courts:   (Partial listing of published opinions and significant cases)

*CPR for SKID ROW,*
779 F.3d 1098 (9th Cir. 2015)
Partial reversal of summary judgment in favor of the Defendant and holding that California Penal Code §403 could not lawfully be applied to criminalize the expressive activity of the Plaintiffs for protesting on Skid Row.
(Lead counsel and argued on appeal)

*Desertrain v. City of Los Angeles*
754 F.3d 1114 (9th Cir. 2014)
Reversal of summary judgment in favor of the Defendants and holding that Los Angeles Municipal Code §85.02, prohibiting parking a vehicle on public streets or parking lots any time of day or night if a person "lives" in the vehicle, is unconstitutionally vague.
(Lead counsel and argued on appeal)

*Lavan v. City of Los Angeles*
693 F.3d 1022 (9th Cir. 2012), *affirming* grant of preliminary injunction 797 F.Supp.2d 1005 (C.D. Cal. 2011)
Preliminary injunction barring City from confiscating and immediately destroying the property of homeless individuals on Los Angeles' Skid Row.
(Lead Counsel)

*Long Beach Area Peace Network v. City of Long Beach*
522 F.3d 1010 (9th Cir. 2008), as amended July 24, 2009
Upholding and reversing in part on appeal a decision of the district court granting Plaintiffs' request for a preliminary injunction to enjoin a municipal parade ordinance that included vague permit standards setting, *inter alia,* advance-notice requirements police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.
(Lead counsel)

*Fitzgerald v. City of Los Angeles*
485 F.Supp.2d 1137 (CD CA 2008)
Extending injunction against police sweeps of homeless persons on Los Angeles' Skid Row on the grounds of searching for parole and probation violations.  See below for discussion of permanent injunction in 2003.
(Co-Counsel)

*Multi-Ethnic Immigrant Worker Organizing Network (MIWON) v. City of Los Angeles*
246 F.R.D. 621 (C.D. Cal. 2007)
Order granting class certification in challenge to police assault on a lawful assembly of immigrant rights supporters by the Los Angeles Police Department on May Day, 2007.
(Class Co-Counsel)

*Edward Jones, et al., v. City of Los Angeles*,
444 F.3d 1118 (9th Cir. 2006), vacated pursuant to settlement 505 F.3d 1006 (2007)
Challenge to City of Los Angeles Municipal Code §41.18(d), prohibiting sitting, lying or sleeping on any street or sidewalk anywhere in the City at any time of day or night.  Plaintiffs, all of whom are homeless persons, brought an 8th Amendment as-applied challenge to their arrests and citations for violating the ordinance when their was no available adequate shelter.
(Co-counsel)

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*
316 F.3d 1059 (9thCir. 2003)
Challenge by City of Los Angeles to interim fee award granting plaintiffs' fees as "catalysts" under state civil rights fee shifting statutes.  Following oral argument, the Ninth Circuit certified issue of continued availability of "catalyst" fees under California law after adverse decision by the United States Supreme Court rejecting catalyst fee doctrine under federal law absent express legislative authorization.  Certified for hearing before the California Supreme Court and ultimately upheld the catalyst fee doctrine under California law.
(Co-counsel; argued in Ninth Circuit)

*Fitzgerald v. City of Los Angeles*
2003 U.S. Dist. LEXIS 27382 (CD CA 2003)
Permanent injunction enjoining Fourth Amendment violations by the Los Angeles Police Department (LAPD).  The injunction prevents the LAPD  from engaging in stops of homeless persons for parole and probation sweeps on Skid Row without reasonable suspicion to believe that specific individuals are on parole or probation and subject to a search condition, or that the individual has engaged in, or is about to commit a crime.
(Lead counsel)

*Khademi v. South Orange County Community College District*
194 F.Supp.2d 1011 (C.D. CA 2002)
First Amendment facial challenge invalidating college policy  regulating time, place and manner of student speech on campus.
(Lead counsel)

*Mardi Gras of San Luis Obispo v. City of San Luis Obispo*
189 F. Supp.2d 1018 (C.D. Cal. 2002)
Preliminary injunction to enjoin a municipal parade ordinance that required lengthy advance-notice requirement and permitted high insurance and police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.

*Bauer v. Sampson*
261 F.3d 775 (9th Cir. 2001)
First Amendment challenge to disciplinary action against college professor for publication of an alternative newsletter criticizing elected and appointed public officials and disclosing wrongdoing by college officials and personnel. The college sought to discipline the professor for violating the district's policies on discrimination and work-place violence. The polices were declared unconstitutional as applied to the professor's speech.

*H.C. v. Koppel*
203 F.3d 610 (9th Cir. 2000)
Dismissal of federal civil rights action filed in federal court against state court judge and appointed counsel for minor in family law matter. Circuit held that Younger Abstention applied and non-custodial parent had adequate state court remedy.

*Justin v. City of Los Angeles*
2000 U.S. Dist. LEXIS (CD Cal. 2000)
Class action to enjoin police sweeps of homeless population on Los Angeles' Skid Row. Permanent injunction stipulated to in settlement following certification of the injunctive relief class.
(Lead counsel)

*Los Angeles Alliance for Survival, et al. v. City of Los Angeles*
987 F. Supp. 819 (1997); 157 F.3d 1162 (9th Cir. 1998); on certification to the California Supreme Court, 22 Cal.4th 352 (2000); 224 F.3d 1076 (9th Cir. 2000)
Injunction issued in challenge to municipal ordinance barring so-called "aggressive solicitation" in broad areas of traditional public fora. Preliminary injunction entered by district court based on California Constitution. On appeal, the Ninth Circuit certified the California Constitution question to the California Supreme Court. Following decision by the California Supreme Court, the Ninth Circuit upheld the original injunction.
(Co-counsel)

*Service Employees International Union 660 v. City of Los Angeles*
114 F. Supp.2d 966 (C.D. Cal. 2000)
Challenge to the "no-protest zone" at the Democratic National Convention in Los Angeles in 2000, as well as a preliminary injunction to enjoin the City of Los Angeles parade ordinance.
(Co-counsel)

*United States v. Wunsch*
54 F.3d 579 (9th Cir. 1995); 84 F.3d 1110 (9th Cir. 1996) (reargument)
First Amendment challenge to discipline of male attorney for "gender bias" in sending note to female Asst. U.S. Attorney after she successfully moved to disqualify him as defense counsel in a criminal case. Ninth Circuit invalidated the penalty and declared unconstitutional California's "offensive personality" regulation on attorneys' professional conduct. (Argued and briefed on appeal).

*American Jewish Congress v. City of Beverly Hills*
65 F.3d 1539 (9th Cir. 1995); 90 F.3d 379 (9th Cir. 1996) (en banc)
First Amendment challenge to display of a religious symbol on public property and to permit scheme for expressive activities in public fora in the City of Beverly Hills. The en banc panel held the permit scheme unconstitutional and found that a preference had occurred for the display of a particular religious symbol. The en banc decision was unanimous. (Argued and briefed on appeal)

*Baca v. Moreno Valley Unified School District*
936 F. Supp. 719 (C.D. Cal. 1996)
First Amendment challenge to school board regulations preventing speakers from making disparaging remarks about public employees during public board meetings.

*Wallin v. City of Los Angeles*,
1194 U.S. App. LEXIS 2343 (9th Cir. 2004)

Circuit dismissed appeal of defendant City and law enforcement officers from denial of qualified immunity. Appellee, a female officer with the Los Angeles Police Department, alleged that appellants violated her right to equal protection, due process and right to petition the government because they violated LAPD confidentiality regulations and delayed the investigation into her allegations of co-worker rape.

(Lead counsel)

*National Abortion Federation v. Operation Rescue*
8 F.3d 680 (9th Cir. 1993)
Class-action state-wide injunction against blockades of women's health care clinics by anti-abortion activists. First case decided under the "frustrate and hinder" clause of 42 U.S.C. § 1985(3), the 1871 Ku Klux Klan Act. Appeals court held cause of action under "frustrate and hinder" clause was properly plead and reversed 12(b)(6) ruling on that claim.

(Co-lead counsel throughout; argued on appeal)

*Hewitt v. Joyner*

940 F.2d 1561 (9th Cir. 1991)

Establishment Clause challenge to Christian  theme park, Desert Christ Park, owned and operated by San Bernardino County.  Ninth Circuit held County ownership and operation of the park violated the Establishment Clause.

(Lead counsel throughout litigation; argued on appeal).

*Standing Deer v. Carlson*

831 F.2d 1525 (9ᵗʰ Cir. 1986)

First Amendment challenge for Native Americans at Lompoc Federal Penitentiary to regulation barring religious headbands in the dining facilities for purported health reasons.

(Argued and briefed on appeal)

*Burbridge v. Sampson*

74 F.Supp.2d 940 (C.D. Ca. 1999)

First Amendment challenge to community college policy regulating student speech in public fora on campus. Court issued a preliminary injunction, declaring the college's speech regulations unconstitutional.

*Rubin v. City of Santa Monica*

823 F.Supp. 709 (C.D. Ca. 1993)

First Amendment challenge to city permit scheme limiting access to public parks for protected expressive activities.  Court issued a preliminary injunction and declared the permit scheme unconstitutionally on vagueness grounds and procedural due process grounds.  (Lead counsel)

# State Court

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*

34 Cal.4th 604 (2002)

California continues to recognize "catalyst" fee awards to prevailing parties under the private attorney-general statute (Cal. Code  of  Civ. Proc. §1021.5) and Fair Employment and Housing Act (FEHA) despite change in federal civil rights fee-shifting law.  Under California law, there is no requirement of a judicial determination establishing a change in the legal obligations of the parties.

(Co-counsel and argued at California Supreme Court)

*Los Angeles Alliance for Survival v. City of Los Angeles*

22 Cal.4th 352 (2000)

Ordinance restricting certain activity as "aggressive solicitation" was not content-based under California Constitution

(co-counsel)

*Williams v. Garcetti*

5 Cal.4th 561 (1993), *sub nom Williams v. Reiner*, 13 Cal.App.4th 392 (1991)

Challenge on due process grounds to portion of STEPP law which imposed a criminal penalty  on parents of minor children engaged in or at risk of delinquent conduct.

(Argued and brief on appeal to California Supreme Court)

*Sands v. Morongo Unified School District*

53 Cal.3d 863 , *cert denied*, 112 U.S. 3026 (1991)

225 Cal.App.3d 1385 (1989)

Establishment Clause challenge invalidating prayers at public high-school graduations.

(Argued and briefed as lead counsel throughout litigation)

*Walker v. Superior Court of Sacramento*

47 Cal.3d 112 (1988)

Establishment Clause/Free Exercise/Due Process challenge to criminal prosecution of Christian Science parents for death resulting from use of prayer instead of traditional medicine in treatment of ill child.  (Wrote amicus brief on due process issues).

*Irvine Valley College Academic Senate, et al. v. South Orange County Community College District*

129 Cal.App.4th 1482 (2005)

Statutory construction of plain language of Education Code §87360, bolstered by legislative intent, requires actual joint agreement and mutual development of revisions to faculty hiring policies.

(co-counsel, drafted final briefs on appeal)

*Fashion 21, et al. v. Coalition for Humane Immigrant Rights (CHIRLA), et al.*

111 Cal.App.4th 1128 (2004)

Special motion to strike defamation complaint by retainer against garment worker advocates must be granted as the plaintiff retailer could not establish a probability of prevailing on the merits of their claims.  Garment worker advocates properly relied on draft labor commission regulations suggesting retailer could be liable for sweatshop conditions of manufacturing of its retail goods.

(lead counsel at all stages)

*Gonzalez v. Superior Court*

33 Cal.App.4th 1539 (1995)

Challenge to discovery order in sexual harassment case requiring plaintiff to disclose name of confidential informant who provided her with photographic evidence of harassment.  "After-acquired evidence" rule applied to require disclosure.

(Lead counsel in trial court and appeal)

*Lantz. v. Superior Court of Kern County*

28 Cal.App.4th 1839 (1994)

Privacy rights challenge to interpretation of Consumer Personnel Records Statute (CCP $\S$ 1985(3), requiring strict adherence to statutory procedures and limiting exemption of local government agencies from adhering to statutory requirements.

(Lead counsel throughout litigation)

*Rudnick v. McMillan*

25 Cal.App.4th 1183 (1994)

Defamation verdict involving public figure plaintiff and local environmentalist author of letter to editor overturned on basis that letter was protected opinion and public figure subject to constitutional malice proof burden.  Wrote amicus brief which formed basis of appellate ruling.

*Westside Sane/Freeze v. Hahn*

224 Cal.App.3d 546 (1990)

Challenge to restrictions on First Amendment petition activities in shopping center.

(Co-counsel, co-wrote appeal)

*City of Glendale v. Robert George*

208 Cal.App.3d 1394 (1989)

Reversal of trial court order imposing prior restraints on speech of "Presidential Santa" on the basis that he constituted a public nuisance to his neighbors in a residential area.

(Argued and briefed on appeal)

*McCarthy v. Fletcher*

207 Cal.App.3d 130 (1989)

Challenge to removal of textbooks from school reading list based on community-based religious objections. Court of Appeal reversed summary judgment decision, holding that there was sufficient evidence of constitutionally impermissible factors in evaluation of appropriateness of class-room reading materials.

(Argued and brief on appeal)

*Fiske v. Gillespie*

200 Cal.App.3d 130 (1988)

Challenge to sex-based actuarial presumptions in insurance industry rate for particular types of life insurance and annuity benefits.

(Co-Counsel, Argued on appeal)


# Publications:
# (Partial listing)s

*Catalyst Fees After Buckhannon*

Civil Rights Litigation and Attorney Fees Annual Handbook

(January 2006)

*Free Speech and Harassment: An Overview*
*in the Public Employee Sector*

CPER: CALIFORNIA PUBLIC EMPLOYEE RELATIONS

Institute of Industrial Relations - UC Berkeley

June 1999  No. 136

*Defeating Employer Defenses to Supervisor Liability*
*After* Ellerth *and* Faragher

ADVOCATE, October 1998

*Student Expression Under California Law*

UCLA Journal of Education

Volume 3, pp. 127-137 (1989)

*Should Attorneys Be Disciplined For Gender Bias*

Point/Counterpoint ABA Journal   August, 1995

*Fight Illegal Police Practices in State Court*

Los Angeles Daily Journal

March 6, 1992

*Judicial Oversight Limited by Supreme Court*

Los Angeles Daily Journal

May 6, 1991

*Jury Nullification is Conscience of Community*

Los Angeles Daily Journal

August 31, 1990

*A Basic Right Merits Shield From The Mob*

Los Angeles Times

August 11, 1991 p.M5

*Prop 115 revisited: Police charged with crimes*
*deserve fair trials too*
Los Angeles Daily News
May 7, 1991

*Prayer Doesn't Belong at Graduation*
USA Today
May 15, 1991 p. A10

*Killea Tactic Can Only Hurt the Church in the Long Run*
Los Angeles Times (San Diego)
November 20, 1989 p.B7

*The Fifth is a Shield for All*
Los Angeles Times
August 6, 1988    II8
(authored for Exec. Dir. ACLU)

*Which Way Will Rehnquist Court Turn?*
Los Angeles Daily News
June 18, 1986 p.21

*Constitution Exacts Cost for Religious Freedom*
Los Angeles Daily News
June 8, 1986 FOCUS   p.3

## Education:

| | |
|---|---|
| Peoples College of Law | J.D.  May, 1978 |
| Douglass College.For Women, Rutgers University | B.A .  June, 1968 |

## Professional and
## Community Activities:

| | |
|---|---|
| Adjunct Professor - Loyola Law School<br>Civil Rights Advocacy Practicum | 2007-present |
| Blue Ribbon Panel on LAPD Rampart Inquiry, Member | 2004-2006 |
| Ninth Circuit Gender Bias Task Force<br>Convenor, Advisory Committee on Employment Law | 1992-1993 |
| Ninth Circuit Conference on "Ethnicity, Race, and Religion in the Ninth Circuit"<br>Member, Working Subcommittee | 1993 |
| Los Angeles Public Interest Law Journal<br>Advisory Board | 2007-present |

| | |
|---|---|
| Los Angeles Center for Law and Community Action<br>Member, Board of Directors | 2015-present |
| National Police Accountability Project<br>Member, Advisory Board and Board of Directors | 2006-present |
| National Lawyers Guild, Los Angeles - President | 2001-2008 |
| National Lawyers Guild - National Executive Vice President | 2009-2011 |
| National Lawyers Guild Far West Regional Vice-President | 2003-2005 |
| National Lawyers Guild, National Executive Committee | 2003-2012 |
| NLG National Mass Defense Committee, Co-chair | 2003-2012 |
| Women Lawyers Association of Los Angeles<br>Member, ProChoice Committee | 1985-2002 |
| The California Anti-SLAPP Project<br>Member, Board of Directors | 1995-2010 |

## Awards:
## (Partial listing)

| | |
|---|---|
| PEN Freedom to Write Award | 1991 |
| American Jewish Congress Tzedek Award | 1992 |
| Planned Parenthood Los Angeles, Distinguished Service Award | 1990 |
| Freethought Heroine Award | 1992 |
| National Lawyers Guild - Los Angeles | 1999 |
| ACLU of Southern California Pro Bono Attorney Award | 2001 |
| Asian Pacific American Legal Center Pro Bono Award | 2003 |
| California Lawyer: Super Lawyer -Civil Rights/Constitutional Law | 2004-2014 |
| ACLU of Southern California Freedom of Expression Award | 2007 |
| Daily Journal Top 100 Most Influential Lawyers in California | 2007 |

National Lawyers Guild - Ernie Goodman Award                                         2007

Angel Award - California Lawyer Magazine Award for pro bono work                     2007

CLAY Award (California Lawyer of the Year - civil rights) - California Lawyer Magazine   2008

Top 75 Women Litigators in California - Daily Journal                          2008, 2013

California Super Lawyers - Top 50 Women Lawyers in Southern California                2014

National Lawyers Guild, Los Angeles Law for the People Award                         2014

ACLU Lifetime Achievement Award                                                      2017

# EXHIBIT 2

Case 2:17-cv-00094-RAJ Document 138 Filed 03/29/18 Page 25 of 129

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

XUE LU, JIE HAO,

               Plaintiffs,

    vs.

UNITED STATES OF AMERICA,

      Defendant.

Case No.: 01-01758-CBM (Ex)

**ORDER RE: ATTORNEYS' FEES**

The matters before the Court are: (1) the parties' briefs regarding attorneys' fees following the Ninth Circuit's remand (Dkt. Nos. 335, 336, 341, 342); and (2) Plaintiffs' Motion For Award of Reasonable Attorneys' Fees on Appeal (the "Motion") (Dkt. No. 338).

## I.    FACTUAL AND PROCEDURAL HISTORY

Plaintiffs Xue Lu ("Lu") and Jie Hao ("Hao") filed suit in 2001 against the United States of America (the "Government") and individual federal officers. Plaintiffs, who are Chinese asylum seekers, alleged that Thomas Powell, a former asylum officer, requested money and sexual favors from them as a requisite to granting their respective asylum applications.

Following a bench trial, the Court issued Findings of Fact and Conclusions of Law in favor of Plaintiffs. (Dkt. No. 278.) Judgment was entered against the Government and in favor of Plaintiffs Lu and Hao on both Plaintiffs' claims under

1   the Federal Torts Claim Act ("FTCA"), and $500,000 in damages was awarded to

2   Lu, and $700,000 in damages was awarded to Hao.  (Dkt. No. 279.)

3        The Court also awarded $881,675.75 in attorneys' fees to Plaintiffs.  (Dkt.

4   No. 318, the "Fee Order".)  The Court held that Plaintiffs' counsel were entitled to

5   reasonable market rates for the period commencing June 8, 2008 under the Equal

6   Access to Justice Act ("EAJA") based on the following four findings of bad faith:

7   (1) the Government's failure to come to Hao's aid after Powell touched her

8   buttock despite promising to protect Hao if Powell touched her, was bad faith; (2)

9   the Government's defense and arguments regarding Plaintiff Hao's

10  consent/assumption of risk constituted bad faith; (3) the Government's seven-year

11  delay in Plaintiff Hao's asylum case—which lasted from the beginning of the

12  litigation until 2007 and prevented Hao from reuniting with her family—

13  constituted bad faith because Defendant could have adjudicated the asylum case

14  while waiting for Hao to testify at Powell's criminal trial; and (4) the

15  Government's continued argument that Plaintiffs' claims are barred by the

16  intentional tort exception under the FTCA—which the Government raised even

17  after the Ninth Circuit held otherwise in *Lu v. Powell*, 621 F.3d 944, 950 (9th Cir.

18  2010)—constituted bad faith.  (Fee Order at 5-8.)  Based on these four findings of

19  bad faith, the Court found, under a totality of circumstances, that from June 8,

20  2000 forward—when Plaintiff Hao completed the sting operation with Department

21  of Justice officials—the Government's bad faith affected all of the "various phases

22  of litigation," including the Government's pre-litigation conduct and conduct

23  during the litigation.  (Fee Order at 5:16-20; 7:21-8:1.)

24       The Government appealed the judgment entered against it and the Fee

25  Order.  On January 27, 2016, the Ninth Circuit affirmed this Court's damages

26  award, but vacated and remanded the fee award for reconsideration of the amount.

27  *Lu v. U.S.*, 638 F. App'x 614 (9th Cir. 2016).  The Ninth Circuit found the Court's

28  finding that the Government argued in bad faith that the intentional tort exception

barred Plaintiffs' claims in spite of the Ninth Circuit's decision in the first appeal[1] was "without support in the record." *Id.* at 618.[2] In light of its reversal of one of the Court's specific findings of bad faith, the Ninth Circuit vacated and remanded the fee award to allow the Court "to decide what, if any, changes should be made to the award of fees incurred after June 8, 2000." *Id.* at 619.[3]

## II. STATEMENT OF THE LAW

28 U.S.C. § 2412(b) of the Equal Access To Justice Act ("EAJA") provides that "a court may award reasonable fees and expenses of attorneys . . . to the prevailing party in any civil action brought by or against the United States or any agency . . . of the United States . . .. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law . . .." The "liable under the common law provision has been used to allow awards of attorney fees at market rates in cases involving bad faith by the United States or an agency of the United States." *Brown v. Sullivan*, 916 F.2d 492, 495 (9th Cir. 1990) (internal quotations omitted). "The district court may award attorney fees at market rates for the entire course of litigation, including

---

[1] In the first appeal of this matter, the Ninth Circuit held that although the Government "is immune from liability for an assault or battery by its employee, . . . [t]he emotional distress suffered as a result of the demand for sexual favors is an injury distinct from assault or battery." *Lu v. Powell*, 621 F.3d 944, 950 (9th Cir. 2010). In the second appeal, the Ninth Circuit concluded that "[w]henever the government presented an intentional tort exception-based theory, it provided a non-frivolous way to reconcile the argument with our previous decision," and that "it was proper for the government to use the intentional tort exception to counter Plaintiffs' claim that they could recover for the totality of Powell's conduct because his battery had been part and parcel of a 'viable' tort." *Lu v. U.S.*, 639 F. App'x at 618.

[2] The Ninth Circuit also found that the Court's finding that the last two years of delay between Plaintiff Hao receiving a fair asylum interview and being granted asylum was in bad faith was clear error because the delay occurred in the ordinary course of processing Hao's claim once it resumed in 2005. *Lu v. U.S.*, 638 F. App'x at 619.

[3] The Ninth Circuit also vacated an award of $4,113 in fees for work prior to June 8, 2000, reasoning the Court awarded those fees pursuant to 28 U.S.C. § 2412(d)(2)(A), which does not apply to tort actions. *Lu v. U.S.*, 638 F. App'x at 619 n.3 (citing 28 U.S.C. § 2412(d)(1)(A)). Accordingly, the Court does not award any fees for work performed prior to June 8, 2000.

time spent preparing, defending, and appealing . . . awards of attorneys' fees, if it finds that the fees incurred during various phases of litigation are *in some way traceable* to the [defendant's] bad faith." *Id.* at 497 (emphasis added). *See also Rodriguez v. U.S.*, 542 F.3d 704, 713 (9th Cir. 2008). Accordingly, the Court must determine the fees expended which are traceable to the three findings of bad faith affirmed by the Ninth Circuit.[4]

### III. DISCUSSION

#### A. Fees For Underlying Action

The parties disagree as to whether any modification of this Court's original $881,675.75 fee award is warranted on remand.[5]

The evidence submitted by Plaintiffs demonstrates $676,751.00 in fees expended in the underlying action is traceable to one or more of the three findings of bad faith by the Government, as set forth in Table 1. (*See* DeSimone Decl., Exs. A-J.)[6] The amount of traceable fees attributable to each attorney and staff member is calculated in Tables A through I.[7]

---

[4] 28 U.S.C. § 2412(d), and *Commission, I.N.S. v. Jean*, 496 U.S. 154 (1990), which held that a single finding that the government's position lacked substantial justification under § 2412(d) operates as a one-time threshold for fee eligibility, are inapplicable here because this is a case "sounding in tort." *See* 28 U.S.C. § 2412(d)(1)(A); *Lu v. U.S.*, 638 F. App'x at 619 n.3.

[5] The parties do not dispute that Plaintiffs are prevailing parties in the underlying action for purposes of § 2412(b).

[6] The Court also finds the evidence demonstrates these fees were reasonably expended.

[7] The Ninth Circuit remanded the case so that the Court "may consider what, if any, modification of the fee award is appropriate in light of this opinion." *Lu v. U.S.*, 638 F. App'x at 618. The Circuit's opinion did not address Powell's prelitigation conduct since this Court made no finding as to such conduct for purposes of finding bad faith under § 2412(b). Accordingly, Powell's pre-litigation conduct is irrelevant for purposes of determining fees. *See Firth v. U.S.*, 554 F.2d 990, 993 (9th Cir. 1977) ("When a case has been decided by an appellate court and remanded, the court to which it has been remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court."); *Hongesmeier v. C.I.R.*, 621 F.3d 890, 899 (9th Cir. 2010) ("A trial court is prohibited from giving relief beyond the scope of an appellate mandate.").

**Table 1:**

| Attorney or Staff | Fees |
|---|---|
| James DeSimone | **$410,986.00** |
| Michael Seplow | **$15,582.00** |
| Meneka Fernando | **$161,816.00** |
| Courtney Abrams | **$10,472.50** |
| Douglas Ingraham | **$4,031.50** |
| Fatemeh Mashouf | **$8,100.00** |
| Kunti Dudakia | **$5,579.00** |
| Emma Huang | **$20,079.50** |
| Bill Clifton | **$4,252.50** |
| Do Kim | **$35,852.00** |
| **TOTAL** | **$676,751.00** |

**Table A:**

| James DeSimone | Hourly Rate | Hours | Total |
|---|---|---|---|
| 2013 | $725.00 | 134.7 | $97,657.50 |
| 2012 | $695.00 | 64.8 | $45,036.00 |
| 2011 | $675.00 | 44.4 | $29,970.00 |
| 2010 | $650.00 | 68.1 | $44,265.00 |
| 2009 | $625.00 | 103.9 | $64,937.50 |
| 2008 | $600.00 | 7.4 | $4,440.00 |
| 2007 | $585.00 | 16.7 | $9,769.50 |
| 2006 | $575.00 | 3.7 | $2,127.50 |
| 2005 | $550.00 | 87.4 | $48,070.00 |
| 2004 | $470.00 | 4.4 | $2,068.00 |
| 2002 | $385.00 | 77.8 | $29,953.00 |
| 2001 | $360.00 | 88.4 | $31,824.00 |
| 2000 | $310.00 | 2.8 | $868.00 |
| **TOTAL** | | **704.5** | **$410,986.00** |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

5

**Table B:**

| Michael Seplow | Hourly Rate | Hours | Total |
|---|---|---|---|
| 2012 | $630.00 | 0.4 | $252.00 |
| 2011 | $610.00 | 0.3 | $183.00 |
| 2010 | $590.00 | 1.7 | $1,003.00 |
| 2009 | $575.00 | 21.5 | $12,362.50 |
| 2005 | $440.00 | 0.6 | $264.00 |
| 2004 | $400.00 | 0.7 | $280.00 |
| 2002 | $325.00 | 1.5 | $487.50 |
| 2001 | $300.00 | 2.5 | $750.00 |
| **TOTAL** | | **29.2** | **$15,582.00** |

**Table C:**

| Meneka Fernando | Hourly Rate | Hours | Total |
|---|---|---|---|
| 2013 | $375.00 | 244.57 | $91,713.75 |
| 2012 | $325.00 | 172.13 | $55,942.25 |
| 2011 | $300.00 | 47.2 | $14,160.00 |
| **TOTAL** | | **463.9** | **$161,816.00** |

**Table D:**

| Courtney Abrams | Hourly Rate | Hours | Total |
|---|---|---|---|
| 2011 | $295.00[8] | 35.5 | $10,472.50 |
| **TOTAL** | | **35.5** | **$10,472.50** |

**Table E:**

| Douglas Ingraham | Hourly Rate | Hours | Total |
|---|---|---|---|
| 2011 | $515.00 | 2.9 | $1,493.50 |
| 2001 | $200.00 | 6.4 | $1,280.00 |
| 2000 | $170.00 | 7.4[9] | $1,258.00 |
| **TOTAL** | | **16.7** | **$4,031.50** |

///

[8] The Court previously awarded fees for work performed by Abrams, Dudakia, Mashouf, Clifton, and Huang based on the "$125 per hour rate authorized by EAJA." (Fee Order at 9.) The $125 per hour statutory rate set forth in 28 U.S.C. § 2412(d)(2)(A)(ii), however, is inapplicable here because this is a case "sounding in tort." 28 U.S.C. § 2412(d); *Lu v. U.S.*, 638 F. App'x at 619 n.3. Accordingly, the Court awards fees based on the market rate for Abrams, Dudakia, Mashouf, Clifton, and Huang.

[9] The Court does not award fees for 4.2 hours of time expended by Ingraham prior to June 8, 2000. (*See* DeSimone Decl. Ex. E.)

**Table F:**

| Fatemeh Mashouf | Hourly Rate | Hours | Total |
|---|---|---|---|
| 2012 | $300.00 | 27.0 | $8,100.00 |
| **TOTAL** | | **27.0** | **$8,100.00** |

**Table G:**

| Kunti Dudakia | Hourly Rate | Hours | Total |
|---|---|---|---|
| 2013 | $350.00 | 15.94 | $5,579.00 |
| **TOTAL** | | **15.94** | **$5,579.00** |

**Table H:**

| Emma Huang | Hourly Rate | Hours | Total |
|---|---|---|---|
| 2013 | $175.00 | 64.91 | $11,359.25 |
| 2012 | $175.00 | 49.83 | $8,720.25 |
| **TOTAL** | | **114.74** | **$20,079.50** |

**Table I:**

| Bill Clifton | Hourly Rate | Hours | Total |
|---|---|---|---|
| 2013 | $175.00 | 2.7 | $472.50 |
| 2012 | $175.00 | 5.8 | $1,015.00 |
| 2011 | $175.00 | 9.8 | $1,715.00 |
| 2010 | $175.00 | 6.0 | $1,050.00 |
| **TOTAL** | | **24.3** | **$4,252.50** |

**Table J:**

| Do Kim | Hourly Rate | Hours | Total |
|---|---|---|---|
| 2008 | $390.00 | 14.9 | $5,811.00 |
| 2005 | $290.00 | 99.4 | $28,826.00 |
| 2004 | $270.00 | 4.5 | $1,215.00 |
| **TOTAL** | | **118.8** | **$35,852.00** |

**B.    Fees on Appeal and Post Remand**

Plaintiffs' Motion also seeks an award of attorneys' fees expended on appeal and post remand.[10]

_____

[10] The Court finds Plaintiffs are the prevailing parties on appeal. *See Lu v. U.S.*, 638 F. App'x at 619 (affirming the award of damages to Plaintiffs and awarding costs on appeal to Plaintiffs).

### 1. Timeliness

The parties disagree as to whether Plaintiffs' Motion for fees on appeal is timely. The Ninth Circuit issued a Mandate stating "[t]he judgment of this Court, entered on January 27, 2016, takes effect this date." (Dkt. No. 332.) Based on applicable rules, Plaintiffs' deadline to file the Appeal Fees Motion was May 10, 2016. *See* Ninth Circuit Rule 39-1.6; Supreme Court Rule 13; 28 U.S.C. § 2101(c); *Arulampalam v. Gonzales*, 399 F.3d 1087, 1090-91 (9th Cir. 2005). Since Plaintiffs filed the Appeal Fees Motion on May 26, 2016, the motion was untimely.

Having found the motion was untimely, the Court must determine whether there is good cause to extend the time to file the Appeal Fees Motion based on excusable neglect. Fed. R. Civ. P. 6(b). The Supreme Court has held that determining whether there is excusable neglect is an "equitable" determination, which takes into account "all relevant circumstances surrounding the party's omission," including: (1) prejudice to the other party; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith. *Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380, 395 (1993).

Applying the four *Pioneer* factors, the Court finds: (1) there is no evidence of prejudice to the Government; (2) the delay (i.e., 16 days) was not lengthy and did not impact judicial proceedings; (3) the reason for the delay was Plaintiffs' counsel's misinterpretation of the law; and (4) there is no evidence of bad faith. Accordingly, the Court finds, on balance, Plaintiffs' delay in filing the Appeal Fees Motion was a result of excusable neglect. *See Pincay v. Andrews*, 389 F.3d 853, 855-60 (9th Cir. 2004) (en banc) (district court did not abuse its discretion in granting the defendant's motion for an extension of time to file a notice of appeal where there was no prejudice, the length of delay was small, the reason

1   {"pageset": "S9f"} for the delay was carelessness based on the attorney's reliance on a

2   paralegal's misreading of a rule, and there was no evidence of bad faith).

3   **2.      Fees Traceable To the Government's Bad Faith**

4   "The district court may award attorney fees at market rates for the entire

5   course of litigation, including time spent ***preparing, defending, and appealing the***

6   ***two awards of attorney fees***, if it finds that the fees incurred during the various

7   phases of litigation are in some way traceable to the Secretary's bad faith."

8   *Brown*, 916 F.2d at 497 (emphasis added) (citing *General Fed'n of Women's*

9   *Clubs v. Iron Gate Inn, Inc.,* 537 A.2d 1123, 1129-30 (D.C. App. 1988)

10  (upholding a trial court's award of attorneys' fees under the bad faith exception to

11  the American Rule, and stating "[t]he law is well established that, when fees are

12  available to the prevailing party, that party may also be awarded fees on fees, i.e.,

13  the reasonable expenses incurred in the recovery of its original costs and fees.").

14          The evidence submitted by Plaintiffs demonstrates $314,651.50 in fees

15  expended on the second appeal and post-remand is traceable to one or more of the

16  three findings of bad faith by the Government.[11]  (*See* DeSimone Decl. Exs. K-Q.)

17  The amount of traceable fees attributable to each attorney and staff member is set

18  forth in Table 2.[12]

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25

26  [11] The evidence demonstrates, for example, that the Government continued to
    pursue its consent defense on appeal, which this Court found to be made in bad

27  faith.

    [12] The Court also finds the evidence demonstrates these fees were reasonably

28  expended.

**Table 2:**

| ATTORNEY | HOURLY RATE[13] | HOURS | FEE AMOUNT |
|---|---|---|---|
| Paul Hoffman | $900 | 27.3 | $24,570.00 |
| Michael D. Seplow | $760 | 84.0 | $63,840.00 |
| Raya Marinova | $420 | 168.7 | $70,854.00 |
| Kai Valenzuela | $200 | 28.6 | $5,720.00 |
| Emma Huang | $200 | 19.0 | $3,800.00 |
| V. James DeSimone | $825 | 175.5 | $144,787.50 |
| Ryan Hall | $300 | 3.6 | $1,080.00 |
| **TOTAL** | | **506.7** | **$314,651.50** |

## IV.   CONCLUSION

The Court **GRANTS** Plaintiffs' Motion For Award of Reasonable

Attorneys' Fees on Appeal.

The Court finds $676,751.00 in fees in the underlying action, and

$314,651.50 in fees on appeal and post-remand were reasonably expended and

traceable to one or more of the three findings of bad faith by the Government.

Accordingly, the Court awards $993,758 in attorneys' fees to Plaintiffs.

**IT IS SO ORDERED.**

DATED:  November 10, 2016.

_____

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

---

[13] Plaintiffs provide declarations regarding counsel's qualifications and experience, and a declaration from Carol Sobel who declares the requested hourly rates are within the range of current reasonable market rates.  (DeSimone Decl. ¶¶ 2-12; Seplow Decl. ¶¶ 3-12; Sobel Decl. ¶¶ 3-32.)  *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008).   Accordingly, the Court finds the hourly rates set forth in Table 2 are reasonable based on the individual's experience and qualifications, and are consistent with current prevailing market rates in the community.  *See U.S. v. $28,000.00 in U.S. Currency*, 802 F.3d 1100, 1107-08 (9th Cir. 2015).

# EXHIBIT 3

1
2
3
4
5
6
7     **UNITED STATES DISTRICT COURT**
8     **CENTRAL DISTRICT OF CALIFORNIA**
9     **WESTERN DIVISION**
10
11    RAY WEBB,                                    )    No. CV 13-9112-PLA
                                                   )
12                        Plaintiffs,              )    **ORDER RE MOTION FOR ATTORNEYS'**
                                                   )    **FEES AND COSTS**
13              v.                                 )
                                                   )
14    OFFICER J. ACKERMAN, et al.,                 )
                                                   )
15                        Defendants.              )
                                                   )
16    ─────────────────────────────────           )
17            On May 2, 2017, following a jury trial, a verdict in this civil rights action was returned in favor

18    of plaintiff and against the four named individual defendants.  The jury concluded that each of the

19    defendants had violated plaintiff's Fourth Amendment rights by using excessive force against him,

20    and that punitive damages against the defendants were justified.  The jury awarded a total of

21    $620,000 to plaintiff ($500,000 for past general damages, $100,000 for future general damages,

22    and $20,000 in punitive damages).  Plaintiff has now filed a Motion for Attorneys' Fees and Costs

23    (the "Motion"), in which he seeks attorneys' fees pursuant to Fed.R.Civ.P. 54(d) and 42 U.S.C. §

24    1988 in the sum of $448,760, as well as paralegal fees of $11,300, costs of $4,092.15, and

25    additional fees of $3,185 for work performed in connection with the Motion.  Defendants filed an

26    Opposition to the Motion, and plaintiff then filed a Reply.  The Court has reviewed the documents

27    submitted by the parties in connection with the Motion, and has considered the statements and

28    arguments presented by counsel at the hearing on January 3, 2018.

There is no dispute that plaintiff is considered the prevailing party in this action under § 1988. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); see Opposition at 4 ("Plaintiffs' [sic] claim of attorneys' fees is authorized by Section 1988. This section permits this Court to 'allow the prevailing party . . . a reasonable attorney's fee as part of the costs.' . . . Defendants oppose the fee motion *not because it disputes that counsel is entitled to fair compensation for their efforts*, but because the demand is unreasonable, and beyond what is fair") (emphasis added). "The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances. Accordingly, a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" Hensley, 461 U.S. at 429 (citations omitted). The applicant bears the burden of showing an entitlement to an award and of documenting the hours expended and hourly rates (id. at 437); the opposing party then "has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." Gates v. Gomez, 60 F.3d 525, 534-35 (9th Cir. 1995). The question presented in the Motion is whether the requested amounts are reasonable under the statute. Plaintiff contends that he is entitled to the requested fees, based on the nature of the case, the experience of counsel, the work involved, and the outcome of the trial. Defendants disagree, generally arguing that counsel's billing statements are too vague, and reflect overhead activities, inefficient work and duplication of effort, but mainly contending that the hourly rates sought are excessive.

The Court examines the "lodestar" in determining whether the requested fees are reasonable. The lodestar is obtained, first, by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. Hensley, 461 U.S. at 433-34. Those hours that were not reasonably expended (such as when a case is overstaffed, or based on varying skills of the lawyers involved, or that are excessive or redundant) should be excluded. Id. A reasonable hourly rate under § 1988 is determined "according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." Blum v. Stenson, 465 U.S. 886, 895 (1984).

1    The factors that may be considered in reaching a lodestar value and possible adjustment

2    are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the

3    skill requisite to perform the legal service properly; (4) the preclusion of other employment by the

4    attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or

5    contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved

6    and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the

7    undesirability of the case; (11) the nature and length of the professional relationship with the client;

8    and (12) awards in similar cases. Hensley, 461 U.S. at 430 n.3.

9    Here, plaintiff seeks an award of fees of $448,760 based on the work of attorney Tiomkin.

10   He asserts that as of the filing of the Motion, Mr. Tiomkin had spent 690.4 hours working on this

11   case, and that a reasonable hourly rate is $650. In support of these numbers, plaintiff has

12   submitted a declaration from counsel setting forth his legal experience, as well as his time records

13   from this case. In sum, Mr. Tiomkin spent a couple of years as a county public defender; since

14   2008, he has managed his own firm and has specialized in criminal defense, personal injury and

15   wrongful death cases; has tried over 50 cases to verdict; has litigated cases involving police

16   misconduct and violations of constitutional rights; and has represented many victims of misconduct

17   by law enforcement. While the precise nature of Mr. Tiomkin's experience in handling section

18   1983 cases and taking such actions to trial is not at all clear from his declaration, he asserts that

19   prosecuting such cases "was a natural transition for him" in light of his background (Motion, at 6).

20   At the hearing, he represented that he had handled just one civil rights action prior to the instant

21   matter, and that action settled before trial. Mr. Tiomkin also submitted declarations from attorneys

22   not associated with this case setting forth their opinions as to the prevailing hourly rates for

23   attorneys with similar experience and skills as Mr. Tiomkin, and the reasonableness of the hourly

24   amounts sought by Mr. Tiomkin. A declaration also represents that the rate of $200 per hour

25   being sought for the paralegal's time in this action is reasonable, based on the paralegal's level

26   of experience.[1]

27

28   _____

   [1]   The paralegal spent 56.5 hours in connection with this litigation which, at a rate of $200
   per hour, amounts to $11,300. Counsel spent 4.9 hours preparing plaintiff's Reply to the

3

In opposition, defendants argue that the requested fees are not reasonable, based on counsel's level of experience and the prevailing fees in the Central District, and as this matter was "relatively straight-forward." Defendants submit that the amount sought would result in an unjustified windfall, and a real person in the real world would not pay an attorney the sought-after hourly amount for the type of work here. Defendants also contend that the billing statements are too vague to support the claimed hours. In particular, defendants note that Mr. Tiomkin has not indicated his hourly rate for private clients in criminal cases, or any other sort of compensation he receives for other attorney work. They argue that what is reasonable must be examined in light of what "a reasonable purchaser of the services would actually pay in a competitive market place," and must reflect the reality that a prevailing attorney has a financial incentive to charge as much as he possibly can. Indeed, according to defendants, those who provided declarations in support of the Motion attesting to the reasonableness of the rates being sought would themselves benefit in their own cases from a high fee award in this case. Further, the Long Beach City Attorney's Office, when it hires outside counsel in civil rights cases, pays less than $300 per hour including for cases that proceed to trial. Counsel thus suggests that a reasonable rate for Mr. Tiomkin, based on his experience, would be $425 per hour at most. Counsel further suggests that the number of hours expended was not reasonable, and that duplicative, unreasonable, unnecessary or unjustified hours should be reduced. Defendants in their pleadings do not question any specific entry of time spent on any task, or any task itself, but instead insist that counsel is seeking compensation "for hours not reasonably expended in the prosecution of this action; just as a private client should not have to pay for overhead activities, inefficient work resulting in excessive billing, duplication of effort, and the like, neither should the defendants." At the hearing, counsel provided examples from Mr. Tiomkin's time sheets of research Mr. Tiomkin engaged in that, according to defense counsel, an experienced civil rights litigator would not have needed to perform.

---

Opposition to the Motion and attending the hearing, which amounts to $3,185 at a rate of $650 per hour.

4

The Court must determine a reasonable hourly rate after "considering the experience, skill and reputation of the attorney requesting fees," guided by the rate "prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." Trevino v. Gates, 99 F.3d 911, 924 (9th Cir. 1996) (citation omitted). After considering the pleadings of the parties and declarations filed in support of their positions, and the statements and arguments of counsel, the Court accepts Mr. Tiomkin's requested rate as falling within the prevailing market rate. Here, plaintiff has submitted evidence that the rate sought by Mr. Tiomkin is appropriate for attorneys of comparable skill, experience, and reputation. Mr. Beck, who has substantial experience in civil rights litigation going back almost 40 years, confirms that Mr. Tiomkin has "substantial trial experience in his 11 years in practice"; and, based on his own detailed experience in fee awards and "awareness of fee awards in the Central District," he believes that the market rate in Los Angeles for attorneys in private practice such as Mr. Tiomkin warrants $700 per hour. Ms. Sobel, who has practiced law for close to 40 years, including 20 years primarily practicing in the area of complex civil rights litigation, and who has made it a practice of surveying firms to obtain relevant billing rates for comparison purposes, states her understanding that Mr. Tiomkin has limited experience in civil litigation, but has extensive trial experience as a criminal defense lawyer. She believes that $650 per hour is within the range of reasonable rates in the Los Angeles legal market for an attorney of his skill and experience. She also opines that $200 per hour for paralegal work is reasonable based on the paralegal's level of experience and the range of rates approved for paralegals of comparable skills and experience. When Mr. Tiomkin's declaration is added to the declarations of outside attorneys attesting to the propriety of the requested rates, the Court will not deviate from that rate as to Mr. Tiomkin. Neither does the Court find convincing defendants' argument that the rate should be considered in light of the hourly rate charged by law firms retained by the City of Long Beach to defend such cases. Those firms are guaranteed payment regardless of the outcome of the case, and may be incentivized to charge a lower rate to ensure repeat business. See, e.g., Trevino, 99 F.3d at 925 ("[p]rivate attorneys hired by a government entity to defend excessive force cases are not in the same legal market as private plaintiff's attorneys who litigate civil right cases.").

Having reviewed all of the time entries of counsel, who is a sole practitioner and thus performed all of the attorney work on this case, the Court rejects defendants' assertions that Mr. Tiomkin's judgment as to the time he needed to prepare for what turned out to be a very successful trial for plaintiff should be questioned.  The Court has not been presented with any sound rationale to question his under oath declarations.  Defense counsel has not convinced the Court that the hours spent by counsel on the various tasks are much beyond what a reasonable attorney would claim.  Further, many hours are claimed based on time spent by counsel reviewing depositions, statements and reports, and meeting with experts and preparing for expert testimony.  The Court observed at trial that much of plaintiff's case was based on a careful review and understanding of prior statements made by defendants, both immediately following the incident and at deposition.  This review necessarily required many hours to compare, contrast, index and reference those statements.  The Court also observed the importance of expert testimony at trial, and the need for a thorough comprehension and understandable presentation of expert opinions.  The requested hours are not excessive.  The Court also notes that in a contingency fee arrangement, "lawyers are not likely to spend unnecessary time . . . in the hope of inflating their fees.  The payoff is too uncertain, as to both the result and the amount of the fee.  It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning." Moreno v. City of Sacramento, 534 F.3d 1106, 1112 (9th Cir. 2008).

Nevertheless, the Court observes that at the time he started working on this case, Mr. Tiomkin had almost no experience in the area of civil rights litigation, having handled only one other such case prior to his efforts here.  His work on this case, including researching and preparing motions and preparing for trial, was with the eye and level of familiarity of an attorney who was new to this field.  Indeed, he had not **tried** any federal civil rights cases prior to this one.  While Mr. Tiomkin's general trial experience may balance out his inexperience in civil rights matters to some degree, that trial experience was not particular to the issues specific to this area of law.  Common sense dictates that an attorney with next to no experience in civil rights litigation, and with no civil rights trial experience, would spend more time preparing a case than would an attorney with years of civil rights experience when faced with the same case.  Based on these

specific reasons and in the exercise of the Court's discretion, the Court finds it appropriate to cut the requested number of hours by 15%, to 586.84 hours. _Moreno_, 534 F.3d at 1112 ("the district court can impose a small reduction, no greater than 10 percent -- a 'haircut' -- based on its exercise of discretion _and without a more specific explanation._") (emphasis added). The same rationale does not apply to the amount of time sought for paralegal assistance, however. Counsel at the hearing represented that Ms. Campros has experience in the area of civil rights litigation. The Court finds no reason to reduce her time or hourly rate.

The fees and expenses being sought by plaintiff consist of the filing fee, deposition costs, mediation costs, and witness fees ($40 per day plus mileage). Defendants do not seriously contest the amount of fees and costs being sought here.

In sum, taking into account the 15% adjustment in the number of hours spent by Mr. Tiomkin in this action, the Court awards attorneys' fees based on the Motion as follows: 690.4 hours, plus 4.9 hours for litigation of the Motion (for a total of 695.3 hours), less a 15% reduction (for a total of 591.005 hours), all at $650 per hour, **for an award on the Motion of $384,153.25**. The Court concludes that the **total award on the Motion** is appropriate and does not amount to a windfall to the attorney involved. The Court further awards $11,300 for paralegal fees (56.5 hours at $200 per hour). The Court further awards fees and expenses in the amount of $4,092.15.

**IT IS SO ORDERED**.

DATED: January 4, 2018

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

7

# EXHIBIT 4

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   JOSE ANTONIO FRANCO-                )   Case No.: CV 10-2211 DMG (DTBx)
     GONZALEZ, et al.,                   )
12                                       )   **ORDER APPROVING PARTIES'**
           *Plaintiffs-Petitioners,*     )   **SETTLEMENT AGREEMENT**
13                                       )   **RESOLVING PLAINTIFFS'**
              v.                         )   **MOTION FOR ATTORNEYS'**
14                                       )   **FEES AND COSTS [827, 864]**
     ERIC H. HOLDER, Jr., Attorney       )
15   General, et al.,                    )
                                         )
16         *Defendants-Respondents.*     )
                                         )
17   _____        )

18

19

20

21

22

23

24

25

26

27

28

WHEREAS, the Parties provided proper notice to the Class [Doc. # 860];

WHEREAS, the Court has already approved the notice provided to the Class as satisfying the requirements of Federal Rule of Civil Procedure 23(e)(1) and due process [Doc. ## 856, 860];

WHEREAS, the notice provided to the Class stated that Plaintiffs would seek attorneys' fees and costs up to $15,000,000, and no Class Member has objected;

WHEREAS, Plaintiffs did not seek the full $15,000,000 in fees and costs of which they gave notice to the Class, and instead filed a Motion for Attorneys' Fees and Costs ("Fee Motion") seeking $11,632,425.73 in attorneys' fees and $81,701.73 in costs (as corrected) [Doc. ## 827, 843];

WHEREAS, Defendants were granted, by order of this Court, over two months to analyze and respond to Plaintiffs' Fee Motion and indicated that they would engage an expert to assist them in analyzing and responding to Plaintiffs' Fee Motion [Doc. ## 822 at 14-16, 825];

WHEREAS, the Parties engaged in non-collusive, arms'-length negotiations to resolve Plaintiffs' Fee Motion, and have now reached a settlement ("Fee Settlement Agreement");

WHEREAS, the Fee Settlement Agreement, attached hereto as Exhibit A, is the entire agreement between the Government and Plaintiffs regarding attorneys' fees and costs;

WHEREAS, the Fee Settlement Agreement requires Defendants to pay Plaintiffs $9,500,000.00 in full satisfaction of all attorneys' fees and costs that Plaintiffs have sought or could seek in this matter as of September 29, 2015;

WHEREAS, Plaintiffs' Fee Motion provides ample support for an award of at least $9,500,000;

WHEREAS, there is no evidence of collusion between the Parties regarding fees, or of Plaintiffs putting their interests in obtaining fees ahead of the interests of

1  the Class [Doc. # 854 at 15-16];

2      The Court hereby awards Plaintiffs $9,500,000 in attorneys' fees and costs,

3  subject to the terms set forth in the Fee Settlement Agreement. The Fee Settlement

4  Agreement is a compromise reached by the Parties as a result of arms'-length

5  negotiations, including negotiations after Defendants had the opportunity to review

6  Plaintiffs' entire Fee Motion, which contained voluminous time records and

7  supporting materials. The Fee Settlement Agreement does not prejudice the Class

8  and was not the result of collusion between the Parties. The Class has received

9  notice of Plaintiffs' Fee Motion that complied with the requirements of Federal

10 Rule of Civil Procedure 23(e)(1), and no Class Member has objected to the Fee

11 Motion. The Court therefore finds the award to be fair, adequate, and reasonable.

12     The Parties are hereby ordered to implement the terms of the Fee Settlement

13 Agreement. The Court retains jurisdiction for the purpose of enforcing compliance

14 with the terms of the Fee Settlement Agreement.

15     IT IS SO ORDERED.

16

17 DATED: October 8, 2015                    _____

18                                           DOLLY M. GEE
                                            UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26

27

28

Exhibit A

## SETTLEMENT AGREEMENT

*Franco-Gonzalez, et al. v. Lynch, et.al.*

Case No. CV 10-2211-DMG (DTBx)

This Settlement Agreement is entered into by all Plaintiffs and all Defendants in this class action lawsuit (collectively, "the Parties"). Plaintiffs are individuals who are, or were during the relevant period, in the custody of U.S. Immigration and Customs Enforcement ("ICE") in Arizona, California, or Washington, who have serious mental disorders, and who lack or lacked counsel in their immigration proceedings. Defendants are Loretta Lynch, United States Attorney General, Juan Osuna, Director of the Executive Office for Immigration Review ("EOIR"), Jeh Johnson, Secretary of Homeland Security, Sarah Saldaña, Director of U.S. Immigration and Customs Enforcement ("ICE"), and David Jennings, Field Office Director for the Los Angeles District of ICE.

### RECITALS

Intention of the Parties. The Parties desire to settle and resolve 1) Plaintiffs' claim for $81,701.73 in costs; 2) Plaintiffs' claim for $11,632,425.73 in attorneys' fees, *see* Dkt. 843-2; 843-4; and 3) any attorneys' fees accrued between July 1, 2015 and September 29, 2015. Plaintiffs' claims for costs and fees accrued prior to July 1, 2015 are contained in Plaintiffs' Motion for Attorneys' Fees and Costs, Dkt. 827, as corrected in Dkt. 843. Plaintiffs have not yet sought fees for work done between July 1, 2015 and September 29, 2015, but they would do so but for this Agreement. The parties enter into this Settlement Agreement to avoid the time and expense of further litigation as to costs and fees. The Parties acknowledge that this Settlement Agreement (1) disposes of all claims and issues regarding the claims for costs and Fees that the Plaintiffs raise or could raise against Defendants in Plaintiffs' Motion for Attorneys' Fees and Costs as of September 29, 2015, and

(ii) fully binds the Parties and their successors.

No Admission of Wrongdoing. By executing this Settlement Agreement, Defendants do not admit that Plaintiffs' claim for fees was meritorious, nor do Defendants admit that Defendants were not substantially justified, in law or fact, in the litigation position advanced in the Action.

Complete Agreement. The Parties agree that this document constitutes the complete integration of the Settlement Agreement between the Parties regarding Plaintiffs' claim for costs and fees for work done prior to September 29, 2015, and supersedes any and all prior oral or written representations, understandings, or agreements by or between the Parties regarding Plaintiffs' claim for that work. The Parties further agree that this Settlement Agreement may not be altered, amended, changed, modified, or revised except by a writing duly executed by or on behalf of Plaintiffs and Defendants.

Agreement Does Not Affect Tax Treatment of Payments. This Settlement Agreement is in no way related to income or other taxes for which Plaintiffs or their attorneys are now liable or may become liable in the future as a result of the execution of this Settlement Agreement.

Award Subject to Court Approval Pursuant to Rule 23(e). The Parties agree that this fee award is subject to Court Approval pursuant to Federal Rule of Civil Procedure 23(e). The Parties agree that no further notice is required to the class, given that the fee settlement is substantially less than the fee award noticed by the parties.

## TERMS AND CONDITIONS OF AGREEMENT

1.    Defendants agree to remit payment of $9,500,000.00 for attorneys' fees and costs in full settlement of Plaintiffs' claim for costs and fees incurred up to and including September 29, 2015. Payment will be remitted within sixty days

after the Effective Date of this Settlement Agreement. The Effective Date is the date the Settlement Agreement is approved by the Court pursuant to Federal Rule of Civil Procedure 23(e). In the event payment is not made by Defendants within sixty days after the Effective Date, Defendants agree that Plaintiffs may seek enforcement by the Court and agree to bear any fees and costs incurred by Plaintiffs in enforcing the Settlement Agreement.

2. Plaintiffs and Defendants further agree to move to dismiss with prejudice Plaintiffs' Motion for Attorneys' Fees and Costs, Dkt. 827, upon approval by the Court of the fee award set forth in this Agreement.

3. Plaintiffs agree not to seek further fees or costs arising from the routine monitoring of Defendants' compliance with the Court's Permanent Injunction or Implementation Plan Order; however, Plaintiffs may seek further fees and costs regarding future litigation by Plaintiffs to enforce compliance with the Court's Permanent Injunction, Implementation Plan Order; Monitoring Order, and Settlement Agreement regarding procedures for Removal Order Class Members.

4. Plaintiffs agree to file a Notice with the Court acknowledging payment within five calendar days of Plaintiffs' receipt of full payment pursuant to this Settlement Agreement.

5. The Parties agree that no later than five calendar days after the Effective Date of this Agreement, Plaintiffs will provide counsel for Defendants with accurate bank account and transfer information to allow Defendants to make payment to Plaintiffs. The Parties further agree that payment shall be transmitted by electronic monetary transfer. The American Civil Liberties Union of Southern California warrants on behalf of Plaintiffs that it is authorized to accept payment for or on behalf of Plaintiffs and will distribute fees among Plaintiffs to the extent agreed by and between them.

6. Defendants acknowledge that Plaintiffs are receiving partial payment of the amount described herein in order to facilitate the orderly execution of this agreement. In the event that any advance payment by Defendants to Plaintiffs exceeds the amount of fees ordered by the Court, Plaintiffs agree to remit the difference in amount back to Defendants.

7. Plaintiffs represent and warrant that, to the best of their knowledge, the named Plaintiffs do not have any outstanding debts, whether tax debts or otherwise, with the United States of America.

Dated: September 30, 2015      By: _____

MICHAEL H. STEINBERG
steinbergm@sullcrom.com
Counsel for Plaintiffs

Dated: September 30, 2015      By: _____

LEON FRESCO
Leon.fresco@usdoj.gov
Counsel for Defendants

# EXHIBIT 5

1   AHILAN T. ARULANANTHAM (State Bar No. 237841)
    aarulanantham@aclusocal.org
2   CARMEN IGUINA (State Bar No. 277369)
    ciguina@aclusocal.org
3   ACLU FOUNDATION OF SOUTHERN CALIFORNIA
    1313 West 8th Street
4   Los Angeles, California 90017
    Telephone: (213) 977-5211
5   Facsimile: (213) 417-2211

6   MICHAEL H. STEINBERG (State Bar No. 134179)
    steinbergm@sullcrom.com
7   SULLIVAN & CROMWELL LLP
    1888 Century Park East, Suite 2100
8   Los Angeles, California 90067-1725
    Telephone: (310) 712-6600
9   Facsimile: (310) 712-8800

10
    *Attorneys for Plaintiffs-Petitioners*
11  (Additional Counsel for Plaintiffs on Following Page)

12              **UNITED STATES DISTRICT COURT**

13             **CENTRAL DISTRICT OF CALIFORNIA**

14

15  JOSE ANTONIO FRANCO-            )   Case No. 10-CV-02211 DMG (DTBx)
16  GONZALEZ, et al.,               )
                                    )   **DECLARATION OF CAROL**
17        *Plaintiffs-Petitioners,* )   **SOBEL IN SUPPORT OF**
                                    )   **PLAINTIFFS' MOTION FOR**
18              v.                  )   **ATTORNEYS' FEES**
                                    )
19  ERIC H. HOLDER, Jr., Attorney   )   Honorable Dolly M. Gee
    General, et al.,                )
20                                  )
          *Defendants-Respondents.* )
21                                  )
                                    )
22  _____     )

23

24

25

26

27

28

1 JUDY LONDON (State Bar No. 149431)
  jlondon@publiccounsel.org
2 TALIA INLENDER (State Bar No. 253796)
  tinlender@publiccounsel.org
3 PUBLIC COUNSEL
  610 South Ardmore Avenue
4 Los Angeles, California 90005
  Telephone: (213) 385 2977
5 Facsimile: (213) 385-9089

6 JUDY RABINOVITZ (State Bar No. JR-1214)
  JRabinovitz@aclu.org
7 ACLU IMMIGRANTS' RIGHTS PROJECT
  125 Broad Street, 18th Floor
8 New York, New York 10004-2400
  Telephone: (212) 549-2618
9 Facsimile: (212) 549-2654

10 BARDIS VAKILI (State Bar No. 247783)
   bvakili@aclusandiego.org
11 DAVID LOY (SBN 229235)
   davidloy@aclusandiego.org
12 ACLU OF SAN DIEGO & IMPERIAL COUNTIES
   P.O. Box 87131
13 San Diego, California 92138
   Telephone: (619) 232-2121
14 Facsimile: (619) 232-0036

15 JAMES PREIS (State Bar No. 82690)
   jpreis@mhas-la.org
16 MENTAL HEALTH ADVOCACY SERVICES
   3255 Wilshire Boulevard, Suite 902
17 Los Angeles, California 90010
   Telephone: (213) 389-2077
18 Facsimile: (213) 389-2595

19 MATT ADAMS (State Bar No. 28287)
   matt@nwirp.org
20 NORTHWEST IMMIGRANT RIGHTS PROJECT
   615 2nd Avenue, Suite 400
21 Seattle, Washington 98104-2244
   Telephone: (206) 957-8611
22 Facsimile: (206) 587-4025

23 JAMES LYALL (State Bar No. 330045)
   jlyall@acluaz.org
24 ACLU FOUNDATION OF ARIZONA
   3707 N. 7th Street, Suite 235
25 Phoenix, Arizona 85014
   Telephone: (602) 773-6001
26 Facsimile: (602) 650-1376

27 *Attorneys for Plaintiffs-Petitioner*

28

### DECLARATION OF CAROL A. SOBEL

I, CAROL A. SOBEL, declare:

1.     I am an attorney admitted to practice before the Supreme Court of the State of California and the Central District of California.  Because few, if any, of the public interest lawyers involved in this litigation are paid by clients to establish a market rate, I am submitting this declaration to provide the court with information concerning reasonable market rates in support of the attorney fees requested by Plaintiffs' counsel in the above-captioned matter. I have personal knowledge of the facts set forth below and, if I were called to testify to those facts, I could and would do so competently.

2.     I graduated from law school in 1978 and was admitted to practice in December of that same year.  Until April of 1997, I was employed by the ACLU Foundation of Southern California (ACLU).  For the six years prior to leaving, I was a Senior Staff Counsel.  Throughout the time that I was an attorney at the ACLU, my primary areas of litigation were First Amendment rights and police litigation.  A true and correct copy of my résumé is attached at Exhibit 1.  I have received numerous awards for my work in the area of First Amendment litigation and, more recently, on behalf of homeless persons. I have been qualified as an expert in ethics and practices of public-interest legal groups, including once before the State Bar and once in the Los Angeles Superior Court.

3.     For many years, I have regularly gathered and submitted declarations containing information about reasonable market rates in support of fee motions filed by civil rights lawyers in private practice and public interest attorneys in Los Angeles.  My declarations have been approved by numerous courts as evidence of reasonable market rates throughout California.  The decisions that have noted my declarations favorably include, among others, *Nadarajah* v. *Holder,* 569 F.3d 906, 916-917 (9th Cir. 2009); *Orantes-Hernandezv. Holder,* 713 F.Supp.2d 29, 963-964(C.D.Cal.2010); *Torrance*

1

*Unified Sch. Dist.* v. *Magee,* CV 07-2164 CAS (Rzx) (C.D.Cal. 2008), [2008
U.S.Dist. Lexis 11 95074, 21]; *Atkins* v. *Miller,* CV-01-01574 DDP (C.D.Cal
2007); *Jochimsen v. County of Los Angeles,* B223518 (2d Dist. June 23, 2011)
(unpublished); *Dugan v. County of Los Angeles*, cv 11-08145 CAS (C.D. Cal.
Mar. 3, 2014); and *Flores v. City of Westminster*, SA-CV-11-0278 (C.D. Cal.
2014).  In *Jochimsen*, the appellate court found me qualified as an expert on
rates.

      4.    My current billing rate is $875 an hour for complex civil rights
litigation.  Although I have settled several cases calculating the lodestar on my
annual rate, I have limited my discussion in this paragraph to the contested fee
awards over the last six years in which judges of this Court found my rate to be
reasonable.   I was awarded fees in 2008 at $695 an hour by the Hon. Manuel
Real in *Jones v. City of Los Angeles*, 444 F.3d 1118 (2006), *vacated per
settlement* 505 F.3d 1006 (9th Cir. 2007.  In 2009, I was awarded fees at $710 an
hour by the Hon. Dean Pregerson in *Fitzgerald v. City of Los Angeles*, 2009 U.S.
Dist. LEXIS 34803 (C.D. Cal. 2009).  Later in 2009, I was awarded fees at the
same rate by the Hon. A. Howard Matz in *Multi-Ethnic Immigrant Worker
Organizing Network v. City of Los Angeles,* cv 07-3072 AHM (C.D. Cal.)*,* a
hybrid class-action.  Exhibit 2.  In 2010, I was awarded fees at $725 an hour by
the Hon. S. James Otero in *Long Beach Area Peace Network v. City of Long
Beach*, 574 F.3d 1011 (9th Cir. 2009).  Although I rarely have paying clients, I
was paid at $795 an hour in 2012 in a case in which I defended an outside
director of a small bank taken over and sued by the Federal Deposit Insurance
Corporation ("FDIC") in an attempt to recover investment losses.  *Federal
Deposit Insurance Company v. Faigin, et al.*, cv-12-03448 DDP (CWx) (C.D.
Cal.).  Most recently, the Ninth Circuit awarded me full fees in *CPR for Skid
Row v. City of Los Angeles*, 779 F.3d 1098 (9th Cir. 2015).  The 2015 rate of
$875 an hour is shown in the motion filed with the Court, a copy of which is

attached at Exhibit 7.

5.     As Senior Staff Counsel at the ACLU, I was responsible for preparing many fee motions in cases where the ACLU represented the prevailing party.  Since the ACLU does not bill clients on an hourly basis, I had to obtain information to establish market rates for the ACLU lawyers.  I did this annually by telephoning partners at firms who knew the ACLU lawyers in question so that they could make an informed judgment about the comparable skill levels of attorneys at their firms whose rates were then used to set ACLU billing rates.

6.     Since entering private practice, I have continued to survey firms each year to obtain relevant comparisons for billing rates as I do not charge my clients for representation and continue to do the same type of cases as I did at the ACLU.  My cases are brought on behalf of low-income persons, who are unable to afford legal representation.  I generally survey annual billing rates at firms the first time each year I prepare a fee motion or enter into settlement discussions regarding fees. I apply this methodology based on my understanding of the U.S. Supreme Court in *Blum v. Stenson*, 465 U.S. 886 (1984), holding that representation by a non-profit legal group is not a factor in arriving at billing rates for attorneys of comparable skill, experience and reputation.   I also research information on rates approved for lawyers at boutique civil rights firms and public-interest organizations whose skills and experience are comparable to those of attorneys who do other types of complex litigation.

7.     I understand that Plaintiffs are seeking market rate fees under both the Rehabilitation Act and enhanced EAJA fees for the following attorneys:

| Attorney | Entity | Grad. | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|---|---|---|
| James Preis | MHAS | 1978 | $875 | $850 | $825 | $775 | $725 | $685 |
| Judy Rabinovitz | ACLU IRP | 1985 | $825 | $790 | $760 | $720 | $680 | $630 |
| Michael Steinberg | Sullivan | 1986 | $1040 | $1020 | $1010 | $1000 | $950 | $890 |
| Judy London | Pub.Counsel | 1990 | $775 | $750 | $725 | $680 | $630 | $600 |

3

| Matt Adams | NW IRP | 1998 | $710 | $680 | $650 | $620 | $580 | $550 |
| A.Arulanantham | ACLUSoCal | 1999 | $690 | $670 | $640 | $600 | $550 | $525 |

I am informed that the rates for Michael Steinberg are discounted from his customary billing rate.

8.    In addition to the attorneys listed above, I am informed that Plaintiffs are seeking market-rate fees under the Rehabilitation Act for the attorneys listed in the table below, but not enhanced EAJA rates.

| Attorney | Entity | Grad. | 2015 |
|---|---|---|---|
| Victoria Lopez | ACLU AZ | 2001 | $640 |
| Bardis Vakili | ACLU SDIC | 2006 | $535 |
| Talia Inlender | Pub. Counsel | 2007 | $535 |
| Sean Riordan | ACLU SDIC | 2007 | $535 |
| James Lyall | ACLU AZ | 2007 | $535 |
| Shawn Lichaa | Sullivan | 2007 | $865 |
| Damion D.D. Robinson | Sullivan | 2007 | $865 |
| Marisol Orihuela | ACLU SoCal | 2008 | $510 |
| Asel Aliyasova | Sullivan | 2008 | $850 |
| Theresa Buckley | Sullivan | 2008 | $850 |
| Alexa Lawson-Remer | Sullivan | 2009 | $800 |
| Sarah Mehta | ACLU IRP | 2009 | $490 |
| Victor Leung | ACLU SoCal | 2009 | $490 |
| Jennifer Stark | ACLU SoCal | 2009 | $490 |
| Riddhi Mukhopadyay | NW IRP | 2009 | $490 |
| Antonia Stamenova-Dancheva | Sullivan | 2009 | $800 |
| Michael Murtagh | Sullivan | 2010 | $750 |
| Carmen Iguina | ACLU SoCal | 2010 | $475 |
| Esha Bhandari | ACLU IRP | 2010 | $475 |
| Thea Bernas | Pub. Counsel | 2011 | $450 |
| Stephen Kang | ACLU IRP | 2011 | $450 |

4

| Sofia Corona | ACLU SDIC | 2014 | $340 |
| Lauren Cruz | Sullivan | 2014 | $370 |

9.      Of the attorneys who seek enhanced EAJA rates by this motion, I am most familiar with James Preis, Judy Rabinovitz, Judy London  and Ahilan Arulanantham.  Most of these attorneys I know primarily by reputation.  I have known James Preis for more than 30 years.  Although I never worked with him on a case, he co-counseled several cases with other staff attorneys at the ACLU when I was there.  In my experience, he is widely regarded as <u>the</u> expert on mental health litigation.  Similarly, I am of the opinion that Judy Rabinovitz and Judy London  are both widely respected and highly skilled immigration attorneys.  I have been at award presentations for each of them recently where there experience and accomplishments have been detailed.

10.      Ahilan Arulanantham and I worked together on several cases, including *Barakat v. Arrellano*, CV 05-08635 SVW, a de novo hearing on the denial of a naturalization application involving a one-week trial in the District Court in June, 2006.  We have also worked together on other immigration-related matters that, ultimately, were resolved without litigation. Based on my discussions with other attorneys on *Barakat*, including Georgetown law professor David Cole, and other immigration attorneys who have worked with Mr. Arulanantham, I am of the opinion that he enjoys an exceptional reputation as an attorney and displays skills and experience far beyond those of most attorneys practicing for 16 years.

11.      Finally, although they are only seeking market rates for 2015, I know three of the ACLU attorneys.  I know Sean Riordan and Bardis Vakili.  I have spoken with them about their litigation at various times and reviewed briefs written by them.  In addition, before he transferred to the ACLU of San Diego, Mr. Vakili and I participated in a coalition working on homelessness issues in Orange County.  I also have known Marisol Orihuela since she was a summer

student at the ACLU after her first year of law school. She assisted on the *Barakat* case. I continued to have contact with her and an opportunity to observe her work during the years she was at the ACLU as a fellow and then a staff attorney. For those attorneys I do not know personally, I reviewed materials on line regarding each attorney's experience, successful litigation they have brought, and recognition they have received for their work. With these factors in mind, I believe that all are highly skilled and enjoy exceptional reputations as such.

12. Based on my knowledge of billing rates for lawyers of similar skill, reputation a nd experience in the greater Los Angeles area, I am of the opinion that the hourly compensation sought for these attorneys is well within the range of reasonable market rates in Los Angeles. I base this opinion on the court orders and declarations of counsel identified below and attached as exhibits to my declaration. Each exhibit is a true and correct copy of the document as it appears in the Court's records, bearing the ECF filing header for documents from the federal courts and the filing stamp for state court documents.

**JAMES PREIS - 1978**

13. Mr. Preis and I have been practicing the same length of time. As stated above, in my experience in the civil rights community in Los Angeles over the past 37 years, James Preis is widely recognized as the expert on mental health issues. I was informed by Mr. Preis that he was awarded fees at the rate of $685 an hour in 2010 by former Judge Matz. This is below the rate I was awarded by Judge Real two years earlier in *Jones v. City of Los Angeles*, and below the rate of $710 an hour I was awarded in 2009 by Judges Pregerson and Matz, as well as the 2010 rate of $725 an hour I was awarded by Judge Otero. Attached at Exhibit 3 is a copy of the fee award issued in *Jones. See ¶3, supra*. Because the 2008 award in *Jones* did not set out the individual rates approved, I have also attached a copy of the Court's order on remand, explaining the basis

for the 2008 decision and setting out the approved rates. *See* Exhibit 4. Attached at Exhibit 5 is a copy of the 2010 fee award identified in paragraph 3 in *Long Beach Area Peace Network v. City of Long Beach*, approving the rate of $725 an hour for me when I was practicing 32 years.

14.     Attached at Exhibit 6 is an excerpt from the order awarding fees to attorneys at Litt, Estuar and Hadsell & Stormer at 2011 rates in *Pierce v. County of Orange*, cv-01-00981 ABC. The case involved both PRLA and non-PRLA fees. In *Pierce*, Barbara Hadsell was awarded market rate fees at $775 an hour for 2011. Exhibit 6, p.3. I know Ms. Hadsell personally and, on that basis, am aware that we both graduated law school in 1978, the same year as Mr. Preis. Ms. Hadsell's approved rate for 2011 is $50 an hour higher than the historic rate sought for James Preis. In 2012, I was paid an hourly rate of $795 an hour to represent John Lannan in an action brought by the Federal Deposit Insurance Corporation ("FDIC") to recover assets from a small regional bank that failed during the recent economic downturn. *See* para. 3, *supra*. My role in the case was to file a motion to dismiss based on procedural due process, as I would do in a civil rights case.

15.     I filed no fee motions in 2013. However, I note that Mr. Preis' requested rate of $825 an hour is only $30, or 3.75 percent, above the rate I was paid on a non-contingent basis in 2012, as described in the preceding paragraph. In 2014, I filed a motion seeking fees at the rate of $875 an hour in the Ninth Circuit in *Desertrain v. City of Los Angeles*, 754 F.3d 1147 (9th Cir. 2014). The Circuit approved the entitlement to fees and transferred the matter to the Appellate Commissioner to determine the amount of fees. While that was pending, the fee award in the district court in *Desertrain* was decided by Judge Klausner, who reduced my rate to $750 an hour, a rate just three percent above the rate I was awarded in 2010 and about an equal percentage below the hourly rate I was paid on a non-contingent basis in 2012. Because of the fee order in

*Desertrain*, I did not raise my rate for 2015: however, just a few weeks after the settlement of fees at the reduced rate in *Desertrain*, the Ninth Circuit approved full fees in *CPR for Skid Row v. City of Los Angeles*, 779 F.3d 1098 (9th Cir. 2015). Exhibit 7. My rate for the motion was $875 an hour. Exhibit 8, pp. 7,11.

**JUDY RABINOVITZ - 1985**

16.    Judy Rabinovitz seeks enhanced EAJA rates of $630 an hour for 2010, $680 for 2011, $720 for 2012, $760 for 2013, $790 for 2014 and $825 for 2015. Ms. Rabinovitz has been practicing the same length of time as V. James DeSimone, a named partner in the Schonbrun, DeSimone, Seplow, Harris & Hoffman firm, and Laurence Paradis, an attorney with Disability Rights Advocates ("DRA"). She has been practicing two years longer than Ron Elsberry, an attorney formerly at DRA and then at Disability Rights Legal Center ("DRLC"), and one year less than civil rights attorney Theresa Traber. I am familiar with each of these attorneys. In my opinion, they have litigation.

17.    In 2010, Laurence Paradis was awarded fees at $740 an hour in *Californians for Disability Rights v. California Dept. of Transportation*, 2010 U.S. Dist. LEXIS 141030, C 06-05125 SBA (N.D. Cal. 2010), *15. Exhibit 9, p. 11. In the same decision, Ron Elsberry was awarded fees at the rate of $640 an hour. *Id.* Although this decision issued in the Northern District, attorneys at DRA apply the same rates statewide. *See* Exhibit 11, ¶ 17 (Decl. of Laurence Paradis of Disability Rights Advocates ("DRA") filed in the Ninth Circuit in support of the motion for attorney fees by Disability Rights Legal Center in *Los Angeles Unified School District v. Michael Garcia*, Ninth Circuit Case No. 10-55879) (attesting that DRA applies the same rates statewide). The interchangeability of rates in Los Angeles and San Francisco was also noted in *Minor v. Christie*, 2011 U.S. Dist. LEXIS 9219 (N.D. Cal. 2011) (rates are essentially the same in Los Angeles, San Francisco and New York). Also in 2010, Jim DeSimone was awarded fees at $650 an hour in *Taylor-Ewing v. City*

8

*of Los Angeles*, cv-07-5556 GHK (C.D. Cal. 2010), an excessive force case. Exhibit 12, p. 7.

18.    In 2012, in *Hickman Mechanical v. FTR International*, LASC Case No. BC 398074, the Court awarded fees to Theresa Traber in an anti-SLAPP case at her 2011 rate of $675 an hour.  Exhibit 13, ¶ 12.  Also in 2012, the Hon. David Carter approved the rate of $695 an hour for Mr. DeSimone in *Charlebois v. Angels Baseball, LP.*, 2012 U.S. Dist. LEXIS 91069 (C.D. Cal. 2012), SACV 10-0853 DOC.  Exhibit 14, pp. 4,10.

19.    In 2013, based on fees set at 2012 rates, the Court approved fees for Laurence Paradis at the rate of $800 an hour in *Communities Actively Living Free and Independent v. City of Los Angeles*, cv-09-0287 CBM (C.D. Cal. June 10, 2013) based on a 2012 rate of $800 an hour.  Exhibit 10, pp. 6-7.   Final approval of the settlement was entered in 2013; however, the parties reached agreement on the terms of the settlement in 2012.  Exhibit 10, ¶ 3, p. 3, l.15-18.

20.    In *Hernandez v. Goliath, Inc.*, LASC BC 462953, the Los Angeles Superior Court approved the 2013 rate of $795 an hour for Theresa Traber in a lodestar crosscheck used in the settlement of a class action. Exhibit 15, p. 5, ¶ 9. Laurence Paradis of DRA attested that his 2013 rate was $825 an hour. Exhibit 11 ¶ 12, Ex. A.  Finally, in 2014, in *Rodriguez v. County of Los Angeles*, cv-10-6432 CBM (C.D. Cal. Dec. 16, 2014), fees were awarded to attorneys Ron Kaye (1988), and Dave McLane and Marilyn Bednarski (1986),at $775 an hour in a police misconduct case.  Exhibit 16, p. 14.

21.    Ms. Rabinovitz's requested 2014 rate of $790 an hour is two percent above the rate approved for attorneys with one to three years less experience.  Her 2015 rate of $825 an hour is the same as the 2013 rate for Mr. Paradis and less than four percent above the 2013 rate approved for Ms. Traber. Thus, the rates sought for Ms. Rabinovitz are fully consistent with  rates approved in the Central District.  In fact, in most instances, they are slightly

1   lower that the rates approved for comparable civil rights attorneys.

2      **MICHAEL STEINBERG - 1986**

3      22. I am informed that Michael Steinberg is requesting rates below the

4 customary billing rates he applies to his commercial clients, and below Sullivan

5 & Cromwell LLP rates approved by other courts.  He  seeks a rate of $890 for

6 2010.  At that time, he was practicing 24 years.  I have reviewed the Declaration

7 of Michael Steinberg submitted in support of this fee application, as well as the

8 various court filings and decisions referenced in his declaration regarding rates

9 approved for Sullivan & Cromwell.  These rates are the customary billing rates

10 for attorneys at the firm and have been repeatedly approved as reasonable

11 market rates by courts across the country.

12      23.   In addition to the evidence submitted by Mr. Steinberg, I am

13 providing additional fee awards in the Los Angeles legal market.   These

14 decisions support the reasonableness of the rates sought.  In 2009, partners at

15 Gibson Dunn & Crutcher were awarded fees at the rate of $785 to $905 an hour

16 in *Rogel v. City of Lynwood*, 194 Cal.App.4th 1319 (2011), where the firm co-

17 counseled with several public interest organizations, including Public Counsel.

18 The trial judge accepted the requested rates but, because the defendant was a

19 government entity, applied a significant negative multiplier, which was reversed

20 by the Court of Appeal. *Id.*  A true and correct copy of the declaration of Wayne

21 Barsky, setting out the 2009 billing rates at Gibson Dunn, is attached at Exhibit

22 17. Mr. Barsky, who attested in his declaration that he was a 1983 law graduate,

23 was the highest biller at $905 an hour. Exhibit 17, p. 14.   Fees were also

24 approved at $785 an hour for Marcellus McRae, then practicing 21 years.  *Id.*

25 The 2009 rate for Wayne Barsky is above the rate sought by Mr. Steinberg for

26 2010.   Although Mr. Steinberg had two years less experience in 2010, Mr.

27 Barsky's rate would be expected to increase significantly for 2010.  With three

28 additional years of experience, Mr. Steinberg's 2010 rate is approximately $100

higher than the 2009 rate for Mr. McRae.  It would be reasonable to anticipate that Mr. McRae's rate would also increase significantly for 2010, reducing the differential between his rate and Mr. Steinberg's.

24.    In 2011, Skadden, Arps, Slate, Meagher & Flom LLP, was awarded attorney fees in the *Mattel v. MGA Entertainment*, 2011 U.S. Dist. LEXIS 85998 (C.D. Cal. 2011), cv-04-9049 DOC (C.D. Cal.).  The motion sought fees at the rate of $1,030 an hour for Jason Russell, a 1993 law.  I obtained the year of graduation for Mr. Russell by reviewing his profile on the firm's website. Attached at Exhibit 19 is a "Time Summary" identified as Exhibit 50 to Document 10684, setting out the rates for the Skadden counsel.  With seven years more experience, Mr. Steinberg's requested 2011 rate is well below the rate for the 1993 Skadden partner.  In the same case, Orrick requested fees for a number of attorneys.  Attached at Exhibit 20 is a list of the attorneys seeking fees at Orrick.  Orrick partner Joshua Rosenkranz is listed with a 2011 rate of $985 an hour. Exhibit 20, p. 4.   According to what I observed on the firm's website, he is a 1986 law graduate, the same year as Mr. Steinberg. Mr. Rosenkranz's 2011 customary billing rate is comparable to Mr. Steinberg's rate.

25.    As further support for the rates sought by Mr. Steinberg, I have attached at Exhibit 21 an order from the United States Bankruptcy Court for Nevada, approving 2012 compensation rates for attorneys at Milbank Tweed. *Circus and Eldorado Joint Venture*, BK-12-51156 (D.Nev. BK 2012).  The 2012 standard billing rates for Milbank Tweed set out in the order were $825 to $1,140 for partners.  Mr. Steinberg's 2012 requested rate of $1,000 an hour is well within the partner range of compensation approved for Milbank Tweed attorneys.

26.    Attached at Exhibit 23 is the Declaration of Hannah Cannom of Milbank, Tweed, Hadley & McCloy LLP filed in *Los Angeles Unified School District v. Garcia*, Ninth Circuit Case No. 10-55879, cv09-9289 VBF (C.D.

11

Cal.).  Milbank was pro bono counsel with the Disability Rights Legal Center ("DRLC").  Ms. Cannom attested that she was a 2006 law graduate with a 2014 billing rate of $800 an hour.  Exhibit 23, ¶ 6.  She also attested that the 2014 customary rate for the partner at Milbank Tweed who worked on the case, Daniel Perry, a 1999 law graduate, was $1,135 an hour.  With 14 years less experience, Mr. Perry's 2014 rate was higher than Mr. Steinberg's rate for 2010 through 2015.

**JUDY LONDON - 1990**

27.  Ms. London seeks rates ranging from $600 an hour in 2010 to $775 an hour in 2015.  She graduated from law school 25 years ago.  In 2010, Melissa Kasnitz, an attorney at DRA identified as a 1992 law graduate, was awarded fees at the rate of $650 an hour.  Exhibit 9, p. 11.  This rate is almost 10 percent above the 2010 rate sought by Ms. London.  In the same decision, the Court approved fees to Julie Nepveu, an attorney with the AARP Foundation Litigation office, at $660 an hour for 2010.  I*d*.  Ms. Nepveu is identified in the order as a 1991 law graduate.  *Id*.  Ms. London seeks a rate of $630 an hour for 2011, well below the 2010 approved rates for Melissa Kasnitz and Julie Nepveu.  It is only slightly above the rate of $600 an hour approved for ACLU attorney Hector Villagra, a 1994 law graduate, in 2011 in *Vasquez*.  Exhibit 18, p. 3.  Ms. London's requested rate is more than 25 percent below the 2011 rate of $820 an hour for Orrick partner Annette Hurst, who is listed on the firm's website as a 1990 law graduate.  Ms. Hurst's rate was applied in the *Mattel* litigation.  Exhibit 20.

28.  Ms. London seeks a rate of $680 an hour for 2012.  In 2013, Judge Marshall approved the 2012 rate of $700 an hour for Michelle Uzeta, identified in the decision as a 1992 law graduate. Exhibit 10, pp. 6-7.  In 2012, Judge Wright approved fees for Glen Jonas and Christopher Driscoll, 1993 law graduates, at $650 an hour in a police misconduct case.  *See* Exhibit 24, p. 5.

While Ms. London's requested rate is $30 higher than the rate approved by Judge Wright, she has three more years of experience than either Mr. Jonas or Mr. Driscoll according to the information available on their firm website and the State Bar. I reviewed both sources and also downloaded the supporting fee declarations in *Dirks* to form the opinion that Mssrs. Jonas and Driscoll are 1993 law graduates.

29.     The 2013 rate of $700 an hour, the 2014 rate of $730 an hour and the 2015 rate of $750 an hour requested for Ms. London are all below the rates approved for civil rights attorneys with less experience than Ms. London. For example, in *Hernandez v. Goliath, Inc.*, LASC Case No. BC 462953, the Court approved fees at the 2013 rate of $695 an hour for Emily Rich of Weinberg, Roger & Rosenfeld, just $5 more than is requested as the 2013 rate for Ms. London. Exhibit 15, p. 5. Based on reviewing her profile on the firm's website, I have formed the opinion that Ms. Rich is a 1993 law graduate.

30.     Additional evidence of the reasonableness of the rates sought for Ms. London is provided in the order by Judge Otero in *Avila v. Los Angeles Police Department*, 11-cv-01326 SJO (C.D. Cal. Aug. 5, 2012), awarding fees at the 2012 hourly rate of $700 an hour to Matthew McNicholas, a 1997 law graduate. *See* Exhibit 25, p. 5. The next year, in a declaration filed in *Simplis v. Culver City Police Dept.,* cv 10-09497 MWF (C.D. Cal. 2013) [Dkt.# 257-1], Mr. McNicholas attested that his 2013 rate was $750 an hour. Exhibit 26, ¶ 16. Based on my review of the PACER docket, I understand that the *Simplis* case settled. Ms. London has seven years more experience than Mr. McNicholas. Her requested rates are also reasonable when measured against the rates previously approved for Peter Eliasberg, a 1994 law graduate at the ACLU, was awarded fees in post-appeal proceedings in *Vasquez* in 2014 at the rate of $730 an hour, the same rate Ms. London seeks for 2014. Exhibit 27; Exhibit 28, p. 7.

31.     As a point of comparison with commercial rates in similarly

complex litigation in the Central District, attached at Exhibit 23 is the 2014 fee declaration filed by Hannah Cannom, then an associate at Milbank Tweed & Hadley and pro bono co-counsel in the *Garcia* case with attorneys from the Disability Rights Legal Center. Ms. Cannom attested to the fact that she was then an eighth-year associate and that her 2014 rate was $800 an hour. Exhibit 23, ¶¶ 2,6.  The senior Milbank attorney on the case, a 1997 law graduate, was billed at $1,135 an hour, more than 50 percent above the rate now sought for Ms. London with nearly a decade more experience. *Id.* at ¶ 7.   Other Milbank attorneys for whom fees were sought in the case included a 2002 graduate with 12 years' experience billed at $900 an hour in 2014 and a 2008 graduate billed at the 2014 rate of $760 an hour.  *Id.* at ¶¶ 8,10.

## MATT ADAMS 1998 and AHILAN ARULANANTHAM 1999

32.    I have discussed Matt Adams and Ahilan Arulanantham in the same section because there is only one year difference in their experience.   In addition, there are very few civil rights attorneys in Los Angeles who are 1998 law graduates. Matt Adams seeks a market rate of $710 for 2015, $680 for 2014, $650 for 2013, $620 for 2012, $580 for 2011 and $550 for 2010.   Ahilan Arulanantham seeks a market rate of $690 for 2015, $670 for 2014, $640 for 2013, $600 for 2012, $550 for 2011 and $525 for 2010.  Mr. Arulanantham was awarded fees at the rate of $550 an*, hour in 2011 in *Islamic Shura Council of Southern Counsel v. Federal Bureau of Investigation,* 2011 U.S. Dist. LEXIS 143832, SACV 07-1088 CJC (C.D. Cal. Dec. 14, 2011), *rev'd on other grounds*, 725 F.3d 1012 (9th Cir. 2013).  I understand that the sanctions upon which the fee award was based were later overturned for reasons unrelated to the nature or amount of the fee award.

33.    In 2012, Judge Otero approved $700 an hour for Matthew McNicholas, a 1997 law graduate, in *Avila v. Los Angeles Police Department,* 11-cv-01326 SJO (C.D. Cal. Aug. 2, 2012), an employment/First Amendment

retaliation case against the Los Angeles Police Department. Exhibit 25, p. 4. I am familiar with the McNicholas law firm. In the past, Patrick McNicholas and I had similar cases on behalf of female officers with the Los Angeles Police Department subjected to sex discrimination. McNicholas and McNicholas is a small civil rights firm, primarily engaged in employment and civil rights litigation. Based on reviewing the docket and speaking to Mr. Galipo's associate, it is my understanding that the fees and damages were resolved by a settlement. This rate of $700 an hour is considerably above the 2012 rates of $620 and $600 an hour requested for Mssrs. Adams and Arulanantham, respectively. In *Communities Actively Living*, the Court approved the 2012 rate of $665 an hour for Shawna Parks, identified in the order as a 1999 law graduate. Exhibit 10, pp. 6,7.

34. In *Simplis v. Culver City Police Department*, 10-cv-09497 MWF, a wrongful death case. I filed a fee declaration for attorney Dale Galipo, who represented a co-plaintiff in *Simplis. Simplis* The *Simplis* attorneys sought $750 an hour for Matthew McNicholas, a 1997 graduate and the same attorney who was awarded fees in 2012 in *Avila*. Mr. McNicholas' declaration in *Simplis* is attached at Exhibit 26. In *Avila*, Judge Otero rejected the defense assertion that McNicholas should only receive $650 an hour and approved the 2012 rate of $700 an hour based on the Court's conclusion that rates increase as attorneys gain more skills. *See* Exhibit 25, pp. 3-4. Mr. Adams is practicing two years longer than Mr. McNicholas was when he was awarded fees in *Avila*. His requested 2015 rate is only $10 above the rate approved for Mr. McNicholas in 2012. Mr. Arulanantham has now been practicing for 15 years, the same length of time that Matthew McNicholas was when he was awarded fees in 2012 at $700 an hour in *Avila*. Mr. Arulanantham's requested 2015 rate is $10 below the rate approved for Matthew McNicholas in 2012 in *Avila*.

35. In his declaration filed in the *Garcia* case, Laurence Paradis attested

that the 2013 rate for a 1998 law graduate at DRA was $655 an hour. *See*
Exhibit 11, Ex. A. For 2012, the rate for the same attorney was $645 an hour.
Exhibit 11, Ex. B. Mr. Paradis also attested that the 2013 rate for Shawna Parks,
a 1999 law graduate like Mr. Arulanantham, was $675 an hour. Exhibit 11, Ex.
A. The requested 2012 rates of $600 and $620, as well as the 2013 rates of $640
and $650 for Mr. Arulanantham and Mr. Adams, respectively, are below the
comparable year rates for attorneys practicing the same length of time at DRA.
Exhibit 11. In 2014, the Court awarded fees at the rate of $640 an hour to Mr.
Arulanantham's colleague at the ACLU, Peter Bibring, a 2002 law graduate with
12 years of experience in 2014. *See* Exhibit 27; Exhibit, 28 at ¶ 16. With three
additional years of experience, Mr. Arulanantham requests a 2014 rate only $30
an hour higher than the rate approved for Peter Bibring. This rate is also only
$10 above the $600 an hour approved by Judge Marshall for Kevin LaHue, a
2004 law graduate, in *Rodriguez.* Exhibit 16, p. 14.

36.    As a point of comparison to comparable attorneys in large firms, I
have submitted a declaration filed in the Eastern Division in *Jones v. Upland
Housing Authority*, EDCV 12-2074 VAP (C.D. Cal. Feb. 24, 2014), by Amy
Lally, a partner at Sidley Austin in Los Angeles serving as co-counsel with
public interest lawyers. Exhibit 22. Ms. Lally attested that she is a 1998 law
graduate and that her 2012 customary billing rate was $700 an hour and her
2014 rate was $825 an hour, an increase of almost 20 percent in just two years.
Ms. Lally's 2014 rate is more than 20 percent higher than Mr. Adams' requested
rate of $680 and Mr. Arulanantham's rate of $670.

**2015 RATES FOR SULLIVAN & CROMWELL ASSOCIATES**

37.    Sullivan & Cromwell is seeking compensation for 2007, 2008 and
2009 law graduates at the 2015 rate of $865 an hour. These rates are supported
by the declaration of Michael Steinberg and the various orders and awards
identified in, and submitted with, his declaration. In addition to the evidence

16

submitted by Mr. Steinberg, additional support for these market rates is found in the rates for Milbank Tweed.   Milbank attorney Hannah Cannom attested that her billing rate for 2014 was $800 an hour with eight years of experience. Exhibit 23, ¶¶ 2,6. This rate is comparable to the $865 requested for the Sullivan 2007 associates.   It represents approximately a 7.5 percent increase for an additional year of experience and an increase in base rates.

38.    Similarly, the rates for sixth-year associates are comparable. Milbank Tweed's 2014 billing rate for an associate with six years of experience was $760 an hour.  Sullivan now requests $800 an hour, which is little more than a five percent increase from 2014.  The rate requested for the 2010 law graduate is also reasonable when compared to the Milbank 2014 rates.   Last year, Milbank billed an associate with six years of experience at $760 an hour.  With one year less experience, but allowing for a rise in base rates for all associates, the Sullivan rate is $10 below the 2014 Milbank rate for an associate with one year less experience.  Sullivan also seeks fees at a 2015 market rate of $370 an hour for a 2014 law graduate.  In 2009, Gibson Dunn billed an attorney with the same experience at $345 an hour.  Exhibit 17, p. 15. The $25 differential in these rates over six years is little more than a $4 a year increase.  As demonstrated by the various fee awards submitted with my declaration, this is far below the actual increases in rates over the past six years.

**2015 RATE FOR 2001 GRADUATE**

39.    The requested 2015 rate for Victoria Lopez, a 2001 law graduate, of $640 an hour is also consistent with the rates approved for civil rights attorneys. For example, in 2014, Peter Bibring, a 2002 law graduate and a staff attorney at the ACLU of Southern California, was awarded fees at $640 an hour by the Hon. Valerie Baker Fairbank in *Vasquez*. Exhibits 27 and 28.  With two additional years of experience, Ms. Lopez seeks the same rate for 2015 that was approved for Mr. Bibring last year.  Ms. Lopez's requested rate is comparable to the 2013

1   rate of $585 an hour approved for Laboni Hoq.  *See* Exhibit 15, p. 5.  Both are

2   2001 law graduates; however, Ms. Lopez has two additional years of experience

3   at this point.  The $55 difference in their rates represents an increase of

4   approximately 4.55 annually, including both an adjustment of base rates an step

5   increases.

6          **2015 RATE FOR 2007 GRADUATES**

7          40.    Three attorneys graduated in 2007.  They seek fees at the 2015 rate

8   of $535 an hour.  They are now practicing eight years. In *Rodriguez*, Judge

9   Marshall approved the 2014 rate of $600 an hour for Kevin LaHue, identified as

10  a 2006 law graduate.  Exhibit 16, p. 14.  In *Communities Actively Living,* Judge

11  Marshall approved the 2012 rate of $555 an hour for Mary-Lee Smith, a

12  seventh-year attorney.   Exhibit 10, p. 6.   In the same decision, the Court

13  approved $525 an hour as the 2012 rate for Matthew Strugar, then an eighth-year

14  attorney.  I am very familiar with Sean Riordan, who was an attorney with the

15  ACLU of San Diego and Inland Counties until recently. I am also very familiar

16  with Matthew Strugar, as previously stated, as he was my law clerk and is now

17  my co-counsel.  Their skills are comparable as attorneys practicing eight years.

18  The $10 difference in their rates is insignificant in view of the three year time

19  difference since the rates approved for *Communities Actively Living*.

20         **2015 RATE FOR 2008 GRADUATE**

21         41.    The 2008 graduate, Marisol Orihuela, is now practicing seven

22  years. She seeks a rate of $510 an hour.  In 2012, Judge Marshall approved the

23  rate of $555 an hour for Mary-Lee Smith of Disability Rights Advocates, then

24  practicing the same length of time. Exhibit 10, p. 6.  That same year, Judge

25  Carter approved the rate of $460 an hour for David Sarnoff, then an associate at

26  Schonbrun DeSimone.  Exhibit 14, p. 8. Ms. Orihuela's proposed rate is at the

27  mid-point of what district court's awarded to civil rights lawyers with seven

28  years experience three years ago.

**2015 RATE FOR 2009 GRADUATES**

42.     The 2009 graduates are now practicing six years. They seek a 2015 rate of $490 an hour. In *Communities Actively Living*, the Court approved the 2012 rates of $430-450 an hour for attorneys then practicing five years.  Exhibit 10, pp. 6-7.  In *Rodriguez*, Judge Marshall approved the 2014 rate of $500 an hour for Caitlin Weisberg, identified as a 2008 law graduate.  Exhibit 16, p. 14. Laurence Paradis attested that the rate for a sixth-year attorney at DRA in 2013 was $455.  Exhibit 11.  The increase of $35 over two years represents an annual increase of approximately 3.5 percent.

**2015 RATE FOR 2010 GRADUATES**

43.     The 2010 graduates are now practicing five years. They seek a 2015 rate of $475 an hour.     As noted in the preceding section, in *Communities Actively Living*, Judge Marshall approved rates of $430 to $450 an hour for civil rights attorneys practicing five years at the time.  Exhibit 10, pp. 6,7.  The increase of the base rate over three years is a modest 1.5 to 3.3 percent annual increase.  In 2010, DRA attorney Mary Lee Kimber was awarded fees at the same rate of $475 an hour when she was practicing five years.  Exhibit 9, p. 11.

**2015 RATE FOR 2011 GRADUATES**

44.     The 2011 graduates are now practicing four years. They seek a 2015 market rate of $450 an hour.  In *Charlebois*, Judge Carter awarded fees to Schonbrun DeSimone associate Amanda Canning, a 2006 graduate, at the 2010 rate of $450 an hour.  Exhibit 14, p. 10.  The rate of $450 an hour is the same as the 2012 rate approved for a fifth-year attorney in *Communities Actively Living*. Exhibit 10, pp. 6,7.  This rate is the same rate approved by Judge Otero in *Avila* for Alyssa Shabloski, a 2008 law graduate with the McNicholas law firm in *Avila*.  Exhibit 25, p. 4.  At the time of this award in 2012, Ms. Shabloski had only four years of experience.

**2015 RATE FOR 2014 GRADUATE**

19

45.     Plaintiffs are seeking fees at $340 an hour for the 2014 graduate. The 2013 rate for a second-year attorney at DRA was $295 an hour. Exhibit 11, Ex. A. The Court approved the 2012 rate of $330 an hour for Kara Janssen, identified as a 2010 graduate. Exhibit 10, p. 7. Also in 2012, the Court approved the rate of $325 an hour for Menaka Fernando, listed as a 2010 graduate. Exhibit 14, p. 8.

**PARALEGALS AND LAW STUDENTS:**

46.     Plaintiffs also seek compensation for paralegals with varying degrees of experience. As the exhibits attached to my declaration demonstrate, it is the practice in Los Angeles to bill the time of paralegals. The rates recently approved for paralegals in civil rights cases range from $150 an hour for a certificated, but relatively new paralegal, to $260 an hour for a highly experienced paralegal. In *Hickman,* the Court approved the 2011 paralegal billling rate of $200 an hour at the firm of Traber & Voorhees. Exhibit 13, ¶ 12. In 2011 in *Vasquez*, Judge Baker approved compensation for paralegals at the ACLU at rates ranging from $165 an hour to $200 an hour. Exibit 18, p. 3. In *Charlebois*, Judge Carter approved compensation for paralegals at Schonbrun DeSimone at a 2012 rate of $150 an hour. Exhibit 14, p. 8. The 2012 rates approved for paralegals in *Communities Actively Living* ranged from $230 to $240 an hour. Exhibit 10, p. 7. In *Hernandez*, the Court approved fees to Traber & Voorhees at $200 to $250 an hour for time incurred by paralegals. Exhibit 15, p. 5. In 2014 in *Rodriguez*, the Court approved paralegal rates of $175 to $295 an hour at the Kaye, McLane, Bednarski & Litt firm. Exhibit 16, p. 14.[1]

47.     In *Charlebois*, the Court approved $200 an hour for law students at

---

[1] Michael Steinberg's Declaration and Exhibits provide support for the rates of Sullivan & Cromwell LLP support staff.

Schonbrun DeSimone.  Exhibit 14, p. 8.  In *Jones v. City of Los Angeles*, Judge
Real approved fees for law clerks at $200 an hour for 2008.  Exhibit 4, p. 4.  The
rate approved for DRA summer law clerks in *Communities Actively Living* was
$250 an hour.  Exhibit 10, p.7.  In *Hernandez*, the Court approved fees for law
clerks at Traber & Voorhees at $225 an hour for 2013.  Exhibit 15, p. 5, ¶ 9.

48.    Based on all of the decisions and declarations identified above, I am
of the opinion that the rates sought by this motion are well within the range of
reasonable market rates for attorneys of comparable skill, experience and
reputation engaged in similarly complex litigation in the Central District.


I declare under penalty of perjury that the foregoing is true and correct.
Executed this 31st day of July, 2015, at Los Angeles, California.


CAROL A. SOBEL

21

# EXHIBIT 6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | |

Present: The Honorable    PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

| Kamilla Sali-Suleyman | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**        MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND ATTORNEYS' FEES

        Before the Court are a Motion for Final Approval of Class Action Settlement (Docket No. 322)
and a Motion for Attorneys' Fees and Costs (Docket No. 307) filed by plaintiffs Michael Nozzi
("Nozzi") and Nidia Pelaez ("Pelaez") (collectively "Plaintiffs" or "Named Plaintiffs"). Defendants
Housing Authority of the City of Los Angeles ("HACLA") and Rudolph Montiel in his official capacity[1]/
(collectively "Defendants") do not oppose either motion. A Fairness Hearing was held on January 29,
2018.

## I.    FACTUAL & PROCEDURAL BACKGROUND

        The Section 8 housing program provides rental assistance to low-income, elderly, and disabled
families. See Nozzi v. HACLA, 806 F.3d 1178, 1184 (9th Cir. 2015) ("Nozzi II"). The majority of this
assistance is provided through the Housing Choice Voucher Program, which is funded and regulated by
the Department of Housing and Urban Development ("HUD") and administered locally by public
housing agencies such as HACLA. Id. Under this program, the renter identifies qualifying housing, the
public housing agency negotiates the rent with the landlord, the public housing agency pays a rent
subsidy to the landlord on behalf of the tenant, and the renter pays the balance of the rent. Id. Within
parameters established by HUD, the public housing agency sets a voucher payment standard (VPS)
representing the maximum subsidy that it will pay for each type of housing in a particular area. Id. at
1185. Raising the VPS will generally yield larger subsidies, while lowering the VPS will generally yield
smaller subsidies. Id. Each renter's eligibility for Section 8 benefits is examined on a yearly basis. Id.
"If the public housing agency decides to lower the [VPS], it must provide information about the change
to all beneficiaries at their annual reexaminations following the decision, and must further advise these
beneficiaries that the change will not go into effect until their following reexamination one year later."
Id.

_____

[1]/        The City of Los Angeles was originally named as a defendant, but was dismissed on May 23,
2007. (Docket No. 48.)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | |

HACLA reduced its VPS in 2004. Under the new standard, an estimated 45% of tenants were required to pay an average of $104 more in rent each month. Id. at 1186. HACLA notified renters of this change in a flyer sent with annual reexamination documents. Id. The flyer provided general information about the new VPS, but did not specify how the changes would affect each renter. Id. An individualized notice was not provided until a second notice sent approximately four weeks before the new subsidy would take effect for each renter. Id.

Plaintiffs, along with the now-defunct Los Angeles Coalition to End Hunger & Homelessness, initiated this action in January 2007. Id. In April 2007, the district court granted in part and denied in part a motion to dismiss. (Docket No. 42.) Plaintiffs filed a First Amended Complaint alleging violations of (1) due process of law under 42 U.S.C. § 1983, (2) rights created by 42 U.S.C. § 1437f, (3) Cal. Gov. Code § 815.6, (4) Art. I, § 7 of the California Constitution, and (5) negligence. (Docket No. 49.) The Court dismissed the second and fifth claims (Docket No. 63) and later granted Defendants' motion for summary judgment on the remaining claims (Docket No. 90). The Ninth Circuit reversed the dismissal of the fifth claim and the grant of summary judgment on the first, third, and fourth claims. Nozzi v. HACLA, No. 09–55588, 2011 WL 1167188 (9th Cir. 2011) ("Nozzi I"). On remand, the district court granted HACLA's renewed motion for summary judgment. (Docket Nos. 190, 192.) The Ninth Circuit again reversed, holding that the flyer sent by HACLA did not provide sufficient notice of the VPS change. The court found that this "failure violated both the requirements of the Voucher Program regulations and the requirements of procedural due process," as well as state law. Nozzi II, 806 F.3d at 1204. The matter was remanded "with instructions for the district court to enter summary judgment in favor of the plaintiffs on the merits of the federal and state law claims at issue on this appeal." Id.

Following remand, this Court certified two classes: (1) the Rule 23(b)(2) "Injunctive Relief Class" and (2) the Rule 23(b)(3) "Damages Class." (Docket No. 245.) The Injunctive Relief Class consists of all Section 8 beneficiaries whose benefits are administered by HACLA and who in the past received, or in the future may receive, notices of a VPS decrease. (Id.) The Damages Class consists of all HACLA Section 8 tenants, between June 1, 2005, and September 30, 2006, whose rental contribution for a period not to exceed eleven months was greater than it would have been but for HACLA's 2004 decrease in the VPS. (Id.) All Damages Class Members are also members of the Injunctive Relief Class. (Docket No. 297, Ex. A ("Settlement Agreement") ¶ 7.) The Damages Class consists of 11,870 tenants on the Damages Class Member List, and their principal damages amount to $10,308,774. (See id. ¶¶ 9, 10; Docket No. 297, Ex. D ¶ 3.)

In February 2017, the parties filed cross-motions for partial summary judgment as to remedies. (Docket Nos. 250, 256.) Before the Court ruled on those motions, the parties filed a Stipulation for Settlement. (Docket No. 286.) On June 19, 2017, Plaintiffs filed an unopposed Motion for Preliminary Approval of Class Action Settlement. (Docket No. 296.) On July 29, 2017, the Court preliminarily approved the Settlement Agreement, as well as the appointment of JND Legal Administration ("JND") as Class Administrator, and Barrett S. Litt, Anne Richardson, and Stephanie Carroll as Class Counsel. (Docket No. 305 ("Prelim. Approval Order").)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | |

Plaintiffs now move for final approval of the Settlement Agreement. In addition, Plaintiffs seek approval of attorneys' fees, litigation costs, settlement administration costs, and incentive awards.

## II. THE SETTLEMENT AGREEMENT

The Settlement Agreement was reached after ten years of litigation, two appeals, and two days of mediation before a retired federal judge. (See Settlement Agreement pp. 2–3.) The parties ultimately agreed that HACLA's insurers would pay a total of between $9 million and $9.4 million toward the "Class Fund" to settle all monetary claims of the Damages Class Members. (Id. at ¶ 6.) Under the Settlement Agreement, and as further explained in the motion for preliminary approval, the following expenses would be deducted from the Class Fund: attorneys' fees of less than 30% of the Class Fund; litigation costs of approximately $220,000; expenses of approximately between $48,000 and $68,000 incurred by the Class Administrator, and publication expenses of approximately $10,000 to $12,000; Pelaez's incentive award of $5,000; and Nozzi's incentive award of $1,000. (Id. at ¶¶ 4, 22, 49, 52; Mot. for Prelim. Approval at 9; Docket No. 297, Ex. E ("JND Proposal").) The residual amount of approximately $6 million (the "Residual Class Fund") would be available for Damages Class Member claims. (See Settlement Agreement ¶ 35.) The final Damages Class Member List was to be prepared by Plaintiffs' expert Kriegler based on information supplied by HACLA and HUD. (Id. at ¶¶ 9, 12.)

The Settlement Agreement required the Damages Class Members to file claims to qualify for and receive damages. (Id. at ¶ 35.) Pursuant to the Settlement Agreement, a Damages Class Member would be compensated up to the amount of additional rent that he or she paid as a result of the reduced HACLA subsidy, depending on the number of claimants. (Id. at ¶ 19.) If more claims were made than could be fully compensated by the Residual Class Fund, claimants would receive proportional reductions in their reimbursements. (Id. at ¶ 32.) If more than $2 million, but less than the Residual Class Fund, was claimed, the remainder would revert to Defendants' insurers. (Id. at ¶ 33.) If less than $2 million in claims were made, the difference between $2 million and the claims made would be donated to a cy pres organization. (Id.) In addition, if Damages Class Members made claims, but do not cash their checks, the parties agreed that the Class Administrator would make efforts to reach them and assist them to do so; the funds from checks not cashed within one year of issuance would go to agreed upon cy pres organizations. (Id.)

The Settlement Agreement further provided that HACLA would treat any payment to Damages Class Members who are current recipients of Section 8 in accordance with HUD regulation 24 C.F.R. § 5.609(c)(3), i.e., as a settlement for personal injury. (Id. at ¶ 34.) Furthermore, HACLA would designate a person whom Damages Class Members could contact with questions about the impact of receipt of settlement funds on their Section 8 benefits. (Id.)

The parties also agreed upon a three-year injunction. Pursuant to the injunction provisions, HACLA, when issuing notices related to reduction of the VPS, must "simply and plainly communicate the information provided in non-technical, [sic] language that would be reasonably understandable to Section 8 tenants, at a language level commensurate with the average educational level of Section 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | |

tenants. The notice shall reasonably explain the known, likely or potential impact on the tenant of the action that is the subject of the notice." (Id. at ¶ 71(a).) Furthermore, any such notice involving reduction of the VPS "shall be provided to Class [C]ounsel before it is sent [to Section 8 tenants], and shall be subject to approval of Class Counsel before it is communicated to Section 8 tenants, which approval shall not be unreasonably withheld." (Id. at ¶ 71(b).) Finally, HACLA is required to "use language reasonably understandable to Section 8 tenants" when communicating any new notices to tenants, other than a notice of reduction of the VPS, which are addressed by ¶ 71(a) of the Settlement Agreement. (Id. at ¶ 71(c).)

In return for the injunction and damages, Class Members agree to release Defendants from "all claims . . . involving violations of law or constitutional rights, including, without limitation, their due process rights under federal and California Constitutions and law, their rights under California Civil Code § 815.6 and for negligence, any other rights under any other federal, state or local law, regulation, duty, or obligation, or any other legal theory, action or cause of action, which are based upon or could be based upon or arise from the facts alleged in the lawsuit (hereafter 'Covered Claims')." (Id. at ¶ 42.) Class Members, including the Named Plaintiffs, "waive all rights to any and all claims relating to damages or reimbursement of any kind for the Covered Claims." (Id. at ¶ 43.) They further "waive any and all rights to pursue, initiate, prosecute, or commence any action or proceeding before any court, administrative agency or other tribunal, or to file any complaint regarding acts or omissions by the Released Persons with respect to the Covered Claims during the Class Period that fit within the definition of the Damages Class; and further, as it relates to this waiver or Release, expressly waive the provisions of California Civil Code § 1542." (Id. at ¶ 44.) Those who suffered damages but were omitted from the Damages Class Member List would not be bound by the Settlement Agreement as to claims for damages, and would be permitted to bring such claims against Defendants. (Id. at ¶ 10 n.1.) Finally, Damages Class Members could opt out or object if they were not satisfied with the settlement amount or other aspects of the Settlement Agreement. (Id. at ¶¶ 66–70.)

## III. FINAL APPROVAL OF CLASS ACTION SETTLEMENT

### A. Fairness of the Class Settlement

Rule 23(e) requires a district court to determine whether a proposed class action settlement is "fundamentally fair, adequate, and reasonable." Staton v. Boeing Co., 327 F.3d 938, 959 (9th Cir. 2003). To make this determination, courts consider a number of factors, including: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. See id. Also, the settlement may not be the product of collusion among the negotiating parties. In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000). The Ninth Circuit has declared that a strong judicial policy favors settlement of class actions. Class Plaintiffs v.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-380 PA (FFMx) | | Date | February 15, 2018 |
|----------|---------------------|--|------|-------------------|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | | |

City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992). For the following reasons, the Court finds that the Settlement Agreement is fundamentally fair, adequate, and reasonable.

> 1.  The Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation

"When evaluating the strength of a case, the Court should evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." De Santos v. Jaco Oil Co., No. 1:14-cv-0738-JLT, 2015 U.S. Dist. LEXIS 93410, at *16 (E.D. Cal. July 17, 2015). Here, prior to settlement, the parties had already litigated for more than 10 years, and endured two appeals, which ultimately resolved the issue of liability. However, whether, and to what extent, damages were available remained unresolved and cross-motions for summary judgment on that issue remained pending at the time of settlement. There remained a likelihood that the Court's ruling on those motions would have been appealed. (See Final Approval Mot. 7, 9.) In addition, failure to settle at this point would have further delayed relief for Class Members who, by definition, are (or at least were during the class period) low-income. These factors favor granting final approval of the Settlement Agreement.

> 2.  The Amount Offered in the Settlement Agreement

The Class Fund amount is $9,339,256.47.[2/] The Motions for Final Approval and Attorneys' Fees seek (1) an attorneys' fee award of $2,801,776.94; (2) reimbursement of litigation expenses of $169,699.88; (3) incentive payments to Pelaez and Nozzi of $5,000 and $1,000, respectively; and (4) costs for settlement administration, totaling $60,000. Thus, the Residual Class Fund of approximately $6.3 million was available for claims by Damages Class Members. The Residual Class Fund was sufficient for up to approximately 58% of claims of Damages Class Members to be compensated in full. In fact, approximately 19.38% of Damages Class Members filed claims that have been approved, and thus each of those claimants will be paid in full for the decrease in rent subsidy, without interest. Claimed damages total approximately $2,160,078.45.[3/] (Keough Decl. ¶ 22.)

---

[2/]      The Settlement Agreement provided for a Class Fund that was between $9 million and $9.4 million, dependent upon defense fees. (Settlement Agreement ¶ 6.) The parties have concluded, after subtracting total defense fees, that $9,339,256.47 is the total available Class Fund. (Final Approval Mot. 2; Litt Decl. ISO Final Approval Mot. ¶ 5.)

[3/]      While the Motion for Final Approval states that the value of all valid claims was $2,218,075.26 as of December 6, 2017, the initial declaration of the Class Administrator attests that the damages for all valid claims amounted to $2,160,078.45 as of December 20, 2017. (Compare Final Approval Mot. 3, with Litt Decl. ISO Final Approval Mot., Ex. 7 ("Keough Decl.") ¶ 22.) However, the Class Administrator has updated the number of valid claims from 2,269 in her initial declaration to 2,300 in a

(continued...)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | | Date | February 15, 2018 |
|---|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | | |

Given the increased expense and risk that would accompany continued litigation and the presence of the opt-out provision, the Court finds that the total settlement amount is reasonable and favors approval of the Settlement Agreement.

### 3. The Extent of Discovery Completed and the Stage of the Proceedings

Litigation in this action has been extensive and discovery was complete at the time of settlement. Furthermore, Plaintiffs hired an expert who performed extensive analysis of records held by HACLA and HUD to determine damages. The parties also engaged in two days of formal mediation before a third-party neutral. This extensive case history weighs in favor of approval of the Settlement Agreement.

### 4. The Experience and Views of Counsel

The Court finds that Class Counsel has sufficient experience with class action litigation to appropriately assess the legal and factual issues in this matter and determine whether the Settlement Agreement serves the interests of the Class Members. Thus, Class Counsel's belief that the Settlement Agreement is both fair and adequate weighs in favor of approval.

### 5. Collusion Between the Parties

To determine whether there has been any collusion between the parties, a court must evaluate whether "fees and relief provisions clearly suggest the possibility that class interests gave way to self interests," thereby raising the possibility that the settlement is the result of misconduct by the negotiators or improper incentives for certain class members. Staton, 327 F.3d at 961. Here, it appears that the Settlement Agreement was the product of informed, arm's-length negotiations between the parties. The reasonableness of the amount offered in settlement, the extensive litigation history, and the involvement of a third-party neutral further suggest an absence of collusion. Furthermore, the fees and incentive awards sought do not suggest collusion, particularly as any such award was conditioned upon approval of the Court. (See Settlement Agreement ¶¶ 49, 52); see also Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 968 (9th Cir. 2009) (finding conflicts of interest where incentive agreements existed between named plaintiffs and counsel). The Court finds that the Settlement Agreement is the product of non-collusive negotiations.

---

[3]/(...continued)
supplemental declaration, but has not updated the dollar value of approved claims. (Compare Keough Decl. ¶ 22, with Docket No. 330-1 ("Keough Suppl. Decl.") ¶ 12.a.) While this change in number of valid claims renders it likely that the $2,160,078.45 figure is low, for purposes of this Order, the Court assumes it is a reasonable approximation of the value of the valid and approved claims.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | | Date | February 15, 2018 |
|----------|---------------------|---|------|-------------------|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | | |

### 6. Presence of Governmental Participant

Pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, Defendants notified the Attorney General of the United States and the CAFA Coordinators of the California Office of the Attorney General of the Settlement Agreement. (See Docket No. 303.) "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." Garner v. State Farm Mut. Auto. Ins. Co., Case No. CV 08-1365 CW (EMC), 2010 U.S. Dist. LEXIS 49477, at *14 (N.D. Cal. Apr. 22, 2010). No government official has objected to the terms of the Settlement Agreement. Accordingly, this factor weighs in favor of final approval. See Noll v. eBay, Inc., 309 F.R.D. 593, 608 (N.D. Cal. 2015); Holman v. Experian Info. Sols., Inc., Case No. 11-cv-0180 CW (DMR), 2014 U.S. Dist. LEXIS 173698, at *8 (N.D. Cal. Dec. 12, 2014).

### 7. Reaction of Class Members to Settlement

Where a settlement agreement enjoys overwhelming support from the class, this lends weight to a finding that the settlement agreement is fair, adequate, and reasonable. Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."); see also Boyd v. Bechtel Corp., 485 F. Supp. 610, 624 (N.D. Cal. 1979) (finding that objections from only 16 percent of the class was persuasive that the settlement was adequate). Class Members were provided notice of the Settlement Agreement pursuant to this Court's order granting the motion for preliminary approval. (See infra Part III.B.)

According to the Class Administrator, there were 2,300 valid and approved claims out of 11,870 Damages Class Members, amounting to 19.38% participation of the Damages Class. (See Keough Suppl. Decl. ¶ 12.a.) Thirty-one additional Class Members filed claims that lacked signatures or were otherwise deficient, and were not timely cured.[4] (Id. at ¶ 12.c.) Twenty-seven claim forms were submitted by eligible Class Members but postmarked after the filing deadline of December 6, 2017.[5]

---

[4]    Additionally, 556 claim forms were submitted by individuals who did not appear on the Damages Class List and 65 claim forms were duplicates of earlier-submitted claims forms. (Id. at ¶¶ 12.d, 12.e.) These claims were denied. (Id. at ¶¶ 12.d, 12.e.)

[5]    At the final fairness hearing, counsel indicated that the parties were still deciding whether to accept these claims despite their untimeliness. Unless otherwise agreed upon by the Parties, claim forms not received or postmarked by December 6, 2017, shall not be paid, although those claimants shall nonetheless be bound by this Order and the Judgment.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | |

(Id. at ¶ 12.b.)  No Class Member objected to the Settlement Agreement[6/] and 8 Class Members opted out.  (Keough Decl. ¶¶ 15, 18.)  The Administrator attempted to mail notices to all Class Members, and after skip-tracing, ultimately 11,056 such notices were mailed and not returned as undeliverable.  (Id. at ¶ 7.)

The settlement website created by JND tracked 13,285 unique users who registered 24,595 page views and 1,103 case document views.  (Id. at ¶ 8.)  The toll-free number established by JND received more than 1,775 calls (id. at ¶ 11), and JND associates spoke with 737 such callers (Keough Suppl. Decl. ¶ 8).  The overall positive reaction of Class Members and lack of objections is strong evidence that the Settlement Agreement is fundamentally fair and reasonable.

## B.    Adequacy of Notice to the Settlement Class

Under Federal Rule of Civil Procedure 23(e), this Court must "direct notice in a reasonable manner to all class members who would be bound by the proposal."  Such notice must be "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  Klee v. Nissan N. Am., Inc., No. CV 12-08238 AWT (PJWx), 2015 WL 4538426, at *5 (C.D. Cal. July 7, 2015).  The notice given in this case was reasonably calculated to reach the Damages Class.  The notices described the essential terms of the Settlement Agreement, defined the classes, set forth the procedure for Damages Class Members to make claims, opt out, or file objections to the Settlement Agreement, and provided information on the date, time, and location of the Final Fairness Hearing.  (Docket No. 297, Ex. C; Keough Decl. ¶ 5.)  They further provided a toll-free number for Class Members to call and a website containing essential case documents.  (Keough Decl. ¶¶ 8, 10.)  In addition, notices were posted at HACLA offices where Section 8 tenants may have occasion to visit.  (See Docket No. 325, Mendoza Decl. ¶¶ 2–3.)  Finally, a notice was published in the L.A. Times for three consecutive weeks on August 18, 2017, August 25, 2017, and September 1, 2017, and a 30-day internet advertising campaign was launched on Facebook, Instagram, and Twitter to inform Class Members about the settlement.  (Keough Decl. ¶ 12.)  The Court therefore concludes that the notice procedures satisfied the requirements of Due Process and Federal Rule of Civil Procedure 23(e).

# IV.   ATTORNEYS' FEES, LITIGATION EXPENSES, INCENTIVE AWARDS, AND ADMINISTRATION EXPENSES

## A.    Attorneys' Fees

The Court is obligated to conduct a careful review of the reasonableness of requested attorneys' fees and costs.  See In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1302 (9th Cir. 1994)

---

[6/]     One objection was received, but that Class Member later withdrew his objection, which involved matters distinct from the instant action or the Settlement Agreement.  (See Docket Nos. 318, 319, 320; see also Litt Decl. ISO Final Approval Mot., Ex. 2.)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | |

("Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs."). Plaintiffs seek $2,801,776.94 in attorneys' fees. (Final Approval Mot. 19.) This constitutes 30% of the Class Fund created by the Settlement Agreement. In common fund cases, "where the settlement or award creates a large fund for distribution to the class, the district court has discretion to use either a percentage or lodestar method." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th Cir. 1998). "The percentage method means that the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee." Id. The Ninth Circuit has established 25% of the common fund "as a benchmark award for attorney fees." Id.

Class Counsel cites numerous cases in district courts and other circuits that have found up to 33% to be a reasonable fee in class action settlement. (See Attorneys' Fees Mot. 13–14 & n.2.) Furthermore, the Ninth Circuit has concluded that "[t]he 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases. Selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1048 (9th Cir. 2002) (holding that district court did not abuse its discretion in awarding 28% of common fund as attorneys' fees). Class Counsel argues that in light of the risk involved; complexity of issues; Class Counsel's experience, skill, and effort expended; and results obtained, 30% of the Class Fund is a reasonable fee in this case. (Attorneys' Fees Mot. 3–9.)

"The lodestar method can 'confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate . . . .'" In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 945 (9th Cir. 2011) (quoting In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 820 (3d Cir. 1995)). Here, according to Class Counsel's professed rates and hours worked, the lodestar calculation would be approximately $3.3 million. (See Final Approval Mot. 17.) The Class was represented by two firms: Kaye, McLane, Bednarski, and Litt and Public Counsel. Between the two firms, ten attorneys have spent 3,735.7 hours working on this case since its inception more than a decade ago. (Litt Decl. ISO Final Approval Mot. ¶ 10; Richardson Decl. ISO Final Approval Mot. ¶ 8.)[7] Each of these attorneys has a rate of between $540 and $1150 per hour. (Litt Decl. ISO Final Approval Mot. ¶ 10; Richardson Decl. ISO Final Approval Mot. ¶ 8.) A litigation coordinator and three paralegals have rates of between $150 and $335 and have committed a total of 685.9 hours to this case, while three law clerks, billing at $200 per hour, spent 96.8 hours on this case. (Litt Decl. ISO Final Approval Mot. ¶ 10; Richardson Decl. ISO Final Approval Mot. ¶ 8.)

---

[7] The Court notes disparity between the hours and rates for Public Counsel provided by Mr. Litt in his Declaration in support of the Motion for Final Approval, and those provided by Ms. Richardson in her Declaration. (Compare Litt Decl. ISO Final Approval Mot. ¶ 10, with Richardson Decl. ISO Final Approval Mot. ¶ 8.) At the Final Fairness Hearing, Class Counsel acknowledged that Ms. Richardson's Declaration should be relied upon for such hours and rates where contradictions between the declarations exist.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|

| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. |
|---|---|

    Considering the results achieved, the time expended, the risks faced in this litigation, the skill required, the quality of work, the contingent nature of the fee, the financial burden carried by Class Counsel, and awards made in similar cases, as well as the lack of Class Member objection to this fee award, the Court finds that the requested attorneys' fee award is reasonable. The Court therefore grants Plaintiffs' request for $2,801,776.94 in attorneys' fees to be awarded from the Class Fund.

### B. Litigation Costs

    Plaintiffs request $169,699.88 in litigation costs. "Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionately by those class members who benefit by the settlement." In re Media Vision Tech. Sec. Litig., 913 F. Supp. 1362, 1366 (N.D. Cal. 1996). However, expenses that should be considered part of an attorney's overhead, and therefore included within an award of attorneys' fees, should not be characterized as a litigation expense and recovered as a cost item. Id. ("An award of out-of-pocket expenses should be limited to those expenses customarily billed to a fee-paying client.") These costs are itemized in detail in the supporting declarations. (See Litt Decl. ISO Final Approval Mot. Ex. 6; Litt Decl. ISO Attorneys' Fees Mot., Ex. D.) The most expensive items include expert fees of $118,430.50, mediation costs of $18,000, and online research costs of $17,094.02. The Settlement Agreement further identifies the types of costs for which Defendants agreed to reimburse Class Counsel, and the Preliminary Approval Order noted that litigation costs of up to $220,000 could be awarded. (See Settlement Agreement ¶¶ 5, 52; Prelim. Approval Order at 3.) No Class Member objected. The Court concludes that with the exception of the online research costs of $17,094.02 which the Court determines is part of an attorney's overhead, the requested litigation costs are reasonable. Accordingly, the Court awards $152,605.86 in litigation costs.

### C. Named Plaintiffs' Incentive Awards

    Plaintiffs also seek incentive awards of $5,000 for Pelaez in addition to her damages award, and of $1,000 for Nozzi inclusive of his damages. (Final Approval Mot. 13.) Courts may consider the following criteria to determine whether to make an incentive award: (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit enjoyed by the class representative as a result of the litigation. Van Vraken v. Atl. Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995); see also Rodriguez, 563 F.3d at 959 (agreeing with district court that incentive award should be tied to work performed, risks undertaken, and time spent on litigation). Courts also consider "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." Staton, 327 F.3d at 975; see, e.g., In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 943 (9th Cir. 2015) (holding that incentive award to class representative was permissible where "[t]he amount sought and awarded was relatively small, well within the usual norms of 'modest compensation' paid to class representatives for services performed in the class action"); Friedman v. Guthy-Renker, LLC, No. 2:14-cv-06009-ODW(AGRx), 2016 WL 6407362, at *8 (C.D. Cal. Oct. 28, 2016) (balancing the above considerations and concluding that "while

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | |

[two of the named plaintiffs'] awards come close to the threshold of disapproval, the Court finds that their participation in this lawsuit—including responding to substantial discovery and sitting for a deposition—justifies the award." (citation omitted)); Cox v. Clarus Mktg. Grp., LLC, 291 F.R.D. 473, 483 (S.D. Cal. 2013).

In its order preliminarily approving the Settlement Agreement, the Court explicitly warned that final approval of an incentive award would require a more significant showing. (See Prelim. Approval Order at 6.) Despite this warning, Plaintiffs have provided little additional factual basis to support the requested incentive awards. Plaintiffs assert that Nozzi initiated this action and without him there may have been no case. (Final Approval Mot. 13.) Meanwhile, Pelaez served as Class Representative and was available for a deposition if necessary, participated in interviews with Class Counsel, and provided declarations. (Id.; Litt Decl. ISO Final Approval Mot. ¶ 2.)

Such assertions do not support the awards sought by Plaintiffs. However, the Court finds an award of $2,500 to Pelaez, in addition to her damages award, and $500 to Nozzi, inclusive of his damages, to be reasonable in light of their participation, and thus, grants awards to Named Plaintiffs in those amounts.

**D.      Settlement Administration Award**

Finally, Plaintiffs seek approval of settlement administration costs. The Class Administrator has billed $24,000 and anticipates billing another $24,000 for administration fees. (Keough Suppl. Decl. ¶ 13.) Furthermore, the Class Administrator seeks $12,000 in costs for publication – $6,000 for costs associated with publication in the L.A. Times, and $6,000 for the internet campaign. (Id. at ¶ 11.) Plaintiffs previously filed JND's bid, in which JND estimated a total cost of $48,000 in the event of a 25% claims rate, and noted it could reach $68,000 if more claims were filed. (See Settlement Agreement, Ex. E.) Here, including claims that have been rejected, the Class Administrator has processed 2,979 claims, representing a 25.1% claims rate. (Keough Suppl. Decl. ¶ 12.) In its bid, JND identified the services it expected to provide depending on the number of claimants. Since then, the CEO of JND has provided declarations in which she attests to the services JND has provided, and will provide in this case. (Keough Decl.; Keough Suppl. Decl.) In addition, the parties previously sought, and the Court considered, publication costs of between $10,000 and $12,000, in preliminarily approving the Settlement Agreement. (See Mot. for Prelim. Approval at 9; Prelim. Approval Order at 3.) No class member has objected to such awards of administration or publication costs. Based on the evidence provided and the lack of objections, the Court finds that up to $60,000 total to be reasonable administration and publication costs in this case, and authorizes payment of such costs to JND from the Class Fund.

Furthermore, as requested in the Proposed Order, the Class Administrator will prepare a list of all rejected claims, with the reasons for rejection, and maintain the list in its case file. The Class Administrator shall preserve all written communications from Class Members in response to the Class for at least three years. All written communications received by the Class Administrator from Class

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | |

Members relating to the Settlement Agreement shall be available at all reasonable times for inspection and copying by Counsel for the Parties. At the conclusion of the Class Distribution, the Class Administrator shall submit a report to the Court summarizing the payments made to the Class.

### Conclusion

For the foregoing reasons, the Court finds that the Settlement Agreement is fundamentally fair, adequate, and reasonable. The Court therefore grants Plaintiffs' Motion for Final Approval of Settlement. Injunctive Relief Class Members and Damages Class Members release those claims against Defendants as set forth in the Settlement Agreement, except as to monetary damages for those Damages Class Members who timely opted out. The Court reaffirms its approval of Barrett S. Litt, Anne Richardson, and Stephanie Carroll as Class Counsel and JND as Class Administrator.

The Court also grants in part Plaintiffs' Motion for Award of Attorneys' Fees and awards $2,801,776.94 in fees and $152,605.86 in costs to Class Counsel to be paid by Defendants. Additionally, the Court grants $2,500 to Pelaez as an incentive award and $500 to Nozzi as an incentive award. Furthermore, JND's costs of up to $60,000 are approved. Each of these awards and costs are to be paid from the Class Fund.

The Court orders Defendants to provide the Class Fund to the Class Administrator for disbursement in accordance with the terms of the Settlement Agreement. The Court further orders the Class Administrator to pay all members of the Damages Class who have filed valid claims in accordance with the terms of the Settlement Agreement. The Court will enter a Judgment consistent with this Order and the Settlement Agreement. The effective date of settlement is 30 days after the date the Judgment is entered on the Docket. (Settlement Agreement ¶ 13.)

IT IS SO ORDERED.

# EXHIBIT 7

Barrett S. Litt, SBN 45527
blitt@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Anne Richardson, SBN 151541
arichardson@publiccounsel.org
Stephanie Carroll SBN 263698
scarroll@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

Attorneys for Plaintiffs
MICHAEL NOZZI, et al.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL NOZZI, et al., | Case No. 2:07-cv-00380-PA-FFM |
| Plaintiff, | [Honorable Percy Anderson] |
| v. | **PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS; MEMORANDUM OF LAW; DECLARATIONS AND EXHIBITS IN SUPPORT** |
| HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, et al., | |
| Defendants. | **Date:       January 29, 2018**<br>**Time:       1:30 P.M.**<br>**Place:      Courtroom 9A** |

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

      PLEASE TAKE NOTICE that, on January 29, at 1:30 p.m., in Courtroom 7 of the United States District Court for the Central District of California, 350 W. 1st Street, Courtroom 9A, 9th Floor, Los Angeles, California 90012, Plaintiffs will, and hereby do, move for an award of attorneys' fees and costs pursuant to the terms of the Settlement Agreement and Preliminary Approval Order in this case.

      This motion is based upon this Notice of Motion and Motion, all Declarations and exhibits submitted in support of it, the papers and pleadings on file in this action, and upon such other and further evidence and argument as the Court deems necessary or convenient at the time of the hearing on this matter.

DATED: September 18, 2017    Respectfully submitted,

                           KAYE, McLANE, BEDNARSKI & LITT, LLP
                           PUBLIC COUNSEL

                           By: /s/ Barrett S. Litt
                               Barrett S. Litt
                               Attorneys for Plaintiffs

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** ......................................1

**I.    INTRODUCTION** ...............................................................................1

**II.   DESCRIPTION OF PLAINTIFFS' CLAIMS** ...................................2

**III.  ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE ATTORNEYS' FEE AWARD.** .........................................................3

    **A.    The Complexity Of The Issues** ..............................................3
        1.  The Legal Issues Here Were Complex And Novel ............4
        2.  The Management of the Case was Challenging ...............5
        3.  Reaching A Settlement Was Difficult ............................5

    **B.    The Risks Of Non-Payment Were Substantial** .......................6

    **C.    The Effort Expended By Counsel.** ..........................................6

    **D.    The Result Obtained For The Class** ......................................7

    **E.    Counsel's Experience** ............................................................8

    **F.    Counsel's Skill** ......................................................................9

    **G.    The Reaction Of The Class** ...................................................9

**IV.  THE AMOUNT REQUESTED BY PLAINTIFFS' COUNSEL IS REASONABLE** ..................................................................................9

    **A.    The Percentage of the Fund Method of Calculating Fees Is the Better Method to Calculate Fees And Supports The Fee Request Here.** ..............10

    **B.    The Fund Here Is The Available Funds To Be Claimed, Including Fees, Costs And Money That May Revert To Defendants If Not Claimed.** ........15

    **C.    Although A Lodestar Cross-Check Is Unnecessary, It More Than Supports The Fee Requested Here.** ...............................................16

D.   The Hours Spent On The Case Are Reasonable ...........................................20

E.   The Hourly Rates That Plaintiffs' Counsel Will Receive Under the 30%
Fee Award Are Reasonable. ....................................................................21

F.   Failing To Award The Fees And Costs Requested Would Frustrate The
Purposes Of Class Actions In The Context Of This Settlement. ................24

V.   THE COSTS ARE REASONABLE. .......................................................................25

VI.  CONCLUSION .........................................................................................................25

# TABLE OF AUTHORITIES

## Federal Cases

*In re Activision Sec. Litig.*
  723 F. Supp. 1373 (N.D. Cal. 1989)..................................................................15

*Barjon v. Dalton*
  132 F.3d 496 (9th Cir. 1997)............................................................................17

*In re Bluetooth Headset Products Liab. Litig.*
  654 F.3d 935 (9th Cir. 2011) ............................................................................13

*Blum v. Stenson*
  465 U.S. 886, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984) ................................11

*Boeing Co. v. Van Gemert*
  444 U.S. 472, 100 S. Ct. 745, 62 L. Ed. 2d 676 (1980) .................................15

*Camden I Condominium Ass'n v. Dunkle*
  946 F.2d 768 (11th Cir.1991) ...........................................................................11

*In re Cendant Corp. PRIDES Litigation*
  243 F.3d 722 (3rd Cir. 2001) ............................................................................16

*Charlebois v. Angels Baseball LP*
  993 F. Supp. 2d 1109 (C.D. Cal. 2012) ...........................................................17

*City of Riverside v. Rivera*
  477 U.S. 561 (1986)..........................................................................................22

*Coles v. City of Oakland*
  No. C03–2961 2007 WL 39304 (N.D.Cal. Jan. 4, 2007) ...............................17

*Cotton v. Hinton*
  559 F.2d 1326 (5th Cir. 1977) .............................................................................4

*Craft v. Cnty. of San Bernardino*
  624 F. Supp. 2d 1113 (C.D. Cal. 2008) ...........................................................23

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*
  553 F. Supp. 2d 442 (E.D. Pa. 2008).................................................................22

*In re Enron Corp. Securities, Derivative & ERISA Litigation*
 586 F.Supp.2d 732 (S.D.Tex. 2008)..................................................... 10

*Fischel v. Equitable Life Assur. Soc'y of U.S.*
 307 F.3d 997 (9th Cir. 2002) ...............................................................23

*Franco v. Ruiz Food Prod., Inc.*
 No. 1:10-CV-02354-SKO, 2012 WL 5941801 (E.D. Cal. Nov. 27, 2012)............... 15

*Gaskill v. Gordon*
 160 F.3d 361 (7th Cir. 1998) ............................................................... 12

*Glass v. UBS Financial Services, Inc.*
 2007 WL 221862 (N.D.Cal. 2007) ...................................................... 16

*In re Heritage Bond Litig.*
 No. 02-ML-1475-DT, 2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10,
 2005) ............................................................................................... 15

*Hicks v. Toys "R' Us-Delaware, Inc.*,
 2014 WL 4670896 (C.D. Cal. Sept. 2, 2014 ......................................... 14

*Johnston v. Comerica Mortg. Corp.*
 83 F.3d 241 (8th Cir. 1996) ................................................................. 16

*Landsman & Funk, P.C. v. Skinder-Strauss Associates*
 639 Fed. Appx. 880 (3d Cir. 2016)....................................................... 15

*LaPeter v. Canada Life Ins. Co. of Am.*
 No. CV06–121–S–BLW, 2009 WL 1313336 (D.Idaho May 11, 2009) ...................... 17

*Lopez v. Youngblood*
 No. CV-F-07-0474 DLB, 2011 WL 10483569 (E.D. Cal. Sept. 2, 2011) ................... 24

*Mashburn v. National Healthcare, Inc.*
 684 F.Supp. 679 (M.D.Ala.1988) ........................................................ 11

*Masters v. Wilhelmina Model Agency, Inc.*
 473 F.3d 423 (2nd Cir. 2007) .............................................................. 15

*Missouri v. Jenkins*
 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ............................. 17

iv

*Moore v. James H. Matthews & Co.*
   682 F.2d 830 (9th Cir. 1982) ........................................................................ 20

*Moreno v. City of Sacramento*
   534 F.3d 1106 (9th Cir. 2008) ...................................................................... 21

*Nozzi v. HACLA*
   806 F.3d 1178 (9th Cir. 2015) ........................................................................ 3

*Paul, Johnson, Alston & Hunt v. Graulty*
   886 F.2d 268 (9th Cir. 1989) .......................................................................... 9

*Perdue v. Kenny A. ex rel. Winn*
   559 U.S. 542, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010) ........................ 22

*In re Quintus Sec. Litig.*
   148 F.Supp.2d 967 (N.D.Cal.2001) ............................................................... 3

*In re Remeron Direct Purchaser Antitrust Litigation*
   2005 WL 3008808 (D.N.J. 2005) ................................................................ 12

*In re Rite Aid Corp. Securities Litigation*
   396 F.3d 294 (3rd Cir. 2005) ................................................................. 13, 22

*Rosenfeld v. U.S. Dep't of Justice*
   904 F. Supp. 2d 988 (N.D. Cal. 2012) ........................................................ 18

*Stanger v. China Elec. Motor, Inc.*
   812 F.3d 734 (9th Cir. 2016) ........................................................................ 23

*Staton v. Boeing Co.*
   327 F.3d 938 (9th Cir. 2003) ........................................................................ 16

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*
   2005 WL 1213926 (E.D. Pa. May 19, 2005) ............................................... 24

*Swedish Hosp. Corp. v. Shalala*
   1 F.3d 1261 (D.C.Cir.1993) ......................................................................... 11

*In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act*
   *(FACTA) Litig.*
   295 F.R.D. 438 (C.D. Cal. 2014) ................................................................... 9

*United States v. $12,248 U.S. Currency*
    957 F.2d 1513 (9th Cir.1991) ....................................................................... 18

*Vizcaino v. Microsoft Corp.*
    290 F.3d 1043 (9th Cir. 2002) .......................................................9, 10, 11, 23

*In re Washington Public Power Supply System Securities Litigation*
    19 F.3d 1291 (9th Cir. 1994) ................................................................... 9, 22

*Waters v. Int'l Precious Metals Corp.*
    190 F.3d 1291 (11th Cir.1999) ..................................................................... 15

*Williams v. MGM-Pathe Commun. Co.*
    129 F.3d 1026 (9th Cir.1997) ...................................................................... 15

*Yang v. Focus Media Holding Ltd.*
    2014 WL 4401280 (S.D.N.Y. 2014)............................................................ 25

**State Cases**

*Peak-Las Positas Partners v. Bollag*
    171 Cal. App. 4th 101 (2009) ...................................................................... 20

*Ramon v. County of Santa Clara*
    173 Cal. App. 4th 915 (Cal. Ct. App. 2009)................................................. 20

**Federal Statutes**

42 U.S.C. §1983 ................................................................................................... 3
42 U.S.C. §1988 ............................................................................................ 4, 17

**State Statutes**

Govt. Code §815.6 ............................................................................................... 3

**Rules**

Rule 23(h)........................................................................................................... 25
Rule 26 ................................................................................................................. 6

**Other Authorities**

Citing, Richard A. Posner, *Economic Analysis of Law* 626–27 (5th ed.1998)................. 25

"Empirical Study of Class Actions in Four Federal District Courts: Final
    Report to the Advisory Committee on Civil Rules" ("FJC Report") ........................... 10

vi

*In re Heritage Bond Litigation*,
   2005 WL 1594403 ................................................................................. 3

John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on
   Deterrence and Its Implementation* (Columbia Law. Sch. Ctr. for Law &
   Econ. Studies, Working Paper No. 293, 2006) (available at
   http://ssrn.com/abstract_id=893833) ................................................... 25

*Myriam Gilles, Exploding The Class Action Agency Costs Myth: The Social
   Utility Of Entrepreneurial Lawyers, University of Pennsylvania Law
   Review,* 155 U ..................................................................................... 25

*Newberg on Class Actions* §16:10 (5th ed.) ................................................. 25

Pa. L. Rev. 103 (November 2006) ................................................................. 25

*Parker v. Vulcan Materials Co. Long Term Disability Plan*
   No. EDCV 07–1512 ............................................................................. 17

Rubinstein, *Newberg on Class Actions* §15:87 (5th ed.) ............................. 23

Silber and Goodrich, *Common Funds and Common Problems: Fee
   Objections and Class Counsel's Response* ..................................... 11, 12

vii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Class Counsel seek an award of 30 % of the Class Fund (somewhere between $2,700,000 and $2,820.000 depending on the size of the available fund) plus an award of litigation and expert costs in the amount of $167,350.61 (exclusive of class administration costs), out of a total class fund of between $9 Million and $9.4 Million. Said fees would be paid separately from payments made to class members pursuant to the provisions of the settlement agreement. The settlement agreement provides as follows regarding money distributions to class members and Class Representatives from available funds after payment of attorney's fees and costs, and class administration costs, subject to the final approval of the Court:

a. Payment of $5,000 to Nidia Pelaez, the designated Class Representative, in addition to her rent reimbursement. Ms. Pelaez will receive this additional amount under the Settlement Agreement because of the role that she played in the litigation. There will also be a payment to Named Plaintiff Michael Nozzi of $1,000 (inclusive of his rent reimbursement) as compensation for his individual damages claim and for his more limited role in initiating the class action (but not ultimately acting as a class representative).

b. Payment to the members of the class who filed claims for payment of the amount of additional rent that each Damages Class Member paid as a result of the reduced HACLA subsidy (to be proportionately reduced if the total claims filed by Damages Class Members exceed the funds available for payment to them).

c. To the extent that the filed claims do not total the amount available for distribution to Damages Class Members, the excess funds will not be paid out and will be retained by HACLA's insurers. However, in no event will the total funds paid out to Damages Class Members, or organizations that assist Section 8 tenants, be less than $2,000,000. (This is so that, if not enough Class

1

Members file claims to total $2,000,000, the difference between the amount claimed and $2,000,000 will be paid to organizations to be agreed upon that help Section 8 tenants.)

In addition, the parties have agreed to the entry of an injunction as follows, which provides (and has effectively provided) a substantial non-monetary benefit to the injunctive relief class members:

a. In any future notices to Section 8 tenants, related to the Voucher Payment Standard, Defendant HACLA shall simply and plainly communicate the information provided in non-technical, language that would be reasonably understandable to Section 8 tenants, at a language level commensurate with the average educational level of Section 8 tenants, and without assuming prior knowledge. The notice shall reasonably explain the known, likely or potential impact on the tenant of the action that is the subject of the notice.

b. Any notice within the next three years regarding reduction of the Voucher Payment Standard shall be provided to Class Counsel before it is sent, and shall be subject to the approval of Class Counsel before it is communicated to Section 8 tenants, which approval shall not be unreasonably withheld.

c. When communicating any new notices to tenants (other than a notice of reduction of VPS to which sub-paragraph (a) above applies), HACLA will use language reasonably understandable to Section 8 tenants. For purposes of the Settlement Agreement, the Parties agree that existing notices that have been historically sent regularly to tenants without challenge, such as the RE 38 notice, notices sent to tenants when HACLA approves a rent increase requested by the landlord, when there is a bedroom downsizing, meet this standard.

## II. DESCRIPTION OF PLAINTIFFS' CLAIMS

The Court is very familiar with Plaintiffs' claims since they have been addressed twice by the Ninth Circuit and by this Court's ruling on the Motion for Class Certification. In light of these extensive court rulings, the claim is described only briefly.

Plaintiffs are Section 8Housing Choice Voucher Participants whose rental contributions were increased as a result of HACLA's reduction in the rental subsidy it provided to them in the period June 1, 2005, through April 30, 2007. Plaintiffs challenged the legal sufficiency of the notice they were provided for this reduction on the ground that they were entitled to a legally sufficient and understandable notice, and they contended that the notice sent indicating that HACLA was reducing the Voucher Payment Standard did not meet that standard. The Ninth Circuit ultimately granted Plaintiffs summary judgment on liability on due process and mandatory duty grounds (under 42 U.S.C. §1983 and Govt. Code §815.6) in *Nozzi v. HACLA*, 806 F.3d 1178 (9th Cir. 2015) ("*Nozzi II*"), and remanded the matter for further proceedings regarding class certification and remedy. The Court certified injunctive relief and damages classes, Dkt. 245. While cross summary judgment motions were pending on the appropriate remedy, the parties reached a settlement, subject to the final approval of this Court, and these proceedings followed.

## III. ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE ATTORNEYS' FEE AWARD.

Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's lodestar. *See, e.g., In re Heritage Bond Litigation,* 2005 WL 1594403 at 18*; In re Quintus Sec. Litig.,* 148 F.Supp.2d 967, 973-74 (N.D.Cal.2001). Because this provides a useful framework for analyzing the appropriate fee award here, counsel will employ that framework in analyzing the requested fee here, although we will reverse the order of discussion.

### A. *THE COMPLEXITY OF THE ISSUES*

This was unquestionably a complex case. First, class actions are generally considered one of the most complex types of litigation. "It is common knowledge that class action suits have a well-deserved reputation as being most complex. The

3

requirement that counsel for the class be experienced attests to the complexity of the class action." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). Second, civil rights cases, even if not class actions, are generally considered complex litigation. Indeed, Congress recognized the complexity of civil rights cases when the civil rights attorneys' fee statute (42 U.S.C. §1988) was passed in 1976. The legislative history states, "It is intended that the amount of fees awarded under S. 2278 (42 U.S.C. §1988) be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature." S.Rep.No. 94-1011, 1976 U.S.Code Cong. & Admin.News at 5913.

## 1.     The Legal Issues Here Were Complex And Novel.

The issues in this case involve complex issues of constitutional law in a novel context where there was little direct authority on the question of whether the HUD regulation mandating one year's advance notice constituted a property interest for purposes of the due process clause. Similarly, there were disputes over what kind of showing Plaintiffs had to make to establish that the notice was not understandable and violated due process. (In the first appeal, the Court found disputed facts regarding the adequacy of notice and remanded for consideration under *Mathews v. Eldridge*.) The novelty and complexity are established by the fact that the case was twice dismissed by the District Court pursuant to Defendants' summary judgment motion on liability, only to prevail both times on appeal (the first time resulting in a remand for further proceedings and the second time resulting in a grant of summary judgment to Plaintiffs). Even after winning summary judgment on liability, there were uncertainty and pending cross summary-judgment motions on whether the violation here resulted in the right to monetary compensation for the increased rent. The case, by the time the Final Approval Motion is heard, will have gone on for nearly twelve years (including the pre-filing work and unsuccessful efforts to resolve the case before filing). Extensive paper discovery and depositions occurred; obtaining class data was heavily litigated (prior to the Ninth Circuit's grant of summary judgment on the second appeal.)

## 2.    The Management of the Case was Challenging.

While the liability case did not present a particular management challenge, the remedy analysis did. The HACLA data was not well suited to answer the questions that needed to be answered to identify class members, for whom there were numerous reasons for exclusion. Many hours were required of both Plaintiffs' counsel and their expert, Brian Kriegler (reflected in the tens of thousands in expert fees advanced to Dr. Kriegler's firm, Econ One). Mr. Litt, who has extensive experience in the use of data in class actions, considers the challenges of identifying class members and their loss among the most challenging he has experienced. See Declaration of Barrett S. Litt, ¶¶ 38-39 (hereafter "Litt Dec.")..

Similarly, the briefing regarding remedy presented novel and complex issues on which there was little directly applicable law. Whether Plaintiffs were entitled to the rent differential between what their rental contribution would have been absent the violation and what they actually paid was vigorously contested. Plaintiffs claimed that the defective notice was the equivalent of no notice, was void *ab initio* and rendered the increased rental requirement unlawful while Defendants contended to the contrary. Because there was a paucity of directly applicable case law, it was difficult to reliably determine the likely outcome of that dispute.

## 3.    Reaching A Settlement Was Difficult.

Another example of complexity, and counsel's skill, arose during settlement discussions. The Defendants' position was that any money could only come from the insurance companies. At the first mediation, there was little movement from the insurance companies, and HACLA's position was that it would not (and could not) make any contribution. Only after that mediation, when Plaintiffs' counsel made a policy limits demand, did movement occur that ultimately resulted in a settlement, and then several knotty issues had to be resolved before settlement could be reached. Litt Dec., ¶31.

**B. THE RISKS OF NON-PAYMENT WERE SUBSTANTIAL**

There was substantial risk of non-payment facing plaintiffs' counsel. While Plaintiffs were not concerned about their ability to collect if they were successful (although, as noted, Defendants contended that they could not, and even were not allowed to, use funds other than insurance funds to pay judgment), the risk lay in establishing that the underlying conduct was illegal and, if so, what the appropriate remedy was. This was discussed at some length in the previous section, and will not be repeated here. Additionally, seeking seven figure amounts of money from government entities carries inherent risks because factors other than economic risk-benefit analysis (i.e., politics) are involved. See Litt Dec. ¶30

Further, class actions are inherently risky for a variety of reasons. Most cases filed as a class action are not certified and many that are can still result in a loss, or in only a partial success. Thus, there is an added level of risk in any class action. See Litt Dec. ¶¶68 to 70. This case was taken with full recognition that, because there were not cases previously finding a property interest in the kind of advance notice here, the case was on the high end of the risk spectrum, and with the expectation that, if successful, it would result in a significant fee enhancement. Litt Dec. ¶30.

**C. THE EFFORT EXPENDED BY COUNSEL.**

Including the investigation time, and pre-litigation settlement efforts, counsel litigated this case for nearly twelve years. A partial list of the work performed (or to be performed) includes: 1) extensive investigation of the underlying circumstances, including communicating directly with class members; 2) extensive (albeit unsuccessful) attempts to settle the case pre-filing; 3) preparation of the complaint and amended complaint and extensive legal research related to framing the issues; 4) the Rule 26 conference and report; 5) propounding discovery related to liability, which included extensive analysis of the relevant documents and several depositions; 6) litigating the first round of summary judgment motions, which included several hearings in the District Court; 7) successfully appealing the grant of summary judgment to Defendants, which

6

required opening and reply briefs and all the other work attendant on an appeal in the Ninth Circuit; 8) returning to the District Court and continuing to litigate the case, which involved further discovery, heavily contested efforts contested to obtain class data from HACLA's data bases, and again opposing (unsuccessfully) Defendants' renewed summary judgment motion; 9) again successfully appealing the grant of summary judgment to Defendants, which this time resulted in a grant of summary judgment to Plaintiffs; 10) successfully opposing Defendants' petition for a writ of certiorari, which Opposition the Court requested after Plaintiffs decided not to file one unless requested; 11) filing and winning a successful motion to certify both an injunctive relief and a damages class; 12) obtaining the class databases and retaining experts to analyze the data in a way that would allow identification of class members and their damages, which was an extremely complex endeavor (for which Plaintiffs' counsel have advanced over $100,000; 13) filing and defending against cross-motions for summary judgment on the appropriate damages remedy; 14) preparation of an extensive mediation brief and two full day mediation sessions; 15) negotiation and preparation of lengthy settlement documents, including settlement agreement, preliminary approval order, class notice and claim forms; 16) obtaining bids from qualified settlement administrators and ongoing work with the selected Class Administrator, JND; 17) yet to be done responses if objections are filed, Motion For Final Approval and proposed Final Approval Order; 18) Final Approval Hearing; and 19) continuing contact with class members offering information and assistance as requested..

### D.  *THE RESULT OBTAINED FOR THE CLASS*

This case was hard fought, as we have already described. The class members are by definition low income individuals of little means. All work was performed on a contingent fee basis. The settlement was the result of arm's length negotiations entered into only after plaintiffs won summary judgment on liability and contested class certification. Even then it required extensive settlement efforts.

The financial terms of the settlement are very favorable to class members. It is likely that every class member who files a claim will receive the full amount of his or her rental differential (the difference between the tenant's rental contribution absent the reduction in subsidy and the rental contribution the tenant actually made). Only if the claims rate reaches well over 50% would there begin to be a slight downward adjustment of class damages (depending on how many claims are filed). In addition, the settlement includes an injunctive relief order that ensures that HACLA provides understandable notice in the future.

This is a very favorable result for the class members and was the result of counsel's extensive and uncompensated effort over many years.

### E. COUNSEL'S EXPERIENCE

Class Counsel are highly experienced litigators in the fields of civil rights and class actions. The first set of counsel is Mr. Litt and attorneys in his office. Mr. Litt is a well-known civil rights lawyer in the Los Angeles area, and has extensive class action and civil rights experience, as his Declaration and CV attached to it attest. He likely has more civil rights class action experience than any attorney practicing in the Central District. The attorneys associated with him who worked on the case (primarily Paul Estuar when he was with Mr. Litt) are also experienced in these areas. Mr. Litt's CV contains a variety of attestations to his skill, experience and reputation, several from judges in this District.

The other set of counsel are attorneys with Public Counsel, the largest pro bono law firm in the country. The Declaration of Anne Richardson, who has 28 years of civil rights and class action experience and is the current Director of Public Counsel's Consumer Law Project, addressees the Public Counsel attorneys' work on this case.

All of the appointed class counsel (Mr. Litt, Ms. Richardson and Ms. Carroll) are well-known and highly regarded civil rights and public interest lawyers, and all have extensive experience dealing both with civil rights and class action litigation, as do the other primary attorneys (Paul Estuar, Lisa Jaskol and Patrick Dunlevy) who worked on the case. See Litt and Richardson Declarations.

8

## F. COUNSEL'S SKILL

As addressed above, Plaintiffs' counsel in this case are highly skilled attorneys in the field of civil rights and civil rights class actions. Their performance in this case, and its successful outcome, attest to their skill level.

## G. THE REACTION OF THE CLASS

As of the time of this writing, Plaintiffs' counsel has not yet received a final report of the number of claims, opt-outs, or objections filed. That information will be provided in connection with the final approval hearing. However, as of September 15, 2017, the Claims Administrator reports receiving 1493 claims (approximately 12.5% of the 11,870 class members), with a value of $1,338,753.60 (approximately 22% of the approximately $9.2 Million class fund after fees), four opt-outs, and no objections. Litt Decl., ¶32. "The negligible number of opt-outs and objections indicates that the class generally approves of the settlement." *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 456 (C.D. Cal. 2014) (citing *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming the approval of a class action settlement where 90,000 members received notice and 45 objections were received).

## IV. THE AMOUNT REQUESTED BY PLAINTIFFS' COUNSEL IS REASONABLE

In this case, plaintiffs' counsel seek an award of $2,700,000-$2,820,000 (30% of the available fund of $9 Million-$9,4 Million), plus costs. Costs are significant, primarily due to the large cost of expert work to analyze the class data to determine class membership and damages, totaling approximately $167,350.61, and mediation costs.

It is well established in the Ninth Circuit that, while the court has discretion to use either a percentage of the fund or a lodestar approach in compensating class counsel (*see, e.g., Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1295 (9th Cir. 1994), the percentage of the fund is the typical method of calculating class fund fees. *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("the primary

9

1   basis of the fee award remains the percentage method"). While most circuits leave the

2   method used to the discretion of the trial court, "[m]ost federal courts use the percentage

3   of the fund approach in awarding attorneys' fees in common fund classes" *In re Enron*

4   *Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 748 (S.D.Tex.

5   2008). Thus, we discuss the requested fee based upon that method. We provide lodestar

6   information as a cross-check, and can provide greater detail if the Court wishes.

7       *A.    THE PERCENTAGE OF THE FUND METHOD OF CALCULATING FEES IS THE*
8           *BETTER METHOD TO CALCULATE FEES AND SUPPORTS THE FEE REQUEST*
            *HERE.*
9
        Class action litigation is risky by its very nature. In a Federal Judicial Center 1996
10
    report, titled "Empirical Study of Class Actions in Four Federal District Courts: Final
11
    Report to the Advisory Committee on Civil Rules" ("FJC Report"), the Report authors
12
    studied the outcomes of four federal districts and concluded that 31.7% or less of the filed
13
    class cases resulted in successful class outcomes for plaintiffs. This does not account for
14
    the degree of success (i.e., some cases could have resulted in minimal or partial success,
15
    and they would still be in the successful claim category). Thus, an outcome such as that
16
    obtained in this case is the exception, not the rule. The FJC Report also examined the
17
    awarded fees and concluded that "attorneys' fees were generally in the traditional range
18
    of approximately one-third of the total settlement."
19
        Courts and commentators recognize that the percentage of the fund approach is
20
    preferred because it more closely aligns the interests of the counsel and the class, i.e.,
21
    class counsel directly benefit from increasing the size of the class fund and working
22
    efficiently. *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002)
23
    ("lodestar method is merely a cross-check on the reasonableness of a percentage figure,
24
    and it is widely recognized that the lodestar method creates incentives for counsel to
25
    expend more hours than may be necessary on litigating a case so as to recover a
26

27

28

                                            10

reasonable fee, since the lodestar method does not reward early settlement.") [1]; Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response,* 17 RevLitig 525, 534 (1998) (the percentage approach avoids numerous drawbacks of the lodestar approach and is preferable because "the attorneys will receive the best fee when the attorneys obtain the best recovery for the class. Hence, under the percentage approach, the class members and the class counsel have the same interest -- maximizing the recovery of the class."). The Supreme Court has recognized that "the calculation of [reasonable] attorney's fees under the "common fund doctrine" … is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900, 104 S. Ct. 1541, 1550, 79 L. Ed. 2d 891 (1984).

Among the drawbacks to the lodestar method listed by Silber & Goodrich are that the lodestar method increases the amount of fee litigation; lacks objectivity; can result in churning, padding of hours, and inefficient use of resources. When the lodestar method is used, class counsel may be less willing to take an early settlement since settlement reduces the amount of time available for the attorneys to record hours. Finally, the lodestar method inadequately responds to the problem of risk. *Id*. at pp.529-532. *See also Vizcaino*., 290 F.3d at 1050 ("it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee"); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp.

---

[1] *See also Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1266-67 & fn.3, 1271 (D.C.Cir.1993) (noting that the lodestar approach "encourages significant elements of inefficiency" by giving attorneys an "incentive to spend as many hours as possible" and "a strong incentive against early settlement"; the percentage approach "more accurately reflects the economics of litigation practice"; "the monetary amount of the victory is often the true measure of success, and therefore it is most efficient that it influence the fee award"; accordingly, "we join the Third Circuit Task Force and the Eleventh Circuit, among others, in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir.1991) (holding in a reversionary common fund case "that the percentage of the fund approach is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class.");

679, 689-91 (M.D.Ala.1988) (cataloguing criticisms of the lodestar approach to fee calculation); *Manual for Complex Litigation* 4th Ed. §14.121 (2004) ("in practice, the lodestar method is difficult to apply, time consuming to administer, inconsistent in result, …capable of manipulation, …[and] creates inherent incentive to prolong the litigation").

Silber and Goodrich advocate that class fund fees should not diminish on a percentage basis, as some courts have done, because that undermines the full alignment between class counsel and the class. This is because, if the percentage of fees go down as the size of the fund goes up, a substantial increase in the size of the fund may be only marginally beneficial to the class counsel while it may be extremely beneficial to the class, with the result being that the economic interests of the class and counsel become misaligned. They also reviewed two studies of fee awards in common fund cases. One study was the FJC Report discussed above. The other study, done by National Economic Research Associates, an economics consulting firm, in 1994, found that attorneys' fees in these class actions averaged approximately 32% of the recovery, regardless of the case size, and averaged 34.74% when the fees and expenses were added together. Silber and Goodrich, *supra,* at 545-546. Silber and Goodrich conclude with the observation that a 33% fee award is both reasonable, and in line with the general market for contingent fee work. *Id.* at 546-549.

Alignment of the class' and Class Counsel's interests is best accomplished by awarding a percentage of the fund in the normal contingent fee range. In this way, class counsel are incentivized to maximize the recovery. In defining a 'reasonable fee' in representative actions, the law should 'mimic the market.' *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998) ("When a fee is set by a court rather than by contract, the object is to set it at a level that will approximate what the market would set."). Attorneys "regularly contract for contingent fees between 30% and 40%." *In re Remeron Direct Purchaser Antitrust Litigation,* 2005 WL 3008808, 16 (D.N.J. 2005)(citing cases), making the requested fee her highly reasonable in relation to the market for contingent fees.

12

The 30% figure sought here compares favorably with the general percentage of recovery awarded in cases around the country. *See* Silber and Goodrich, *supra* (summarizing available data and recommending that a 33% of the fund fee award is both reasonable, and in line with the general market for contingent fee work); *In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 303 (3rd Cir. 2005), citing three studies ("[O]ne study of securities class action settlements over $10 million ... found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period ... found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million ... found recoveries in the 25-30% range were 'fairly standard.'") (citations omitted).

Further supporting the requested award is that none of the warning signs for a settlement that may be influenced by improper favorable treatment of class counsel exists here. The class was certified through a contested motion, not by agreement, and the merits of the case were heavily litigated, including a contested petition for a writ of certiorari. Class counsel are not receiving a disproportionate distribution of the settlement, the payment of fees is not separated from the class funds and therefore counsel cannot receive excessive fees in exchange for an unfair class settlement, and the fund established, whether fully claimed or not, is a substantial one sufficient to substantially compensate class members for their losses (and to refund the full principle if the claims rate is in the 50-60% range. *See, e.g., In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946-947 (9th Cir. 2011).

While the Ninth Circuit has set a benchmark of 25% as a percentage of the fund, (*see Six Mexican Workers v. Arizona* Citrus *Growers,* 904 F.2d 1301, 1311 (9th Cir.1990) (establishing benchmark percentage of 25% of the fund as normal class counsel percentage of fund award)), this is an across the board benchmark, which is often adjusted upward or downward depending upon the assessment of the results, and the size of the fund. For cases under $10 Million, the percentage is usually adjusted upward,

13

generally to 30% or more. *See, e.g., Hicks v. Toys "R" Us-Delaware, Inc.*, 2014 WL 4670896, at *1 (C.D. Cal. Sept. 2, 2014) (awarding 30% of the fund in a $4 Million settlement where the Court found little risk "in any even arguably meritorious California wage and hour class action," such as the case before the court there, and citing *In re Omnivision Technologies, Inc.,* 559 F.Supp.2d 1036, 1047–48 (N.D.Cal.2007) ("nearly all common fund awards range around 30% ... [and] absent extraordinary circumstances that suggest reasons to lower or increase the percentage, the rate should be set at 30%"); *Van Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 297 (N.D.Cal.1995) ("the cases ... in which high percentages such as 30–50 percent of the fund were awarded involved relatively smaller funds of less than $10 million" and concluding that, "30 % is a common percentage award" in such cases); *Cicero v. DirecTV, Inc.*, 2010 WL 2991486, at *6 (C.D. Cal. Jul. 27, 2010) ("a review of California cases in other districts reveals that courts usually award attorneys' fees in the 30-40% range in wage and hour class actions that result in recovery of a common fund under $10 million"); I*n re: Cathode Ray Tube (Crt) Antitrust Litigation.*, 2016 WL 721680 (N.D. Cal. 2016) (awarding $173,025,000 fee, 30 % of over $575,000,000 megafund, in light of the eight year length of the case, the uncertain state of the applicable class action and antitrust law and the outstanding result). [2]

---

[2] Numerous other cases support a 30% or higher fee. *See, g.g., Bostick v. Herbalife Int'l of Am., Inc.*, 2015 WL 12731932 (C.D. Cal. May 14, 2015) (awarding 30% of the gross settlement fund of $17.5 Million reached before class certification motion was filed, considering *inter alia* the monetary benefit to the class "in light of the complex factual and legal issues involved in the case," the intangible benefit of the injunctive relief obtained, the contingent nature of the representation and the risk of loss, the high level of skill and quality of class counsel's work in a complex case); *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 449 (E.D. Cal. 2013) (awarding 33% of gross settlement fund where class counsel created a roughly proportional gross settlement fund in wage-and-hour case); *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *1 (N.D. Cal. Apr. 1, 2011) (awarding over 40% of settlement fund in wage-and-hour case, observing that throughout "the course of the litigation Class Counsel successfully defended against [Defendant's] attempts to dismiss Plaintiffs' claims and to decertify the classes and pursed Plaintiffs' claims until the point of settlement"); *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (finding district court did not abuse its discretion when awarding

**B. THE FUND HERE IS THE AVAILABLE FUNDS TO BE CLAIMED, INCLUDING FEES, COSTS AND MONEY THAT MAY REVERT TO DEFENDANTS IF NOT CLAIMED.**

The Ninth and other Circuits have explained that all funds recovered should be aggregated into a common fund in a class action settlement, even where the defendant pays attorneys' fees directly to class counsel as opposed to paying all sums directly into a fund, and even where funds revert to the defendant to the extent they are not claimed. Thus, in claims made or class reversion cases in this Circuit where there is a maximum fund, and unclaimed funds revert to the defendant, attorney's fees are awarded based on the gross settlement fund. See *Williams v. MGM-Pathe Commun. Co.*, 129 F.3d 1026 (9th Cir.1997) (reversing award of attorneys' fees because trial court failed to base fee award on the entire settlement, rather than the amount claimed). Other circuits are in accord.[3]

---

33% fee award in light of "the complexity of the issues and the risks").); *Franco v. Ruiz Food Prod., Inc.*, No. 1:10-CV-02354-SKO, 2012 WL 5941801, (E.D. Cal. Nov. 27, 2012) (approving 33% of the Maximum Settlement Fund "in two year old wage-and-hour action, in part, because the "case was actively litigated and significant time was spent on discovery," and, "[o]verall, the specialized skill of Class Counsel in this area of the law was generally an asset to the Class Members and the quality of work performed was good"); *In re Heritage Bond Litig.*, No. 02-ML-1475-DT, 2005 U.S. Dist. LEXIS 13555, at *65 (C.D. Cal. June 10, 2005) ("[t]he experience of Class Counsel also justifies the [33%] fee award requested"); "); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1377 (N.D. Cal. 1989) ("nearly all common fund awards range around 30%").

[3] *See Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295 (11th Cir.1999) (distribution of attorneys' fees are to be based upon the funds available to eligible claimants, whether claimed or not; affirming a fee award nearly twice the amount actually claimed by the class from the fund); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2nd Cir. 2007) (the "entire Fund… is created through the efforts of counsel at the instigation of the entire class"; an "allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not"); *Landsman & Funk, P.C. v. Skinder-Strauss Associates*, 639 Fed. Appx. 880, 884 (3d Cir. 2016) (holding that the lower court "properly relied on the entire fund as the appropriate benchmark for assessing the size of the fund created" for the purpose of calculating a fee award, as opposed to calculating fees based on the amount claimed by class members); *cf Boeing Co. v. Van Gemert*, 444 U.S. 472, 480, 100 S. Ct. 745, 750, 62 L. Ed. 2d 676 (1980) (observing that absent class members' "right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel").

15

Fees, litigation costs and class administration costs are included in determining the size of the fund. *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003) ("constructing a hypothetical 'fund' by adding together the amount of money Boeing would pay in damages to members of the class …, the amount of fees provided to various counsel, the cost of the class action notices paid for by Boeing, and a gross amount of money ascribed to all the injunctive relief contained in the agreement"; court accepted the concept but not its application there); *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 245 -246 (8th Cir. 1996)(although "technically" defendant would pay fees directly rather than their being paid "out of the class' recovery… in essence the entire settlement amount comes from the same source"; even if "the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery", and, "[a]ccordingly, the direct payment of attorney fees by defendants should not be a barrier to the use of the percentage of the benefit analysis"), citing *In re General Motors,* 55 F.3d 768, 821 (3rd Cir. 1995) (the "rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source"); *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722, 734 (3rd Cir. 2001) ("[t]hough this is not a traditional common-fund case, because the unclaimed portion of the settlement fund is returned to Cendant and because the plaintiffs who recover may not be affected by the attorneys' fee award (depending on the number of plaintiffs who recover rights from the fund), use of the percentage-of-recovery method is appropriate in this case").

### C. ALTHOUGH A LODESTAR CROSS-CHECK IS UNNECESSARY, IT MORE THAN SUPPORTS THE FEE REQUESTED HERE.

A lodestar cross-check is not required in this circuit, and, in a case such as this, is likely not a useful reference point. *See, e.g., Glass v. UBS Financial Services, Inc.*, 2007 WL 221862, 16 (N.D.Cal. 2007). In *Glass*, no lodestar cross-check was required by the Court where an early settlement resulted in exceptional results for the class even though some class members and the New York attorney general objected to the 25% of the fund request as excessive. The *Glass* Court awarded fees of $11,250,000 where, as here, the

1  $45 Million fund was subject to a reversion for unclaimed funds so that the actual fund

2  could end up being substantially less than the theoretical fund. Here, the case was heavily

3  litigated, and, as of this motion, there have been no objections. Litt Decl., ¶32.

4      In discussing the lodestar, we use current rates to adjust for delay in payment. *See,*

5  *e.g., Missouri v. Jenkins,* 491 U.S. 274, 282, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989)

6  ("an appropriate adjustment for delay in payment—whether by the application of current

7  rather than historic hourly rates or otherwise—is within the contemplation of the statute

8  [42 U.S.C. § 1988]"); *Barjon v. Dalton*, 132 F.3d 496, 502–03 (9th Cir. 1997) ("the

9  district court may choose to apply either the attorney's current rates to all hours billed or

10  the attorney's historic rates plus interest"). Generally, for a "fee award to be reasonable, it

11  must be based on current, rather than historic, hourly rates." *Charlebois v. Angels*

12  *Baseball LP*, 993 F. Supp. 2d 1109, 1119 (C.D. Cal. 2012) (lodestar award in settled class

13  action, citing *Missouri v. Jenkins*). The *Charlebois* Court went on to note that the

14  increase to current rates

15          "is justified by comparable increases in the market. *See Coles v. City of Oakland,*

16          No. C03–2961 THE, 2007 WL 39304, *7 (N.D.Cal. Jan. 4, 2007) (rejecting

17          defendants' argument that rate increases should not surpass the rate of inflation and

18          stating 'the focus of the rate analysis is to ensure that fees are awarded at

19          'prevailing market rates in the relevant community,' and such rates may be

20          affected by factors other than inflation, such as attorneys' additional years of

21          experience or changes in the legal market') (quoting *Blum v. Stenson,* 465 U.S.

22          886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *Parker v. Vulcan Materials Co.*

23          *Long Term Disability Plan,* No. EDCV 07–1512 ABC (OPx), 2012 WL 843623,

24          *7 (C.D.Cal. Feb. 16, 2012) (approving as reasonable an approximate 10 percent

25          increase between 2011 rates and 2012 rates and because '[i]t is common practice

26          for attorneys to periodically increase their rates for various reasons, such as to

27          account for expertise gained over time, or to keep up with the increasing cost of

28          maintaining a practice'); *LaPeter v. Canada Life Ins. Co. of Am.,* No. CV06–121–

S–BLW, 2009 WL 1313336 *3 (D.Idaho May 11, 2009) ('It is typical for rates to increase on a yearly basis and, also, for associates' and paralegals' rates to increase as they gain more experience.').”

Because the requested fee is not based on the lodestar, “a less exhaustive cataloging and review of counsel's hours” is involved than where the fee is based on a lodestar directly. *See, e.g., Victoria Secret Stores, LLC*, 2008 WL 8150856, at *9 (C.D. Cal. July 21, 2008) and cases cited therein.  Nonetheless, we provide detailed timesheets in the event the Court wishes to review them. All the time records submitted were contemporaneously maintained with two exceptions.[4]

For purposes of the lodestar cross-check, the tables below show each person for whom time has been billed, that person's position and years of practice, the hours worked (through August 31, 2017) and the hourly rate used to bill for that person's time (using current rates) for the firms in which Mr. Litt worked during the pendency of the case (which changed over the course of the twelve years of work) and for Public Counsel. Some qualifications and explanations are in order. The Litt firms had eleven billers who billed under 15 hours on the case; all of those were eliminated. Paul Hughes is listed

---

[4] As is explained in the Anne Richardson Declaration, the time records of two Public Counsel attorneys could not be located. Hernán Vera's records are no longer available. Mr. Vera left his position as Executive Director of Public Counsel in 2014 and has submitted a Declaration attesting that his reconstructed time is correct. Lisa Jaskol left Public Counsel in 2016 to become a Superior Court judge, and her contemporaneous time records cannot be found; she has similarly submitted a Declaration that the reconstructed time is correct. While contemporaneous time records are preferred, reconstructed records are acceptable when adequately supported. *See, e.g., United States v. $12,248 U.S. Currency,* 957 F.2d 1513, 1521 (9th Cir.1991) (accepting “reconstructed records developed by reference to litigation files and other records”); *Rosenfeld v. U.S. Dep't of Justice*, 904 F. Supp. 2d 988, 1005 (N.D. Cal. 2012) (“‘[b]asing the attorneys' fee award in part on reconstructed records developed by reference to litigation files and other records’ is an established practice in this circuit” ) (quoting *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1473 (9th Cir.1983). Here, the reconstructed time constitutes a small percentage (approximately 6%) of the lodestar (otherwise based on contemporaneous time records). The file in this case establishes that massive time was spent by both sides litigating it.

1 under the Litt firms but is actually a partner in the appellate section at Mayer Brown (and
2 co-director of the Yale Law School Supreme Court Clinic); Mr. Litt associated him in
3 specifically to work on the (successful) opposition to the Petition for Certiorari given his
4 experience and expertise in opposing such petitions. His hours are based on the bill he
5 sent to Mr Litt after the Supreme Court activity ended. The $730 rate charged for Mr.
6 Hughes, who regularly does retained work, is his current standard rate for retained work
7 at Mayer Brown. The Litt firm also has billed for Patrick Dunlevy, who had worked on
8 the case when he was at Public Counsel and was brought in by Mr. Litt to assist after Mr.
9 Dunlevy left Public Counsel. Each of the billers for the Litt firms, and an explanation of
10 the role they played, is discussed in Mr. Litt's Declaration. All Litt firm time was
11 contemporaneously recorded. See Litt Dec., ¶¶28, 31.

| LITT FIRM BILLERS | | | | | |
|---|---|---|---|---|---|
| Biller | Position | Years Practice (Grad Yr) | Rate | Hours | Total |
| Barrett S. Litt | Attorney | 48 years (1969) | $1150 | 1189 | $1,367,350 |
| Paul Estuar | Attorney | 24 years (1993) | $765 | 516.1 | $394,816.50 |
| Pat Dunlevy | Attorney | 25 years (1992) | $750 | 324 | $243,000 |
| Paul Hughes | Attorney | 9 years (2008) | $730 | 60 | $43,800 |
| Stacey Brown | Attorney | 11 years (2006) | $600 | 22.1 | $13,260 |
| Julia White | Sr. Paralegal | | $335 | 504.1 | $168,873.50 |
| Miguel Villafuerte | Jr. Paralegal | | $150 | 42.3 | $6,345 |
| Charla Gray | Law Clerk | | $200 | 39.8 | $7,960 |
| James Debergh | Law Clerk | | $200 | 27.1 | $5,420 |
| Jonathan Dale | Law Clerk | | $200 | 29.5 | $5,900 |
| **TOTAL** | | | | | **$2,256,725** |

| PUBLIC COUNSEL BILLERS | | | | | |
|---|---|---|---|---|---|
| **Biller** | **Position** | **Years Practice (Grad Yr)** | **Rate** | **Hours** | **Total** |
| Hernán Vera | Attorney | 23 Years (1994) | $750 | 160.6 | $120,450 |
| Lisa Jaskol | Attorney | 29 Years (1988) | $850 | 75.6 | $64,260 |
| Anne Richardson | Attorney | 28 Years (1989) | $850 | 146.7 | $124,695 |
| Stephanie Carroll | Attorney | 13 Years (2004) | $640 | 945.8 | $605,312 |
| Pat Dunlevy | Attorney | 25 years (1992) | $750 | 195 | $146,250 |
| Adelaide Anderson | Attorney | 2010 (7 years) | $540 | 19.9 | $10,746 |
| **TOTAL** | | | | | **1,071,713** |

Based on these hourly rates (which are the rates these attorneys would seek in an awarded statutory fee motion), the lodestar through August 31, 2017 is $3,328,438. This does not account for the remaining work, which includes work done after August 31 on this motion, the yet to be drafted motion for Final Approval and Order, responses to objections to the extent necessary, and ongoing work with the Class Administrator and class members as needed (which time will be provided for the Final Approval Hearing).

### D.    *THE HOURS SPENT ON THE CASE ARE REASONABLE*

The hours spent by Plaintiffs' counsel to assess the lodestar cross-check are reasonable. Hours are reasonable if "at the time rendered, [they] would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest in the pursuit of a successful recovery . . . ." *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982) (internal quotations omitted); *see also Ramon v. County of Santa Clara*, 173 Cal. App. 4th 915, 925 (Cal. Ct. App. 2009). In making that determination, courts must look at "the entire course of the litigation, including pretrial matters, settlement negotiations, discovery, litigation tactics, and the trial itself . . . ." *Vo v. Las Virgenes Municipal Utility Dist.*, 79 Cal.App.4th 440, 447 (2000); *see also Peak-Las Positas Partners v. Bollag*, 171 Cal. App. 4th 101, 114 (2009) (fees reasonable because of complexity of issues, results obtained, and defendants' aggressive litigation).

20

As the Ninth Circuit has recognized, civil rights lawyers working without payment from their clients have little to gain from "churning" a case. "[L]awyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). Accordingly, they should be fully compensated for taking the steps that they reasonably believe are necessary to *win* the case: "By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; ***after all, he won, and might not have, had he been more of a slacker.***" *Id.* (emphasis added).

Counsel have presented detailed evidence of the time spent litigating this case for the past twelve years. *See* Exhibit C to Litt Declaration. The substantial time spent was justified in the context of this litigation. In any event, since this is a percentage of the fund fee claim, any unnecessary hours do not increase Plaintiffs' fee.

### E. THE HOURLY RATES THAT PLAINTIFFS' COUNSEL WILL RECEIVE UNDER THE 30% FEE AWARD ARE REASONABLE.

The listed rates in the foregoing table are amply supported. The evidence submitted attests to the skill, experience and reputations of the lead attorneys in this case. Lead counsel Mr. Litt has been recognized as a Super Lawyer every year between 2005 and the present, is named in Best Lawyers In America, and was described in 2014 by one court in this District as "one of the leading civil rights attorneys in the country." See Litt Declaration, ¶¶ 5, 12. His CV identifies numerous certified class actions in which he has been the, or one of the, lead counsel as well as pending class actions. Ms. Richardson has provided evidence of her skill, experience and reputation. She has been a Super Lawyer every year since 2004. The experience and qualifications and reputation of the lawyers is addressed in the accompanying Litt and Richardson Declarations.

The Declaration and supporting exhibits of Mr. Litt and Carol Sobel have provided ample citations from a variety of sources to support the rates used for the lodestar comparison. (As their Declarations explain, both Mr. Litt and Ms. Sobel have been identified by courts as experts on attorney fee rates in Southern California.)

21

The submitted evidence includes numerous attorney fee awards in civil rights cases (either direct fee awards or lodestar cross-checks in class actions) and consumer class actions using or awarding rates comparable to those requested here (or in which rates are comparable to those requested after accounting for the general increase in rates in Los Angeles in intervening years). In addition, Plaintiffs identified numerous commercial rate awards or commercial fees charged to clients at similar or higher rates. Congress expressly recognized that fees in federal civil rights cases should be comparable to those in complex federal civil litigation. *See City of Riverside v. Rivera*, 477 U.S. 561, 575-76 (1986) ("Congress made clear that it 'intended that the amount of fees awarded under [§1988] be governed by the same standards which prevail in other types of equally complex Federal litigation.'" (citing S. Rep. No. 94-1011, at 6 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5913)).

In this lodestar cross-check, whose purpose is to "alert[]the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award"( *In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 306, 60 Fed. R. Serv. 3d 851 (3d Cir. 2005), as amended, (Feb. 25, 2005), the Court need not make an independent determination that each rate is reasonable. The Court is essentially ensuring that Plaintiffs' counsel do not receive a "windfall." *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 553 F. Supp. 2d 442, 467 (E.D. Pa. 2008), *as corrected* (Apr. 9, 2008).

Whether the Court would award these rates in this case in a pure statutory fee motion is not the issue in this motion because, while multipliers are generally not available (see *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553–57, 130 S. Ct. 1662, 1673–75, 176 L. Ed. 2d 494 (2010)) in statutory fee cases, they are expected, indeed required, in successful class action litigation where the fund is sufficient. *See, e.g., In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299–300 (9th Cir. 1994) (reversing denial of risk multiplier in class action; noting that, "[i]f this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class

22

client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing" and that "courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases," and distinguishing common fund cases from fee shifting awards because the class pays the attorneys from the common fund); *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002) ("It is an abuse of discretion to fail to apply a risk multiplier… when (1) attorneys take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence that the case was risky."); *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 741 (9th Cir. 2016) ("the district court must apply a risk multiplier to the lodestar" where the foregoing conditions exist).  This case was taken with the expectation that of a risk enhancement; discounted hourly rates would not reflect that risk; and the case was indisputably risky.

While the foregoing cases do not identify a benchmark multiplier, "[e]mpirical evidence of multipliers across many cases demonstrates that most multipliers are in the relatively modest 1–2 range," which "counsels in favor of a presumptive ceiling of 4, or slightly above twice the mean." Rubinstein, *Newberg on Class Actions* § 15:87 (5th ed.).[5]

Class Counsel seek a fee award of $2,700,000 to $2,820,000 depending on the size of the fund available after defense litigation attorneys' fees and costs, plus an additional

---

[5] In practice, many cases have awarded multiplier above four where the Court found it appropriate. *See Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) (multiplier of 5.2 in $25.5 Million settlement based on award of 25% of fund, collecting cases with high multipliers). Multipliers above two are common where the fund supports it. *See, e.g.,Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (risk multiplier appropriate on percentage of fund award in megafund settlement resulting in 28.5% of the fund and a multiplier of 3.65). *Vizcaino* contains an Appendix listing percentage and multipliers in several megafund cases, and is enlightening on the norm even in megafund cases. It lists 46 cases, the smallest of which is a $53 Million fund, and the largest of which is a $193 Million fund. Of those 46 cases, 30 received a multiplier (eight with a multiplier between 1.2-1.8, twelve with a multiplier between 2.0-2.5, six with a multiplier between 3.0-3.6, three with a multiplier between 4.0-6.2, and one with a multiplier of 19.6). Despite the fact these were mega-fund cases, where percentages of the fund are generally smaller, ten awarded percentages of the fund between 30-40%.

23

1    $167,350.61 through August 31, 2017 (to be supplemented with a final accounting) for
2    litigation costs. The total hours in the case through August 31, 2017 are 4297.60. The
3    lodestar through August 31, 2017, using Plaintiffs' counsel claimed rates, is $3,328,438.
4    Plaintiffs estimate an additional 200 plus hours for the work performed after August 31
5    on the fee motion, the final approval motion and order and related work.

6        Thus, if the rates submitted are used to calculate the lodestar, the award Plaintiffs'
7    counsel will receive is in the range of 80% of the lodestar. Even using substantially lower
8    rates, the multiplier would likely be under 1.5. Plaintiffs' counsel have addressed the risk
9    in class actions generally, the risks in this case given the absence of clear authority on the
10   property interest in advance notice under the HUD regulation, and the expectation of a
11   substantial multiplier if the case were successful.

12       Where Plaintiffs' counsel obtain an expeditious and "excellent result" in a
13   "complex and risky case", they are entitled to a fully compensatory award. *See Stop &
14   Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926 (E.D. Pa. May
15   19, 2005). This was a risky, exceptionally protracted and complex case, where there was
16   a substantial risk that Plaintiffs would not prevail, and, even if they prevailed on liability
17   as they ultimately did, there remained a risk that that a court would not award monetary
18   damages based on the claim of entitlement to the difference between the rental
19   contribution the tenant actually and the lowered rental contribution they should have been
20   paying during the one year notice period , regardless of individual circumstances (an
21   issue unresolved at the time of settlement).  The "skill and experience brought to bear by
22   counsel throughout the year[s] they spent actively litigating this case" justifies a
23   substantial fee award, a conclusion reinforced "by the high caliber of Plaintiffs' counsels'
24   work in this case." *Id.*

25       **F.    FAILING TO AWARD THE FEES AND COSTS REQUESTED WOULD FRUSTRATE
26           THE PURPOSES OF CLASS ACTIONS IN THE CONTEXT OF THIS SETTLEMENT.**
27   As *Lopez v. Youngblood*, No. CV-F-07-0474 DLB, 2011 WL 10483569, at *14
28   (E.D. Cal. Sept. 2, 2011) explained, "[w]here… class members are receiving a substantial
     monetary recovery, and the interests of the class members and counsel are aligned, i.e.,

class counsel is not receiving an unreasonable proportion of the total recovery," the court should consider that "one important purpose of the class action device is that defendants should not benefit from their wrongdoing, and should be deterred from doing so by being vulnerable to class actions to remedy their wrongful conduct." (Citing, Richard A. Posner, *Economic Analysis of Law* 626–27 (5th ed.1998) ("the most important point from an economic standpoint is that the violator be confronted with the costs of his violation-this achieves the allocative purpose of the suit not that he pays them to his victims"); John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation,* 2–3 (Columbia Law. Sch. Ctr. for Law & Econ. Studies, Working Paper No. 293, 2006) (available at http://ssrn.com/abstract_id=893833). *See also Myriam Gilles, Exploding The Class Action Agency Costs Myth: The Social Utility Of Entrepreneurial Lawyers, University of Pennsylvania Law Review,* 155 U. Pa. L. Rev. 103 (November 2006).

## V.   THE COSTS ARE REASONABLE.

Plaintiffs seek $167,350.61 in costs, which are primarily for expert and mediation costs (plus other chargeable costs). See Litt Dec. ¶ 68; Exhibit D. These costs, primarily reimbursement for out of pocket costs for experts, mediation and litigation costs, are reasonable, and the Court should award costs (exclusive of class administration) in that amount (as supplemented by costs to be supplemented for the Final Approval hearing). Nontaxable cost reimbursement is authorized by Rule 23(h), and "include[s] counsel's out-of-pocket expenses that would normally be charged to a fee paying client." *Newberg on Class Actions* §16:10 (5th ed.). In class actions, expenses that "are of the type that law firms typically bill to their clients … include such things as: mediator fees, expert fees, computer research, photocopying, postage, meals, and court filing fees"). *Yang v. Focus Media Holding Ltd*., 2014 WL 4401280, *19 (S.D.N.Y. 2014).

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court award 30%

1   of the class fund as attorneys' fees plus litigation, consulting and expert costs in the

2   amount of $167,350.61.

3   Dated: September 18, 2017                    Respectfully Submitted,

4
                                                 KAYE, MCLANE, BEDNARSKI & LITT
5                                                PUBLIC COUNSEL

6

7                                                By:__/s/ Barrett S. Litt_____

8                                                      Barrett S. Litt

9                                                      Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 8

LODESTAR RATES:

| Attorney | Firm | Graduation | 2018 | 2017 |
|---|---|---|---|---|
| Trina Realmuto | Am. Immig. Council | 1997 | $825 | $800 |
| Matt Adams | Northwest Immig. Rights | 1998 | $800 | $775 |
| Stacy Tolchin | Tolchin Immigration | 2001 | $750 | $725 |
| Jennifer Pasquarella | ACLU SoCal | 2006 | $650 | $625 |
| Hugh Handeyside | ACLU Natl Security Proj | 2007 | $625 | $600 |
| Sameer Ahmed* | ACLU SoCal | 2009 | $600 | $575 |
| Kristin Macleod-Ball | Am. Immig. Council | 2012 | $480 | $450 |

ADJUSTED LAFFEY MATRIX:

| Trini Realmuto | Am. Immig. Council | 1997 | $864 | $826 |
|---|---|---|---|---|
| Matt Adams | Northwest Immig. Rights | 1998 | $864 | $826 |
| Stacy Tolchin | Tolchin Immigration | 2001 | $717 | $685 |
| Jennifer Pasquarella | ACLU SoCal | 2006 | $717 | $685 |
| Hugh Handeyside | ACLU Natl Security Proj | 2007 | $717 | $685 |
| Sameer Ahmed | ACLU SoCal | 2009 | $636 | $608 |
| Kristin Macleod-Ball | Am. Immig. Council | 2012 | $440 | $421 |

FEDERAL LOCALITY PAY ADJUSTMENT FOR SEATTLE: 2017 = 5.6%**

| Trini Realmuto | Am. Immig. Council | 1997 | $815.62 | $779.74 |
|---|---|---|---|---|
| Matt Adams | Northwest Immig. Rights | 1998 | $815.62 | $779.74 |
| Stacy Tolchin | Tolchin Immigration | 2001 | $676.85 | $646.64 |
| Jennifer Pasquarella | ACLU SoCal | 2006 | $676.85 | $646.64 |
| Hugh Handeyside | ACLu Natl Security Proj | 2007 | $676.85 | $646.64 |
| Sameer Ahmed | ACLU SoCal | 2009 | $600.38 | $573.95 |
| Kristin Macleod-Ball | Am. Immig. Council | 2012 | $415.36 | $397.42 |

* Adjustment for clerkship

** 2017 and 2018 GS Locality Rate for Los Angeles (30.57%) - Rate for Seattle (25.11%)

# EXHIBIT 9

# LAFFEY MATRIX

History

Case Law

Expert Opinions

**See the Matrix**

Contact us

Home

Links

|  |  |  | Years Out of Law School * | | | | |
|---|---|---|---|---|---|---|---|
| Year | Adjustmt Factor** | Paralegal/ Law Clerk | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/17- 5/31/18 | 1.0463 | $196 | $359 | $440 | $636 | $717 | $864 |
| 6/01/16- 5/31/17 | 1.0369 | $187 | $343 | $421 | $608 | $685 | $826 |
| 6/01/15- 5/31/16 | 1.0089 | $180 | $331 | $406 | $586 | $661 | $796 |
| 6/01/14- 5/31/15 | 1.0235 | $179 | $328 | $402 | $581 | $655 | $789 |
| 6/01/13- 5/31/14 | 1.0244 | $175 | $320 | $393 | $567 | $640 | $771 |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03-6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02-5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01-5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00-5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99-5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98-5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97-5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96-5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |
| 6/1/95-5/31/96 | 1.0322 | $85 | $156 | $191 | $276 | $311 | $375 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been approved in a number of cases. See, e.g. McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar v. Dist. of Col., 123 F.Supp.2d 8 (D.D.C. 2000).

* "Years Out of Law School" is calculated from June 1 of each year, when most law students graduate. "1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). "4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier "1-3" from June 1, 1996 until May 31, 1999, would move into tier "4-7" on June 1, 1999, and tier "8-10" on June 1, 2003.

** The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.