UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ABDIQAFAR WAGAFE, *et al.*, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, President of the United States, *et al.*,<br><br>Defendants. | CASE NO. C17-94 RAJ<br><br>ORDER |

This matter comes before the Court on Plaintiffs' Motions to Compel (Dkt. ## 109, 111) and on Defendants' Motion for Protective Order (Dkt. # 126). For the following reasons, the Court grants in part and denies in part the motions.

## I. BACKGROUND

On June 21, 2017, the Court granted Plaintiffs' motion to certify two classes: a Naturalization Class and an Adjustment Class. Dkt. # 69. The parties have since been engaged in discovery. The parties have attempted to resolve their discovery disputes without court intervention but have reached an impasse. Plaintiffs now move the Court to compel the Government to produce certain documents. In addition, the Government requests that certain information be subject to a limited and more robust protective order.

## II. LEGAL STANDARD

The Court has broad discretion to control discovery. *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002); *see also Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 833 (9th Cir. 2011), *In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988). That discretion is guided by several principles. Most importantly, the scope of discovery is broad. A party must respond to any discovery request that is not privileged and that is "relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

If a party refuses to respond to discovery, the requesting party "may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). "The party who resists discovery has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *Cable & Computer Tech., Inc. v. Lockheed Saunders, Inc.*, 175 F.R.D. 646, 650 (C.D. Cal. 1997).

## III. DISCUSSION

A. Law Enforcement Privilege

The Government has claimed that the law enforcement privilege protects its documents for quite some time. *See, e.g.*, Dkt. ## 94 at 7-8, 94-5 at ¶ 7. The Court

addressed the issue and required the Government to produce privilege logs if it wished to withhold documents based upon the privilege. The Government created privilege logs and claimed the law enforcement privilege. *See, e.g.*, Dkt. # 110. The Government now argues that it need not satisfy the requirements of this specific privilege unless it "formally invoke[s]" the same. Dkt. # 119 at 8. This argument—that the Government may somehow claim the privilege without actually claiming it—defies logic. The Government's actions and discovery tactics—including, for example, unjustified delays and the questionable timing of affidavits—thus far have been nothing less than obstructionist; such behavior is inappropriate and will not be tolerated.

To claim this privilege, the Government must satisfy three requirements: (1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege. *In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988). This privilege is qualified: "[t]he public interest in nondisclosure must be balanced against the need of a particular litigant for access to the privileged information." *Id.* at 272.

The Government did not properly claim this privilege because it refused to abide by the first and second prongs; that is, a department head did not claim the privilege and therefore did not assert such privilege based on actual personal consideration. This is notable considering the Government cited the privilege at least as early as October 2017 and included a declaration from the agency head, Mr. Emrich, though not in support of the privilege. Dkt. ## 94, 94-8. The Government now offers an affidavit of this same agency head—more than four months later—to invoke the law enforcement privilege. *See* Dkt. # 119-2. Tactics like this do nothing more than delay and frustrate the fundamental concept of discovery.

In his new affidavit, Mr. Emrich describes categories of withheld information and the law enforcement interest in keeping the information withheld. *Id.* The compelling portions of the affidavit relate to any documents "for applicants whom adjudicators have determined pose a national security or public risk," and the processes and checks utilized to assess such applicants and related risks. *See, e.g.*, *id.* at ¶ 21. Mr. Emrich states that disclosure of this information "could provide aliens with a roadmap into the techniques USCIS uses to uncover information that an individual may wish to hide, and the techniques used to elicit information." *Id.* But this type of information—the specific process in which USCIS discovers a national security risk and the subsequent investigation—is distinguishable from documents that "relate primarily to immigration benefits processing, not law enforcement in the traditional sense[.]" *Am. Civil Liberties Union of S. California v. United States Citizenship & Immigration Servs.*, 133 F. Supp. 3d 234, 245 (D.D.C. 2015).

Because this is an important distinction, and because the Court must view USCIS's withholding with more skepticism than it might with a different agency, *see id.*, the Court requires the Government's privilege log to reflect such precise distinctions. This is to ensure that the Government's blanket affidavit is not being used in an unbridled sense; the Government must specifically identify the documents that fall within this privilege. The Government's privilege log is insufficient in this regard. For example, most if not all of the Government's law enforcement privilege descriptions relate only to "procedures on the adjudication of an immigrant benefit application" as they pertain to the "applicant's eligibility for the immigration benefit." *See, e.g.*, Dkt. # 11- at 11. There is no law enforcement concern here; the Government's vague concern is that an applicant may learn how eligibility was decided and this may somehow "risk circumvention or evasion of the law." *Id.* This description—repeated throughout the log—relates primarily to immigration benefits processing and not to Mr. Emrich's contention that the individual document is related to law enforcement or national security concerns. Though

the Court accepts Mr. Emrich's affidavit to claim the privilege, generally[1], the Court requires the Government to use the privilege deliberately and will expect the Government to be exacting with which documents fall within this privilege, stating its reasons for withholding clearly in the privilege logs. *Am. Civil Liberties Union of S. California*, 133 F. Supp. 3d at 243–44 ("There is no explanation of how the information, if released, could risk circumvention of the law, no explanation of what laws would purportedly be circumvented, and little detail regarding what law enforcement purpose is involved (other than vague references to 'national security concerns'). This is not enough to justify withholding records . . . .").

The Court will allow the Government to revise its privilege log. Based on its review, the Court is hesitant to conclude that all of the currently claimed law enforcement privileges are accurate. The Government has fourteen (14) days from the date of this Order to revise its log and reproduce to Plaintiffs. The parties may file supplemental briefing at that time to address the privilege's balancing test for any documents that the Government continues to withhold based upon the law enforcement privilege. The Government must produce any documents over which it declines to claim the law enforcement privilege.

The deadlines vacated pursuant to the parties' stipulation, Dkt. # 136, remain vacated pending the Government's revised privilege log and resolution of the remaining discovery issues addressed in this Order. The Government is warned that any further

---

[1] The Court is perplexed why this affidavit or specific claim of privilege was not asserted months ago, thereby avoiding much of the delays that have occurred. Tactics like this only fuel the notion that the Government's intention is to purposely delay the discovery process in this lawsuit. Nonetheless, the Court finds Mr. Emrich's affidavit suitable for the issue at hand. This does not alleviate the Government of its responsibility to provide additional affidavits from heads of agencies for future productions in which the Government wishes to claim the law enforcement privilege. This affidavit may not be sufficient to cover all discovery productions during the course of litigation.

obstructionist behavior with regard to discovery production will not be met with such leniency.

B. <u>Production of Documents Responsive to RFPs 40, 41, and 44</u>

Plaintiffs' Requests for Production ("RFP") Numbers 40, 41, and 44 are as follows:

> <u>REQUEST FOR PRODUCTION NO. 40</u>: All Documents referring or relating to any interpretation or implementation of the First EO or Second EO that would affect in any way the adjudication of immigration benefits petitions, applications, or requests of those individuals who are part of the Naturalization Class, the Adjustment of Status Class, or the Muslim Ban Class, including, but not limited to, all documents referring or relating to the Extreme Vetting Initiative by the U.S. Immigration and Customs Enforcement agency.

> <u>REQUEST FOR PRODUCTION NO. 41</u>: All Documents referring or relating to "the suspension of immigration petitions, applications, or requests involving Plaintiff Wagafe, Plaintiff Ostadhassan, Plaintiff Bengezi, and members of the Muslim Ban Class," pursuant to the First or Second Eos, as described in the First and Second Claims for Relief outline in Plaintiffs' Second Amended Complaint.

> <u>REQUEST FOR PRODUCTION NO. 44</u>: All Documents referring or relating to any screening, vetting, or adjudication program, policy, or procedure connection to Section 4 of the First EO or Sections 4 or 5 of the Second EO, including, but

>not limited to, all documents referring or relating to the Extreme Vetting Initiative by the U.S. Immigration and Customs Enforcement agency. This Request is limited to those programs that apply or would apply to, or would affect in any way the immigration benefit petitions, applications, or requests of those individuals who are part of the Naturalization Class, the Adjustment of Status Class, or the Muslim Ban Class.

Dkt. # 112 at 22-24, 25-26.

The parties disagree about the continued relevancy of the Muslim Ban Class (also referred to as the Six Countries Class) and the propriety of producing records from ICE. Plaintiffs referenced the Muslim Ban Class in their Second Amended Complaint. Dkt. # 47 at ¶ 237. But Plaintiffs did not seek certification of this class in their Amended Motion for Class Certification "because, after the filing of the First Amended Complaint, the Acting Director of USCIS issued a memorandum indicating that Section 3(c) of the First EO would no longer operate to stop the processing of immigration benefits for those already in the United States." Dkt. # 49 at 9, n. 1. Plaintiffs reserved the "right to seek certification of the additional class if circumstances change again." *Id.*

Local Rule 23(i)(3) affords parties 180 days after filing a complaint to move for class certification. Local Rules W.D. Wash. LCR 23(i)(3). "This period may be extended on motion for good cause." *Id.* Any such motion "should, whenever possible, be filed sufficiently in advance of the deadline to allow the court to rule on the motion prior to the deadline." LCR 7(j). If a determination as to class certification is postponed, "a date will be fixed by the court for renewal of the motion." LCR 23(i)(3).

Plaintiffs have not pursued certification of the Muslim Ban Class. They claim that RFP Nos. 40, 41, and 44 are pre-certification discovery requests, yet those requests were propounded after the 180-day deadline had passed. Dkt. # 112 at ¶ 2 (Plaintiffs served the RFPs in November 2017; the deadline to seek class certification on the Muslim Ban

Class was in October 2017). Plaintiffs did not seek an extension of any deadlines with regard to pre-certification discovery or certifying the Muslim Ban Class. And, they fail to offer any compelling reasons for failing to conduct such discovery or file such motions within the 180-day window. Moreover, Plaintiffs' articulated reasons for not seeking certification of the Muslim Ban Class related to whether certain portions of the First and Second EOs would be implemented. Plaintiffs do not argue that circumstances have changed to warrant such a request to now certify the Muslim Ban Class. Nor do Plaintiffs argue that RFP Nos. 40, 41, or 44 seek to discover evidence of changing circumstances such that this discovery would impact the decision to request class certification. In fact, at the time of this Order, it is unclear whether Plaintiffs had even contemplated filing a motion to certify the Muslim Ban Class. To follow Plaintiffs' approach would relegate class certification to a moving target subject only to Plaintiffs' control and completely ignore the established Local Rule of this Court.

Plaintiffs did not timely move to certify the Muslim Ban Class. However, this does not affect their ability to pursue discovery as to the representative plaintiffs. Whether the named plaintiffs' claims are moot has not been briefed before this Court, and the Court will not entertain a motion to dismiss embedded in an opposition to a motion to compel.

Defendants object to RFP Nos. 40, 41, and 44 on account of their allegedly broad context and target of ICE records. Dkt. # 120 at 11-12. The Court disagrees that the RFPs are too broad. Indeed, the RFPs are targeted at certain programs that may encompass a successor program to CARRP. The Court finds that the information requested in RFP Nos. 40, 41, and 44 is relevant and within the scope of litigation at this stage in the proceedings, albeit not with regard to the Muslim Ban Class.[2]

---

[2] The Court will not tolerate the Government using this Order to withhold swaths of information that is discoverable. The Court notes that information relevant to the Muslim Ban Class is most likely relevant to the two certified classes, as well as the named plaintiffs who

1  Defendants also object to these RFPs because they claim that searching for
2  documents at ICE "is not proportional to the needs of this case," especially in light of
3  ICE's non-party status. *Id.* at 13. But the RFPs do not ask Defendants to search for
4  records "at ICE." *See* Dkt. # 112 at 21, 25-26; *see also* Dkt. # 122 at 9 (stating that
5  Plaintiffs are inquiring into documents that are in the possession, custody, or control of
6  DHS). Plaintiffs are seeking documents within Defendants' control that reference certain
7  programs that are promulgated or maintained by ICE. Any relevant documents within
8  Defendants' possession, custody, and control must be produced.

### C. Protective Order

The Government argues that a more robust protective order must be in place before it will produce the class list to Plaintiffs. Dkt. # 126. In support of its argument, the Government contends that disclosure "risks prejudice to national security and intelligence interests." *Id.* at 3. But the risks cited by the Government are vague and speculative—there is no evidence that any individuals on the class list are or were subjects of investigations or are, generally, "bad actors." *Id.* Furthermore, any sensitive information on the class list is subject to the existing protective order. To be sure, the Government creates scenarios in which Plaintiffs may violate the spirit of the protective order. *Id.* at 6. The Court warns Plaintiffs that should they attempt to purposely and improperly disclose information subject to the protective order, then the Court may issue sanctions, which may include dismissal of this matter.

The Court does not find that the Government has supported its argument that the class list, generally, must be subject to an "attorney eyes only" provision. However, the Court recognizes that potential national security risks may exist as to specific individuals; the burden is on the Government to make such case-by-case determinations. Any

---

would have represented the Muslim Ban Class. Plaintiffs should not be forced to file yet another motion to compel in the event that the Government purposely withholds such information.

determinations must be made with sufficient detail and specificity. Such determinations and the individuals to which they apply must be protected by the "attorney eyes only" protections described by the Government in its brief. Dkt. # 126. Any such determinations must be produced to Plaintiffs' counsel—with the understanding that this information is considered "attorney eyes only"—within fourteen (14) days from the date of this Order. The remaining portion of the class list must be produced at the same time, subject to the existing protective order, Dkt. # 86.

D. Status Reports (Dkt. ## 124, 125, 130, 132)

The Court is in receipt of the parties' status reports. Dkt. ## 124, 125, 130, 132. The Court is concerned with the Government's behavior in this matter. Based on the record before it, the Court finds reason to believe that the Government is purposely obstructing and hindering the discovery process in this lawsuit.

There is already a pending motion for sanctions in this matter regarding the Government's discovery behavior. Dkt. # 137. As previously noted, the Government must cease its delay tactics in the discovery practice. These tactics do nothing more than unduly delay the production of documents it is obligated to produce. Unless the Government has a credible basis to assert a claim of privilege, it should fully abide by the rules of timely disclosure.

The Court has repeatedly explained to the Government that orders from the federal bench are mandatory, not voluntary. *See, e.g.*, Dkt. ## 115, 121 (hearing and hearing transcript regarding discovery disputes). The executive branch does not stand alone in the federal system; the Government may not usurp the judicial branch and decide for itself when or if it will produce documents. The Court has no patience for Defendants' apparent disregard for the discovery process and for its attorneys' inappropriate actions in

furthering and participating in such behavior.[3] The Court hopes to proceed to the merits in this matter rather than interminably remain in this morass of unnecessary delays and discovery disputes.

**IV. CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part the motions. Dkt. ## 109, 111, 126.

Dated this 11th day of April, 2018.

The Honorable Richard A. Jones
United States District Judge

---

[3] Attorneys appearing in the Western District of Washington must be familiar with the Washington Rules of Professional Conduct ("RPC"). Local Rules W.D. Wash. LCR 83.3(a)(2). These include RPC 3.3 and 3.4, which aim to prevent "conduct that undermines the integrity of the adjudicative process." WA R RPC 3.3. Attorneys' duty to advocate for their clients "is qualified by the advocate's duty of candor to the tribunal." *Id.*