IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| ABDIQAFAR WAGAFE, *et al., on behalf of himself and other similarly situated*,<br><br>               Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, President of the United States, *et al.*,<br><br>               Defendants. | CASE NO.  C17-00094RAJ<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR A PROTECTIVE ORDER** |

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for a Protective Order
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

# Introduction

With fewer than two months remaining in the discovery schedule, Plaintiffs make three separate requests that are inconsistent with their own class-wide claims, threaten to undo prior orders of the Court, and impose unreasonable burdens on the Defendants at the eleventh hour. All three requests revolve around obtaining information about individual class members, with the ultimate goal of discovering why each individual class member's applications were reviewed under the Controlled Application Review and Resolution Program ("CARRP") policy. First, Plaintiffs seek to compel production of 100 randomly selected A-files of unnamed class members. Second, they ask permission to post a public class notice to reach out to unnamed class members – again, for the purpose of discovering additional information about individual class members and "why information." Finally, they seek to compel disclosure of the most sensitive law enforcement information relating to the named Plaintiffs – "why" their applications have been processed pursuant to the CARRP policy. Each of these requests should be denied.

The touchstone of the discovery process is reasonableness. But Plaintiffs overrun that boundary. An order to produce even one randomly selected A-file poses an extraordinary burden on the Defendant agencies that are already stretched to the limit in meeting Plaintiffs' current discovery demands. An A-file for an individual whose application was processed pursuant to the CARRP policy contains law enforcement and other privileged information, third-agency information, and possibly classified information. The mere presence of such information requires privilege review, compliance with third-agency information-sharing agreements, multi-agency coordination, and line-by-line review of what may exceed thousands of pages of material, and declassification review where applicable. A-file production is uniquely more onerous than the production of programmatic-related material. The Court recognized both the special burden associated with this material, as well as its irrelevance, when it limited discovery into individual cases and restricted discovery demands to the five representative class members. Plaintiffs now attack that foundational judgment. Plaintiffs' effort to disable this longstanding discovery limitation must be rejected.

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 1
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

Plaintiffs' new request to publicly disseminate a class notice is equally unworkable and disruptive. Indeed, Plaintiffs take aim at another of the Court's judgments. The Court granted Plaintiffs' counsel attorney-eyes-only access to the full list of unnamed class members *on the condition* that they refrain from "contacting [such] unnamed members . . . for any purpose. . . ." Dkt. 183 at 3. But counsel's class-notice proposal specifically invites and facilitates that contact and may result in hundreds of unnamed class members contacting class counsel. It is also inconsistent with the theory of Plaintiffs' case because the Complaint challenges the CARRP *policy*, not its application through individual adjudications. Thus, again, Plaintiffs challenge the Court's basic framework for the conduct of this litigation: the Court decided that class certification rested on the conclusion that Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Dkt. 69 at 30-31. The public class notice, however, just like the request to discover additional A-files, violates this principle. In short, inevitably fact-bound determinations contained in A-files have no bearing on the facial challenges to agency policy.

Finally, Plaintiffs unreasonably seek the disclosure of the most sensitive information contained in the A-files of the named Plaintiffs. Defendants demonstrate below that this very sensitive information merits continued protection, and the courts have found that even attorney-eyes-only protection creates undue risk of disclosure. Plaintiffs' chief argument is that they need to see individualized "why information" to understand the national security basis for processing an individual's immigration benefit application pursuant to the CARRP policy. However, the Court recognized in its prior orders the need and importance of protecting the integrity of national security investigations. Thus, it urged the parties to work together to find alternative "ways in which Defendants might be able to provide Plaintiffs' counsel with information about particular unnamed class members to develop evidence for use in their case." Dkt. 183 at 3. Although Plaintiffs gloss over this, Defendants have worked diligently to find those ways over the last six months. Defendants have produced more than 13,000 documents, comprising more than 120,000 pages of relevant and responsive material. This evidentiary material includes CARRP-related

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 2
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

policies, operational guidance, and training materials, which explain how the CARRP policy applies to benefit applications (including the unnamed class members' applications), along with an Administrative Record consisting of thousands of pages of key CARRP-related documents. Defendants have also provided extensive data through quarterly class lists and in response to an interrogatory.

Plaintiffs do not assert that this information is lacking in any way. To the contrary, they do not discuss it at all. Whether it is the hope that something better lies around the corner, or the simple failure to understand the full extent of the information already provided, Plaintiffs simply provide no justification to bury the Defendants with more and more discovery requests. At some point, a line must be drawn. Accordingly, and as further demonstrated below, the Court should deny the Plaintiffs' three requests in full and grant the Defendants' cross-motion for a new protective order.

## ARGUMENT

### I. Plaintiffs' Motion to Compel the Production of 100 A-files Should be Denied.

Plaintiffs' Request For Production (RFP) No. 53 directs Defendants to produce "[t]he Alien Files ("A-files") of 100 class members chosen at random." These A-files pertain to immigration-benefit applicants whose applications have, been or are being adjudicated pursuant to the CARRP policy because an articulable link has been identified between the applicant and one of the Immigration and Nationality Act's ("INA") national security inadmissibility or deportability grounds. Accordingly, this group of A-files is distinguishable from those pertaining to the vast majority of persons applying for immigration benefits.

As set forth in the accompanying declarations, Plaintiffs' demand, if enforced, presents an enormous logistical challenge and burden for the Government. Indeed, even producing one A-file will impose a substantial burden on the Government without providing any significant information to Plaintiffs. Before producing these A-files, they must be reviewed by third agencies with law enforcement or intelligence responsibilities for privilege, including law enforcement privilege and the presence of classified information to ensure that this information is properly identified and protected from disclosure. *See* Declaration of Tracy L. Renaud (USCIS), ¶¶ 8-11; 18-35;

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 3
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

Declaration of Luis Mejia (CBP), ¶¶ 9; 20; Declaration of Douglas Blair (TSA), ¶¶ 11; 13; 17; and Declaration of Deborah A. Crum (FBI), ¶¶ 8-18. For the FBI in particular, this will require painstaking multi-level review at literally the page-by-page and line-by-line level of each A-file of a class member that the Government is required to disclose. Crum Decl. ¶¶ 8; 10-12; *and see* Tabb. Decl. (*ex parte*, *in camera*).

Given the tremendous burden Plaintiffs' request for 100 A-files of unnamed class members places on Defendants, and their lack of need for this material in light of the nature of their class claims and the documents and information Defendants have already produced concerning class members and CARRP, Plaintiffs' request implicates the Federal Rules of Civil Procedure's proportionality limitation. Reinforcing the importance of proportionality, the text of Rule 26(b)(1) was revised in 2015 to incorporate proportionality as defining the scope of permissible discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and <u>proportional to the needs of the case</u>, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and <u>whether the burden or expense of the proposed discovery outweighs its likely benefit</u>. (emphasis added)

In the wake of this amendment, the permissible scope of discovery is no longer defined by relevancy alone. Instead, "discovery must also be proportional to the needs of the case." *In re Bard IVC Filters Prod. Liab. Litig.*, 317 F.R.D. 562, 566 (D. Ariz. 2016). This rule change "emphasize[d] the need to impose 'reasonable limits on discovery through increased reliance on the common-sense concept of proportionality.'" *Roberts v. Clark Cty. Sch. Dist.*, 312 F.R.D. 594, 603 (D. Nev. 2016) (internal citation omitted).

While Rule 26(b)(1) identifies various factors for the Court to consider in evaluating proportionality, most salient here is the question of whether the burden of the proposed discovery outweighs its likely benefit. As shown in the accompanying declarations, producing even one such A-file, let alone 100 A-files, adds a substantial and potentially enormous burden on federal agencies, particularly USCIS and FBI. *See* Crum Decl., ¶¶ 11; 14-17; Renaud Decl., ¶¶ 24; 27; 29-35.

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 4
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

On the benefit side of the equation, Plaintiffs suggest that information gleaned from a random set of class member A-files may advance their case for two reasons. First, they assert that the A-files "likely contain highly relevant information regarding the unreasonable delays. . . ." Second, they argue that the 100 A-files might show "how CARRP is being applied to their applications" and "shed light on how CARRP has affected individuals over the past two years." Dkt. 221 at 6, 16-17. In other words, Plaintiffs seek to parse a sample of 100 A-files that contain privileged – and even classified – national security information in the hope of finding instances of what they deem to be unlawful or irregular conduct in individual cases. *See* Crum Decl. ¶¶ 8, 10; Tabb Decl., *passim*. Apparently, Plaintiffs would like to use any claimed instances of such conduct they might identify in any individual file to argue that CARRP, as a whole, must be operating globally in an unlawful matter.

This type of request, *i.e.*, an unfocused search through random class member A-files in hope of finding individual instances of improper conduct, is plainly "a fishing expedition." *See, e.g.*, *Exxon Corp. v. Crosby-Mississippi Res., Ltd.,* 40 F.3d 1474, 1487 (5th Cir. 1995) (district court properly denied request for additional discovery based on attorney's representation that, in his experience, in an undertaking as complex and expensive as drilling an oil well, it was reasonably probable that errors constituting breach of an agreement could be found). District courts need not condone the use of discovery to engage in "fishing expedition[s]." *Rivera v. NIBCO, Inc*., 364 F.3d 1057, 1072 (9th Cir. 2004) (*citing Exxon Corp., supra*)*.* Further, production of additional A-files will only provide anecdotal evidence with no reliable significance for the programmatic validity of the CARRP policy.

It is also important to recognize that the class claims upon which this lawsuit are based and, accordingly, the manner in which the case was certified to proceed as a class action, rest upon causes of action that typically are resolved purely as questions of law, *e.g.*, Administrative Procedure Act, Mandamus, Establishment Clause, Equal Protection, Due Process, *etc*. Thus, class certification was based on F.R.Civ.P. 23(b)(2) and rested on the conclusion that Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 5
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

declaratory relief is appropriate respecting the class as a whole." Dkt. 69 at 30-31. Each class member's application for immigration benefits has undergone CARRP processing. Under Plaintiffs' theory of the case, class certification was appropriate because the CARRP policy is unlawful on its face rather than as applied to any individual's personal circumstances. The Court, agreeing with Plaintiffs that their action could proceed as a class action under Rule 23(b)(2), observed that, "[t]he common question here is whether CARRP is lawful. The answer is 'yes' or 'no.' The answer to this question will not change based on facts particular to each class member, because each class member's application was (or will be) subjected to CARRP." *Id*. at 25, ll. 24-26.

This suit proceeds as a class action on the theory that every class member is entitled to injunctive relief if the named Plaintiffs demonstrate that CARRP was illegally conceived and operates globally in an unlawful manner. The facts of any individual class-member's interactions with USCIS, aside from having their application processed pursuant to the CARRP policy (which is discernable from the Class Lists Plaintiffs already received), are irrelevant. Thus, Plaintiffs have no need to view any unnamed class member's A-file, and they cannot justify the arduous review that will be required of Defendants if ordered to produce the unnamed class member A-files Plaintiffs demand.

The burdensome process of producing any additional A-files would doubtfully yield any valuable information. The information Plaintiffs primarily seek to derive from these A-files – the reason(s) "why" the applications of each of the 100 individual unnamed class members were processed pursuant to CARRP policy – will, in most if not all cases, be subject to a law enforcement privilege or possibly classified, and thus redacted. Indeed, the Court's review *in camera* of 50 case samples of CARRP-related "why information" makes this plain. Thus, given the tremendous undertaking required by USCIS, *see* Renaud Decl., ¶¶ 8-11, the FBI, *see* Crum Decl., ¶¶ 7-16, and other law enforcement and intelligence agencies to comply with Plaintiffs' request, and the case schedule delays that complying would certainly necessitate, the outcome of any production would necessarily involve producing A-files so heavily redacted that Plaintiffs would obtain little, if any, useful information. *See In re Blue Cross Blue Shield Antitrust Litig*. (MDL No. 2406), No. 2:13-

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 6
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

CV-20000-RDP, 2017 WL 2889679, at *2 (N.D. Ala. July 6, 2017) (discovery request seeking information likely to be shielded by privilege was disproportionate given the burden).

Plaintiffs have not only failed to support their claimed need for 100 random A-files, but also to show that substantially the same information is otherwise unavailable to them. Ignoring the class member and historical information that Defendants have already produced, Plaintiffs wrongly suggest that Defendants have not cooperated in providing them access to "information about particular class members to develop evidence for use in their case." Dkt. 221 at 19, quoting Dkt. 183 at 3.

Defendants have already produced far more extensive and complete information on the claimed delays and CARRP processing times than Plaintiffs could possibly obtain from a random draw of 100 A-files. On October 16, 2018, Defendants served their Objections and Response to Plaintiffs' Fifth Request for Production of Documents and Third Interrogatory. Dkt. 222-1 at 33. Interrogatory no. 3, comprised of fourteen alphabetized subparts, each seeking scores of separate items of information for each alphabetized subpart, sought essentially the same type of information Plaintiffs now tout as justifying their demand for 100 A-files. *See* Dkt. 222-1 at 24-25, 50-52.

Defendants provided information responsive to the hundreds of categories and thousands of items sought by Interrogatory no. 3. The spreadsheet Defendants produced included 8,862 lines of information – each one with multiple cells containing data Plaintiffs sought – and spanning 1,516 pages. Defendants' responsive information was broken out, as Plaintiffs requested, by application type, fiscal year of application referral to CARRP processing, nationality, country of birth, religion, aggregate information about KST or non-KST designation status for the purposes of CARRP processing, adjudication outcome or application status, mean and median processing days from referral for CARRP processing to adjudication, *etc.*, and with numerical counts for each data item. *See* Renaud Decl., ¶ 17. This rich volume of data, with other documents and information Defendants have provided concerning CARRP, more than satisfies Plaintiffs' claimed need for information in 100 randomly selected class members' A-files. The extensive spreadsheet data is far more specific,

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 7
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

extensive, and comprehensive than Plaintiffs could possibly glean from a randomized production of 100 A-files.

Even before providing this extensive information, and to move this litigation forward, Defendants offered additional demographic data about particular unnamed class members for Plaintiffs' use in developing their class claims. On September 21, 2018, following earlier production of eight categories of demographic data (ethnicity, etc.), Defendants offered two additional categories of demographic data – on race and religion – where available. First, this data included the race of certain naturalization class members where self-identified on their Form N-400, "Application for Naturalization." Second, this data included religious information where included in USCIS' electronic case management used to track and process asylum applications, credible fear and reasonable fear screening processes, and applications for benefits provided by Section 203 of the Nicaraguan Adjustment and Central American Relief Act, as an applicant's religion may be inextricably linked to his/her persecution claim and relief request.

In addition to the foregoing, and the massive volume of CARRP-related documents produced in this litigation to date – approximately 12,000 documents – detailing how applications are handled under CARRP and thus how class members' applications have been handled, Defendants on November 19, 2018, provided Plaintiffs with the Administrative Record underlying this litigation. Consisting of thousands of pages of key CARRP-related documents – many previously produced to Plaintiffs and others then in processing for production – this extensive Administrative Record includes the central documents on CARRP policy for vetting and adjudicating cases with national security concerns, *see* Renaud Decl., ¶¶14-15. Collectively, these documents provide far more extensive, representative and reliable information about how applications are processed pursuant to the CARRP policy than Plaintiffs could possibly divine from 100 random A-files. Many of these documents describe "the phases of the CARRP policy, what steps should be taken in each phase, and how certain sensitive or derogatory information should be handled." *See* Renaud Decl., ¶ 15.

As the Court has already appointed the five named Plaintiffs to represent the certified classes, was deliberate in holding the line against discovery into individual benefit adjudications, and the

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 8
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

issues being litigated are not specific to handling any particular person's application, Plaintiffs have no need for A-files of individual members of the certified classes. The extraordinary and disproportionate review and processing burdens imposed on Defendants because of the need to protect the law enforcement privileged and third-agency information contained in such A-files, as well as any classified information, from unauthorized disclosure, is set forth in the attached declarations. Thus, producing any additional A-files, would unreasonably burden Defendants and delay this litigation.

## II.    Plaintiffs' Motion to Post a Public Notice Should be Denied.

On May 10, 2018, after multiple rounds of litigation, the Court entered an Order prohibiting disclosure of sensitive information revealing whether the named Plaintiffs' applications were processed pursuant to the CARRP policy produced by Defendants in discovery by placing an "attorney eyes only" ("AEO") limitation on Plaintiffs' class counsel's ability to disclose such information. Dkt. 183. Plaintiffs now seek to reopen that litigation and overturn that Order to post a public notice about this action on various websites. But publication of such a notice, and the inevitable communications between class counsel and unnamed class members, will almost certainly lead to the disclosure. This provides too great a risk of disclosure of sensitive communications in violation of the Court's Protective Order. The integrity of thousands of ongoing investigations rests upon an applicant's *lack* of knowledge (or even suspicion) that such investigations are underway – high stakes that warrant stringent precautions. The Court should reject Plaintiffs' request.

Plaintiffs note that "[i]n most class action lawsuits," counsel can routinely communicate with unnamed class members. Dkt. 221 at 14. But this is not an ordinary class action, as communicating information received from the Government in discovery to unnamed class members, most of whom are or were the subject of law enforcement or national security investigations, can result in a direct and serious harm to national security. Thus, ordinary practice has limited applicability here – as the Court's May 10, 2018 Order implicitly recognized.

Under Plaintiffs' proposal, Dkt. 222-1 at 6, a class notice, (Ex. C), will be published on several websites and email list serves that will generally describe this litigation. The notice explains

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 9
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

that the existing AEO protective order, Dkt. 183, places limitations on class counsel's ability to communicate with unnamed class members who might respond to the notice. Under Plaintiffs' proposal, class counsel will not contact any individual to provide any information about their applications and cannot disclose whether anyone responding to the notice is a class member and/or whether that individual's application has been subjected to CARRP review. When contacted, class counsel propose to request that each individual complete a generic questionnaire and provide any notices they have received from USCIS related to their application. Class counsel will inform them that they cannot confirm or deny whether unnamed class members are members of the *Wagafe* class, nor can counsel provide any additional information. All of these limitations on counsel's ability to provide information to unnamed class members are required by the Court's May 10, 2018 Order.

While this proposal does not appear to significantly enhance class counsel's ability to communicate with unnamed class members or develop evidence (the responses to questionnaires would be inadmissible as hearsay), it puts at risk of a disclosure sensitive information subject to the AEO protective order to unnamed class members who may be or may have been targets of investigations. When class counsel are in communication with individuals who respond to the notice, a very real risk exists that they may inadvertently reveal information provided under the AEO protective order. Defendants estimate that approximately 12,000 documents have been provided to Plaintiffs' counsel under the Stipulated Protective Order, Dkt. 86, and the subsequent Protective Order limiting certain material to an AEO restriction, Dkt. 183, over the past 18 months. But there is extensive information related to CARRP from various public sources. *See* USCIS Electronic Reading Room, https://www.uscis.gov/sites/default/files/USCIS/About%20Us/Electronic%20Reading%20Room/Policies_and_Manuals/CARRP_Guidance.pdf. Human memory is fallible and class counsel may confuse information provided under the AEO restriction with information from public sources. In similar circumstances, the Second Circuit recognized that "there are all-too-human lapses with material filed 'under seal.'" *In Re the City of New York,* 607 F.3d 923, 938 (2d Cir. 2010). The Government's and the foregoing courts' concerns are rooted in common sense. They recognize that

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 10
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

even the best of intentions are undermined by human inadvertence and error – hence the need for the clear, bright-lines, and easily implemented protections embedded in this Court's existing AEO protective order.

As detailed in Argument III, *infra,* and in the supporting declarations, the risk of harm to the Government's law enforcement and national security programs can be exceptionally severe if an unlawful disclosure of highly sensitive information occurred. Unauthorized disclosure risks "disruption and serious injury to ongoing and future investigations" that could also "compromis[e] the safety of HSI agents." Declaration of Thomas Allen (ICE), ¶ 31. *See also In Re the City of New York,* 607 F.3d at 936 ("the consequences of accidental disclosure are too severe to employ the procedure here").

Second, this proposal, which may result in dozens or hundreds of unnamed class members contacting class counsel, is inconsistent with the theory of Plaintiffs' Complaint, which challenges the CARRP *policy*, not its application through a series of individual adjudications. Class certification rested on the conclusion that Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Dkt. 69, at 30-31. By agreement of the parties, Defendants' document production has prioritized CARRP policy documents, and has specifically not searched for or produced documents relating to individual CARRP adjudications. *See* Renaud Decl., ¶ 15 (value of CARRP policy documents).

Plaintiffs' public notice proposal threatens to distract the parties from the central issue in this case and to throw the case schedule into disarray. After the extensive discovery from the Government produced in this action, that process is near an end with document production scheduled for completion by April 26, 2019. As unnamed class members come forward in response to the notice, Plaintiffs' counsel will most certainly raise their claims with Defendants and serve document production requests seeking information relating to such claims, including claimants' A-files, *see* Dkt. 221 at 16-17 – thus diverting resources and attention from the central issue of the facial legality of the CARRP policy. If the notice generates a substantial number of responses, Plaintiffs will need

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 11
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

to request repeated extensions of discovery, as class members respond to the notice. Under those circumstances, pretrial proceedings in this case will have no predictable endpoint.

## III. The Law Enforcement Privilege Protects the "Why" Information.

Plaintiffs seek to pierce the law enforcement privilege protecting law enforcement investigative interests and techniques and offer an illusory "compromise" AEO proposal to appease the Government's concerns. But the courts instruct, as set forth below, that even AEO orders, developed for use in commercial and sometimes criminal litigation, are inappropriate for civil matters involving the law enforcement privilege. Moreover, Plaintiffs fail to overcome the high threshold for removing law enforcement privilege protections. They simply fail to show that their need (heavily undercut by the voluminous policy, training, and aggregate materials on CARRP decision-making they now possess) outweighs the self-evident risks to the integrity of national security investigative techniques and information.

### A. The Purpose of the Law Enforcement Privilege

"[R]ooted in common sense" and "common law," the law enforcement privilege recognizes that "law enforcement operations cannot be effective if conducted in full public view." *Black vs. Sheraton Corp. of Am.*, 564 F.2d 531, 542 (D.C. Cir. 1977). Its purpose is to prevent disclosure of law enforcement techniques and procedures, preserve confidentiality of sources, protect witness and law enforcement personnel, safeguard the privacy of individuals involved in an investigation, and otherwise prevent interference with an investigation. *In re Dep't of Investigation*, 856 F.2d 481, 483-84 (2d Cir. 1988). The privilege may be invoked "to prevent disclosure of information that might impede important Government functions, such as conducting criminal investigations, securing the borders, or protecting the public from international threats." *In re U.S. Dep't of Homeland Security*, 459 F.3d at 571. The privilege also protects the ongoing or future effectiveness of investigatory techniques. *See Shah v. Dep't of Justice*, 89 F. Supp. 3d 1074, 1080 (D. Nev. 2015); *In re City of New York*, 607 F.3d at 944; *Tuite v. Henry*, 98 F.3d 1411, 1413 (D.C. Cir. 1996). "[T]he reasons for recognizing the law enforcement privilege are even more compelling" where, as here, "the compelled production of government documents could impact highly sensitive matters

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 12
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

relating to national security." *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 569 (5th Cir. 2006); *Olivares v. TSA*, 819 F.3d 454, 462 (D.C. Cir. 2016) ("[C]ourts do not second-guess expert agency judgments on potential risks to national security").

The law enforcement privilege is qualified, with a plaintiff's need for the information balanced against the Government's need to protect confidentiality. *In re City of New York*, 607 F.3d at 940. In applying this balancing, courts have recognized the "strong presumption against lifting the [law enforcement] privilege." *In re City of New York*, 607 F.3d at 945. To lift the privilege, a party must demonstrate a *compelling* need for the information. *Id.* Ultimately, the courts have used the law enforcement privilege to protect exactly the type of information Plaintiffs seek in this case – information that, if disclosed, could undermine national security-related investigations, reveal covert law enforcement techniques in cases involving threats to national security, and compromise the safety of law enforcement personnel and sources.

### i. The "Why" Information Is Privileged.

In general, for any individual processed pursuant to the CARRP policy, "why" information contained in that A-file and other documents is highly sensitive and, in some cases, classified. It reveals insight into federal law enforcement decision-making processes related to investigations involving national security concerns and, when taken collectively, provides a roadmap of the investigative techniques and procedures that USCIS and its partner agencies use to uncover derogatory information about individuals in the immigration system, including applicants for immigration benefits. The privileged and classified content can be separated into two broad and inter-related categories: (1) sensitive information containing the results of law enforcement checks performed on applicants for immigration benefits raising national security concerns; and (2) records of communications and coordination between USCIS and third-party law enforcement agencies.

### (a) Security Checks

All applicants for adjustment of status and naturalization must undergo numerous background checks to identify potential national security concerns, among other things. *See* Emrich Decl., Dkt. 146-3, ¶11. The required screening includes checks run against information originating

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

with, or operated by, the FBI and CBP.  Renaud Decl., ¶ 11.  A national security concern arises when a background check indicates that an individual has an articulable link to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in 8 U.S.C. §§ 1182(a)(3)(A), (B), or (F) or 1227(a)(4)(A) or (B).  CARRP provides a consistent approach to processing, and adjudicating immigration benefit applications that present national security concerns.  *See* Emrich Decl., Dkt. 126-1.  Because the named Plaintiffs all applied for one or more immigration benefits, each application was subjected to background checks.  For the following reasons, the background check results and associated records describing those results are properly withheld under the law enforcement privilege.

FBI name checks:  For reasons detailed in the Tabb Declaration, filed *in camera,* and *ex parte,* release of law enforcement privileged information found in A-files, which includes, *inter alia*, name check results and records referencing these results, could reasonably be expected to interfere with the FBI's ability to carry out its investigative missions.  *See* Tabb Decl,, ¶¶ 9-11, 15-16, 18-21, 26. 28-30, 42, 49, 56, 63, 80, 82-89, 94-98.  When conducting a name check on an individual, the FBI does not disclose the results of that check, regardless of whether it revealed derogatory information—*i.e.*, the existence of investigative records.  *See* Eisenreich Decl., Dkt. 126-2 at ¶ 31.  The FBI follows this policy because if it only refused to disclose information when a name check revealed derogatory information, that refusal would itself be interpreted as an admission that the FBI possessed investigative records about the individual.  *Id.*

All name checks concerning investigative records are thus law enforcement privileged, if not also classified, and are properly withheld because, if subjects or targets of FBI investigations were privy to this information, they could take countermeasures to undermine investigations—risking the confidentiality of sources and the effectiveness of investigative techniques, along with the integrity of current and future investigations.  *Id.*; *see In re Dep't of Investigation*, 856 F.2d at 483-84.  Thus, if Defendants were ordered to produce this information for the named Plaintiffs, accidental disclosure could result in individuals inferring that they are or were the subjects of law enforcement scrutiny.  The possibility of unauthorized disclosure creates an undue risk that one or more of the

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 14
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

above harms would occur. Moreover, even after USCIS adjudicates a case that was processed pursuant to the CARRP policy (favorably or not), underlying information from the FBI Name Check is still privileged because it may refer to an ongoing investigation, or could, for instance, disclose sensitive information about investigations of the applicant's associates.

TECS Records: TECS is a law enforcement information collection, analysis, and sharing system owned and operated by Customs and Border Patrol (CBP) and used by more than 40 federal law enforcement agencies, including the FBI and Secret Service.[1] Allen Decl., ¶ 15. TECS's capabilities and functions are not generally known to the public and "disclosing TECS records could reveal the knowledge law enforcement agencies have or had about an individual's unlawful activities and methods used to obtain that information." Allen Decl., ¶ 18.

TECS records or records from similar databases may indicate, *inter alia*, why an individual was of interest to immigration officials. *Id.*, ¶ 17. The reasons why an investigation was conducted on a particular occasion or the fruits it yielded are protected by the law enforcement privilege for well-established reasons. First, if the derogatory information justifying an investigation is uncovered, the manner in which law enforcement obtained the information may well be revealed. *See Abdou v. Gurrieri*, No. 05 Civ. 3946 (JG) (KAM), 2006 U.S. Dist. LEXIS 68650, 2006 WL 2729247, at *3 (E.D.N.Y. Sept. 25, 2006) (finding documents subject to the law enforcement privilege where disclosure "would reveal how the FBI follows up on confidential lead[s] and the tools, techniques and procedures utilized in such an investigation"). If bad actors gain knowledge of methods and techniques utilized in a particular investigation, it creates ready opportunities for circumventing the law in both the near and long term. *See* Allen Decl., ¶ 18; *Coalition v. Jewell*, 292 F.R.D. 44, 51-52 (D.D.C. 2013). Finally, when disclosure of these records across multiple cases occurs, as it would here if the Court were to grant Plaintiffs' motion to compel, it tends to reveal an agency's investigative standards for launching investigations in the first instance. *See* Allen Decl., ¶ 18 (release of this information "tends to indicate what will trigger the initiation of such an investigation . . . allow[ing] an individual to change his or her behavior.")

---

[1] The TECS database was originally named the Treasury Enforcement Communication System.

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 15
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

Relatedly, CBP has asserted the law enforcement privilege over TECS records because of similar but distinct concerns. *See* Ex. A to Mejia Decl. (Wagner Decl., Dkt. 146-7). Disclosing this information could put investigations at risk by revealing the Government's knowledge of criminal or terrorist activities, as well as what knowledge it lacks. *See Soghoian v. DOJ*, 885 F. Supp. 2d 62, 75 (D.D.C. 2012) ( "[k]nowing what information is collected, how it is collected, and more importantly, when it is *not* collected" might allow "would-be offenders to evade detection").

Moreover, even release of database codes contained within TECS could seriously damage law enforcement operations. Allen Decl., ¶ 19. These codes thus provide a window into developing a case over time, revealing when an individual is added to the TSDB or has a change in Watchlist status—potentially allowing a watchlisted individual to "reconstruct the sources and methods used to gather information that led to such classification." *Id.*

### (b) Records of Communications and Coordination

Divulging the reasons why an individual's application was handled under CARRP would implicate communications between USCIS personnel and third-party law enforcement officials that have been properly withheld pursuant to the law enforcement privilege. These communications must be safeguarded because they reveal coordination between USCIS and third-party law enforcement that could divulge whether an individual is or was the subject of a third-party law enforcement or intelligence agency investigation. *See also* Renaud Decl. at ¶ 47. More broadly, such would also provide insight into how USCIS or other law enforcement agencies identify, investigate, and combat security threats, thus allowing individuals engaged in prior or ongoing fraud or criminal activity to alter or conceal their conduct to avoid detection. This risks create larger programmatic vulnerabilities to CARRP and undermine its effectiveness. Renaud Decl., ¶ 43; *see Wishart v. Comm'r of Internal Revenue*, No. 97-20614 SW, 1998 WL 667638, at *6 (N.D. Cal. Aug. 6, 1998) *aff'd*, 199 F.3d 1334 (9th Cir. 1999) (protecting codes IRS used to select tax returns for examination because "taxpayers could manipulate their return information so as to avoid examination").

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 16
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

Further, releasing TECS records and email correspondence—often including full names, office locations, and phone numbers—could jeopardize law enforcement personnel. Allen Decl., ¶ 26. Disclosing these records could put ICE personnel at risk of becoming targets of harassment pertaining to investigations in which they have been involved. *Id.*, ¶ 26. The law enforcement privilege was intended to protect law enforcement personnel and has been used to protect identities of individuals involved in law enforcement operations. *In re Dep't of Invest.,* 856 F.2d at 486.

Significantly, unauthorized disclosure of these communications would also risk more far-reaching repercussions for Government deliberations, including the post-9/11 emphasis on real-time information sharing between agencies. Allen Decl., ¶ 27. However, if redacted information in the named Plaintiffs' A-files were released, it could jeopardize the nature and extent of information sharing between federal agencies. *Id.*

Indeed, if USCIS were unable to fulfill its obligation to protect third-party information, it would undermine the collaborative relationships essential to reliable information sharing and jeopardize USCIS' access to third-party derogatory information. *See* Renaud Decl., ¶ 45; Allen Decl., ¶¶ 28-29. If USCIS' access to currently shared information were limited, USCIS could improperly approve immigration benefits for ineligible individuals who, in some cases, may seek citizenship or permanent residence to harm the United States. *See* Renaud Decl., ¶ 46. Therefore, the privileged information should be afforded the continued protection it merits.

### ii. Plaintiffs' Purported Need Does Not Outweigh the National Security Interests.

Plaintiffs contend that their purported need for the "why" information outweighs the Government's interest in non-disclosure because it will allow them to assess, *inter alia*, if the named Plaintiffs' "why" information "relies on non-statutory criteria" or "unlawfully takes into account an individual's national origin or religion," and is thereby probative of their legal claims. Dkt. 221 at 15. However, class certification was based on F.R.Civ.P 23(b)(2)., and rests on the conclusion that Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Dkt. 69, pp. 30-31. Indeed, Plaintiffs aver that the CARRP policy is *void ab initio.*

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 17
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

The individualized circumstances of any particular case cannot be representative of how CARRP administrators acted or refused to act with the whole class. Conversely, Plaintiffs, through discovery, have sought and received tens of thousands of documents concerning, *inter alia*, CARRP policy, guidance and training. These documents illuminate how CARRP adjudicators are instructed to examine and assess whether certain derogatory evidence meets the "articulable link" standard that determines whether an individual's application should be designated as a national security concern. Thus, Defendants have demonstrated that the withheld information falls squarely within the law enforcement privilege, and Plaintiffs have simply not demonstrated a compelling need which outweighs the Government's interest in nondisclosure.

Finally, Plaintiffs also note Defendants' previous admonishment that there may be "why" information contained in documents other than the A-files. *See* Dkt. 221 at 6. On numerous occasions, including in their discovery responses and in their response to Plaintiffs' motion for sanctions, *see* Dkt. 146, Defendants have documented that information about the named Plaintiffs exists outside the A-files, including in response to Requests for Production, and review of such documents is ongoing. *See* Emrich Decl., filed *ex parte*, *in camera* ¶ 12-13.

### iii. An Attorneys' Eyes Only Protective Order is not Sufficient.

Because Defendants have established the applicability of the law enforcement privilege, disclosure of "why" information under a protective order raises unwarranted risks. *See In Re the City of New York* at 936-37 (protective orders associated with law enforcement sensitive information are a "deeply flawed procedure that cannot fully protect the secrecy of information in this case; it merely mitigates—to some degree—the possibility of unauthorized disclosure."). AEO orders were developed for use in commercial and sometimes criminal litigation, but are inappropriate for civil matters involving the law enforcement privilege. The potential injuries in the law enforcement context are "more severe" and "far more difficult to remedy;" and the source of unauthorized disclosures are difficult or impossible to pin down. *Id.* at 936.

Privileged "why" information would include details of investigations into specific individuals who present national security concerns, which may be yet to be resolved. While Defendants have no

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 18
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

doubt that Plaintiffs' counsel would do their utmost to safeguard any "why" information if disclosed under an AEO protection, humans are fallible and mistakes can happen. Courts have recognized the potential for human error, and have created a margin of protection to counter that risk by declining to order the disclosure of law enforcement privileged information under a protective order. *See In Re the City of New York,* 607 F.3d at 938. The federal agencies with equities in this case should not be asked to incur the risk of compromising the tools and resources that they rely on daily to protect the national security interests of the United States in the event that "why" information shared in compliance with an AEO protective order were to fall into the wrong hands. *See also* Renaud Decl., ¶ 42. Plaintiffs have failed to meet the high bar that the courts impose for piercing the law enforcement privilege, and present no method by which production of such information will avoid providing a roadmap to understanding the techniques and procedures USCIS and its partner agencies use to uncover derogatory information and how that information is used in adjudicating immigration benefit applications. They manifestly fail to show that their need exceeds the Government's vital interest in protecting this information from unauthorized disclosure.

**B. Plaintiffs' Challenges to Defendants' National Security Concerns Lack Merit.**

Plaintiffs raise several meritless arguments to undermine the Defendants' valid invocation of the law enforcement privilege and related national security concerns. First, the isolated occasions on which the Government mistakenly released information under FOIA do not constitute waiver of Defendants' privilege assertions in this case. Curiously, the particular instances of erroneous disclosure Plaintiffs cite, Dkt. 221 at 12, do not pertain to the very category of information they now seek to compel: the reasons why particular individuals were selected for CARRP screening. Further, these mistaken disclosures are not tantamount to a concession that the information was non-privileged. Indeed, the Government's mistaken "release of a document only waives these privileges for the document or information specifically released, and not for related materials." *In re Sealed Case,* 121 F.3d 729, 741. (D.C.Cir.1997); *see also Smith v. Cromer,* 159 F.3d 875, 880 (4th Cir.1998) (explaining that "disclosure of factual information does not effect a waiver of sovereign

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

immunity as to other related matters"). Thus, these past mistaken disclosures are irrelevant to Defendants' valid law enforcement privilege assertions in this case.

Second, the Government's security concerns as to the "why" information are not, as Plaintiffs assert, undermined by INA requirements. *See* Dkt. 221 at 12-13. Even where the Government has sufficient evidence to support a charge of removability or inadmissibility based on statutory national security grounds, it often nevertheless elects not to bring charges on those grounds. There are numerous reasons for this, including but not limited to, protecting another law enforcement or intelligence investigation. Indeed, disclosure would only occur if the Government pursued removal based on a national security ground, where it then may be required to present sufficient evidence to sustain that ground. 8 U.S.C. § 1229a(c)(3)(A). Still, even there, the Government is permitted to submit national security information *ex parte* in the case of arriving aliens or those seeking discretionary relief. *See* 8 U.S.C. § 1229a(b)(4)(B). This important distinction Plaintiffs overlook illustrates that derogatory information in the national security context is closely guarded at every turn.

Third, Plaintiffs' assertion that regulatory disclosure requirements command disclosure of the reasons why an application may have been placed under CARRP review is a faulty conclusion based a faulty premise. USCIS generally must advise an individual of derogatory information unknown to the applicant or petitioner only if an adverse decision is based on that information. *See* 8 C.F.R. 103.2(b)(16)(i)-(iv). However, if USCIS is aware of certain national security information, but elects to not base an adverse decision on it, it is not obligated to share such information. *Id.*

More importantly, pursuant to the CARRP policy, identifying a national security concern is the first step in a process that includes internal and external vetting, deconfliction, and adjudication. An "articulable link" determination does not signify, as Plaintiffs seemingly suggest, that the derogatory information behind it is inconsequential or insufficient to support a final determination on an individual's eligibility for an immigration benefit. The very point of the remaining stages of the process is to further probe, analyze, and assess the nexus between the applicant and the national security concern and determine whether it can be resolved, and affects benefit eligibility. One

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 20
(Case No. C17-00094RAJ)

possibility is that the nexus proves compelling and ultimately supports a determination of benefit ineligibility. Indeed, USCIS does not disclose preliminary national security information before vetting and investigating to determine if it impacts an individual's eligibility for an immigration benefit or could be used to form the basis of a decision. Thus, Plaintiffs' characterization of the derogatory information underlying national security concerns as amounting to "only" an "articulable link" is shortsighted.

Furthermore, as to classified information, regulations provide that the Government's disclosure concerns are only more manifest. 8 C.F.R. § 103.2(b)(16)(iv) provides that the applicant shall be given general notice of the nature of the concern only if a decision is based on classified information and the classifying authority has agreed to its disclosure in writing. In fact, USCIS interprets this regulation in accordance with agency guidance, which provides that classified information should be used only as a last resort and decisions should be based on unclassified information whenever possible. Therefore, contrary to Plaintiffs' assertion that the regulations "undermine any security rationale" for withholding the "why" information, they bolster Defendants' fundamental assessment that this information is privileged and highly sensitive.

Lastly, Plaintiffs' assertion that "whatever concerns that Defendants may have when an application is pending, they do not apply when the application *has already been adjudicated*" lacks merit. *See* Dkt. 221 at 13-14 (emphasis in original). Protection afforded by the law enforcement privilege is not eliminated once a particular investigation is concluded or a national security concern is resolved. *See In re City of New* York, 607 F.3d at 944 ("An investigation, however, need not be ongoing for the law enforcement privilege to apply as 'the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information is revealed to the public.") As discussed, the reasons why an individual was subject to CARRP may in turn reveal why a law enforcement investigation was conducted on a particular occasion along with the tools, techniques and procedures used in such an investigation—irrespective of whether that individual was the subject of the investigation. Accordingly, this information remains protected by the privilege. *See Black. v. Sheraton Corp. of America*, 564 F.2d 531, 546 (D.D.C. 1977).

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 21
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

## C.  There is no Jurisdiction to Review Sensitive Security Information.

Finally, this Court lacks jurisdiction to review TSA Final Orders concerning Sensitive Security Information (SSI).  *See* Blair Decl., ¶¶ 3, 4.  Congress has specifically directed TSA to "prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security" if the Administrator for TSA (or his designee(s)) "decides that disclosing the information would . . . be detrimental to the security of transportation."  49 U.S.C. § 114(r)(1)(c) (formerly § 114(s)).  The statutory and regulatory scheme authorizes TSA to determine whether particular material is SSI, and, if so, whether and to what extent it may be disclosed.  *See id.*; 49 C.F.R. Part 1520.  Such a determination constitutes final agency action subject to exclusive review in the United States Court of Appeals. 49 U.S.C. § 46110(a).  *MacLean v. Dep't of Homeland Sec.*, 543 F.3d 1145, 1149 (9th Cir. 2008); *Lacson v. U.S. Dept't of Homeland Sec.*, 726 F.3d 170, 173 & n.2 (D.C. Cir. 2013).  TSA has determined that certain information contained in A-files contains SSI.  *See* Blair Decl., ¶ 8.  TSA reasonably determined that disclosing this information would be detrimental to the security of transportation because, among other reasons, disclosure would enable terrorists to change their behavior and circumvent transportation security.  *Id.*  Therefore, such information cannot be disclosed publicly.  *Id.*

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 22
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445

# CONCLUSION

For the reasons argued above, Plaintiffs' Motion to Compel should be denied; and, further, Defendants respectfully request the entry of a protective order to relieve them of any obligation to produce the "why" information or comply with RFP No. 53. Further, Plaintiffs' motion to modify the protective order to allow Plaintiffs' counsel to publish notices directed to class members should be denied.

DATED this 7th day of March, 2019.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division
U.S. Department of Justice

AUGUST FLENTJE
Special Counsel
Civil Division

ETHAN B. KANTER
Chief, National Security Unit
Office of Immigration Litigation
Civil Division

DEREK C. JULIUS
Assistant Director
Office of Immigration Litigation
Civil Division

BRIAN T. MORAN
United States Attorney

BRIAN C. KIPNIS
Assistant United States Attorney
Western District of Washington

DANIEL E. BENSING
Senior Trial Counsel
Federal Programs Branch

LEON B. TARANTO
Trial Attorney
Torts Branch

ANDREW C. BRINKMAN
Trial Attorney
Office of Immigration Litigation

/s/ Brendan T. Moore
BRENDAN T. MOORE
Trial Attorney
Office of Immigration Litigation

LINDSAY M. MURPHY
Counsel for National Security
National Security Unit
Office of Immigration Litigation

Counsel for Defendants

Defendants' Opposition to Plaintiffs' Motion to Compel
And Cross Motion for Protective Order - 23
(Case No. C17-00094RAJ)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL
P.O. BOX 878 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 598-2445