# Exhibit A

The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ABDIQAFAR WAGAFE, *et al.*,

               Plaintiffs,

          v.

DONALD TRUMP, *et al.*,

               Defendants.

No. 2:17-cv-00094-RAJ

DECLARATION OF TRACY L. RENAUD

I, Tracy L. Renaud, do hereby declare and say:

1. I am the Associate Director of the Management Directorate, U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security ("DHS"). I have held this position since November 2, 2014. Since March 5, 2018, I have been serving as the Acting Deputy Director of USCIS, a position I also held from January to October 2017.

2. As acting Deputy Director, I am responsible, along with the Director, for overseeing 18,000 federal employees, handling approximately 8 million immigration benefit applications, petitions, and requests each year. This includes overseeing the Immigration Records and Identity Services Directorate, which is charged with managing and maintaining over 24 million active Alien files (A-Files), and overseeing the National Records Center ("NRC"), where over 18 million inactive A-Files are stored.

3. The matters contained in this declaration are based upon information available to me in my capacity as USCIS' acting Deputy Director, and my understanding of

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

the case of *Wagafe, et al., v. Trump, et al.,* Case No. 2:17-cv-00094 in the United States District Court for the Western District of Washington.

4. I understand that the naturalization and adjustment classes that were certified in this case are defined as follows:

> Naturalization Class:
> A national class of all persons currently and in the future (1) who have or will have an application for naturalization pending before USCIS, (2) that is subject to CARRP or a successor "extreme vetting" program, and (3) that has not been or will not be adjudicated by USCIS within six months of having been filed.

> Adjustment Class:
> A national class of all persons currently and in the future (1) who have or will have an application for adjustment of status pending before USCIS, (2) that is subject to CARRP or a successor "extreme vetting" program, and (3) that has not been or will not be adjudicated by USCIS within six months of having been filed.

5. I understand that on August 24, 2018, Plaintiffs propounded their Fifth Requests for Production and Third Interrogatories, which included the following:

> Request for Production 53: The Alien Files ("A-Files") of 100 members of the Naturalization and Adjustment Classes statistically chosen at random ("RFP 53").

6. I understand that on October 16, 2018, Defendants served a response on Plaintiffs, which objected to producing any documents responsive to RFP 53 on the basis of burden and proportionality. Defendants also asserted that some documents responsive to the request were protected by the law enforcement and other privileges.

7. I also understand that on February 21 2019, Plaintiffs filed a Motion to Compel the Defendants to produce A-files in response to RFP 53 and information related to why the five named Plaintiffs were subject to the CARRP policy. Defendants can neither confirm nor deny, on the public docket, whether any of the named Plaintiffs' adjustment of status or naturalization applications were processed

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

pursuant to the CARRP policy, although this information was provided to Plaintiffs' counsel.

**Plaintiffs' Request for 100 Randomly Selected Class Members' A-Files**

8.  In my judgment, producing documents in response to RFP 53 would be extraordinarily burdensome and time-consuming, and after redaction of privileged information, would not provide Plaintiffs with the information they seek. In addition to potential disruption of USCIS' adjudicative processes during the file collection, all A-Files for unnamed class members in this litigation will contain privileged information, including information affecting equities and privileges of other agencies. Past experience has proven that such privilege review will be a resource-intensive and time-consuming process for USCIS and other agencies.

9.  As previously explained in a declaration by Fraud Detection and National Security Directorate ("FDNS") Associate Director Matthew D. Emrich, an A-File serves as the official record of an individual's immigration history. *See* Declaration of Matthew D. Emrich, Dkt. 146-3, ¶ 6. *See also* DHS/USCIS-ICE-CBP-001 Alien File, Index, and National File Tracking System of Records, 82 Fed. Reg. 43556, 43557 (Sept. 18, 2017) (A-Files contain documents derived from the three immigration components of DHS: USCIS, U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). *Id.* A-Files also contain information that originates elsewhere within DHS, and outside of DHS.

10. For instance, the A-Files of the five named Plaintiffs implicated the equities of several agencies and DHS components other than USCIS, including ICE, CBP, Transportation and Security Administration ("TSA"), as well as the Department of State ("DOS") and Federal Bureau of Investigation ("FBI"). *See* Declaration of Douglas Blair, Dkt. 146-2 (TSA); Declaration of Matthew D. Emrich, Dkt. 146-3 (USCIS); Declaration of Carl Ghattas, Dkt. 146-4 (FBI); Declaration of Tatum King, Dkt. 146-5 (ICE); Declaration of Corey A. Price, Dkt. 145-6 (ICE);

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

Declaration of John P. Wagner, Dkt. 146-7 (CBP). Similar to the review process for the named Plaintiffs, the 100 A-Files required for a response to RFP 53 would also implicate the equities of multiple third-party agencies and DHS components, requiring a similarly complex review process.

11. The 100 randomly selected A-Files will also contain privileged information, as was the case for the A-Files of each of the named Plaintiffs. A-Files generally contain information that is subject to the law enforcement and other privileges. For instance, all individuals applying for adjustment of status or naturalization must undergo a suite of background checks, the results of which are often law enforcement privileged. Required security checks include checks of information originating with, or databases operated by the FBI (FBI name check and FBI fingerprint check) and CBP (TECS). Information contained within the CBP's TECS database may contain derogatory information that originates with other agencies, such as, but not limited to, ICE, TSA, FBI, or DOS. Pages from additional databases, such as the Consolidated Consular Database (CCD) (operated by DOS), or Student and Exchange Visitor Information System (SEVIS) (operated by ICE) are often contained in A-Files. A-Files may also contain pages that originate with other agencies depending on how that individual entered the United States. For instance, it is likely that an A-File would contain information that originated with DOS if the individual entered as a refugee. A-Files may also include discussions, communications, and deliberations, including with attorneys, regarding immigrant benefit applications that are privileged.

**Providing 100 A-files to Plaintiffs Will Not Serve Their Expressed Purposes**

12. I understand that Plaintiffs have suggested that the 100 randomized A-Files will allow them to understand why those individuals were determined to have an articulable link to one of the Immigration and Nationality Act's ("INA") national security inadmissibility or deportability grounds, and thus, were subject to the CARRP policy.

DECLARATION OF TRACY L. RENAUD - 4
(2:17-cv-00094-RAJ)

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

13. As I have previously declared, "[t]he reason(s) why any particular individual potentially poses a national security risk, in USCIS' judgement, is in itself law enforcement privileged information." Declaration of Tracy L. Renaud, Dkt. 156-2, ¶ 12. Therefore, the information that Plaintiffs seek would be withheld pursuant to the law enforcement privilege in any A-File production.

14. I understand that Plaintiffs also seek production of 100 random A-Files to ascertain what instructions are given in an individual's A-File for next steps in processing an application under the CARRP policy and to understand how applications are processed under the CARRP policy.

15. However, the best source for this type of information is the CARRP policy documents previously provided to Plaintiffs which describe the phases of the CARRP policy, what steps should be taken in each phase, and how certain sensitive or derogatory information should be handled. Further, certain instructions concerning sensitive or derogatory information are law enforcement privileged, would have been redacted in policy documents already produced and would be redacted pursuant to the law enforcement or other privileges, to the extent they exist in A-files. A non-exhaustive list of CARRP policy documents covering this information that have been provided to plaintiffs in the Certified Administrative Record include:

    a. 4/11/08 Policy for Vetting and Adjudicating Cases with National Security Concerns (CAR_000001);

    b. 04/24/08 Operational Guidance for Vetting and Adjudicating Cases with National Security Concerns (CAR_000010);

    c. 06/24/08 USCIS Domestic Operations Directorate ("DOMOPS") CARRP Workflows (CAR_000058);

    d. 02/06/09 Additional Guidance on Issues Concerning the Vetting and Adjudications of Cases Involving National Security Concerns (CAR_000075);

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

1       e.  06/05/09 Clarification and Delineation of Vetting and Adjudication

2           Responsibilities for CARRP Cases in Domestic Field Offices

3           (CAR_000095); and

4       f.  07/26/11 Revision of Responsibilities for CARRP Cases Involving Known

5           or Suspected Terrorists (CAR_000342).

6   16.  I also understand that Plaintiffs seek production of 100 random A-Files to identify

7       occurrences in which an application for naturalization or adjustment of status is

8       delayed by the CARRP policy or because the applicant fits a certain profile (*e.g.*,

9       demographic) or history.

10  17.  Defendants have already provided Plaintiffs extensive information and data in

11      response to interrogatory no. 3, and included in 8862 spreadsheet lines comprised

12      of tens of thousands of cells of information.  Various types of information detailed

13      in the spreadsheet tabs included, for example, numerical counts for applicants by

14      nationality (country of citizenship), country of birth, type of application (*i.e.*, I-485

15      or N-400), fiscal year of application referred for CARRP processing, year for

16      elevation to HQ Directorate of USCIS, known or suspected terrorist ("KST")

17      designation (KST, non-KST, non-National Security) for the purposes of CARRP,

18      religion, application's adjudication status (*e.g.*, approved, denied, administratively

19      closed, withdrawn, adjudicated, pending), and also the mean and median for

20      processing days from referral to CARRP processing to adjudication.  The

21      spreadsheet included data in multiple tabs, including, but not limit to, the

22      following:

23      a.  Tab A – Total CARRP: This data represents I-485 and N-400 CARRP

24          applications by fiscal year first referred to CARRP, nationality, country of

25          birth, KST designation (KST, non-KST, non-National Security), religion,

26          and form number.  USCIS CARRP Applications, I-485 Application to

27          Register Permanent Residence or Adjust Status, N-400 Application for

28          Naturalization, totals for Fiscal Years 2015 - 2018 (Sep 12), for each year,

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

and separately By Country of Citizenship, By Country of Birth, By KST Designation, By Religion. *[599 lines – 54 pages]*

    b. Tabs E, G, I – Adjudicated & Denied: This data represents I-485 and N-400 CARRP applications by fiscal year first referred to CARRP, current status, nationality, country of birth, KST designation, religion, and form number. USCIS CARRP Applications, I-485 Application to Register Permanent Residence or Adjust Status, N-400 Application for Naturalization, totals for Fiscal Years 2015 - 2018 (Sep 12), for each year, and by Current Status, shown separately By Country of Citizenship, By Country of Birth, By KST Designation, By Religion. *[1902 lines – 211 pages]*

    c. Tabs H, J – Proc Times Detailed: Approval Adjudication, Denial Adjudication, Withdrawal-Admin Closure, and Overall Processing Times by nationality, country of birth, KST designation, religion, and form number (I-485 and N-400) and for forms combined, and detailed by fiscal years (2015-2018). *[3065 lines – 898 pages]*

    d. Tabs H, J – Proc Times High Level: These data represent I-485 and N-400 processing days from original CARRP opening date for each individual until application adjudication. The CARRP opening dates are person centric, rather than application centric, and therefore the earliest date for each individual had to be utilized. In instances where an individual had both I-485 and N-400 applications the CARRP opening date would be the same. USCIS CARRP Applications, I-485 Application to Register Permanent Residence or Adjust Status, N-400 Application for Naturalization, for Fiscal Years 2015 - 2018 (Sep 12), mean and median processing days from CARRP opening (CME created date) to adjudication, separately shown by adjudication outcome (approved, denied, admin closed, withdrawn). *[27 lines – 3 pages]*

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

e. Tab K – Elevated to HQ Directorate:  This data represents I-485 and N-400 CARRP applications elevated to HQ Directorate by fiscal year first referred to CARRP, by nationality, country of birth, KST designation, religion, and form number (I-485 and N-400).  Data is shown separately for each fiscal year.  *[295 lines – 23 pages]*

f. Tab L – CARRP to HQ Proc Times:  CARRP to Elevated to HQ Processing Times, mean and median, detailed by fiscal year (from 2015 to 2018) and shown by nationality, country of birth, KST designation, religion, and form number (I-485 and N-400), and overall.  *[1571 lines – 176 pages]*

g. Tab M – Adjudicated After HQ:  This data represents I-485 and N-400 CARRP applications elevated to HQ Directorate and subsequently adjudicated by fiscal year first referred to CARRP, nationality, country of birth, KST designation, religion, and form number.  USCIS CARRP Applications, I-485 Application to Register Permanent Residence or Adjust Status, N-400 Application for Naturalization, for Applications Elevated to HQ Directorate and Subsequently Adjudicated, for Fiscal Years 2015-2018, shown by year, application type, nationality, country of birth, KST designation and religion.  *[240 lines – 20 pages]*

h. Tab N – Adj After HQ Proc Times: mean and median processing times to adjudication shown by fiscal year (2015-2018) for I-485 and N-400 applications elevated to HQ Directorate, and detailed by nationality, country of birth, KST designation, religion.  *[1163 lines – 131 pages]*

**Identifying, Transferring, and Reviewing A-Files**

18. In addition to not serving Plaintiffs' stated purpose, the process to identify, transfer, and conduct privilege review of the 100 randomly selected A-files would be substantial and burdensome.  Specifically, USCIS estimates this would take approximately four to five weeks to identify, scan, transfer and upload to the Department of Justice's (DOJ) document review platform, assuming no further

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

1    reviews are required in advance of and to allow uploading of the files, and USCIS'
2    privilege review would require an additional 1000-2000 employee work hours.
3    19.    USCIS' Office of Performance and Quality ("OPQ") would first identify 100 A-
4           Files using a statistically sound methodology designed to randomly select A-Files
5           based on the latest list of class members.
6    20.    Once the list is generated, OPQ would check electronic systems and verify that for
7           each A-File selected, that individual's benefit remains pending, and thus, that the
8           individual remains in the class. If any of the individuals selected are no longer in
9           the class, OPQ would use the class list to randomly select replacement A-Files
10          until 100 class member A-Files are selected.
11   21.    Once 100 randomly selected A-Files are identified, USCIS would identify their
12          locations because they will reside at different USCIS locations throughout the
13          country. The A-Files will be shipped to a central location where they can be
14          scanned. Electronic version will then be transferred to DOJ for loading into DOJ's
15          document review platform to be reviewed for privilege and produced.
16   22.    The most efficient process for collecting, scanning, and transferring the A-Files to
17          DOJ would be to utilize the facilities, equipment, and personnel available at the
18          NRC in Lee's Summit, MO. Among other duties, the NRC stores over 18 million
19          inactive A-files processes and responds to Freedom of Information Act ("FOIA")
20          requests. Because of its record-keeping function, only the NRC has sufficient
21          resources to collect, scan, and transfer all affected A-Files to DOJ.
22   23.    Based on experience, USCIS estimates that an average A-File raising national
23          security concerns contains approximately 500 pages. Based on experience with
24          copying and producing A-Files for a variety of purposes, USCIS estimates that
25          shipping unclassified paper A-Files to the NRC, scanning them, and transferring
26          the files to the DOJ would likely take four to five weeks.
27   24.    Following completion of USCIS' process of collection and transfer of A-Files to
28          the DOJ, USCIS will have to review the files and assert applicable privileges.

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

Because an average A-File raising national security concerns contains approximately 500 pages, this will require privilege review of approximately 50,000 pages. Based on prior privileged reviews of A-Files that have been subject to the CARRP policy that were produced in litigation, I understand that privilege review of an A-file that is subject to the CARRP policy generally requires 10-20 hours of review by USCIS personnel, due to the need to identify documents for other agencies' information and the complexity and volume of privileged information. Thus, I estimate that review of 100 randomly selected A-Files will require 1,000-2,000 USCIS employee work hours.

25. All A-Files generally contain some information that is covered by the law enforcement or other privileges. Because the individuals associated with these A-Files necessarily have been subject to the CARRP policy, more information will certainly be protected under the law enforcement privilege than for an average A-File, including the reasons why any individual was determined to have an articulable link to a national security concern, and thus, is subject to the CARRP policy.

26. USCIS is not the only agency that would have to review the randomly selected A-Files to determine applicable privileges. For example, the A-Files of the five named Plaintiffs affected the equities of several agencies other than USCIS, including ICE, CBP, TSA, DOS, and FBI.

27. All of the 100 randomly selected A-Files of individuals with a pending benefit adjustment-of-status or naturalization application should contain pages that originate with CBP and FBI, as mandatory security checks associated with those benefit applications require review of those agencies' databases. It is highly likely that other agencies' equities will be implicated with the randomly selected A-Files as well, particularly if any derogatory information that contributed to the individual being subject to the CARRP policy originated with, or is contained within systems maintained by, any other agency. Depending on the individuals'

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

immigration history, other agencies, such as ICE, DOS, and TSA, will likely also have documents within the A-file that implicate their equities.

28. Examples of privileged information originating from third party-agencies include the print-outs of databases maintained by those agencies, results of security checks conducted by those agencies, and records of privileged communications between USCIS and other agencies.

29. Coordination and privilege review by multiple agencies of A-File pages would likely take a significant amount of time and resources, including resources of agencies who are not parties to this litigation. I understand that CBP, FBI, and TSA are also providing declarations describing the burden of their review. ICE has informed USCIS that it expects its review burden to be onerous because ICE would need to review all ICE identified information for privileges. The privileges may include law enforcement, attorney-client, attorney work product, and other privileges. In addition to the names of investigative subjects and potential national security threats, A-files may also contain database codes that may reveal critical information through their designation. Because the consequences of releasing highly sensitive law enforcement information relating to past and ongoing investigations is so serious, this review requires careful examination and consultation between ICE attorneys, HSI leadership and USCIS.

30. Given this complex coordination and the need for a minimum of several agencies to review A-File documents for applicable privileges, I expect the third agency privilege review, presuming that all third agencies review simultaneously, to require a minimum of several weeks or longer. This is in addition to the four to five weeks USCIS would need to identify, collect, and scan the A-Files, and the 1000-2000 employee hours to conduct its privilege review and identify pages for third agencies.

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

31.  The steps described in paragraphs 16 - 25 apply to A-Files that do not contain classified information.  A-Files containing classified information would require a substantial amount of additional resources due to security protocols for handling such information.

32.  Such A-files would need to be scanned on a secure machine authorized to scan classified information, and if necessary, they would need to be transported to a location with such secure machines.

33.  The A-files would then need to be reviewed for classified and privileged information by personnel with the appropriate clearance on a secure network, so that they can be appropriately redacted and prepared for production.  If the classified information originated with another agency, the A-File would need to be securely transferred to that agency so it could review.

34.  I have been informed that the DOJ document review platform generally used in this case for document production cannot store classified information.

35.  Thus, if Defendants were required to review the classified information from A-Files, privilege review would be especially unwieldy, substantially complicated, and prolonged. This would result in a substantial delay in producing such files. Currently, USCIS is reviewing classified information in documents or records responsive to other RFPs. That ongoing process has been considerably more time-consuming than processing unclassified material due to the sensitivity of the information, the need to review on secure networks, and the inability to use DOJ's document review platform.  It is not possible to estimate the further delay that would result from the need to process A-Files containing classified information in the context of responding to RFP 53, as it would depend on the nature and number of classified documents, which can only be determined at the time the A-File is identified and reviewed. However, it is likely that the additional burden would be substantial.

**Adjudicative Delay**

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

36. As noted above, the NRC has the necessary equipment to scan a significant number of large A-Files, and shipping the A-Files to the NRC for scanning and transfer to DOJ is most efficient.

37. However, *Wagafe* class members are, by definition, individuals who have pending benefit applications. Adjudicators require A-Files to prepare for and conduct interviews. If interviews are scheduled in any case where the A-File has been selected for production to Plaintiffs, USCIS would either have to reschedule the interview and delay the adjudication, or wait until the interview has been completed to ship the A-file to the NRC for scanning.

38. Further, producing A-Files responsive to RFP 53 would potentially delay adjudications in other contexts. For instance, during the time a paper A-File has been removed from the office where it is being adjudicated, the adjudicator would be unable to review documents in the A-File, issue any needed Request(s) for Additional Evidence, or issue a decision. Thus, it is likely that producing the A-Files responsive to RFP 53 would delay USCIS adjudicative work in a variety of contexts that could not be effectively mitigated.

39. USCIS' resources would be further diverted by the process of producing A-Files if any individual affected by such a delay files a mandamus or other lawsuit alleging an unreasonable delay or failure to meet a statutory adjudication deadline due to delays caused by responding to RFP 53. For example, naturalization applicants may file an action in district court if the application is not adjudicated within 120 days of an initial interview. 8 C.F.R. § 336.1(a).

## Compelling Production of the "Why" Information

40. On April 9, 2018, USCIS' FDNS Associate Director Matthew Emrich formally asserted law enforcement and deliberative process privilege over information withheld in the named Plaintiffs' A-Files. Dkt. 146-3.

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

41.     USCIS cannot confirm or deny on the public docket whether any of the five
        named Plaintiffs' adjustment of status or naturalization applications were subject
        to the CARRP policy, although it has provided this information to Plaintiffs
        pursuant to the May 10, 2018 protective order.  If any of the named Plaintiffs were
        subject to the CARRP policy, information regarding the reasons that the individual
        is or was a national security concern, is law enforcement privileged.

42.     Further, if such information did exist in any of the named Plaintiffs' A-Files, an
        "attorneys' eyes only" limitation would not sufficiently ameliorate the potential
        for accidental disclosure, and the severe consequences that could follow.  Because
        the highly sensitive information in question regards matters of national security,
        and implicates the collection and analysis of information necessary to such
        determinations, an "attorneys' eyes only" procedure provides insufficient
        protection. It should not be employed here as an alternative to not disclosing this
        privileged information.

43.     To the extent it exists, disclosure of the information Plaintiffs seek to compel
        could provide individuals with a roadmap of the specific procedures and
        investigative techniques USCIS uses to uncover information that an individual
        may wish to hide, and how that information relates to the adjudication of
        immigration benefits applications. It may also reveal the techniques USCIS uses to
        elicit derogatory information.  Individuals who are aware of these techniques are
        more likely to successfully employ evasion tactics that will make it difficult for
        USCIS to discover information necessary to the proper adjudication of
        immigration benefit applications.  Individuals could also share these techniques
        with others, including criminals, individuals engaged in fraud, terrorist
        organizations, or other bad actors, further impairing USCIS' ability to gather
        critically important information necessary to the proper adjudication of
        immigration benefit applications.

44.     The information Plaintiffs seek to compel would also likely contain records and
        information obtained from sensitive law enforcement data systems maintained by

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

USCIS' law enforcement partners. For example, accidental disclosure to an individual of the results of background checks that USCIS conducted regarding her would provide her with insight into how USCIS or other law enforcement agencies identify, investigate, and combat security threats. This could create programmatic vulnerabilities and allow individuals to adjust, adapt and otherwise better avoid detection of prior or ongoing fraud, criminal activity, and matters of national security concern.

45. Disclosure of information in the named Plaintiffs' A-Files obtained from law enforcement partners, including intelligence agencies, could threaten ongoing and/or future investigations and activities conducted by those organizations by revealing highly sensitive information to the targets of interest, or to the relatives or associates of targets of interest. USCIS is obligated to protect information that it obtains from third-party agencies. If USCIS is unable to protect, and instead is compelled to produce this highly sensitive information which is the property of our law enforcement and intelligence partners, it would harm the existing collaborative relationship and would degrade USCIS' future access to information necessary to identifying potential bad actors and preventing them from obtaining immigrations benefits to which they are not entitled.

46. If USCIS' access to sensitive law enforcement and intelligence information is degraded, USCIS could grant immigration benefits to individuals who are ineligible, and who may seek to acquire U.S. citizenship or permanent residence to harm the United States.

47. Disclosure of USCIS' coordination and interaction with third-party law enforcement or intelligence agencies could also provide applicants with information to discover whether that individual is the subject of an investigation by a third-party law enforcement or intelligence agency. In addition, the privileged documents could provide individuals with information that could allow them to determine if they are or were likely under investigation by another law enforcement or intelligence agency. Individuals who become aware of such

DECLARATION OF TRACY L. RENAUD - 15
(2:17-cv-00094-RAJ)

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

information could gain insight that would allow them to disrupt or circumvent a third-party immigration, criminal, or national security investigation. Further, if confidential law enforcement information is accidentally disclosed, law enforcement or intelligence agencies may never know if their operations have been compromised.

48. In conjunction with this declaration, USCIS is submitting an additional declaration, *ex parte in camera*, that will inform the Court as to whether any of the named Plaintiffs' adjustment of status or naturalization applications were processed pursuant to the CARRP policy. If any of the named Plaintiffs' applications were processed under the CARRP policy, that declaration would also describe the privileged information in the A-File that relates to the reasons why the individual's application was processed pursuant to the CARRP policy and why it is privileged. This declaration will also discuss additional issues regarding the burden of producing 100 randomized A-Files. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of March, 2019 at Washington, D.C.

Tracy L. Renaud
Acting Deputy Director
U.S. Citizenship and Immigration Services
Washington, D.C.

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, DC 20044
(202) 532-4542

# Exhibit B

ABDIQAFAR WAGAFE *et al.*, on behalf )
of themselves and others similarly situated, )
                              )
               Plaintiffs, )
                              )         No. 17-cv-00094 RAJ
     v.                        )
                              )
DONALD TRUMP, president of the )
United States *et al.*, )
                              )
              Defendants. )

## DECLARATION OF LUIS MEJIA

1. I am the Director of the Enforcement Programs Division, within Admissibility and
   Passenger Programs, Office of Field Operations (OFO), U.S. Customs and Border
   Protection (CBP). I have been employed in my current capacity since January 8, 2018.
   As a Director of Enforcement Programs Division, I oversee the issuance of OFO policies
   related to the admissibility of passengers at ports of entry, including policy guidance
   pertaining to passenger inspectional process, and policy guidance relating to detainers
   issued by OFO. I have been an officer with CBP for over 15 years. Prior to this
   position, I was the Branch Chief, Enforcement Operations at the Port of New
   York/Newark within the New York Field Office. I also served as the acting Director,
   Enforcement Programs Division from January to August 2017.

2. The Enforcement Program Division is responsible for overseeing policy and programs
   related to the inspection of arriving international travelers, determinations of
   admissibility, and implementation of statutory and regulatory requirements. The office

also provides processing and procedure guidance to ports of entry as well as guidance to internal and external stakeholders on new policies and programs, and provides operational oversight of enforcement policy at ports of entry (POEs). Finally, Enforcement Programs Division represents CBP as admissibility and immigration subject matter experts on internal and external agency projects and working groups.

3. CBP is a law enforcement agency comprised of more than 60,000 employees charged with enforcing hundreds laws on behalf of numerous federal agencies. Approximately 45,000 of those employees are armed law enforcement officers engaged in carrying out CBP's expansive border security mission (U.S. Border Patrol Agents, CBP Officers, and CBP Air and Marine Agents). OFO is the primary law enforcement agency responsible for securing the U.S. border at ports of entry while facilitating lawful trade and travel. OFO has more than 28,000 employees, operations at 20 major field offices, 328 POEs, and 70 locations in over 40 countries internationally. On average, OFO processes 1,088,300 passengers and pedestrians a day; 340,444 incoming international air passengers and crew; 55,709 passengers and crew arriving by vessel; 283,664 incoming privately owned vehicles; and 78,137 truck, rail, and sea containers.

4. I am familiar with the policies, practices and procedures of OFO that govern the inspection of passengers seeking to enter the United States at ports of entry. In addition, I am familiar with CBP's law enforcement records related to admissibility and processing of international travelers, as well as OFO's procedures for reviewing and processing such records to identify information subject to the law enforcement privilege. I am also familiar with CBP's use of Alien Files ("A-Files"), and the kinds of CBP records that are generally included in A-Files.

2

5. I make this declaration on the basis of my knowledge, the documents and information made available to me in my position, and my understanding of CBP records that may be included in an A-File.

6. I understand that a Complaint has been filed in this matter and that litigation is ongoing. Moreover, I understand that Deputy Executive Assistant Commissioner John P. Wagner has also provided a declaration which was previously filed in this matter, which asserts that the CBP information contained within class member A-files is subject to the law enforcement privilege. I have reviewed that declaration and attach it here. *See* Exhibit A.

7. I understand that on August 24, 2018, the Plaintiffs in this matter propounded their Fifth Requests for Production and Third Interrogatory, which included the following:

   > Request for Production 53: The Alien Files ("A-Files") of 100 members of the Naturalization and Adjustment Classes statistically chosen at random ("RFP 53").

8. I understand that on October 16, 2018, Defendants served a response on the Plaintiffs, which objected to producing any documents responsive to RFP 53 on the basis of burden and proportionality.

9. In my judgment, reviewing and processing records that originated with CBP that are contained in 100 randomly selected A-files in response to RFP 53 would be extraordinarily burdensome and time-consuming. CBP records included in A-files for class members in this litigation will contain privileged information and third agency information. For the reasons explained in greater detail below, review of these types of documents is a resource-intensive and time-consuming process.

10. A-files may include records and information that originate with CBP, including TECS records documenting inspections, border crossing information, copies of CBP forms submitted by travelers, and records pertaining to targeting and law enforcement

3

activities. I understand that the law enforcement privilege has already been asserted over that information by Mr. Wagner. *See* Exhibit A, John P. Wagner, Declaration Asserting Law Enforcement Privilege, April 5, 2018, (hereinafter, Wagner Declaration).

11. CBP records are included in A-files, and I understand that they may be considered by USCIS when USCIS makes a determination regarding whether to include an individual in a program known as CARRP.

12. CBP maintains information regarding international travelers. All international travelers are obligated to present themselves and their effects to CBP for inspection. When a traveler is referred for additional scrutiny – often known as "secondary inspection" – CBP often maintains additional documentation regarding that inspection, which may include law enforcement sensitive information which is at times in narrative form. As explained in greater detail in the Wagner declaration, in addition to information that originated with CBP, which I have reviewed, CBP records also include information supplied by third party agencies. *See* Exhibit A, Wagner Declaration. This makes review of CBP documents time intensive as careful review for not only our own law enforcement sensitive information, but also information supplied by third agencies. I understand that Mr. Wagner's declaration, in asserting the law enforcement privilege, specifically identified both CBP information and data belonging to third-party agencies or departments. *See* Exhibit A, Wagner Declaration.

13. An attorneys-eyes-only protective order provides insufficient protection for the law enforcement sensitive information implicated in this case. While I do not question the integrity of attorneys involved in this litigation, the consequences of accidental disclosure are too severe, and an attorneys-eyes-only protective order is insufficient to

4

protect the sensitive information at issue. Accidental disclosure would implicate not only CBP's sensitive investigative practices, techniques and procedures, but also national security and the safety of CBP officers and the general public. In addition, in the event of an unauthorized disclosure, both the unauthorized disclosure itself and its source may be difficult to detect, making remediation and assessment of the gravity of the unauthorized disclosure more challenging. I agree with what is emphasized in the Wagner Declaration, that sensitive investigative techniques and methods that are not known to the public are critical to the effectiveness of CBP's broad mission and ability to secure the border while facilitating lawful trade and travel. *See* Exhibit A, Wagner Declaration. Unauthorized disclosure would thus have negative impact on national security and border security. In addition, CBP records include sensitive information provided by third-party agencies or departments, the unauthorized disclosure of which could impair sharing of law enforcement and other information within the federal government. An attorney-eyes only protective order is insufficient to protect these interests

14. Review of such documents requires analysis of the application of the law enforcement privilege by an official in an operational office. In addition, because some CBP records incorporate information provided by other federal agencies, CBP's review of such records requires coordination with other agencies and law enforcement partners.

15. The amount of CBP information contained in any particular A-file varies greatly, and it depends on numerous factors. For example, the number of times the individual has crossed the United States border or whether CBP has seized any merchandise from the individual will affect the volume of CBP information in the individual's A-file.

Consequently, it is difficult to estimate how much information originating with CBP will be in any random sample of A-files.

16. In addition to CBP records, A-Files may also contain records that mention CBP or implicate CBP equities. For example, records generated by USCIS may incorporate CBP information, such as an individual's border crossing history or information relating to CBP's inspection of the individual. If additional A-files are produced in this case, CBP will have to review not only the CBP records, but also the separate records that may include CBP information, or implicate CBP equities.

17. As explained above, the number of pages of CBP records or of records with CBP equities included in any particular A-file varies greatly. Specifically, CBP reviewed approximately 400 pages of records in the five A-files of named plaintiffs that were previously produced in this case. Based on the number of pages identified as potentially having CBP equities in the five A-files of named plaintiffs that were produced previously in discovery, I estimated that CBP may have to process 8,000 pages if 100 randomly selected A-files are produced.

18. These pages would include information subject to the law enforcement privilege that would require review and redaction by officers within Office of Field Operations at CBP headquarters. In addition, attorneys in the CBP Office of Chief Counsel would need to conduct a legal review and answer any questions regarding the applicability of privilege to specific information in the records. Because the number of pages with CBP equities containing law enforcement privileged information varies greatly in each A-file, it is difficult to estimate how many such pages in each randomly selected A-file would require the review by CBP officers and Office of Chief Counsel attorneys.

6

19. Moreover, documents in A-files that originated at CBP can be expected to also contain third agency information, which would require consultation with such agencies. Finally, redacting law enforcement sensitive information is a time-consuming task that requires careful analysis and consideration of each document or piece of information that may be covered by law enforcement privilege.

20. Given these factors and levels of review, CBP estimates that it can process the A-files at an average rate of 10-15 pages per hour. Applying that rate and assuming approximately 8,000 relevant pages, CBP estimates that at this rate it will require between 500 to 800 hours to review all records with CBP equities contained in 100 randomly selected A-files.

21. Officers within Office of Field Operations at CBP headquarters are not generally assigned to conduct document review and assist in litigation full-time. Consequently, CBP Officers who normally work on programs and policies essential to CBP's mission of facilitating lawful trade and travel while protecting the public will need to set aside their normal duties to review the relevant materials and identify sensitive law enforcement information that is subject to the law enforcement privilege.

22. This declaration is presumes that 100 randomly selected A-files will not contain any classified information. To the extent any of the A-files contain classified information, the review will require additional time and impose a substantial additional burden on the agency, beyond the burdens previously described. Specifically, the review of classified documents will need to be conducted separately using a classified computer system. The classified system will be different depending on levels of classification of the documents. Further, review of classified documents may only take place at specially

7

designated locations. In addition, only individuals with necessary security clearance will be able to conduct the review of classified documents and the availability of individuals who can conduct the review, in both Office of Chief Counsel and Office of Field Operations, will be limited. Finally, to the extent the classified documents contain information from third agencies, additional interagency coordination will be required, beyond what was already described.

23. Given the amount of time and interagency coordination required responding to RFP 53 will present a substantial additional burden on CBP resources.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on the **6th** day of March, 2019

Luis Mejia
Director, Enforcement Programs Division
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection

# Exhibit C

| | |
|---|---|
| ABDIQAFAR WAGAFE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DONALD TRUMP, President of the United | ) |
| States, *et al.*, | ) |
| | ) |
| Defendants. | ) |

No. 2:17-cv-00094-RAJ

## DECLARATION OF DOUGLAS BLAIR

I, DOUGLAS BLAIR, make this declaration in support of Defendants' Opposition to

Plaintiffs' Motion to Compel and in Support of Motion for a Protective Order.

1. I serve as the Chief of the Sensitive Security Information (SSI) Program of the

Transportation Security Administration (TSA), a Department of Homeland Security (DHS)

component. The statements made in this declaration are based upon my personal knowledge and

information made available to me in the performance of my official duties, my personal review

of the records in question, and conclusions reached in accordance therewith. As Chief of the SSI

Program, I am responsible for determining whether the disclosure of information would be

detrimental to the security of transportation.

2. Pursuant to 49 U.S.C. § 114(r), the Administrator of TSA is vested with the authority

to determine what information constitutes SSI and to prohibit its disclosure. 49 U.S.C. 114(r)

refers to TSA's Administrator as "the Under Secretary of Transportation for Security" because

TSA was originally a part of the Department of Transportation. TSA's functions, as well as the

Under Secretary's, were transferred to DHS pursuant to section 403(2) of the Homeland Security

Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (codified at 6 U.S.C. 203(2)). The Under

Secretary is now known as the Administrator of TSA. See 49 C.F.R 1500.3. That authority is

delegated from the Administrator to the Chief of the SSI Program pursuant to a Management

Directive signed by the Administrator on November 4, 2015. The SSI Program serves as the

primary point of contact for other DHS Components, transportation security stakeholders, and

TSA as a whole on issues involving SSI in accordance with 49 C.F.R. part 1520.

3. The SSI Program conducts assessments and reviews of TSA and DHS records, and

upon request, records of other "covered persons" under 49 C.F.R. § 1520.7, to determine which

information contained within those records is SSI. The SSI Program thereafter ensures that the

appropriate SSI designations and redactions are made in accordance with 49 C.F.R. part 1520.

The prohibition on public release of SSI is not discretionary but is mandatory in accordance with

49 C.F.R. § 1520.15(a). The SSI Program also determines whether specific information should

no longer be protected as SSI in accordance with 49 C.F.R. § 1520.5(c) and whether information

previously not deemed SSI should be so designated.

4. Pursuant to 49 U.S.C. § 114(r) and implementing regulations at 49 C.F.R. part 1520

("TSA's implementing regulations"), information designated as SSI is exempt from disclosure if

TSA determines disclosure would "(A) be an unwarranted invasion of personal privacy; (B)

reveal a trade secret or privileged or confidential commercial or financial information; or (C) be

detrimental to the security of transportation." 49 U.S.C. § 114(r)(1). TSA's determinations as to

what constitutes SSI are exclusively reviewable by the United States Courts of Appeals. 49

U.S.C. § 46110.

5. I understand that Plaintiffs' *Request for Production 53 of their Fifth Requests for

Production and Third Interrogatories* ("RFP 53") seeks production of the Alien Files ("A-Files")

of 100 members of a class of persons currently and in the future (1) who have or will have an application for naturalization or an application for adjustment of status pending before the US. Citizenship and Immigration Services (USCIS), (2) that is subject to the Controlled Application Review and Resolution Program (CARRP) policy or a successor "extreme vetting" program, and (3) that has not been or will not be adjudicated by USCIS within six months of having been filed.

6. I also understand that Plaintiffs are seeking to compel Defendants to produce certain information in unredacted form regarding why the named plaintiffs' immigration benefit applications were subject to the CARRP process, assuming they were. A-Files may contain TECS records and records pertaining to targeting and operations. TECS is the principal law enforcement database for U.S. Customs and Border Protection (CBP). CBP uses TECS when inspecting individuals at U.S. ports of entry and preclearance locations in foreign countries. (TECS is not an acronym but is the updated and modified version of the former Treasury Enforcement Communications System).

7. It is also my understanding that USCIS reviewed the A-Files of the named plaintiffs, identified documents that it believed may implicate SSI and submitted them to TSA for review. These documents include TECS records and documents discussing TECS records.

8. As explained in a declaration on April 9, 2018, (SSI Declaration I), I have determined that, to the extent that the Named Plaintiff's A-Files contain TECS records, those documents contain SSI to the extent they contain information concerning the status of individuals on or off the No Fly and Selectee Lists and records pertaining to TSA targeting and operations, such as whether or not certain individuals were identified for enhanced airport screening on certain occasions and, if so, certain reasons for selection. Such information constitutes SSI because their public release would be detrimental to the security of transportation. I also stated in that

3

declaration that I had determined that, to the extent that any other documents at issue contain this type of information, they also contain SSI.

9. 49 C.F.R. § 1520.5(b)(9)(i) specifically prohibits the disclosure of "[a]ny procedures, including selection criteria and any comments, instructions, and implementing guidance pertaining thereto, for screening of persons, accessible property, checked baggage . . . that is conducted by the Federal government or any other authorized person." Records pertaining to targeting and operations may include information pertaining to screening procedures, to include selection criteria, as well as comments, instructions, and guidance. This type of information cannot be publicly disclosed because the release of such information would provide terrorists and terrorist organizations valuable knowledge about how screening takes place, how individuals are selected for different types of screening (including expedited screening, standard screening and enhanced screening), and which individuals are selected for different types of screening. Such information would provide terrorists and terrorist organizations a roadmap to circumvent those procedures and would enable them to select operatives based on which type of screening they are likely to receive. This type of information in the hands of resourceful, committed terrorists would be harmful to the security of transportation, and therefore such information cannot be disclosed publicly.

10. Similarly, 49 C.F.R. § 1520.5(b)(9)(ii) expressly prohibits the disclosure of "[i]nformation and sources of information used by a passenger or property screening program or system, including an automated screening system." TECS records may include a passenger's status on Federal government watch lists, including the No Fly and Selectee lists. TSA uses No Fly and Selectee list status when vetting passengers attempting to board commercial aircrafts. The No Fly and Selectee lists remain effective tools in the government's efforts to secure

transportation because, among other reasons, their contents are not disclosed. If the Government formally revealed the status of individuals as being either on or off the No Fly and Selectee lists, terrorists and terrorist organizations would be able to circumvent the purpose of those screening systems. Such circumvention of security screening systems would be detrimental to the security of transportation. Furthermore, disclosure of status on the No Fly or Selectee lists could harm the government's ability to use the watch lists as a means of gathering information about individuals suspected of being connected to terrorism. (In certain limited circumstances, the government may inform U.S. Citizens and Lawful Permanent Residents of their status on the No Fly List. Those circumstances are not presented here).

11. Moreover, any additional A-Files that might be produced in response to RFP 53 must first be reviewed by TSA to determine whether those files contain SSI and redacted accordingly in order to ensure the protection of SSI, as required by 49 U.S.C. §114(r), 49 C.F.R. part 1520 and TSA's previous final determination reflected in SSI Declaration I.

12. In my judgment, reviewing such responsive documents would be extraordinarily burdensome and time consuming. A-Files for the class of persons sought by RFP 53 would include information contained in TECS. As explained above, I have determined that, to the extent that the A-Files contain TECS records, those documents contain SSI because they contain information pertaining to TSA targeting and operations and because they contain information concerning the status of individuals on or off the No Fly and Selectee Lists. I also stated in that declaration that I had determined that, to the extent that any other documents at issue contain this type of information, they also contain SSI.

13. It is also my understanding that SSI may be contained not only in TECS records but in other portions of A-Files concerning immigrant benefit applications. This is because other

portions of the A-Files reference information contained in TECS records or because other SSI may be contained in those portions.

14. It is my understanding that USCIS estimates that an average A-File that would be responsive to RFP 53 contains 500 pages. Based on that understanding, I must anticipate that TSA could be asked to review approximately 50,000 pages of A-Files to identify and redact SSI. If, however, USCIS were to identify and refer only those A-Files that potentially contain SSI to TSA for SSI review, the volume of pages TSA would need to review could be less as would the associated administrative burden and time needed to complete such a review. Under this approach, however, TSA could not begin to review such files until USCIS had completed its own review and made the appropriate referrals.

15. Pursuant to TSA Management Directive 2810.1 and *SSI Policies & Procedures Handbook (Attachment to TSA MD 2810.1) Version 2.*0, and implementing *Internal SSI Program Consolidated SOP Roles and Responsibilities Version 3.2*, TSA' SSIP policy requires multi-layered reviews before finalization. This includes: intake by an analyst who assigns three program analysts to a review; a First Review Analyst who will review the materials and consult 49 C.F.R. part 1520, TSA official SSI Identification Guides and open source research to prepare a first set of redactions as appropriate; a Second Review Analyst who will conduct the same review as the First Review Analyst but who may also consult with subject matter experts which typically takes more time to complete; a Final Review by a Senior Analyst who will review all redactions previously made and make a final SSI determination and prepare an official SSI findings memorandum; a Close-Out Analyst who will apply the final approved redactions to the materials and assign a Quality Assurance Analyst; and a review by a Quality Assurance Analyst

who compares the working copy of each document with the final document and ensures all redactions are consistent.

16. Based upon TSA's experience reviewing A-Files in the past, I estimate it would take the SSI Program 16 working hours to process each file. If TSA were required to review all of the 100 requested A-Files processing would likely take 1600 working hours which would impose a significant burden on TSA's SSI Program.

17. It is my understanding that some A-Files may contain classified information. The process for reviewing classified information will take longer. The SSI Program does have the ability to review materials classified at the SECRET level in its own work space although it must first access a Classified Processing Center to make paper copies that may be safeguarded appropriately. The SSI Program does not have the ability to review materials classified at the TOP SECRET level or above in its own work space and would need to arrange the review of materials in a Sensitive Compartmented Information Facility ("SCIF"), when space would be available. Only the SSI Program Chief and Deputy Chief have routine access to a SCIF and would still need to make arrangements for working space to review materials marked TOP SECRET or above. If review of classified materials is required, this will lead to delays in review time and the degree of any such delays will depend on the level of classification involved, the number of staff authorized to review such materials and the availability of appropriate secure facilities.

18. Finally, reviewing 50,000 pages of A-Files for this one litigation constitutes a substantial and disproportionate burden on TSA's SSI Program's resources because the SSI Program's day to day work includes conducting SSI reviews to meet the needs of numerous entities including: other court cases in litigation across the nation, reviews of Freedom of

Information Act (FOIA) requests for TSA and other agencies, reviews for TSA's own security needs including security operations and the Federal Air Marshal's Service, SSI reviews for Congressional inquiries and numerous oversight investigations including those by the Government Accountability Office ("GAO"), the DHS Inspector General, and TSA's Office of Investigations. The SSI Program's resources are limited, and assigning resources for one review necessarily means diverting resources from other reviews of importance.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on March 7, 2019.

_____

DOUGLAS BLAIR
Chief, Sensitive Security Information Program
Office Security and Administrative Services
Transportation Security Administration
Department of Homeland Security

# Exhibit D

ABDIQAFAR WAGAFE, *et al.*

      Plaintiffs,

    v.

TRUMP, *et al.*,

      Defendants

Case No. 2:17-cv-00094-RAJ

Honorable Richard A. Jones

**Declaration of Matthew C. Allen**

I, Matthew C. Allen, state as follows:

## INTRODUCTION

1. I am the Assistant Director (AD), Domestic Operations, Homeland Security
   Investigations (HSI), U.S. Immigration and Customs Enforcement (ICE), an agency in
   the Department of Homeland Security (DHS). Following the enactment of the Homeland
   Security Act of 2002, DHS was created from some twenty-two different federal agencies.
   This was done in part to facilitate and enhance the sharing of information across agencies
   that held similar or related mandates. ICE was created in 2003 from elements of several
   legacy agencies, including the criminal investigations staffs of the former U.S. Customs
   Service (USCS) and the former Immigration and Naturalization Service (INS).
   Following ICE's creation, all Special Agents who formerly worked for the USCS and the
   INS became part of ICE. ICE is the second-largest investigative agency in the Federal
   Government. Within ICE, HSI has approximately 8,260 employees, including more than
   6,100 Special Agents assigned to thirty (30) Special Agent-in-Charge (SAC) offices in

cities throughout the United States and countries around the world. Special Agents have a wide array of responsibilities relating to the investigation of criminal activity, including: the investigation of contraband and merchandise smuggling; illicit trade, travel, and finance; money laundering; fraud in both import and export transactions; and other criminal activity. HSI also has significant administrative authority over immigration and customs matters, which it exercises in conjunction with its criminal authorities.

2. I joined the USCS as an Intelligence Research Specialist (intelligence analyst) in 1986 after graduating from college and completing an agency cooperative education program. As an intelligence analyst, I received training on conducting research, critical thinking, analysis, reporting, and the structure and functions of the U.S. intelligence community. My primary area of work as an analyst was national security, in particular export enforcement. While I was an intelligence analyst, I attended one year of graduate school at Georgetown University, studying in their National Security Studies Program. I was selected to be a USCS Special Agent in 1989 and joined ICE when this agency was created in 2003. Following training to become a Special Agent, I continued to work in the national security area, conducting investigations into export enforcement violations for approximately one year. I have served HSI in a variety of roles, from Special Agent to several different leadership roles in the field and at Headquarters. I held multiple positions at ICE Headquarters from 2004 to 2008, including as Deputy Assistant Director (DAD) of the Financial, Narcotics, and Public Safety Division. In this position, I had oversight of HSI's Financial, Drug, Human Rights Violations and Public Safety (gang) programs. I also served as the DAD of the Critical Infrastructure and Fraud Division,

where I had oversight of ICE's human smuggling and trafficking portfolio, worksite enforcement, commercial fraud, intellectual property rights, and immigration document and benefit fraud programs within HSI. From August 2008 until June 2016, I served as the HSI Special Agent in Charge in Arizona. There, I had oversight of the full spectrum of ICE investigative activities in Arizona and led more than 500 personnel assigned to offices in Phoenix, Tucson, Douglas, Nogales, Sells, Casa Grande, Yuma, and Flagstaff. From June 2016 until June 2018, I served as the AD for HSI Investigative Programs, where I was responsible for programmatic oversight of HSI's strategic planning, national policy implementation, and the development and execution of operational initiatives. I hold an undergraduate degree in Criminal Justice from the John Jay College of Criminal Justice in New York, New York. In 2003, I completed the Columbia Business School's Executive Development Program as part of the USCS Leadership Development Program.

3. In June 2018, I was reassigned to serve as AD of HSI's Domestic Operations. As such, I am responsible for managing, directing, coordinating, and supporting all investigative activities of ICE HSI domestic field offices, including 30 SACs with responsibility for more than 200 offices. In this capacity, I am responsible for strategic planning, national policy implementation, and the development and execution of operational initiatives. The offices under my direction are responsible for leading HSI's effort to identify, disrupt, and dismantle terrorist and other transnational criminal organizations that threaten the security of the United States and immigration and customs violators who threaten public safety. I also oversee all major ICE HSI enforcement initiatives and the de-confliction of operations for and among ICE HSI field offices and other agencies. I

am therefore well positioned to discuss the broad range of HSI's work, including its cooperation with other agencies.

4. Through the exercise of my official duties, I have been briefed on the civil action *Wagafe v. Trump, et al.*, pending in the United States District Court for the Western District of Washington, Case No.: 2:17-cv-00094-RAJ. I understand the matter is proceeding in discovery, and that Plaintiffs have served document requests on the Defendants. The Defendants have responded to the document requests, including by producing redacted versions of the named Plaintiffs' A-files, and asserted objections over privileged and classified information and documents where appropriate. ICE is not a Defendant in this lawsuit; however, as set forth in this declaration, ICE's equities would be harmed by the release of such information. USCIS provided ICE with selected information from each of the named Plaintiffs' A-files for our review. The named Plaintiffs' A-files contain significant amounts of law enforcement sensitive material over which ICE has asserted, and continues to assert, Law Enforcement Privilege. The named Plaintiffs' A-files further contain information, not belonging to ICE, that could impact ICE equities, including current or former investigations. While only the named Plaintiffs' A-files have been produced at this time, I understand that additional documents pertaining to the named Plaintiffs are still being reviewed. If such documents contain ICE information, ICE would review those documents and would assert any applicable privileges at the appropriate time. As further set forth in this declaration, release of these materials could harm ongoing investigations, including those unrelated to the actions of anyone with interest in this lawsuit. Indeed, as explained further below, it could harm ICE

investigations across the U.S. Government because of the risk that it could impede information-sharing, among other harms.

5. This declaration is therefore submitted to support ICE's continuing assertion of Law Enforcement Privilege, first asserted by then-AD for Domestic Operations Tatum King on April 9, 2018, over law enforcement sensitive information owned by or originating from ICE contained in the A-files pertaining to the five named Plaintiffs in *Wagafe*. This declaration is based on my personal knowledge, my personal review and appraisal of the claims of Law Enforcement Privilege previously asserted, and the factual background of the case, as well as information conveyed to me by my staff and other knowledgeable ICE personnel in the course of my official duties and responsibilities. I have personally reviewed the ICE records and information that were included in the A-files of the five named Plaintiffs that were produced in this case. I have determined that disclosure of the privileged information that was redacted from the A-files produced to Plaintiffs' counsel poses an undue risk of harm to individual investigations, as well as the general nature of HSI law enforcement techniques and procedures; this, in turn, would directly impact public safety and national security. As set forth below in this declaration, revealing such sensitive information, the techniques and procedures involved in acquiring such information, and the combination thereof could undermine the efforts of HSI to carry out its mission of identifying and eliminating vulnerabilities that pose a threat to our nation's borders, as well as ensuring economic, transportation, infrastructure security, and national security. This declaration will address the nature of HSI's operations and the harms to existing and future investigations that could follow the release of this information. It will

also address the prospective harm posed to ICE personnel by the release of information contained in the named Plaintiffs' A-files.

## HSI OPERATIONS

6.  HSI, the largest investigative arm of DHS, holds broad criminal and administrative investigative authorities, which it employs to disrupt national security and transnational criminal threats to the United States. HSI is authorized to conduct, and does conduct, both criminal and administrative investigations into national security and public safety threats related to immigration and transnational crime. In many cases, the final disposition of an investigation depends on the evidence gathered; it can be impossible to know in the early stages whether the ultimate result will be criminal prosecution, administrative proceedings, both, or neither. If the investigation reveals criminal activity that may be prosecuted under United States law, HSI works with the relevant United States Attorney's Office, as well as any other participating Federal agency, to prosecute the subject or subjects of the investigation. In some investigations, HSI may present evidence to state, local, or tribal prosecutors for charges in their jurisdictions. Common charges include naturalization fraud, visa fraud, and aggravated identity theft. If administrative proceedings are more appropriate – either because the evidence does not indicate criminal wrongdoing or because evidence necessary to criminal prosecution is classified, or its use otherwise restricted – HSI uses administrative processes to seek removal of an individual from the United States. An investigation may also result in evidence that indicates neither criminal nor administrative proceedings are appropriate at that time.

7. HSI also represents ICE on the Federal Bureau of Investigation-led national Joint

   Terrorism Task Force (JTTF), as well as local JTTFs nationwide, and therefore plays a

   critical role in national security operations throughout the country. Often, national

   security cases follow the approach outlined above, using a combination of criminal and

   administrative authority. However, in some cases, a national security or public safety

   threat will develop rapidly, making it necessary to act to prevent or disrupt the threatened

   harm before criminal charges can be developed. In those instances, HSI works with

   partner agencies to identify places to disrupt the dangerous behavior using its

   administrative authorities. This cooperative technique has resulted in the prevention of

   serious crimes and threats to national security.

8. Since the terrorist attacks of September 11, 2001, and the creation of DHS and ICE in

   2003, many federal agencies' information sharing culture has evolved from one centered

   on the principle of "need to know" to one that fosters a principle of "need to share,"

   which recognizes that protecting our nation requires the cooperation and sharing of

   information among a network of agencies that work on national security and transnational

   crime issues. HSI is no exception. In developing cases to protect public safety and

   safeguard national security, HSI routinely shares sensitive law enforcement information

   with other components of DHS, as well as with Federal, state, local, and tribal law

   enforcement agencies. The information can include specific details about investigations

   into active criminal enterprises and national security threats, including counterterrorism,

   counter-proliferation, and visa violations with national security or public safety

   implications. Although sometimes transmitted in person, a great deal of critical law

   enforcement information is shared through integrated government databases, including

those discussed below. This relationship among law enforcement agencies is reciprocal. ICE, in seeking to carry out its mission, benefits significantly from other agencies' willingness to share information about their own investigations. Without such information from law enforcement partners, HSI Special Agents would be unable to engage in real-time decision-making related to national security, criminal law enforcement, and administrative investigations.

9. In carrying out its mission, ICE depends on the use of sensitive law enforcement and investigative techniques, methods, and procedures not widely known to the public. The disclosure of the law enforcement sensitive information contained in the named Plaintiffs' A-files illustrates some of these techniques. The release of this information to the public would seriously compromise ICE's ability to perform its mission.

## CONSEQUENCES OF RELEASE

10. Disclosure of law enforcement sensitive information could provide those who wish to harm the United States with valuable information about how the U.S. Government detects, investigates, and thwarts criminal and terrorist activity. The redacted information in the named Plaintiffs' A-files may contain internal case handling procedures used during investigations, including sensitive information about investigative processes. This type of information often reveals the methods and techniques used to uncover or elicit information by parties intent on harming the United States. Disclosure of information related to investigative processes, coordination with law enforcement partners, and insight into the types of sensitive information that law enforcement checks may contain could significantly undermine future law enforcement efforts, as further discussed in this declaration. As set forth in this declaration, providing bad actors with the information

they need to evade or otherwise thwart U.S. law enforcement efforts has potentially grave consequences for national security and public safety.

**Harm to Ongoing or Closed Investigations**

11. The A-files of the named Plaintiffs may contain information related to specific investigations. I have reviewed this information and determined that if the subjects of these investigations were to obtain this investigative information, they could identify the types of information that are of interest to federal law enforcement, the sources of the information, and/or the methods that the U.S. Government used to gather the information. Such knowledge could allow bad actors to change their behavior in order to evade law enforcement. Even the date on which an investigation began provides valuable insight, in that it can alert an individual to an event that may have triggered the interest of law enforcement.

12. Additionally, the existence of an investigation into one individual may reveal investigative interest in other subjects, which could reasonably be expected to alert those individuals that they are of interest to law enforcement. Disclosure of the details of any investigation is particularly dangerous where associates of the individuals are under investigation. If such information were contained in the named Plaintiffs' requested A-files, its release would reveal the existence of open and/or closed investigations, potentially harming investigations that may be ongoing or revealing crucial information about investigations that have already been closed – as even closed investigations can provide valuable insights into investigative techniques that can aid bad actors in avoiding detection by law enforcement agencies. This is not to cast aspersions on the named Plaintiffs. Even if they were to make a deliberate effort not to reveal any information

contained in their A-files, they might very well change the nature or frequency of their interactions with any associates. This could alert those individuals to the existence of investigations, and possibly the methods the government has used to obtain the specific derogatory information.

13. Similarly, the records in an A-file may also indicate when an investigation has reached the conclusion that there is no national security concern. This demonstrates the benefit of a thoroughly documented investigation. Agencies with access to the A-file or the records contained therein are on notice that the subject in question has been investigated and cleared. But it is impossible to share that information with the subject without also providing information that has the potential to harm other ongoing investigations, or to jeopardize the safety of ICE personnel.

**Harm to Future Investigations**

14. Revealing the Law Enforcement Privileged material in the named Plaintiffs' A-files has the potential to do harm beyond any investigations indicated therein. The named Plaintiffs' A-files contain printouts from several databases containing ICE data: TECS, the Advance Visual Abstracted Links and Name Collection Handler Engine (AVALANCHE), Student and the Student and Exchange Visitor Information System (SEVIS), ENFORCE, and ENFORCE Alien Removal Module (EARM).

15. TECS, an interagency database that ICE uses in the course of conducting its investigations, is used by more than 40 federal law enforcement agencies, including the FBI and the Secret Service. In turn, TECS interfaces with many of the databases belonging to these federal law enforcement agencies. Information from other federal law enforcement databases is communicated to ICE law enforcement officials through TECS,

which stores that information. The capabilities, functions, and uses of TECS among law enforcement officials are not generally known to members of the public. They are routinely withheld from public disclosure to protect the integrity of the data and the privileged law enforcement information that TECS contain. Data in TECS is also withheld to protect the privacy of subjects of records, as well as third parties mentioned in other subjects' records. AVALANCHE, an ICE system no longer in operation, provided law enforcement personnel with the capability to rapidly search across 15 databases consisting of approximately 50 million indexed names, vehicles, and addresses. It allowed searching by multiple fields including by sensitive personally identifiable information, such as name, social security number, Fingerprint Identification Numbering System (FINS), Alien File Number, and date of birth. SEVIS is a critical tool in the Student and Exchange Visitor Program's mission to protect national security and public safety while supporting the legal admission of more than one million international students (F and M visa holders) and exchange visitors (J visa holders) into the United States. ENFORCE and EARM provide a comprehensive view of a subject's detention and removal status, including information about immigration history and criminal history. They also include biographical, descriptive, biometric, and encounter-based data about subjects, including aliases. This often includes details about their encounters with law enforcement officers, including personally identifiable information about those officers.

16. HSI Special Agents rely on data contained in these databases in the course of their investigations, both criminal and administrative. Most of these databases could indicate whether a subject is under investigation by HSI or another law enforcement agency. TECS records often indicate the reasons for an investigation, such as revocation of a visa

by the Department of State. TECS records can also indicate whether HSI's Counterterrorism and Criminal Exploitation Unit (previously the Compliance and Enforcement Unit) has initiated an investigation based on a revocation. The details of such investigations are law enforcement sensitive.

17. EARM records may indicate, among other things, the reason an individual encountered by immigration officials was deemed inadmissible to the United States or is otherwise of interest to those officials. Among the possible reasons are the grounds of inadmissibility found at INA § 212(a)(3)(B), 8 U.S.C. §§ 1182(a)(3), Security and Related Grounds. These grounds of inadmissibility are highly specific, including types of terrorist activities and the ways in which an individual might engage in them. Because of the specific nature of the grounds of inadmissibility, if an individual is informed of which ground(s) the government seeks to apply to him or her, he or she could become aware of how the government learned of the information. This could mean that the individual would learn details about investigative methods, or even the source of the information, which the individual could then use to thwart or impede the investigation.

18. Learning the specifics of any investigation or series of investigations will allow subjects, or simply interested third parties, to evade such scrutiny by disclosing the types of information ICE is interested in when the agency undertakes specific types of investigations. Individuals who learn that they are being investigated can often deduce the methods the government is using to monitor them, or the sources the government used to uncover their terrorist or criminal activity. Disclosure of such information increases the likelihood that subjects and potential subjects of such investigations will develop and employ methods to obscure or alter such information and thereby circumvent

the agency's efforts to collect information and evidence of serious violations that may affect national security and public safety. The release of seemingly small details, such as the date on which an investigation commenced, or when the subject of the investigation used a particular alias, can also have significant effect by making clear what information had been detected at any given point in an investigation. To release this information, particularly in multiple cases, tends to indicate what will trigger the initiation of such an investigation, as well as the methods and processes used during the investigation. This allows an individual the opportunity to change his or her behavior, jeopardizing the techniques and procedures used during a particular investigation.

19. Even the release of the database codes and record locator numbers contained within the databases could seriously damage law enforcement operations. The following types of codes appear in TECS, AVALANCHE, SEVIS, ENFORCE, and EARM records: case/file numbers, report numbers, class numbers, source symbol numbers, case program codes, access codes, classification codes, identification numbers, investigative distribution codes, computer function commands, and other administrative codes. Some of the codes can serve a dual purpose. Aside from the purposes of indexing, storing, locating, retrieving, and distributing information, these codes also indicate various aspects of the investigative case, such as: the type and location of the case; what unit or type of unit is investigating the case; whether or not the subject should undergo close inspection; what other procedures law enforcement should take upon encountering the subject; and the distribution of information relating to the case, which would indicate the scope and relative size of the investigation in terms of agency resources, types of activity being investigated, and location of investigative efforts. Each of the named Plaintiffs' A-

files could contain multiple records that meet the descriptions above. When reviewed together, the risk is that an individual could extrapolate details about investigations, including the government's understanding of activities at any given time, to include methods of communication, techniques for evading law enforcement detection, and aliases being used.

20. Codes contained within a TECS record may include whether an individual is the subject of a counterterrorism investigation; the focus of that investigation (*e.g.*, financial or otherwise); the location where the investigation originated; the existence of a terrorism-related record in a database owned by another Federal agency, primarily Terrorist Identities Data Mart Environment (TIDE) and Terrorist Screening Database (TSDB); and Watchlist status. The release of multiple TECS records would establish the development of a case over time, specifically, when an individual is added to the TSDB or has a change in Watchlist status. The release of that information would permit a potential subject to reconstruct the sources and methods used to gather information that led to such classification.

21. AVALANCHE may contain codes tied to the admission into the United States of a particular subject. SEVIS contains locator numbers for individual schools and students. EARM may contain various file locations, event numbers, case numbers, and operation indicators. Again, when multiple files are reviewed together, it begins to become clear what various codes, prefixes, and other indicators mean. Additionally, release of these codes, along with computer function commands, could assist third parties in deciphering the meanings of the codes. Release of this information could permit someone (*e.g.*, a

hacker) to improperly gain access, or attempt to gain access, to any of these databases and to navigate the systems that housed ICE investigative records.

22. Access to the various database codes can also provide subjects with an insight into law enforcement techniques. Records contained in the databases discussed in this declaration may contain remarks and information that would reveal law enforcement strategies and investigation techniques. As noted above, release of this information increases the likelihood that subjects and potential subjects of such investigations will develop methods to obscure or alter such information and thereby circumvent HSI's efforts to collect information and evidence to thwart serious violations that may affect public safety and national security.

23. Nor is the information contained in databases the only source of concern. E-mail communications by and between USCIS employees and ICE Special Agents, which also commonly appear in A-files, often include details of the agents' investigative efforts including the priority of specific investigations and the ways that different agencies cooperate to carry out a joint investigation. Disclosure of this information risks revealing both investigative techniques and procedures and the names of individuals who potentially were, and possibly still are, subjects of investigations. Furthermore, disclosure may inhibit the candid discussion and sharing of pre-decisional, law enforcement sensitive information between agencies and/or DHS components. Protections over these communications is needed to promote the free flow of information, which permits law enforcement personnel to make well-informed determinations.

## Risk to ICE Personnel

24. Special Agents handle a myriad of tasks relating to official investigations into the criminal activities of third parties. The agents are in positions to access information regarding official law enforcement investigations and immigration proceedings. Printouts from databases often contain the username of the individual who viewed and printed the record. These can contain names or parts of names or other personal identifiers, including Social Security Numbers. Release of information tying particular employees to specific investigations could increase the risk that those employees would become targets of harassing or coercive inquiries for unauthorized access to information pertaining to ongoing and closed investigations, thereby compromising ICE's law enforcement operations.

25. Additionally, in my experience I have encountered or learned of individuals who believe they are under investigation that have taken affirmative steps to thwart law enforcement, including by engaging in counter-surveillance. If unredacted A-files were released, it could alert the subjects of investigations to the existence of those investigations. The subjects could then engage in such tactics, making even routine investigatory steps potentially contentious. This would increase the risk that HSI or other law enforcement personnel will come into direct contact with subjects who are aware that they are under investigation, which places them at greater of risk of harm. At the extreme, if an individual who was planning a violent attack learned that they were under investigation, they may accelerate their plans.

26. Release of the information may also pose a danger to ICE personnel. Emails reveal email addresses and may also contain full names, specific field offices, and phone numbers. If

this information is released, the safety of ICE personnel could very well be compromised. The current environment reveals the risk public disclosure of personally identifiable information can pose to ICE personnel. For example, in the summer of 2018 during the height of the "abolish ICE" movement, dozens of ICE employees, including agents, officers, attorneys, and mission support personnel, were the subject of "doxing" attacks in which their personally identifiable information was publicized and, in some cases, the public was encouraged to target them for violence because of their affiliation with ICE and its mission. In many cases the employee's personally identifiable information was harvested from the social media site LinkedIn and then published in doxing attacks. In one case, an individual used the Twitter social media site to offer $500 to anyone who would murder an ICE agent. That subject was identified, arrested and prosecuted by the Department of Justice as a result of their conduct. ICE cannot take the risk of even inadvertent disclosure, given the high stakes and potential danger to HSI Special Agents if this information were disclosed.

**Impediment to Information Sharing**

27. The release of the redacted information in the named Plaintiffs' A-files could diminish the effectiveness of law enforcement sensitive sources, methods, and techniques by inhibiting the current willingness – and even creating a disincentive – to share information between and among federal agencies, such that interagency information sharing could revert to a level reminiscent of that that existed prior to the attacks of September 11, 2001. That tragedy demonstrated that "need to know" had to give way to "need to share." This new model resulted in successes in both national security and criminal investigations. The real-time information sharing permitted by this model has

allowed front-line agents and officers to make informed decisions at critical junctures. When agencies and departments work in isolation, such achievements simply are not possible.

28. It is possible that other federal law enforcement agencies – the FBI and others – would continue to share information with HSI due to its ability to disrupt plots using its administrative authorities. However, those same agencies would likely prohibit the further dissemination of that information, particularly to USCIS. This could put ICE in an untenable position – in order to continue to conduct criminal investigations in cooperation with the FBI or other federal law enforcement agencies, HSI could face the prospect, in many cases, of being unable to fully utilize its administrative authorities in the immigration arena. In some cases, information discovered during the course of a criminal or administrative investigation is key to a determination later made by USCIS. An inability to share information significantly increases the likelihood that USCIS would grant benefits to individuals who are ineligible to receive them, including to individuals of national security concern. If and when the FBI was able to clear the information for use in administrative proceedings, DHS would need to work to rescind or terminate the benefits inappropriately granted, including to any beneficiaries or derivatives. Thus, in addition to harming government deliberations, this would be the equivalent of locking the barn door after the horse has fled.

29. Nor would the disruption be limited to information sharing across departments. Even within DHS, it would likely constrain communication between two of the three DHS immigration components. HSI Special Agents would be more cautious before recording information learned in the course of their investigations, lest USCIS be forced to provide

it to individuals who are or have been under investigation. This is precisely the sort of divide that DHS was created to prevent.

**Additional Randomly Selected A-files**

30. I have been informed that Plaintiffs have requested that the government produce 100 additional, randomly selected A-files as part of discovery. The same types of law enforcement privileges and otherwise sensitive information discussed above would be found in the randomly selected A files as well. Therefore, if the government were required to furnish these A-files and the law enforcement privileged material within them, the risks described above would be magnified proportionally. Such information released from the A-files of other members of the certified classes would potentially reveal the existence of open and/or closed investigations and could harm those that may be ongoing or reveal information about closed investigations. Such a release could also pose the other risks discussed in this declaration, also proportionally. The more records are released, the greater the cumulative impact to public safety and national security.

## INSUFFICIENCY OF A PROTECTIVE ORDER

31. A protective order allowing ICE to reveal this information in this litigation is not acceptable. The safety of HSI Special Agents involved in ICE's investigations and the national security could be placed in jeopardy as a result of disruptions to the agency's law enforcement efforts. Moreover, even the possibility of an inadvertent disclosure of information by the Plaintiffs' attorneys creates the risk of compromising investigative techniques, methods, and thus investigations. The Plaintiffs and their attorneys would not necessarily have sufficient knowledge of law enforcement and investigative

processes, techniques, and methods, to enable them to understand and identify the sensitive nature of the information claimed herein as protected by the Law Enforcement Privilege. Without directing any aspersions toward the integrity of the plaintiff's attorneys, this agency simply cannot afford even a slight risk that the attorneys most closely involved with the case could, as has been known to happen, inadvertently lose possession or control of the documents or otherwise compromise their security, leading to improper and unauthorized use of the information. This risk of disruption and serious injury to ongoing and future investigations and serious injury to the results of prior investigations that would be caused by even an inadvertent release of ICE's use of these investigative techniques and methods is unacceptable to ICE.

## CONCLUSION

32. Therefore, the information contained in the A-files of the named Plaintiffs Law Enforcement Privileged and must be protected by the claimed privilege, as discussed in this declaration.

33. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C. this 4th day of March, 2019.

Matthew C. Allen
Assistant Director, Domestic Operations
Office of Homeland Security Investigations
U.S. Immigration and Customs Enforcement

# Exhibit E

| | | |
|---|---|---|
| ABDIQAFAR WAGAFE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Docket No. 17-cv-0094-RAJ |
| | ) | |
| v. | ) | |
| | ) | |
| TRUMP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DECLARATION OF DEBORAH A. CRUM</u>

I, Deborah A. Crum, hereby state and declare as follows:

1.  I am the Acting Section Chief for the Discovery Management Section, Litigation Branch in the Federal Bureau of Investigation's (FBI), Office of the General Counsel (OGC), at FBI Headquarters in Washington, D.C. Prior to my selection as the Acting Section Chief of the Discovery Management Section, I held the position of Unit Chief of the Discovery Processing Unit I (and its predecessor discovery unit) for over seven years. I also previously served as a Paralegal Specialist and a Supervisory Paralegal Specialist in these discovery units.

2.  The statements contained in this declaration are based upon my personal knowledge, my review and consideration of documents and information available to me in my official capacity, and on information obtained from other FBI employees.

3.  The purpose of this declaration is to address the burden and proportionality issues presented by Plaintiffs' Motion to Compel (Motion) dated February 21, 2019, and demand for production of 100 Alien (A) files of unnamed Plaintiffs, and to support the Defendants' opposition to Plaintiffs' Motion and the Defendants' Cross Motion for a Protective Order.

4.     Within the FBI's Office of the General Counsel is the Discovery Management Section

(DMS).  The DMS consists of three components that provide discovery services to

approximately 29 customer groups both inside and outside the FBI.  Together, the FBI's

Discovery Processing Units (DPU) comprise one of the three DMS components and provide

litigation support to the FBI's Office of General Counsel and other FBI and DOJ components.

5.     There are two separate Discovery Processing Units within the DMS.  Collectively, the

DPU is responsible for locating, reviewing, and processing for release any and all responsive

material.  The DPU is also tasked with conducting a line-by-line review for privileged

information of the responsive material before it can be released outside of the FBI.  A line-by-

line review is a burdensome manual task where the assigned employee is responsible for

reviewing every word on every page of a document looking for any privileged information,

which also includes recognizing that information on one page that normally does not qualify as

privileged information on its own could be privileged when combined with information from

another page of the document.  The DPU is also tasked with asserting various Government

privileges to protect classified information, FBI informants, grand jury material, personal

identifiers, and other information.  Only after this careful review with appropriate redactions and

assertion of privileges may information be released outside of the FBI.

6.     The DPU's two units are comprised of  Paralegals and Supervisory Paralegals.  There are

approximately 40 Paralegal Specialists and Supervisory Paralegal Specialists currently assigned

to the DPU.  Of these approximately 40 Paralegal Specialists and Supervisory Paralegal

Specialists, approximately eight have been temporarily assigned to work only on matters related

to congressional demands for FBI records and the remaining 32 DPU personnel are currently

assigned to meet the FBI's discovery obligations in approximately 375 ongoing litigation cases nationwide.

7.     I am aware of Plaintiffs' demand for the production of a random sample of 100 A-files for the *Wagafe* class members in this case. The A-files the FBI already reviewed in connection with this case consisted of several hundred pages, which included handwritten information that also needed to be deciphered by the FBI for classified or privileged information.[1]

8.     As explained in more detail in the FBI's classified declaration submitted *in camera, ex parte*, a partial review of A-files for this case demonstrated that files contained classified information. Thus, the DPU would need to coordinate a classification review of any sampling of 100 A-files with the FBI's Information Management Division (IMD). Within IMD is the FBI's Classification Unit. The Classification Unit is responsible for reviewing documents for national security classification purposes. This includes reviewing documents responsive to civil or criminal discovery proceedings and special administrative reviews requested by other FBI components.

9.     It is my understanding that part of IMD's Classification Unit review of A-files could involve individuals from other FBI components having both the appropriate subject matter expertise and Original Classification Authority. The information within each A-file would need to be reviewed in the aggregate since information from one part of the A-file coupled with information from another part of the A-file could be considered classified when the information is taken together.

10.     Following a review by the Classification Unit, the DPU would perform its own line-by-line review of the documents for privileged information that must be redacted prior to release

---

[1] I understand that a classified declaration is being filed *ex parte, in camera* and this declaration describes in detail some of the harms that would result in having to disclose FBI information to Plaintiffs or their counsel.

outside of the FBI. This painstaking review includes an initial review, redaction, and marking conducted by the FBI's DPU Paralegal Specialists. Each document is afforded an additional two-stage review by DPU Paralegal Specialists prior to being prepared for release. The two reviews are standard procedure and each review is conducted by a different, experienced paralegal specialist. Supervisory Paralegal Specialists then review such draft productions, after which the drafts undergo review by attorneys in the FBI's Office of General Counsel (OGC) Civil Litigation Units.

11.     The Civil Litigation Unit attorneys are responsible for handling civil actions brought against the FBI or its personnel. There are approximately 12 attorneys in the FBI's OGC Civil Litigation Units, one of whom is assigned to this matter and is responsible for the final release of the document production.

12.     The amount of time it will take to review each page of an A-file will depend upon the amount and type of information on each page, the number of pages, and whether there is handwritten information that needs to be deciphered. In this case, the FBI already conducted a preliminary review of some *Wagafe* class member A-files ranging from almost 300 pages to more than 800 pages. This preliminary review took the FBI several months (March 2018 through September 2018) to complete.

13.     It is impossible to calculate precisely how much time could be required for the FBI to complete this review. However, a review of each individual A-file will require an inordinate amount of FBI resources, especially in light of the required review by multiple FBI components.

14.     Given the several months needed to conduct a preliminary review of a couple of A-files for this case, I am able to extrapolate that a review of 100 sample A-files could take the FBI

several months, if not years, to complete its review for both classified and privileged information.

15.     The review by both the FBI's DPU and the Classification Unit is required since the potential release of classified information puts national security at risk.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of March, 2019.


DEBORAH A. CRUM
Acting Section Chief
Discovery Management Section
Office of the General Counsel
Federal Bureau of Investigation

# Exhibit F

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ABDIQAFAR WAGAFE, *et. al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>TRUMP, *et al.*,<br><br>     Defendant. | )<br>)<br>)<br>)<br>) Case No. 17-CV-0094-RAJ<br>)<br>)<br>)<br>)<br>) |

## <u>DECLARATION OF JAY S. TABB, JR.</u>

I, Jay S. Tabb, Jr., hereby state and declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am the Executive Assistant Director of the National Security Branch (NSB) of the Federal Bureau of Investigation (FBI), United States Department of Justice (DOJ).

2. The NSB oversees the FBI's efforts to deter, detect, and disrupt national security threats to the United States and its interests, and oversees the national security operations of the FBI's Counterintelligence Division, Counterterrorism Division, High-Value Detainee Interrogation Group, Terrorist Screening Center (TSC), and Weapons of Mass Destruction Directorate. The NSB also facilitates the functions carried out by other FBI divisions that support the FBI's national security mission, such as training, technology, human resources, and security countermeasures.

3. As the Executive Assistant Director of the NSB, I am responsible for, among other things, directing and overseeing the programs responsible for conducting national security investigations. I am the accountable executive for the files and records of the NSB. In my oversight capacity for the NSB, which includes the TSC, I am responsible for the protection of

classified national security information and processes within the NSB, including information received from other agencies and otherwise in the NSB's possession. I have been delegated original classification authority by the Attorney General. *See* Executive Order 12958, *as amended* by Executive Order 13292, *as amended* by Executive Order 13526, Section 1.3(c). As a result, and pursuant to all applicable Executive Orders, I am responsible for the protection of classified national security and law enforcement sensitive information within the NSB, including the sources and methods used by the FBI in the collection of such information. Thus, I have been authorized by the Attorney General and the Director of the FBI to execute declarations and affidavits in order to protect such information.

4.      The matters stated herein are based on my personal knowledge; my background, training, and experience related to national security matters; my review and consideration of documents and information available to me in my official capacity; and information furnished to me by Special Agents and other FBI and DOJ employees. It is also based on information furnished by the United States Citizenship and Immigration Service (USCIS) and its employees.

5.      Through the exercise of my official duties, I have been briefed on the *Wagafe* lawsuit in which the Court has certified two classes of individuals seeking to adjust to lawful permanent resident status and individuals seeking naturalization. I understand this matter is proceeding in discovery and that Plaintiffs have filed a motion to compel the production of certain information and records by the Defendants. I also understand the Defendants are asserting objections over privileged and classified information and documents.

6.      It is my understanding that the USCIS is the government agency responsible for identifying, screening, and adjudicating applications for immigration benefits, including naturalization, adjustment of status, and asylum. It is also my understanding that the USCIS

created the Controlled Application Review and Resolution Program (CARRP) through which the USCIS adjudicates immigration applications it deems to represent a potential national security concern. According to USCIS policy guidance made available to me, the USCIS defines national security concerns to include individuals who may engage in or endorse terrorist activities or who plan to engage in espionage or sabotage.

       7.      The FBI does not administer CARRP, which is solely a USCIS program. The FBI does not adjudicate immigration benefits.

       8.      As explained in more detail in my declaration submitted *ex parte, in camera*, the FBI asserts the law enforcement privilege over FBI information contained in USCIS records, including A-files, pertaining to the *Wagafe* class members.[1]

       9.      For the reasons explained in more detail in my declaration submitted *ex* parte, *in* camera, and in the publicly filed declaration executed by Deborah A. Crum, the FBI also opposes plaintiffs' motion to require the parties to produce the A-files of 100 random class members. The FBI also supports the USCIS in its opposition to providing public notice to class members.

---

[1] (U) The FBI reaffirms its previous assertion of the deliberative process privilege as more fully set forth in its classified, *in camera, ex parte* declaration submitted April 9, 2018. The FBI continues to assert the deliberative process privilege over FBI information released to the USCIS.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of March, 2019.

JAY S. TABB, JR.
Executive Assistant Director
National Security Branch
Federal Bureau of Investigation
Washington, D.C.