# Exhibit A

THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ABDIQAFAR WAGAFE, *et al.*, on behalf of themselves and others similarly situated,<br><br>    Plaintiffs,<br><br> v.<br><br>JOSEPH R. BIDEN, President of the United States, *et al.*,<br><br>    Defendants. | No. 2:17-cv-00094-RAJ<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br><br>NOTE FOR MOTION CALENDAR:<br>Friday, July 2, 2021<br><br>**ORAL ARGUMENT REQUESTED** |

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# Table of Contents

Page

I.  INTRODUCTION ............................................................................. 1

II. STATEMENT OF FACTS ................................................................ 2

    A.  USCIS's Creation of CARRP ................................................... 2

    B.  Overview of CARRP Processing ............................................. 4

    C.  CARRP's Expansive View of "National Security Concerns" .............. 8

        1.  Confirmed and Not Confirmed Concerns ........................... 8

        2.  KSTs and Non-KSTs .................................................... 9

        3.  Indicators of a National Security Concern ......................... 10

            a.  National Origin ................................................ 11

            b.  ███████████ ................................................ 12

            c.  Education and Professional Background ................... 12

            d.  Associations ................................................... 13

            e.  ████ ............................................................ 13

            f.  Government Interest .......................................... 14

        4.  Resolving and Confirming Concerns ................................ 14

    D.  CARRP Results in Significant Delays and Denials ....................... 15

    E.  Named Plaintiff Facts ......................................................... 17

III. SUMMARY JUDGMENT STANDARD ............................................. 26

IV. ARGUMENT ............................................................................... 26

    A.  Plaintiffs Are Entitled to Summary Judgment Because CARRP Violates the APA ..................................................................... 26

        1.  CARRP Violates the APA Because It Is Contrary to Law ..... 26

            a.  CARRP Imposes Extra-Statutory Eligibility Requirements Contrary to the INA ......................... 27

            b.  CARRP Denies Applicants their Right to Know About and Respond to Alleged NS Concerns in Violation of Agency Regulations ................................................. 32

        2.  CARRP Violates the APA Because It Unlawfully Withholds and Unreasonably Delays Adjudication of Class Members' Applications ............................................................... 33

        3.  CARRP Violates the APA Because USCIS Failed to Engage in Notice and Comment Rulemaking ................................ 35

        4.  CARRP Violates the APA Because It Is Arbitrary and Capricious ........ 36

            a.  USCIS Failed to Articulate *Any* Reasoned Explanation for CARRP ....................................................... 36

            b.  USCIS Ignored Crucial Considerations in Adopting CARRP ....................................................... 37

    B.  CARRP Violates the Procedural Due Process Rights of the Naturalization Class ........................................................... 43

        1.  The Naturalization Class Members' Interests Are Significant ... 44

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – i
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## Table of Contents

|  |  |  | Page |
| --- | --- | --- | --- |
|  | 2. | CARRP Entails a High Risk of Erroneous Deprivation | 45 |
|  | 3. | Defendants' Burden in Adopting Additional Safeguards Is Low | 47 |
|  | C. | CARRP Denies Class Members Equal Protection | 48 |
| V. |  | CONCLUSION | 50 |

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – ii
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

## Table of Authorities

Page

CASES

*Al Haramain Islamic Found. v. Dep't of Treasury,*
    686 F.3d 965 (9th Cir. 2012) ................................................................46

*Al Karim v. Holder,*
    2010 WL 125840 (D. Colo. Mar. 29, 2010) ........................................30

*Ali v. Mukasey,*
    No. C07-1030RAJ, 2008 WL 682257 (W.D. Wash. Mar. 7, 2008) ............2, 35, 50

*Am.-Arab Anti-Discrimination Comm. v. Reno,*
    70 F.3d 1045 (9th Cir. 1995) ................................................................47

*Armstrong v. Manzo,*
    380 U.S. 545 (1965)................................................................................44

*Ball v. Massanari,*
    254 F.3d 817 (9th Cir. 2001) ................................................................48

*Beno v. Shalala,*
    30 F.3d 1057 (9th Cir.1994) .................................................................36

*Campos-Granillo v. INS,*
    12 F.3d 849 (9th Cir. 1993) ..................................................................28

*Ching v. Mayorkas,*
    725 F.3d 1149 (9th Cir. 2013) ..............................................................44

*City & Cty. of S. F. v. USCIS,*
    408 F. Supp. 3d 1057 (N.D. Cal. 2019) ...............................................27

*City & Cty. of San S. F. v. USCIS,*
    981 F.3d 742 (9th Cir. 2020) ...................................................37, 38, 41

*DHS v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020)............................................................36, 37, 40

*Dos Reis v. McCleary,*
    200 F. Supp. 3d 291 (D. Mass. 2016) ..................................................31

*East Bay Sanctuary Covenant v. Barr,*
    964 F.3d 832 (9th Cir. 2020) ...........................................................27, 36

*Elhady v. Kable,*
    391 F. Supp. 3d 562 (E.D. Va. 2019) ........................................9, 43, 45

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009)..........................................................................36, 39

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – iii
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**Table of Authorities**

**Page**

*Gete v. INS,*
   121 F.3d 1285 (9th Cir. 1997) ....................................................................46

*Ghafoori v. Napolitano,*
   713 F. Supp. 2d 871 (N.D. Cal. 2010) .........................................................32

*Greene v. McElroy,*
   360 U.S. 474 (1959)......................................................................................43

*Hemp Industries. Ass'n v. Drug Enf't Admin.,*
   333 F.3d 1082 (9th Cir. 2003) .....................................................................35

*Hunt v. Cromartie,*
   526 U.S. 541 (1999)................................................................................48, 49

*In re Messina,*
   207 F. Supp. 838 (E.D. Pa. 1962) ...............................................................31

*In re Sousounis,*
   239 F. Supp. 126 (E.D. Pa. 1965) ...............................................................31

*INS v. Pangilinan,*
   486 U.S. 875 (1988)......................................................................................28

*Jaa v. INS,*
   779 F.2d 569 (9th Cir. 1986) .......................................................................30

*Jafarzadeh v. Nielsen,*
   321 F. Supp. 3d 19 (D.D.C. 2018) .........................................................30, 36

*Jones v. Williams,*
   791 F.3d 1023 (9th Cir. 2015) .....................................................................26

*Judulang v. Holder,*
   565 U.S. 42 (2011)..................................................................................36, 43

*Kaur v. Holder,*
   561 F.3d 957 (9th Cir. 2009) ..................................................................46, 47

*Khan v. Johnson,*
   65 F. Supp. 3d 918 (C.D. Cal. 2014) ...........................................................33

*Kiareldeen v. Reno,*
   71 F. Supp. 2d 402 (D.N.J. 1999) ................................................................47

*Kim v. Ashcroft,*
   340 F. Supp. 2d 384 (S.D.N.Y. 2004)..........................................................33

*Kim v. USCIS,*
   551 F. Supp. 2d 1258 (D. Colo. 2008).........................................................33

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**Table of Authorities**

Page

*Kirwa v. Dep't of Def.*,
   285 F. Supp. 3d 21 (D.D.C. 2017) ...........................................................39, 40, 44

*Kungys v. U.S.*,
   485 U.S. 759 (1988) (Brennan, J., concurring).........................................................31

*L.V.M. v. Lloyd*,
   318 F. Supp. 3d 601 (S.D.N.Y. 2018).......................................................................34

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir. 2005) ...................................................................................38

*Latif v. Holder*,
   28 F. Supp. 3d 1134 (D. Or. 2014) .................................................................42, 46, 47

*Lindems v. Mukasey*,
   530 F. Supp. 2d 1044 (E.D. Wis. 2008).....................................................................33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)....................................................................................................26

*Matter of Arai*,
   13 I&N Dec. 494 (BIA 1970) .....................................................................................28

*Matter of Chawathe*,
   25 I&N Dec. 369 (BIA 2010) .....................................................................................31

*Matthews v. Eldridge*,
   424 U.S. 319 (1976)....................................................................................................44

*Michigan v. EPA*,
   576 U.S. 743 (2015).....................................................................................................39

*Mohamed v. Holder*,
   No. CV-50 2015 WL 4394958 (E.D. Va. July 16, 2015) .........................................46

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983).................................................................................................36, 40

*Naiker v. USCIS*,
   352 F. Supp. 3d 1067 (W.D. Wash. 2018).................................................................32

*Nat'l Med. Enters. v. Bowen*,
   851 F.2d 291 (9th Cir. 1988) ......................................................................................27

*Nio v. DHS*,
   385 F. Supp. 3d 44 (D.D.C. 2019) ..................................................................30, 37, 43

*Oniwon v. USCIS*,
   No. CV H-19-3519, 2020 WL 1940879 (S.D. Tex. Apr. 6, 2020) ............................33

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**Table of Authorities**

Page

*Pinnacle Armor, Inc. v. U. S.*,
648 F.3d 708 (9th Cir. 2011) ...................................................43

*Plyler v. Doe*,
457 U.S. 202 (1982)...................................................................50

*Rafeedie v. INS*,
795 F. Supp. 13 (D.D.C. 1992) ................................................47

*Rajput v. Mukasey*,
2008 WL 2519919 (W.D. Wash. June 20, 2008)......................33

*Ralls Corp. v. Comm. on Foreign Inv.*,
758 F.3d 296 (D.C. Cir. 2014) ................................................46

*Ramos v. Wolf*,
975 F.3d 872 (9th Cir. 2020) ...................................................48

*Rashtabadi v. INS*,
23 F.3d 1562 (9th Cir. 1994) ...................................................28

*Reddy v. Mueller*,
551 F. Supp. 2d 952 (N.D. Cal. 2008) .....................................33

*Roshandel v. Chertoff*,
554 F. Supp. 2d 1194 (W.D. Wash. 2008).................................44

*Roshandel v. Chertoff*,
No. CV 07-1739, 2008 WL 1969646 (W.D. Wash. May 5, 2008)........34

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ...................................................36

*Santillan v. Gonzalez*,
388 F. Supp. 2d 1065 (N.D. Cal. 2005) ...................................40

*Santosky v. Kramer*,
455 U.S. 745 (1982)...................................................................45

*Siddiqui v. Cissna*,
356 F. Supp. 3d 772 (S.D. Ind. 2018) ......................................30

*Singh v. Still*,
470 F. Supp. 2d 1064 (N.D. Cal. 2007) ..............................35, 50

*The Comm. Concerning Cmty. Improvement v. City of Modesto*,
583 F.3d 690 (9th Cir. 2009) ...................................................48

*Tiwari v. Mattis*,
363 F. Supp. 3d 1154 (W.D. Wash. 2019)................................48

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**Table of Authorities**

Page

*Tutun v. U.S.*,
270 U.S. 568 (1926)..................................................................................28

*U.S. v. Arvizu*,
534 U.S. 266 (2002)..................................................................................31

*U.S. v. Hovsepian*,
359 F.3d 1144 (9th Cir. 2004) ..................................................................31

*Yakima Valley Cablevision, Inc. v. FCC*,
794 F.2d 737 (D.C. Cir. 1986)..................................................................37

*Yea Ji Sea v. DHS*,
No. CV-18-6267-MWF (ASX), 2018 WL 6177236 (C.D. Cal. Aug. 15, 2018)....................33

*Yepes-Prado v. INS*,
10 F.3d 1363 (9th Cir. 1993), *as amended* (Nov. 12, 1993)......................28

*Zerezghi v. USCIS*,
955 F.3d 802 (9th Cir. 2020) ....................................................................46

**STATUTES**

5 U.S.C. § 551(13) ...................................................................................33

5 U.S.C. § 553(b) .....................................................................................35

5 U.S.C. § 553(c) .....................................................................................35

5 U.S.C. § 555(b) .....................................................................................33

5 U.S.C. § 704 ..........................................................................................26

5 U.S.C. § 706(1) .....................................................................................33

5 U.S.C. § 706(2) .....................................................................................36

5 U.S.C. § 706(2)(A).................................................................................26

5 U.S.C. § 706(2)(C).................................................................................26

8 U.S.C. § 1101(f) ....................................................................................27

8 U.S.C. § 1159 ........................................................................................28

8 U.S.C. § 1182(a)(3)..............................................................................3, 28

8 U.S.C. § 1227(a)(4)...........................................................................3, 28, 39

8 U.S.C. § 1255 ........................................................................................28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# Table of Authorities

**Page**

8 U.S.C. § 1255(a)(2)..................................................................................................28

8 U.S.C. § 1424(a).....................................................................................................27

8 U.S.C. § 1427(a).....................................................................................................27

8 U.S.C. § 1430.........................................................................................................27

8 U.S.C. § 1439.........................................................................................................27

8 U.S.C. § 1440.........................................................................................................27

8 U.S.C. § 1446.........................................................................................................33

8 U.S.C. § 1447(b).....................................................................................................33

8 U.S.C. § 1571.........................................................................................................33

8 U.S.C. § 1612.........................................................................................................44

8 U.S.C. § 1612(a)(2).................................................................................................24

Administrative Procedure Act............................................................................. passim

Immigration and Nationality Act ........................................................................ passim

REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231 (May 1, 2005)..................................3

USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001) .......................3

**RULES**

Fed. R. Civ. P. 56(a) ..................................................................................................26

**REGULATIONS**

8 C.F.R. § 103.2(b)(8)(i)..............................................................................................28

8 C.F.R. § 103.2(b)(16)...............................................................................................47

8 C.F.R. § 103.2(b)(16)(i)............................................................................................32

8 C.F.R. § 103.2(b)(16)(ii)...........................................................................................32

8 C.F.R. § 103.2(b)(16)(ii)-(iv).....................................................................................32

8 C.F.R. § 209.1(e).....................................................................................................28

8 C.F.R. § 316.2(a).....................................................................................................27

8 C.F.R. § 316.2(b).....................................................................................................31

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## Table of Authorities

**Page**

8 C.F.R. § 316.14 .......................................................................................................32

8 C.F.R. § 316.14(b)(1) ..............................................................................................33

8 C.F.R. § 319.1-4 ......................................................................................................27

8 C.F.R. § 329.2(d) .....................................................................................................27

8 C.F.R. § 335.3 ..........................................................................................................33

8 C.F.R. § 335.3(a) .....................................................................................................28

53 Fed. Reg. 26034 (July 11, 1988) ...........................................................................32

**OTHER AUTHORITIES**

Dulce Redin, et al., *Exploring the Ethical Dimensions of Hawala* J. Bus. Ethics
    327 (2014) ...........................................................................................................12

H.R. 3938, 109th Cong. §§ 120-21 (2005) ...................................................................3

H.R. 4313, 109th Cong. §§ 324-25 (2005) ...................................................................3

Muneer I. Ahmad, *A Rage Shared by Law: Post September 11 Racial Violence as
    Crimes of Passion*, 92 Cal. L. Rev. 1259 (2004) ...............................................49

Nermeen Arastu, *Aspiring Americans Thrown Out in the Cold*, 66 UCLA L. Rev.
    1078 (2019) ....................................................................................................12, 50

S. 1348, 110th Cong. §§ 201, 531 (2007) .....................................................................3

S. 1438, 109th Cong. §§ 209-10 (2005) ........................................................................3

S. 1984, 110th Cong. § 233 (2007) ...............................................................................3

S. 2294, 110th Cong. § 233 (2007) ...............................................................................3

S. 2368, 109th Cong. §§ 304, 306 (2006) .....................................................................3

S. 2377, 109th Cong. §§ 304, 306 (2006) .....................................................................3

S. 2454, 109th Cong. §§ 201, 217 (2006) .....................................................................3

S. 2611, 109th Cong. § 201 (2006) ...............................................................................3

S. 2612, 109th Cong. §§ 201, 531 (2006) .....................................................................3

S. 330, 110th Cong. § 201 (2007) .................................................................................3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## I.    INTRODUCTION

Hundreds of thousands of immigrants apply to U.S. Citizenship and Immigration Services ("USCIS") each year for green cards and citizenship. But since 2008, USCIS has secretly excluded tens of thousands of applicants from the statutory promises of naturalization and lawful permanent residency by delaying and denying their applications without legal authority. Without notice to applicants, their lawyers, or the public at large, USCIS has profiled law-abiding applicants as "national security concerns" based on national origin, religious activity, and innocuous characteristics and associations—casting unfounded suspicion on applicants based on who they are, not because they did anything wrong or are ineligible for the benefit. Once labeled a "concern," USCIS puts their applications in a "vetting" purgatory designed to pretextually deny the benefit or resolve the "concern."

This policy, known as the Controlled Application Review and Resolution Program ("CARRP"), prohibits officers from approving applicants with unresolved "concerns" unless every effort is first made to deny the application or resolve the "concern." The default is to not approve. As a result, most applications with unresolved "concerns" sit for years without adjudication. Contrary to USCIS's own regulations, applicants are not permitted any opportunity to know about or respond to the "concern." Those applications USCIS does adjudicate, it mostly denies when it would otherwise grant the application. By putting applications on hold or rejecting them for unfounded reasons, tens of thousands of law-abiding immigrants have had their lives irrevocably upended, without ever being told why they were treated differently than others.

CARRP serves no discernable national security purpose. Without *any* input from law enforcement officials, USCIS created a program that ascribes "national security concerns" to attributes shared by millions of U.S. citizens and residents without any consideration for the substantial risk of discrimination and error. Indeed, USCIS still cannot explain why delaying or denying citizenship and green cards to long-time U.S. residents serves our national security. As this Court has observed, USCIS "protects no one" by delaying decisions for long-time U.S.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    residents—it still "retain[s] a panoply of options [if] it discovered . . . a threat to national

2    security." *Ali v. Mukasey*, No. C07-1030RAJ, 2008 WL 682257, *4 (W.D. Wash. Mar. 7, 2008).

3           Withholding adjudication for prolonged periods and denying eligible applicants based on

4    discriminatory and unsubstantiated "concerns" is unlawful. CARRP violates the Administrative

5    Procedure Act ("APA"), the Immigration and Nationality Act ("INA"), and governing

6    regulations by imposing extra-statutory criteria for the adjudication of immigration benefits,

7    concealing "concerns" from applicants, and unreasonably delaying adjudication. CARRP also

8    violates the APA because it is arbitrary and capricious, and USCIS implemented it without

9    notice and comment. CARRP violates the due process rights of the naturalization class by failing

10   to provide notice of the "concern" or an opportunity to respond, and it unlawfully discriminates

11   against applicants for naturalization and adjustment of status who are Muslim or from Muslim-

12   majority countries. The Court should grant Plaintiffs' motion for summary judgment.

13                        **II.    STATEMENT OF FACTS[1]**

14   **A.    USCIS's Creation of CARRP**

15          Following the September 11, 2001 attacks, the Immigration and Naturalization Service

16   ("INS") added new security checks to the processing of immigration benefits. It added the

17   Interagency Border Inspection System ("IBIS") database (today known as TECS)[2] and expanded

18   its use of the FBI Name Check Program to screen applicant names against FBI reference files, in

19   addition to the FBI's main files. **Ex. 4** (2003 DOJ Audit) at iii, 9-10; **Ex. 5** (2005 DHS Audit) at

20   DEF-00041257-58. USCIS soon found that unlike criminal background checks, these lookout

21   and investigatory systems were "[s]low" and contained information that was "inconclusive" or

22   "legally inapplicable" to the adjudication of the benefit. **Ex. 5** at DEF-00041278. But the

23   government "prefer[ed] not to approve [the] petition" when the security checks raised concerns

24   and instead adopted informal practices to deny those benefit applications or withhold

25

26          [1] All exhibits are attached to the Declaration of Jennie Pasquarella unless otherwise noted.
27          [2] **Ex. 1** (Quinn Dep.) 38:5-13 (IBIS rolled into TECS); **Ex. 2** (Renaud Dep.) 144:3-13. TECS is a database
     owned and maintained by Customs and Border Protection ("CBP") that contains law enforcement "lookouts," border
     screening, and CBP primary and secondary inspection information. **Ex. 3** at DEF-0039007-8.

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 2
151538082.9

1  adjudication. *Id.* at 41279-80 (describing agents 'shelving' cases and security check information

2  that was "vague, inconclusive or difficult to relate to the case adjudication"); *id.* at 00041258.

3   Immigration officials had no legal authority to deny applications when security check

4  information was irrelevant to eligibility. *See* **Ex. 4** at 11 ("If, for example, a beneficiary is

5  otherwise eligible for a particular benefit, the INS cannot deny that individual on the basis of an

6  IBIS hit."); **Ex. 5** at DEF-00041279 (eligibility for certain benefits requires evaluation "without

7  regard to whether the person evokes security concerns"). Consequently, the agency began

8  "pursu[ing] regulatory and statutory options to expand authority to withhold adjudication and to

9  deny benefits due to national security concerns." *Id.* at 41281; *see* **Ex. 4** at 11 & n.14.

10   In 2001 and 2005, Congress amended the INA to expand the class of individuals

11  considered inadmissible and deportable for national security-related activity.[3] These statutory

12  provisions became known as the terrorism-related inadmissibility grounds ("TRIG"). 8 U.S.C. §§

13  1182(a)(3), 1227(a)(4). TRIG, however, did not provide grounds to deny naturalization, nor did

14  it give USCIS any legal basis to deny or withhold adjudication based on security check concerns.

15  So, USCIS lobbied Congress to amend the INA. It sought a legal basis "to deny *any* benefit to

16  [noncitizens] described in [TRIG], who are the subject of a *pending* investigation or case that is

17  material to eligibility for a benefit, *or* for whom law enforcement checks have not been

18  conducted and resolved" to the satisfaction of DHS. **Ex. 5** at DEF-00041281 (emphasis added).

19  USCIS's draft amendments were introduced in Congress *eleven times* from 2005 to 2007, but

20  each time Congress rejected them. *See id.* at n.33; S. 1438, 109th Cong. §§ 209-10 (2005).[4]

21   Undeterred, in 2008, USCIS secretly adopted CARRP. *See* **Ex. 7** (RFAs) Nos. 1, 3 & 4;

22  **Ex. 8** (USCIS Dep.) 25:22-26:6; **Ex. 9** (Arastu Rep.) ¶54. CARRP imposed the rules Congress

23

24   [3] USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001); The REAL ID Act, Pub. L. No.
109-13, 119 Stat. 231 (May 1, 2005).

25   [4] The amendments were titled "Denial of Benefits to Terrorists and Criminals" and "Completion of
Background and Sec. Checks." *See* **Ex. 5** at n.33; H.R. 3938, 109th Cong. §§ 120-21 (2005); H.R. 4313, 109th Cong.

26  §§ 324-25 (2005); S. 2611, 109th Cong. § 201 (2006); S. 2612, 109th Cong. §§ 201, 531 (2006); S. 2454, 109th Cong.
§§ 201, 217 (2006); S. 2368, 109th Cong. §§ 304, 306 (2006); S. 2377, 109th Cong. §§ 304, 306 (2006); S. 330, 110th

27  Cong. § 201 (2007); S. 1348, 110th Cong. §§ 201, 531 (2007); S. 2294, 110th Cong. § 233 (2007); S. 1984, 110th
Cong. § 233 (2007).

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 3
151538082.9

1    refused to adopt. Like the proposed legislation, CARRP prohibited officers from approving

2    applications involving any "unresolved" security check, any open or unresolved investigation,

3    and any unresolved TRIG-related concerns, and directed officers to find a way to deny such

4    applications whenever possible. *See* **Ex. 7** (RFA) Nos. 5 & 22; *infra* Part II(B).

5         As USCIS admits, "Congress did not enact CARRP," Dkt. 74 (Answer) ¶56, and no

6    "statute directly created the CARRP policy," **Ex. 7** (RFAs) No. 2. USCIS staff developed it on

7    their own. **Ex. 8** (USCIS Dep.) 32:10-22. No person outside of USCIS—not a single official

8    from law enforcement or any other agency—participated in the formulation of CARRP, nor

9    provided input, feedback, advice, commentary, or recommendations either before or after the

10   policy was adopted. *Id.* at 32:20-34:3. USCIS conducted no studies, reviewed no reports, and

11   considered no information other than the INA and its own "on-the-job" experience in developing

12   CARRP. *Id.* at 34:4-35:16, 42:13-43:3.

13   **B.    Overview of CARRP Processing**

14        With CARRP, USCIS created two separate schemes to process immigration benefits: the

15   routine track and the CARRP track. All naturalization and adjustment of status applications are

16   subject to background checks run by the USCIS National Benefits Center ("NBC"). **Ex. 10**

17   (Lombardi Dep.) 199:6-14; **Ex. 11** (Heffron Dep.) 81:12-82:22. In a "routine" case, following

18   these background checks, the NBC schedules an applicant for an interview and sends the case to

19   the respective field office for assignment to an Immigration Services Officer ("ISO") (a benefits

20   adjudication officer) who evaluates the applicant's eligibility, conducts the interview, and

21   approves the case, if eligible. **Ex. 2** (Renaud Dep.) 147:20-148:22; **Ex. 11** (Heffron Dep.) 82:11-

22   18, 85:11-14; **Ex. 12** (Benavides Dep.) 91:12-16 ("Q. . . .in a normal course if there are no

23   ineligibilities found, set aside CARRP, the application is granted, right? . . . A. Yes.").

24        CARRP cases, by contrast, face four stages: (1) the identification of a national security

25   concern ("NS concern"), (2) assessment of eligibility for the benefit and internal vetting, (3)

26   external vetting, and (4) adjudication. **Ex. 13** CAR000003-7. USCIS puts applications in CARRP

27   the moment an indicator of an NS concern is identified. **Ex. 7** (RFAs) No. 21. From there, the

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 4
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

NBC sends the case to a field office, where it is assigned to an ISO, who handles the eligibility assessment and adjudication, and a Fraud Detection and National Security ("FDNS")[5] Immigration Officer ("IO")—who does not necessarily "have a background in adjudications or immigration law"—for internal and external vetting. **Ex. 16** at DEF-00116759.0012, .0084-85; *see* **Ex. 17** DEF-00402579.0002-7; **Ex. 18** at CAR000345-46.

Once an NS concern is identified, CARRP prohibits officers from approving that application unless they have concurrence from both a supervisor and senior agency official at stage four (adjudication). **Ex. 13** at CAR000006-7; *see* **Ex. 7** (RFAs) Nos. 5 & 22. Officers, however, may deny a CARRP case at any time. **Ex. 14** at CAR000061-74.

Thus, CARRP's second stage, eligibility assessment and internal vetting, focuses on identifying reasons to deny the application, "to ensure that valuable time and resources are not unnecessarily expended" vetting an NS concern when the individual can be denied. **Ex. 13** at CAR000005. In other words, denial is the favored outcome before USCIS has even attempted to resolve the concern through external vetting. **Ex. 16** at DEF-00116759.0015-20.

In the eligibility assessment, USCIS instructs ISOs to identify any inconsistency in an application—however trivial or immaterial—that can be used to allege the applicant provided false testimony. **Ex. 16** at DEF-00116759.0021-25; .0032-35 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████), *id.* at .0072-85; **Ex. 22** at DEF-00052177.0023; **Ex. 23** at DEF-00066528.0010-13; 16-19; **Ex. 24** at DEF-00123645, ████████████████████████████████████████████████ **Ex. 25** at DEF-00095009.0016; **Ex. 22** at 52177.0031; **Ex. 20** at DEF-00359641.0184. ███████████ ████████████████████████████████████████████████. *See* **Ex. 51** at DEF-00126236 (█████████████████████████████████████████); **Ex. 26** at

---

[5] FDNS is one of several USCIS Directorates. *See* USCIS, Org. Chart, shorturl.at/wCO78. The Field Operations Directorate oversees field offices, which adjudicate naturalization and adjustment of status applications. **Ex. 15** at DEF-00035391; **Ex. 11** (Heffron Dep.) 17:18-21.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 5
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

DEF-0022418-34 (████████████████); **Ex. 27** at DEF-00065590.0179-80, .0174, .0186, .0205-07 (████████████████████████████

██████████████████████████████████████

█████████████████████████████); **Ex. 24** at DEF-00123649.

If the ISO and FDNS IO are unable to identify any ineligibility grounds, the application proceeds to the external vetting phase. **Ex. 28** at DEF-00003732; **Ex. 16** at DEF-00116759.0094.

████████████████████████. *Id.* at .0092-93; **Ex. 13** at CAR000005-6.

███████████████████████████████████ **Ex. 16** at DEF-00116759.0146. ████████████████████████████████

████████████████████████. *Id.* at .0093 (emphasis in original).

█████████████████████████████████████

█████████████████████████ **Ex. 29** at CAR000032; **Ex. 16** at DEF-00116759.0008; *see* **Ex. 6** at CAR001817; **Ex. 8** (USCIS Dep.) 224:14-21. ████████████

█████████████████████████ **Ex. 16** at DEF-00116759.0146, ████

█████████████████, **Ex. 19** at DEF-0090968.0014.

████████████████████████████. *Id.* at DEF-0090968.0014.

████████████████████████████████████

███████████████████████. **Ex. 16** at DEF-00116759.0161-66; *see also* **Ex. 19** at DEF-0090968.0014 (████████████████████████

████████████████). ████████████████████

█████████████████████████████████████ **Ex. 16** at DEF-00116759.0162. ████████████████

█████████████████████████████████████

█████████████████████████. **Ex. 19** at DEF-0090968.0037

█████████████████████████████████████

████████████████); *see* **Ex. 21** at DEF-00068350.0017 (████████

█████████████████████████████████████

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  ████████████████).  █████████████████████████████████████████

2  █████████████████████████████████████████████████████████████████

3  ███████ *Id.* at .0142-153, .0156 █████████████████████████████████

4  ████████████████████████████████████████████████████; *id.* at .0148 ████

5  ██████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████

7  ███████████████████████████

8      Once external vetting is complete, the application moves to the adjudication stage. ███

9  █████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 █████████████████████████. **Ex. 29** at CAR000039; *see infra* Part II(C)(2).

12     CARRP prohibits officers from approving KST applications unless they have

13 concurrence from the USCIS Deputy Director. **Ex. 7** (RFAs) No. 5; *see also* **Ex. 19** at DEF-

14 0090968.0049. ████████████████████████████████ **Ex. 30** at DEF-00024886. The

15 process is onerous. **Ex. 19** at DEF-0090968.0049-65; **Ex. 31** (SLRB SOP) at CAR000371-75.

16 Assistance from agency counsel and FDNS Headquarters is provided to help identify grounds of

17 ineligibility. **Ex. 19** at DEF-0090968.0049-50; *see* **Ex. 29** at CAR000039. If such efforts are

18 unsuccessful, the field office must present the application to the Field Office Directorate

19 Headquarters, which then presents it to the Senior Leadership Review Board ("SLRB"), **Ex. 19**

20 at DEF-0090968.0052-53, which is a body composed of headquarters directors of each USCIS

21 component, *id.* at .0056-59. The SLRB "puts their heads together" and makes a recommendation

22 to the Deputy Director. *Id.* at .0057; *see* **Ex. 31** at CAR000372. Since 2008, ████████

23 naturalization or adjustment applications have been presented to the Deputy Director. **Ex. 8**

24 (USCIS Dep.) 233:8-234:7. Between FY 2013 and 2019, USCIS approved █████████

25 ████████. **Ex. 32** (May 3, 2021 Kruskol Rep.) ¶¶18(c), 20(c).

26     CARRP policy also prohibits officers from approving non-KST applicants with

27 unresolved NS concerns unless they obtain supervisory approval and concurrence from the local

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 7
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

field office director. **Ex. 29** at CAR000037; **Ex. 7** (RFAs) No. 5. USCIS requires officers to elevate any non-KST case to their supervisor and work with USCIS counsel to identify ineligibilities. **Ex. 19** at DEF-0090968.0049-50; *see also* **Ex. 29** at CAR000037. If the field office director "says they don't want to approve," the case may be elevated to headquarters. **Ex. 19** at DEF-0090968.0053; *see* **Ex. 29** at CAR000039. For applications received between FY 2013 and 2019, USCIS approved only ███████████████████████████ applications received in this period and only ██████████████████████ ███████████████ applications. **Ex. 32** (May 3, 2021 Kruskol Rep.) ¶¶34-36.

### C.    CARRP's Expansive View of "National Security Concerns"

Under CARRP, an NS concern exists "when an individual or organization has been determined to have an articulable link to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in [TRIG]." **Ex. 13** at CAR000001 n.1; **Ex. 7** (RFAs) No. 6. "NS concern" is a USCIS-invented designation. It has no basis in the INA or implementing regulations. **Ex. 7** (RFAs) Nos. 7 & 8. No law determines what amount of evidence is necessary to establish an NS concern. **Ex. 34** at DEF-0094973. And the definition is far broader and vaguer than the "legal standard used to determin[e] admissibility or removability" in TRIG. **Ex. 35** at CAR000084. *See* **Ex. 7** (RFAs) Nos. 8 & 9.

#### 1.    Confirmed and Not Confirmed Concerns

████████████████████████████████████████████████████ **Ex. 36** at CAR000776-81. ████████████████████████████████████████ ██████████████████████████████████ **Ex. 8** (USCIS Dep.) at 224:22-225:16. ████████████████████████████████████████████████████ ████████████ *Id.* at 226:14-18. ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ **Ex. 93** at DEF-0089772; **Ex. 94** at DEF-00230842-43 ████████████████████████████████████████ ████████████████████████. Of the 28,214 applications USCIS subjected to CARRP

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   between FY 2013 and 2019, by September 2019, USCIS ████████████████ of them—

2   meaning ██████ of applicants subjected to CARRP ultimately did not even meet USCIS's

3   definition of NS concern. **Ex. 32** (May 3, 2021 Kruskol Rep.) ¶¶15, 34-36.

4          An NS concern is ████████████ when USCIS has only identified one or more

5   "indicators" of a concern (described below) but has not articulated a link to the applicant. **Ex. 8**

6   (USCIS Dep.) 226:14-227:13; **Ex. 91** (Cook Dep.) 175:18-176:6; **Ex. 36** at CAR000779-80,

7   786-87; *see also* **Ex. 48** at 373850.0029. An applicant labeled as an NS concern ████████

8   is still subject to CARRP. **Ex. 8** (USCIS Dep.) 228:3-12, 231:8-232:18; **Ex. 42** at .0150.

9          **2.    KSTs and Non-KSTs**

10         As discussed above, USCIS divides applicants it labels as having NS concerns into two

11  categories: KSTs and non-KSTs. **Ex. 7** (RFAs) No. 10.

12         A KST is any person the FBI has placed in the Terrorist Screening Database ("TSDB" or

13  the "Terrorist Watchlist") and recorded in the TECS database. **Ex. 13** at CAR000001 n.3. As of

14  June 2017, the Watchlist contained 1.2 million people. *Elhady v. Kable*, 391 F. Supp. 3d 562,

15  568 (E.D. Va. 2019); **Ex. 37** (Sageman Rep.) ¶41. The FBI's standard for Watchlist placement is

16  "articulable intelligence or information, which . . . creates a reasonable suspicion that the

17  individual is engaged, has been engaged, or intends to engage, in conduct constituting in

18  preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." **Ex.**

19  **37** (Sageman Rep.) ¶37; *see* **Ex. 38** (Danik Rep.) ¶64. Federal courts describe this standard as

20  "lacking any ascertainable standard of exclusion or inclusion," *Elhady*, 391 F. Supp. 3d at 581,

21  and have noted that it "makes it easy to imagine completely innocent conduct serving as the

22  starting point for a string of subjective, speculative inferences that result in a person's inclusion,"

23  *id.* (quoting *Mohamed v. Holder*, 995 F. Supp. 2d 520, 532 (E.D. Va. 2014)).

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████

26  ████████████████████████████████ **Ex. 37** (Sageman Rep.) ¶40; **Ex. 39** at DEF-

27  00429588. ████████████████████████████████████████

28

1    ████ . **Ex. 39** at DEF-00429588, 609; **Ex. 8** (USCIS Dep.) 167:11-19, 172:17-173:2; *see also*

2    **Ex. 40** at DEF-00193290; **Ex. 41** at DEF-00095124.

3           USCIS treats KSTs as *per se* NS Concerns and automatically refers them to CARRP. **Ex.**

4    **35** at CAR000084; **Ex. 42** at DEF- 00372280.0156. USCIS considers KSTs to meet the

5    "articulable link" standard for an NS concern "by having met the reasonable suspicion standard

6    for placement on the watchlist," ████████████████████████████

7    ████████████████████████ **Ex. 43** at DEF-0094381; **Ex. 8** (USCIS Dep) 152:20-154:5.

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████ **Ex. 45** at

10   DEF-00431609.

11          A "non-KST" is a USCIS-invented term that "refers to all other NS concerns, regardless

12   of source." **Ex. 35** at CAR000084. To identify a non-KST, CARRP instructs officers to look for

13   any "indicator" of an NS concern. *Id.* at 085. There is no exhaustive list of indicators, and

14   officers are instructed that identifying a non-KST NS indicator is a "subjective" assessment that

15   "require[s] an independent judgment by the officer." **Ex. 46** at DEF-00024990; **Ex. 8** (USCIS

16   Dep.) 106:18-108:15; **Ex. 39** at DEF-00429615.

17          CARRP ISOs and FDNS IOs tasked with identifying NS concerns attend only a 3-day in-

18   person training on CARRP. **Ex. 8** (USCIS Dep.) 70:19-71:18. They are not trained *at all* by

19   intelligence or law enforcement officials on identifying NS concerns. *Id.* at 71:19-72:17; **Ex. 11**

20   (Heffron Dep.) 42:8-10, 262:4-263:22. Nor do CARRP trainings educate officers how not to

21   confuse certain country conditions, national origins, or lawful Muslim or cultural practices with

22   an NS concern. **Ex. 8** (USCIS Dep.) 102:7-103:11; **Ex. 33** (Emrich Dep.) 136:1-141:16; **Ex. 11**

23   (Heffron Dep.) 264:2-266:20. Once trained on CARRP, there is no refresher training required of

24   officers even as policy changes. **Ex. 8** (USCIS Dep.) 75:21-77:9.

25          **3.     Indicators of a National Security Concern**

26   ████████████████████████████████████████ **Ex. 8** (USCIS Dep.) at

27   157:12-158:13; **Ex. 47** at DEF-0094983. Non-KSTs, on the other hand, can be identified based

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 10
151538082.9

on one or more "indicators" located in any source. **Ex. 13** at CAR000004; **Ex. 35** at CAR000085-88. NS indicators derive from applicants' associations, ██████████████. **Ex. 48** at DEF-373850.0029.

   a.  **National Origin**

  USCIS teaches that "residence in"—a euphemism for 'being from'—or "travel through" "areas of known terrorist activity" may be an NS indicator. **Ex. 35** at CAR000086; **Ex. 42** at DEF-00372280.0149; **Ex. 49** at DEF-00373991.0034-35 ████████████████

██████████████████████████████████

██████████████████████████████

████. **Ex. 51** at DEF-00126210; **Ex. 28** at DEF-00003603-04; **Ex. 50** at DEF-0088111-12; **Ex. 22** at DEF-00052177.0078; **Ex. 24** at DEF-00123620.████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████ **Ex. 51** at DEF-00126210.

███████████████████████████████[6] **Ex. 28** at DEF-00003603-3604.████████████████

████████████████████████████████████

██████████████████████████ *See* **Ex. 49** at DEF-00373991.0035

████████████████████████; **Ex. 34** at DEF-0094972████████████████████████████

████████████████████████████; **Ex. 20** at 359641.0185-86:

---

[6] ████████ **Ex. 52** at DEF-00186425; *see also* **Ex. 53** at DEF-00156318.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 11
151538082.9

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; **Ex. 54** at DEF-

3 000095963.0043, .0053; **Ex. 55** at DEF-00366903-04, 915-17.

4      Between FY 2013 and 2019, most naturalization (68%) and adjustment (60%) applicants

5 put in CARRP were from Muslim-majority countries, even though Muslim-majority applicants

6 made up only 17% and 14.5%, respectively, of the general applicant pool.[7] **Ex. 56** (July 7, 2020

7 Siskin Rep.) at 71-72; **Ex. 57** (July 7, 2020 Kruskol Rep.) Exs. AO, AM.

8       **b.** ▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **Ex. 26** at DEF-00022467, 76; **Ex.**

13 **58** at DEF-0076056, 059; **Ex. 25** at DEF-00095009.0016; **Ex. 43** at DEF-0094409-10 (citing an

14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮ **Ex. 59** at DEF-00095871.0045-48; **Ex. 60** at DEF-00036345-46; *see also*

19 **Ex. 61** at DEF-00095760.0046-50.

20       **c.**    **Education and Professional Background**

21      "[T]echnical skills gained through formal education, training, employment, or military

22 service, including foreign language or linguistic expertise, as well as knowledge of radio,

23 cryptography, weapons, nuclear physics, chemistry, biology, pharmaceuticals, and computer

24

25        [7] One study found that 46 percent of all applicants in federal district court cases challenging naturalization denials were from Muslim-majority countries, although they represented only 12 percent of naturalization

26 applicants. The top represented countries in CARRP are all Muslim-majority countries or have sizeable Muslim populations. **Ex. 9.** (Arastu Rep.) ¶¶27, 67; Nermeen Arastu, *Aspiring Americans Thrown Out in the Cold*, 66 UCLA

27 L. Rev. 1078, 1111-12 (2019).
       [8] *See, e.g.,* Dulce Redin, et al., *Exploring the Ethical Dimensions of Hawala*, 124 J. Bus. Ethics 327 (2014).

28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  systems" are indicators of an NS concern. **Ex. 35** at CAR000086. **Ex. 42** at DEF-

2  00372280.0149. ███████████████████████████████████████████

3  ███████████████████████████████████████████████████

4  ███████████████████████████████████████████████ **Ex.**

5  **42** at DEF-00372280.0149-52. ███████████████████████

6  ███████████████████████████████████████████████████

7  ███████████████████████████████████████████████

8  ███████████████████████████████ *Id*. at .0149-52.

9       d.    **Associations**

10      Family members and "close associates," including roommates, co-workers, employees,

11  owners, partners, affiliates, or friends of KSTs are NS concerns. **Ex. 35** at CAR000087. **Ex. 66** at

12  DEF-00173682. ███████████████████████████████████████

13  ███████████████████████████████████ **Ex. 67** at DEF-00021397.0063.

14  ███████████████████████████ **Ex. 19** at DEF-0090968.0021; **Ex. 16** at

15  DEF-00116759.0121. █████████████████████████████████

16  ███████████████████████████████████████████████

17  ███████████████ . *See* **Ex. 54** at DEF-00095963.0036; **Ex. 42** at DEF-00372280.0177.

18      █████████████████████████████████████████

19  ██████████████████████████████████████████████

20  █████████████████████████ **Ex. 16** at DEF-00116759.0121; *see* **Ex. 39** at DEF-

21  00429660 (inferences of culpability to be drawn by mere relationship), *id.* at 429666 (same). ██

22  ███████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████ **Ex. 16** at DEF-116759.0121.

26      e.    ████████

27      ████████████████████████████████████ **Ex. 42** at DEF-00372280.0148-

28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000



49, or "large scale transfer or receipt of funds" are also indicators of an NS concern. **Ex. 35** at CAR000086; **Ex. 42** at DEF-00372280.0148-49 ███████████████████████████████ ████████████████████████

**f.      Government Interest**

███████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████. **Ex. 23** at DEF-66528.0034-35. ██████████

████████████████████████████████████ **Ex. 39** at DEF-00429677. ██

██████████████████████████████████████████

███████████████████████████████████ *Id.* ██████

████████████████████████████████████████████

████████████████. **Ex. 19** at DEF-0090968.0020; **Ex. 49** at DEF-00373991.0113-14; **Ex. 24** at DEF-00123629; **Ex. 69** at DEF-00130856. ████████████████████████████

████████████████████████████████████. **Ex. 42** at DEF-00372280.0055-56; **Ex. 49** at 373991.0160; **Ex. 1** (Quinn Dep.) 73:7-18. █████████████

███████████████████████████████████████████

██████████████████████ **Ex. 67** at DEF-00021397.009-10.

**4.      Resolving and Confirming Concerns**

USCIS advises officers to over-refer applications to CARRP: "it is better to over-refer and resolve than not refer at all." **Ex. 46** at DEF-00024989. For an applicant, that referral is critical to the fate of their application. ██████████████—those that USCIS ████████████ and removes from CARRP—are adjudicated faster than other CARRP cases, and ███████ cases are approved, whereas only ███████████████████████████████ are approved. **Ex. 32** (May 3, 2021 Kruskol Rep.) ¶¶18, 34. Once in CARRP, USCIS never tells applicants it has labeled them a "concern," and thus never gives them an opportunity to help resolve (or confirm) the concern. **Ex. 7** (RFAs) Nos. 23 & 24.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    CARRP trainings make clear that concerns can be "confirmed" based not on actionable

2  evidence but unanswered questions or lingering doubts that USCIS cannot resolve. USCIS

3  instructs officers to confirm an NS concern based ███████████████████████████

4  ████████████████████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████.[9] **Ex. 42** at DEF-

6  00372280.0059; **Ex. 23** at DEF-00066528.0034-35. ██████████████████

7  ████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████

9  ███████████████████████████. . **Ex. 8** (USCIS Dep.) 221:12-224:9; **Ex. 42** at DEF-

10  00372280.0059, .0179-80; **Ex. 70** at DEF-00166783; **Ex. 93** at DEF-0089772.

11      █████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████

13  ██████████████████████████████**Ex. 19** at DEF-0090968.0020.████

14  ████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████**Ex. 16** at DEF-00116759.0144.[10]███████████████

18  █████ *Id.* at .0146; *see also* **Ex. 12** (Benavides Dep.) 91:17-92:6████████████

19  ████████████████████████████████████████████████████████████

20  ███████████████████████.

**D.    CARRP Results in Significant Delays and Denials**

USCIS imposes no time limit on how long a case may be vetted or labeled "not

---

[9] Such "definitive findings" are rare in counterterrorism investigations, even when there was never any evidence of wrongdoing. **Ex. 38** (Danik Rep.) ¶¶ 49, 94.

[10] *See also* **Ex. 19** at DEF-0090968.0020 ██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   ██████████████████████████████████████████████████ **Ex. 8** (USCIS

2   Dep.) 227:14-17; **Ex. 11** (Heffron Dep.) 289:17-19. ████████████████████

3   ████████████████████████████████████ **Ex. 42** at DEF-00372280.0183.

4   Applications subject to CARRP take 2.5 times longer to be adjudicated than non-CARRP

5   applications. **Ex. 57** (July 7, 2020 Kruskol Rep.) ¶8(a). The length of delay increases for ████

6   ████████████████ applicants, who wait on average ████████ longer to be adjudicated.

7   Pasquarella Decl. ¶2.

8   ████████████████████████████████████████████████████

9   ████████████. *See, e.g.,* **Ex. 30** at DEF-00024886 ████████████████████

10  ████████████████████████████. This chart reflects the number of

11  class members on a class list from March 2021 that have faced long delays waiting for a

12  decision. **Table 1:**

| Length of time waiting | More than 20 years | More than 15 years | More than 10 years | More than 5 years | More than 3 years | More than 2 years |
|---|---|---|---|---|---|---|
| Number of class members | 18 | 81 | 162 | 309 | 715 | 1,348 |

16  Pasquarella Decl. ¶3. When this case was filed, these delays were far worse. In response to this

17  lawsuit, the USCIS Field Office Directorate conducted a national review of long-pending

18  CARRP cases that the agency had shelved instead of adjudicating. **Ex. 2** (Renaud Dep.) 121:20-

19  126:6. The review identified 6,000 "adjudication ready" cases that had been shelved. **Ex. 2**

20  (Renaud Dep.) 121:20-126:6.

21       USCIS data shows that having an unresolved NS concern is a critical factor influencing

22  adjudication. The below chart reflects statistics from naturalization and adjustment applications

23  received between FY 2013 and 2019 from both routine and CARRP processed cases.[11]

---

[11] Because this data only includes applications received between FY 2013 and 2019, it does not include applications that were received prior to October 2013 but that were either adjudicated after October 2013 or still pending as of September 2019. **Ex. 32** (May 3, 2021 Kruskol Rep.) ¶ 12. As a result, they do not reflect overall rates of delay, which are inherently worse. For example, as of August 2020, the average length of delay for the combined classes, including ████ applicants, was 881 days. **Ex. 8** (USCIS Dep.) 240:4-13.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**Table 2:**

| | Routine | CARRP | | | |
|---|---|---|---|---|---|
| **Category of NS concern** | **Not CARRP** | ███████ | ████████ ██████ | | ███ |
| **Approval Rate for Adjudicated Cases** | 92.5% | ██ | ███ | ███ | ███ |
| **Denial Rate for Adjudicated Cases** | 7.5% | ███ | ███ | ███ | ███ |
| **Delay Rates for Adjudicated Cases** | 244 days | █████ | █████ | █████ | █████ |
| **Delay Rates for Cases Pending as of September 2019** | 371 days | █████ | █████ | █████ | █████ |

*See* **Ex. 57** (July 7, 2020 Kruskol Rep.) Exs. Z, AC, AV; **Ex. 32** (May 3, 2021 Kruskol Rep.)

¶¶8-9, 32, 34, 46; Exs. BM, BN, BO, BP, BQ, BR; *see also* **Ex. 56** (July 7, 2020 Siskin Rep.) at

50, Table 8. Even ███████████████—those returned to routine processing after the concern is

resolved—are ████████████ than applications never processed through CARRP, revealing

████████████████████████████████████████████████████████, a

problem USCIS is aware of. *See supra* Table 2; *see also* **Ex. 2** (Renaud Dep.) 92:3-98:21

████████████████████████████████████████).

E.   **Named Plaintiff Facts**

 **Abdiqafar Aden Wagafe** is a Somali national who has resided in the United States since

March 2007, when he resettled as a refugee. **Ex. 74** at DEF-00422653.0103-04. He applied to

naturalize on November 8, 2013. *Id.* at .0103, .0266. ████████████████████████

████████████████████████ **Ex. 8** (USCIS Dep.) 267:10-11; **Ex. 74** at

DEF-00422653.0267, .0103 (████████████████████████████████████████

████████████████████████████████████████████████████████ *Id.* at

.0104; **Ex. 75** at 3. ███████████████████████████

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    ████████████████████████████████████. *Id.*; **Ex. 74** at DEF-00422653.0105. In

2    June 2014, USCIS reviewed ████████████████████████████████████, **Ex.**

3    **75** at 1, and ████████████████████████████████ **Ex. 74** at DEF-

4    00422653.0104-05.

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████ **Ex. 8**

7    (USCIS Dep.); **Ex. 74** at DEF-00422653.0268-69. After that, USCIS took *no adjudicatory action*

8    until the filing of this lawsuit in January 2017. *Id.* at .0269-70. Only then did USCIS act on his

9    case, concluding, ████████████████████████████████████████

10   ██████████████████ *Id.* at .0270. USCIS conducted Mr. Wagafe's interview on February 22,

11   2017 and approved his application *the same day*. *Id.* at .0009, .0270. During this over-three-years

12   wait, ██████████████████████████████████████████████████

13   ██████████████████. The delay impacted his ability to visit his wife living in Uganda,

14   and his ability to bring his wife to the United States. **Ex. 76** (Gairson Rep.) ¶124.

15          **Mehdi Ostadhassan** is an Iranian national and practicing Muslim who came to the

16   United States in August 2009 as a student. Ostadhassan Decl. ¶¶3-4. In 2013, he earned his Ph.D.

17   in Petroleum Engineering from the University of North Dakota ("UND"), where he also met his

18   U.S. citizen wife. *Id.* ¶¶4-5, 22. UND then hired him as a tenure-track Assistant Professor of

19   Petroleum Engineering and granted him tenure in 2019. *Id.* ¶¶5, 7, 17. Mr. Ostadhassan is

20   recognized as a leading expert in the field of Petroleum Engineering. *Id.* ¶¶8, 14, 19. Over the

21   years, he led teams of university researchers on numerous projects funded by the U.S.

22   government and the State of North Dakota on projects critical to U.S. energy independence. *Id.*

23   ¶¶6, 10-13. He collaborated with the U.S. Geological Survey, the National Science Foundation,

24   the National Institute of Health, among other agencies. *Id.*

25          In February 2014, Mr. Ostadhassan applied for adjustment of status. **Ex. 85** (Ostadhassan

26   A-file) at DEF-00422120.0167. ████████████████████████████████████

27   ████████████████████████ *Id.* at .0472; **Ex. 8** (USCIS Dep.) 264:13-14. ██████

28

---

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 18
151538082.9

**Ex. 85** at DEF-00422120.0523. On October 23, 2014, an FBI agent contacted Mr. Ostadhassan and requested a meeting about a recent trip to Iran. Ostadhassan Decl. ¶27, Ex. A (FBI Memo) at 1. After learning the meeting was voluntary, he informed the FBI agent that he did not wish to meet. *Id.* ¶28.

**Ex. 8** (USCIS Dep.) 264:13-17; **Ex. 86** (Ostadhassan T-file) at DEF-00427012.0194.

**Ex. 39** at DEF-00429651-52; *see supra* at Part II(C)(3)(c). On December 3, 2014, USCIS wrote

. 85 at DEF-00422120.0529-30.

*Id.* at .0395.

One month later, USCIS scheduled Mr. Ostadhassan and his wife for an interview. On the day of his interview, September 24, 2015, he provided a 3-page amendment to his application, adding organizations he had been affiliated with since his 16th birthday, including the "student Basij," which he participated in during high school. *Id.* at .0168-70, .0274. During his interview, USCIS officers extensively questioned Mr. Ostadhassan and his wife about their religious practices, the mosques they have attended, the religious trips they have made, their participation in religious organizations, and whether Mr. Ostadhassan forced his wife to convert to Islam and wear the hijab. *Id.* at .0274-85; Ostadhassan Decl. ¶30.

Thereafter, USCIS worked to find a pretextual reason to deny his application.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 19
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1     ██████████████. **Ex. 85** at DEF-00422120.0382-83. ███████████

2     ████████████████████████████████████████████████████

3     ██████████████████████████████████████

4     ███████████████████████ *Id* at .0382-84.

5        Zero evidence supports such a view. As Mr. Ostadhassan explained at his interview, he

6 had only participated in the High School Basij, a non-militia, mandatory cultural organization in

7 Iran that gave students access to cultural and religious activities. *Id.* at .0019; *see also* **Ex. 87**

8 (Interview Transcript) 57:17-21; **Ex. 86** at DEF-00427012.0037; *see also* **Ex. 88** (Bajoghli Rep.)

9 ¶¶25-26, 40, 50. Indeed, he only participated in religious activities. **Ex. 87** at 19:22-20:3. He had

10 no affiliation with the Basij after graduating high school; rather, at university he joined the

11 Islamic Student Association, an organization "directly opposed" to the University Basij. *Id.* at

12 57:17-58:3; **Ex. 88** (Bajoghli Rep.) ¶28. Ostadhassan explained that he did not understand he

13 needed to disclose high school affiliations or compulsory military service on his applications

14 until he spoke to a lawyer, upon which he promptly disclosed that information. *Id.* at 45:59-

15 46:25; Ostadhassan Decl. ¶30.

16        After the interview, USCIS issued two Requests for Evidence and a Notice of Intent to

17 Deny ("NOID"), questioning whether Mr. Ostadhassan could legally marry Ms. Bubach. **Ex. 85**

18 at DEF-00422120.0256-57, .0261-71, .0289-91, .0351-56. After the couple responded with the

19 requested additional evidence, the USCIS adjudicator wrote a note on July 8, 2016 to "Email []

20 [████ officer] for next step as likely we will have to approve I-130." *Id.* at .0364. USCIS took

21 no action until this lawsuit was filed in January 2017. On March 24, 2017, USCIS finally

22 approved Ms. Bubach's I-130 petition recognizing her marriage to Mr. Ostadhassan. *Id.* at .0299.

23 But, on April 5, 2017, USCIS issued a new NOID stating an intent to deny Mr. Ostadhassan's

24 adjustment of status application "as a matter of discretion" for failure to disclose on his *prior*

25 *visa application* the affiliations and associations he disclosed in writing at the time of his

26 interview. *Id.* at .0131-34. On May 5, 2017, through his counsel, Mr. Ostadhassan responded to

27 the NOID with a letter, including supporting evidence, explaining that alleged omissions were

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 20
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   inadvertent and based on reasonable interpretations of the question about affiliations and

2   associations. *Id.* at .0009-20.

3         On August 9, 2017, USCIS denied Mr. Ostadhassan's adjustment application, although

4   for unknown reasons it did not notify him of its decision until October 27, 2017, nearly three

5   months later. *Id.* at .0161, .0001-8. The denial letter reiterated the agency's position that Mr.

6   Ostadhassan failed to disclose his prior military service, certain work history, and some

7   affiliations and memberships; and denied his application in the exercise of discretion. *Id.*

8         In December 2017, Mr. Ostadhassan submitted a second application to adjust status. **Ex.**

9   **86** at DEF-00427012.0018, .0189. This second application cured the alleged defects of the first,

10  disclosing Mr. Ostadhassan's prior military service, affiliations with political and professional

11  groups, and employment. Nonetheless, on April 10, 2019, USCIS again denied Mr.

12  Ostadhassan's second application to adjust status "as a matter of discretion" due to his alleged

13  failure to disclose information in his prior applications. *Id.* at .0001-14.

14        Both decisions ████████████████████████████, faulting him for alleged

15  inconsistencies that had no bearing on eligibility and failing to adhere to the legal standard for

16  false testimony and discretionary denials. **Ex. 89** (Ragland Rep.) ¶¶139-144. Notably, the

17  decision made no effort to explain how Mr. Ostadhassan's unwitting failure to disclose

18  immaterial information on prior applications could have outweighed his substantial positive

19  equities, including his academic and scientific contributions and the interests of his U.S.-born

20  wife and child. *Id.*; **Ex. 85** at DEF-00422120.0001-8; **Ex. 86** at DEF-00427012.0001-14.

21        Mr. Ostadhassan and his family have suffered extraordinary harm because of USCIS's

22  denial of his adjustment application. Because of USCIS's denial of his application and work

23  permit, Mr. Ostadhassan lost his tenured university position—two months after earning it—and,

24  with it, lost his cutting-edge scientific research and the successful academic career he built.

25  Ostadhassan Decl. ¶¶17-20, 40-41. USCIS took from him and his family their future together in

26  the United States. *Id.* ¶¶39-40. Unable to work in the U.S., Mr. Ostadhassan was forced to pursue

27  employment overseas, obtaining a position in China. *Id.* ¶42. For now, Mr. Ostadhassan is

28

1  painfully separated from Ms. Bubach and his young U.S. citizen children (ages 4 and 17 months)

2  who remain in North Dakota, with no clear end to their separation in sight. *Id.* ¶¶43-45.

3      **Hanin Bengezi** is a Libyan national, Canadian citizen, and Muslim who lives with her

4  U.S. citizen husband and child. Bengezi Decl. ¶3. She immigrated to the United States on a

5  fiancée visa and applied for adjustment of status in February 2015. *Id.* ¶¶4-5; **Ex. 82** at DEF-

6  00419977.0595. In late 2015, ██████████████████████████████████████

7  ████████████████████████████████████████████████████████. *Id.* at

8  .0595, .0176-92, .0583; **Ex. 8** (USCIS Dep.) 266:5-6.

9  ██████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████████████

11 ███████████████████████████████████████████ **Ex. 82** at DEF-

12 00419977.0583; **Ex. 83** (Daud Dep.) 114:17-115:5. Nonetheless, days later, on March 16, 2017,

13 ████████████████████████████ **Ex. 82** at DEF-00419977.0743; **Ex. 8** (USCIS Dep.) 266:7-9.

14     USCIS's position changed entirely when Ms. Bengezi joined this lawsuit on April 4,

15 2017. ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████ **Ex. 84** at DEF

18 00425660-61. On May 9, 2017, USCIS approved her application. **Ex. 82** at DEF-

19 00419977.0235.

20     As a result of USCIS's delay, Ms. Bengezi was not able to travel and, as a result, was not

21 able to visit her family or attend her brother's wedding. Bengezi Decl. ¶6. Throughout the more

22 than two years she waited, ████████████████████████████████████████████████

23 ████████████████████████████ *Id.* ¶4.

24     **Noah Abraham**—formerly known as Mushtaq Jihad—is an Iraqi refugee and Muslim

25 who resettled in the United States in 2008 with his wife and children. Abraham Decl. ¶¶4-5; **Ex.**

26 **77** at DEF-00420731.0587-89. In Iraq, Mr. Abraham was a successful businessman who was

27 targeted by a militia group, initially for his money and later for his cooperation with American

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 22
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  forces. Abraham Decl.¶¶6-7; **Ex. 77** at DEF-00420731.0574, .0576-78. The militants subjected

2  him to kidnapping, torture, extortion, death threats, and gun shots. Abraham Decl.¶¶6-7.

3  Eventually they detonated a bomb that killed his infant son and left him with brain trauma and a

4  missing leg. *Id.* ¶¶8-9; **Ex. 77** at DEF-00420731.0578, .0033. American soldiers gave him first

5  aid, transported him to a hospital, took his fingerprints, and gave him a "protection card" to

6  enable him to leave Iraq as a refugee. Abraham Decl.¶¶9-10; **Ex. 77** at DEF-00420731.0574,

7  .0587-89; **Ex. 78** at DEF-00425686.

8      Mr. Abraham applied to naturalize on July 1, 2013. **Ex. 77** at DEF-00420731.0589. On

9  his naturalization application, he requested to change his name from Mushtaq Jihad to Noah

10  Abraham because he found Americans misunderstood the name "Jihad" and discriminated

11  against him as a result. Abraham Decl. ¶11; **Ex. 76** (Gairson Rep.) ¶140. On July 26, 2013,

12  ████████████████████████████████. **Ex. 77** at DEF-00420731.0589. Days later, on

13  July 30, ███████████████████████████████████████ **Ex. 8** (USCIS Dep.)

14  266:19-21. █████████████████████████████████████████

15  ████████████████████████████████████████████████ **Ex.**

16  **19** at DEF-0090968.0020; *see supra* Part II(C)(f).

17      On August 16, 2013, ████████████████████████████████

18  ██████. **Ex. 77** at DEF-00420731.0575; **Ex. 78** at DEF-00425687. Days later, FBI agents

19  came to his home and interrogated him in front of his family about why he sought to change his

20  name. Abraham Decl. ¶12; **Ex. 76** (Gairson Rep.) ¶145.

21      By mid-2014, ███████████████████████████ **Ex. 77** at DEF-

22  00420731.0590; *see also* **Ex. 78** at DEF-00425683 ███████████████████

23  ███████████████ **Ex. 77** at DEF-00420731.0590. ███████████████

24  █████████████████████████████████████████████████

25  █████████████████████████ *Id.* at .0225.

26      In 2013, Mr. Abraham was diagnosed with leukemia. Abraham Decl. ¶14; **Ex. 76**

27  (Gairson Rep.) ¶147. To cover medical costs for his chemotherapy, as well as ongoing treatment

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 23
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  for his amputated leg, brain injury, and gunshot wounds, he depended on social security benefits.

2  Abraham Decl. ¶¶14-15; **Ex. 76** (Gairson Rep.) ¶147. By law, those benefits would terminate in

3  2015 without citizenship status, a fact known to USCIS. 8 U.S.C. § 1612(a)(2); **Ex. 76** (Gairson

4  Rep.) ¶147; **Ex. 79** at DEF-00425698-99. Beginning in October 2014, Mr. Abraham's attorney,

5  his Congressional representative, and members of the media made numerous inquiries to USCIS

6  about the delayed adjudication. **Ex. 77** at DEF-00420731.0583-86. In 2016, his attorney sent

7  USCIS 33 letters from community members testifying to his good moral character. *Id*. at .0097-

8  139. These efforts did not move USCIS to act. Mr. Abraham lost his social security benefits in

9  2015, forcing him to work long hours at various manual jobs to pay for his cancer treatment and

10 support his family, despite being ill, on chemotherapy, and disabled. Abraham Decl. ¶¶14-15;

11 **Ex. 76** (Gairson Rep.) ¶151, 154. This took a toll on his health and caused extreme stress to both

12 Mr. Abraham and his family. Abraham Decl. ¶16; **Ex. 76** (Gairson Rep.) ¶¶151, 154. Throughout

13 this period, ███████████████████████████████████████████████

14 ███████████████████████. Abraham Decl. ¶17.

15     By 2015, ███████████████████████████████████████

16 ██████████████████████████████████████████████

17 ██████████████████████████████████████████ **Ex.**

18 **77** at DEF-00420731.0324-26.██████████████████████████

19 ██████████████████████████████████████████████

20 ██████████████████████████████████████████████

21 ████████████████████████████████████. *Id*. at .0326.

22 ████████████████████████████████. *Id*. at .0324.

23 ██████████████████████████████████████████████

24 ██████████████████████████████████████████

25 ██████████████████████████████████████████████

26 ████████████████ *Id*.

27     In July 2016, █████████████████████████. **Ex. 8** (USCIS Dep.) 267:1. Mr.

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 24
151538082.9

Abraham's A-File suggests that a February 2016 search for his name erroneously returned

information for a different person named ████████████████████████████.

**Ex. 80** at 232. USCIS took no steps to adjudicate his application until after Mr. Abraham joined

this lawsuit on April 4, 2017. On April 25, 2017, USCIS interviewed Mr. Abraham, and

approved his application on May 9, 2017. **Ex. 77** at DEF-00420731.0229, .0017.

**Sajeel Manzoor**, a Pakistani national and Muslim, came to the United States in August

2001 as a student. Manzoor Decl. ¶¶3, 5. In October 2007, he applied to adjust status. **Ex. 81**

(Manzoor A-File) at DEF-00421322.0350. In November 2007, ████████████████████

████████ **Ex. 8** (USCIS Dep.) 268:21-269:2. ████████████████████████████

████████████████████ **Ex. 81** at DEF-00421322.0751. ████████████████████

████████████. *See supra* Part II(C)(3)(a). A few months after applying, an FBI

agent showed up at his house and questioned him about his immigration history, his family, and

if he knew people in Pakistan who planned to travel to the United States. Manzoor Decl. ¶6.

In April 2009, ████████████████████████████████████████████

████████████████ **Ex. 8** (USCIS Dep.) 268:19-269:6. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ **Ex. 81** at DEF-00421322.0751-52. USCIS

approved his adjustment of status application on September 18, 2010. *Id.* at .0350.

Mr. Manzoor then applied to naturalize in November 2015. *Id.* at .0011. In 2016, he

received another visit and call from the FBI. Manzoor Decl. ¶8. USCIS again delayed

adjudicating his application. USCIS took no action on his naturalization application until shortly

after he was added as a Named Plaintiff in this lawsuit in April 2017, when USCIS suddenly

interviewed Mr. Manzoor and approved his application *on the spot*, on May 1, 2017. **Ex. 81** at

DEF-00421322.0011, .0032.

While his application was delayed, Mr. Manzoor could not travel due to fear of not being

allowed back into the country, which caused him to miss his grandfather's funeral, his sister-in-

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 25
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

law's engagement, and other important family events. Manzoor Decl. ¶9. He suffered anxiety while his immigration status was in limbo, and felt the government was discriminating against him because of his religion and national origin. *Id.* ¶¶10, 12. His wife was similarly harmed because her naturalization application was held while Mr. Manzoor's application languished. *Id.* ¶11. USCIS never informed Mr. Manzoor that it considered him an NS concern nor give him an opportunity to respond. *Id.* ¶10.

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *Id.* The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Bare allegations, speculation, or conclusory language will not meet this burden; nor will inadmissible evidence or only a "scintilla" of evidence. *See, e.g.*, *Jones v. Williams*, 791 F.3d 1023, 1032 (9th Cir. 2015).

### IV.   ARGUMENT

**A.   Plaintiffs Are Entitled to Summary Judgment Because CARRP Violates the APA**

CARRP violates the APA for four independent reasons. It (1) is contrary to the INA and implementing regulations, (2) results in agency action withheld or unreasonably delayed, (3) was adopted without notice and comment rulemaking, and (4) is arbitrary and capricious.[12]

**1.   CARRP Violates the APA Because It Is Contrary to Law**

Under the APA, a court "shall" hold unlawful and set aside agency action "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). "A regulation has the force of law;

---

[12] CARRP is reviewable under the APA because, as this Court has already held, it is final agency action under 5 U.S.C. § 704. Dkt. 69 at 19.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 26
151538082.9

therefore, an agency's interpretation of a statute in a manner inconsistent with a regulation will not be enforced." *Nat'l Med. Enters. v. Bowen*, 851 F.2d 291, 293 (9th Cir. 1988).

### a. CARRP Imposes Extra-Statutory Eligibility Requirements Contrary to the INA

Through CARRP, USCIS created two regimes for the adjudication of benefits. In "routine" processing, applicants are adjudicated according to statutory eligibility. In CARRP, applicants must clear another hurdle: they must be both eligible and not present an "NS concern." Where they are eligible but labeled a "concern," CARRP policy directs officers to resolve the concern, or find ways to pretextually deny their applications. *See supra* Part II(B).

The INA provides no support for USCIS's invented "NS concerns" and self-proclaimed rules on approvals and denials in CARRP. Indeed, Congress declined—eleven times—to amend the statute to permit USCIS to deny benefits based on unresolved "concerns" in the two years before USCIS's secretive adoption of CARRP. *See supra* Part II(A). Of course, "Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *City & Cty. of S. F. v. USCIS*, 408 F. Supp. 3d 1057, 1100 (N.D. Cal. 2019), *quoting INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987); *see East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 855 (9th Cir. 2020) (judiciary must ensure that "executive procedures do not . . . displace congressional choices of policy"). The undisputed facts show that CARRP is squarely at odds with the INA.

### (i) The INA's Eligibility Framework

The INA provides a detailed framework for evaluating whether national security concerns render noncitizens ineligible for immigration benefits or deportable. In the naturalization context, for example, applicants who advocate for "the overthrow by force or violence or other unconstitutional means of the Government of the United States or of all forms of law" are ineligible. *See* 8 U.S.C. § 1424(a).[13] Applicants may also be deported under TRIG for

---

[13] Naturalization applicants also must establish "good moral character" for up to five years preceding the application, 8 U.S.C. §§ 1427(a), 1430, 1439, 1440, a term defined by statute and regulations. 8 U.S.C. § 1101(f); 8 C.F.R. §§ 316.2(a), 319.1-4, 329.2(d). CARRP does not overlap with the good moral character determination.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 27
151538082.9

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  engaging in terrorist activity, being a member of a terrorist organization, endorsing or espousing

2  terrorist activity, or inciting terrorist activity. 8 U.S.C. § 1227(a)(4). Similarly, in the adjustment

3  context, applicants can be found inadmissible, and thus ineligible, or deportable under TRIG. *See*

4  8 U.S.C. §§ 1255(a)(2), 1182(a)(3), 1227(a)(4).

5        When applicants satisfy the eligibility criteria, the law *requires* USCIS to grant their

6  naturalization and nondiscretionary adjustment-of-status applications. *See* 8 C.F.R. § 335.3(a)

7  ("The [] officer *shall* grant the application if the applicant has complied with all requirements for

8  naturalization") (emphasis added); *Tutun v. U.S.*, 270 U.S. 568, 578 (1926) ("there is a statutory

9  right in the alien. . . to receive the [naturalization] certificate" if the requisite facts are

10  established); *INS v. Pangilinan*, 486 U.S. 875, 884 (1988) (no discretion to deny naturalization if

11  an applicant is eligible); 8 U.S.C. § 1159 (nondiscretionary refugee adjustment); 8 C.F.R. §

12  209.1(e) ("If the applicant is found to be admissible for permanent residence. . ., [USCIS] *will*

13  approve the application and admit the applicant for lawful permanent residence.").

14        Some forms of adjustment make approval "a matter entrusted to USCIS discretion." 8

15  U.S.C. § 1255; 8 C.F.R. §§ 103.2(b)(8)(i), § 209.1(e). But that does not give USCIS carte

16  blanche to pick and choose categories of people it wants to approve. Rather, the exercise of

17  discretion is still governed by applicable law. "In the absence of adverse factors, adjustment will

18  ordinarily be granted, still as matter of discretion." *Matter of Arai*, 13 I&N Dec. 494, 496 (BIA

19  1970). Positive and adverse factors weighed in the exercise of discretion are "of necessity. . .

20  resolved on an individual basis," *id.* at 495, and discretionary denials must be "supported by

21  reasoned explanation based on legitimate concerns." *Yepes-Prado v. INS*, 10 F.3d 1363, 1368

22  (9th Cir. 1993) (cleaned up), *as amended* (Nov. 12, 1993)*; see also Rashtabadi v. INS*, 23 F.3d

23  1562 (9th Cir. 1994) (discretionary decisions are made "on a case by case basis"). The law

24  requires positive factors, such as "length of residence in the United States, close family ties, and

25  humanitarian needs," to be weighed against adverse factors, such as "violations of immigration

26  and other laws." *Campos-Granillo v. INS*, 12 F.3d 849, 852 (9th Cir. 1993)*.*

27

28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

### (ii)   CARRP's Extra-Statutory Criteria

CARRP operates wholly outside this statutory framework. As USCIS admits, the NS Concern label is entirely distinct from statutory eligibility criteria. *See* **Ex. 8** (USCIS Dep.) 57:3-58:6 (NS concern does not mean a person is ineligible); **Ex. 16** at DEF-00116759.0019 (NS concern "isn't the same as a statutory ineligibility"); *id.* ("We've identified a connection to an NS ground in [TRIG]. . . aren't all of those cases ineligible? SORT OF BUT NOT REALLY. A 'connection' for the purposes of starting our CARRP process isn't the same as a statutory ineligibility."); **Ex. 48** at DEF-373850.0096 (CARRP and TRIG "are fundamentally different things"; "[TRIG] is a straight up application of the law," while "CARRP is a subjective assessment that the individual is a threat."); **Ex. 62** at DEF-00045893 (CARRP is "more expansive" than TRIG); **Ex. 63** at DEF-00231014 ("TRIG is a legal inadmissibility" while CARRP is "an internal USCIS policy and operation guidance.").[14] Moreover, CARRP's "indicators" of an NS concern have no relationship to eligibility, as nothing in the statute says, for example, that an applicant is ineligible based on ██████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████ *See supra* Part II(C)(3). Nor does the INA indicate that any of those criteria should make it harder to naturalize or adjust status.

USCIS's handling of CARRP cases also makes clear that it treats NS concerns as entirely distinct from statutory eligibility. For example, ██████████████████████████████ █████████████████████████████████████████████████████████ *See supra* Part II(E). Thus, the concern clearly bore no relation to ██ eligibility. Similarly, ██ ████████████████████████████████████████████████

---

[14] *See also* **Ex. 64** at CAR000611-12 ("What we are talking about right now is not eligibility related. We are trying to decide if an NS concern is present and if the case should be in CARRP."); **Ex. 65** at DEF-00045880 ("because CARRP. . . does not require a person to actually be inadmissible under one of the security grounds. . . [w]e can take an expansive reading of what INA security activities should be reviewed as a potential NS concern, because all we're doing is using the [INA] security grounds to outline what should be handled through the process of CARRP."); **Ex. 35** at CAR000084 ("When evaluating whether an NS indicator or NS concern exists, however, the facts of the case do not need to satisfy the legal standard used in determining admissibility or removability.").

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 29
151538082.9

1 ████████████████████████████████████████████. *See supra* Part II(E). In

2 ████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████████████

4 ████████████████████████.[15] *See supra* Part II(E).

5       There is no dispute that being labeled an NS concern causes denials and substantial

6 delays. **Ex. 57** (July 7, 2020 Kruskol Rep.) ¶¶7b, 8a; **Ex. 68** at Siskin Dep. Tr. 28:14–17.

7 Between FY 2013 and 2019, USCIS denied only 7.5% of "routine" applicants. *See supra* Part

8 II(D) (Table 2). But in CARRP, it denied ██████████████████████████████

9 ██████ applicants, while making these groups wait 3.15 times longer than non-CARRP

10 applicants to be adjudicated. *See id*. ██████████████ NS concerns were more likely to be denied

11 than "routine" applications. *See id*. And USCIS is clear that applicants with █████████ NS

12 concerns should be denied or not approved, wherever possible. *See supra* Parts II(B), (C)(4), (D).

13       Thus, with CARRP, USCIS created an extra-statutory impediment to the approval of an

14 immigration benefit. As a result, CARRP violates USCIS's compulsory duties to approve

15 eligible naturalization and non-discretionary adjustment applications. And, in the context of

16 discretionary adjustment, "[CARRP's] mandates [] restrict agency activities" where greater

17 discretion is required to weigh equities on a case-by-case basis. *Jafarzadeh v. Nielsen*, 321 F.

18 Supp. 3d 19, 42 (D.D.C. 2018). As in *Siddiqui v. Cissna*, "Defendants [can] point to no statute

19 permitting [CARRP's] enactment, nor can the policy be considered an inherent part of a

20 discretionary process." 356 F. Supp. 3d 772, 778 (S.D. Ind. 2018).

21       USCIS's unilateral deviation from statutory standards through CARRP violates the INA

22 for several other reasons. The law is clear that USCIS may not simply "delay the processing of

23 naturalization applications so it can wait to see if an applicant becomes disqualified." *Nio v.*

24 *DHS*, 385 F. Supp. 3d 44, 67-68 (D.D.C. 2019); *see also Al Karim v. Holder*, 2010 WL 125840,

25 at *3 (D. Colo. Mar. 29, 2010) (adjudication of immigration benefit may not be delayed to see

26 ───────────────────────

27 [15] ████████████████████████████████████████████████████████

28 ████████████████████████████████**Ex. 16** at DEF-00116759.0012.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   whether the applicant's "classification. . . may change at some indeterminate point in the

2   future"); *see also Jaa v. INS*, 779 F.2d 569, 572 (9th Cir. 1986) (deliberate delay in adjudicating

3   an immigration benefit could be grounds to estop government from denying benefit). Nor may

4   USCIS deny immigration benefits based on unsubstantiated concerns and mere government

5   suspicion. When an applicant has met their burden of proving eligibility by the preponderance of

6   the evidence, the INA requires actual evidence to refute that. *See* 8 C.F.R. § 316.2(b) (burden of

7   proof for naturalization); *U.S. v. Hovsepian*, 359 F.3d 1144, 1168 (9th Cir. 2004) (same); *Matter*

8   *of Chawathe*, 25 I&N Dec. 369, 375 (BIA 2010) (same for adjustment).[16]

9          Here, USCIS's long delays in CARRP are akin to waiting for information that could

10  provide a basis to deny the case. And, NS Concerns often amount to nothing more than

11  speculation, suspicion and profiling—not actual evidence. **Ex. 42** at DEF-00372280.0159. KSTs,

12  for instance, at most only meet the Watchlist "reasonable suspicion" standard, *see supra* Part

13  II(C)(2), but reasonable suspicion "falls considerably short of satisfying a preponderance of the

14  evidence standard." *U.S. v. Arvizu*, 534 U.S. 266, 274 (2002). So thin are USCIS's "concerns"

15  about applicants, ███████████████████████████████████████████████████████████

16  █████████████████████████—even though it holds 100% of these applicants hostage to

17  delays and efforts to deny. **Ex. 32** (May 3, 2021 Kruskol Rep.) ¶34(d). In other words, ███████

18  ████████████████████████, USCIS cannot even move the concern from what it describes as

19  ███████████████████████████████████ *See* **Ex. 42** at DEF-00372280.0159. Its

20  "concerns" hardly suffice as probative evidence to rebut an applicant's showing of eligibility.

21         To be sure, "[e]vidence that simply raises the possibility that a disqualifying fact might

22  have existed does not entitle the government to the benefit of a presumption that the citizen was

23  ineligible, for … citizenship is a most precious right, and as such should never be forfeited on the

24  basis of mere speculation or suspicion." *Kungys v. U.S.*, 485 U.S. 759, 783-84 (1988) (Brennan,

---

[16] *See also, e.g., Dos Reis v. McCleary*, 200 F. Supp. 3d 291, 303 (D. Mass. 2016) (government failed to
provide evidence to substantiate claim that applicant lacked good moral character for naturalization); *In re Messina*,
207 F. Supp. 838, 840 (E.D. Pa. 1962) ("suspicion, surmise, or guess" insufficient for finding of lack of good moral
character); *In re Sousounis*, 239 F. Supp. 126, 127-28 (E.D. Pa. 1965) (conduct "bound to cause suspicions" not
enough for finding of lack of good moral character).

J., concurring); *see also Matter of Chawathe*, 25 I&N Dec. at 375 (adjustment case) ("Even if the director has some doubt as to the truth, if the petitioner submits relevant, probative, and credible evidence" that they are "more likely than not" or "probably" eligible for the benefit, "the applicant or petitioner has satisfied the standard of proof.").

> **b.    CARRP Denies Applicants their Right to Know About and Respond to Alleged NS Concerns in Violation of Agency Regulations**

CARRP also violates agency regulations. When USCIS intends to deny an application "based on derogatory information considered by [USCIS] and of which the applicant. . . is unaware," it "shall" advise the applicant of this fact and offer him or her "an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered."[17] 8 C.F.R. § 103.2(b)(16)(i). That "explanation, rebuttal, or information presented by. . . the applicant. . . shall be included in the record of proceeding." *Id.*; *see Ghafoori v. Napolitano*, 713 F. Supp. 2d 871, 880 (N.D. Cal. 2010) (the regulation "imposes the unambiguous requirement that the information be *disclosed* to the petitioner."); *Naiker v. USCIS*, 352 F. Supp. 3d 1067, 1078 (W.D. Wash. 2018). Further, "[w]hile 8 C.F.R. § 103.2(b)(16)(i) requires only that the agency ensure the Petitioner is 'aware' of the derogatory information, 8 C.F.R. § 103.2(b)(16)(ii) confers the explicit right . . . to have statutory eligibility based 'only' on information in the record which is disclosed." *Id.* The only exceptions to these general rules are for classified information, in which case different disclosure rules apply, based on whether the denial is statutory or discretionary. 8 C.F.R. § 103.2(b)(16)(ii)-(iv).

It is undisputed that USCIS's policy is to not disclose to applicants that it has labeled them NS concerns, the reasons why, or give them any meaningful opportunity to respond. **Ex. 7** (RFAs) Nos. 23 & 24; **Ex. 8** (USCIS Dep.) 271:18-272:20. Withholding "derogatory information" and the opportunity to rebut that information is "precisely the situation [the regulation] seeks to avoid." *Naiker*, 352 F. Supp. 3d at 1078 (holding plaintiff was "essentially

---

[17] 8 C.F.R. § 316.14 also requires USCIS to "provide reasons for the determination" to deny a naturalization application, but, in CARRP, USCIS does not provide the NS concern reasons for the denial.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

denied an opportunity to rebut the derogatory e-mails, or to argue against their reliability").[18]

### 2. CARRP Violates the APA Because It Unlawfully Withholds and Unreasonably Delays Adjudication of Class Members' Applications

The APA requires administrative agencies to conclude matters presented to them "within a reasonable time." 5 U.S.C. § 555(b). A district court may "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "Agency action" includes, among other things, a "failure to act." 5 U.S.C. § 551(13).

USCIS has a mandatory duty to act on naturalization and adjustment-of-status applications without unreasonable delay. In the naturalization context, USCIS has a nondiscretionary duty to "examine" naturalization applicants within a reasonable time, 8 U.S.C. § 1446; 8 C.F.R. § 316.14(b)(1), and to render a determination within 120 days of the examination, 8 U.S.C. § 1447(b); 8 C.F.R. § 335.3. *See also Oniwon v. USCIS*, No. CV H-19-3519, 2020 WL 1940879, at *3-4 (S.D. Tex. Apr. 6, 2020) (collecting cases); *Rajput v. Mukasey*, 2008 WL 2519919, at *3 (W.D. Wash. June 20, 2008). Likewise, in the adjustment context, USCIS has a "non-discretionary duty to grant or deny an application for adjustment of status within a reasonable time." *Lindems v. Mukasey*, 530 F. Supp. 2d 1044, 1046 (E.D. Wis. 2008); *see also, e.g.*, *Khan v. Johnson*, 65 F. Supp. 3d 918, 920 (C.D. Cal. 2014); *Kim v. USCIS*, 551 F. Supp. 2d 1258, 1262-64 (D. Colo. 2008). Otherwise, USCIS "could hold adjustment applications in abeyance for decades without providing any reasoned basis for doing so." *Kim v. Ashcroft*, 340 F. Supp. 2d 384, 393 (S.D.N.Y. 2004). "Such an outcome defies logic—[USCIS] simply does not possess unfettered discretion to relegate aliens to a state of 'limbo,' leaving them to languish there indefinitely." *Id.*

The INA codifies the "sense of Congress" that applications for immigration benefits "should be completed not later than 180 days after the initial filing of the application." 8 U.S.C. § 1571. While this deadline is not mandatory, it provides a yardstick for measuring whether

---

[18] In fact, in 1985, the INS published a proposed rule in the Federal Register that would have allowed the agency to deny applications and then not disclose the grounds for denial if a civil or criminal investigation had been undertaken. 53 Fed. Reg. 26034 (July 11, 1988). The rule was rejected as prejudicial to applicants. *Id.*

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 33
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    delays are reasonable. *See Yea Ji Sea v. DHS*, No. CV-18-6267-MWF (ASX), 2018 WL

2    6177236, at *4–5 (C.D. Cal. Aug. 15, 2018). Using the 180-day timeframe as a guide, "many

3    courts have found delays of 'around two years'" to be "'presumptively unreasonable as a matter

4    of law.'" *Id.* (quoting *Daraji v. Monica*, No. CV 07-1749, 2008 WL 183643, at *5 (E.D. Pa. Jan.

5    18, 2008) (citing cases)); *see also, Reddy v. Mueller*, 551 F. Supp. 2d 952, 954 (N.D. Cal. 2008);

6    *Roshandel v. Chertoff*, No. CV 07-1739, 2008 WL 1969646, at *8 (W.D. Wash. May 5, 2008).

7        The systemic delays resulting from CARRP are unreasonable.[19] As of August 2020, class

8    members (including those ███████████ and returned for routine processing) had been waiting

9    on average two-and-a-half years (881 days) for adjudication. **Ex. 8** (USCIS Dep.) 240:4-13. By

10    contrast, the average delay for non-CARRP cases pending as of September 2019 was one year

11    (371 days). *See supra* Part II(D) (Table 2). As of March 2021, 1,348 class members had been

12    waiting more than two years for adjudication. *See id.* (Table 1). The numbers were even more

13    extreme when this case was filed because, in response to this lawsuit, USCIS adjudicated 6,000

14    "adjudication ready" CARRP cases that the agency had shelved. *See supra* at Part II(D); **Ex. 2**

15    (Renaud Dep.) 121:20-126:6.

16        Plaintiffs' experiences are emblematic of USCIS's practice of simply shelving CARRP

17    applications. It took filing this lawsuit to finally prompt immediate action on all five Plaintiffs'

18    applications. *See supra* Part II(E). By then, Plaintiff Abraham had waited four years for

19    adjudication, during which time USCIS tried but failed to find pretextual bases to deny his

20    application. *Id.* Plaintiff Wagafe waited three and a half years for adjudication, and although his

21    case was "adjudication ready" as of October 2015, USCIS took no steps to adjudicate it until

22    February 2017, after this lawsuit was filed. *Id.* USCIS even immediately adjudicated the

23    applications of two individuals with six- and four-year delays immediately after being notified of

24    their intention to serve as witnesses in this case. Pasquarella Decl. ¶4.

25        [19] FBI Name Check processing alone, which is responsible for ████████████
     ████████████████. *See* **Ex. 47** at DEF-0094986; **Ex. 8**
26    (USCIS Dep.) 210:3-212:16. In 2017, when this case was filed, FBI Name Check was taking ████████
     ████████████ o process. **Ex. 100** (FBI Name Check Processing Times). Before 2008, USCIS was sued more than
27    6,000 times over similar Name Check delays. **Ex. 96** (DOJ OIG) at 13.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14

Where a review procedure adds substantial and unnecessary delay to a process that must be completed reasonably expeditiously, that review procedure violates the APA. *See L.V.M. v. Lloyd*, 318 F. Supp. 3d 601 (S.D.N.Y. 2018) (immigration agency policy violated a statutory requirement that unaccompanied children be "promptly" released from agency custody because it "add[ed] substantial delay to, and in some cases, completely stop[ped] the … release process."). Here, CARRP adds lengthy and unnecessary delays to immigration benefits processing, sometimes stopping the process altogether. As both this Court and former Secretary of Homeland Security Michael Chertoff have previously observed, delaying adjudication for individuals already residing in the country bears "no connection" to protecting national security and makes no sense. *Ali*, 2008 WL 682257, at *4; **Ex. 71** (Chertoff) at 2 ("If you're going to do something bad, you're still here legally. . . So if you think about it logically, the risk of giving you the green card with the understanding that it can be pulled away if something turns up, it's a minimal risk. . . Whereas the customer service value of giving someone the green card is high."); *see also Singh v. Still*, 470 F. Supp. 2d 1064, 1070-71 (N.D. Cal. 2007).

15
16

### 3. CARRP Violates the APA Because USCIS Failed to Engage in Notice and Comment Rulemaking

17
18
19
20

The APA requires an agency to adhere to a three-step notice and comment process when it issues a "legislative rule." 5 U.S.C. § 553(b), (c). "Failure to implement the notice-and-comment procedure invalidates the resulting regulation." Dkt. 69 at 20. USCIS promulgated CARRP without using these procedures. Dkt. 74 (Answer) ¶56; **Ex. 7** (RFAs) No. 3.

21
22
23
24
25
26
27

A legislative rule imposes "extrastatutory obligations" or "effect[s] a change in existing law pursuant to authority delegated by Congress." *Hemp Industries. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). A rule is legislative "(1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action; (2) when the agency has explicitly invoked its general legislative authority; *or* (3) when the rule effectively amends a prior legislative rule." *Id*. By contrast, "interpretive rules merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule." *Id.*

28

CARRP is a legislative rule under the first and third *Hemp Indus.* factors. First, there is no legislative basis to deny or refuse to approve immigration benefits for reasons unrelated to eligibility. But CARRP authorizes—even requires—exactly that. As this Court has already indicated, such treatment goes "well beyond" the INA and "transports CARRP into the realm of the substantive." Dkt. 60 at 21. Second, CARRP effectively amends the INA, adding substantive eligibility criteria that do not otherwise exist. *See id.* at 21-22; *see also Jafarzadeh*, 321 F. Supp. 3d at 45–47 (denying motion to dismiss claim that CARRP is a legislative rule subject to notice and comment). When Defendants implemented CARRP behind closed doors rather than through the public notice-and-comment procedures required for legislative rules, they violated the APA.

### 4.      CARRP Violates the APA Because It Is Arbitrary and Capricious

A court may hold unlawful and set aside final agency action that is arbitrary and capricious. 5 U.S.C. § 706(2). Agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). "The touchstone of arbitrary and capricious review is reasoned decisionmaking." *East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 849 (9th Cir. 2020) (cleaned up). A court's review under the APA "must be sufficiently probing to . . . ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

#### a.      USCIS Failed to Articulate *Any* Reasoned Explanation for CARRP

"When an administrative agency sets policy, it must provide a reasoned explanation for its action." *Judulang v. Holder*, 565 U.S. 42, 45 (2011); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not. . . depart from a prior policy *sub silentio*" and "must show that there are good reasons for the new policy."). Where the administrative record lacks any explanation or analysis to support agency action, the action is arbitrary and capricious. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (Failure to supply a

1    "reasoned analysis" in terminating the DACA program "alone render[ed] [the] decision arbitrary

2    and capricious"). A court, moreover, "cannot infer an agency's reasoning from mere silence. . .

3    Rather, an agency's action must be upheld, if at all, on the basis articulated by the agency itself."

4    *Beno v. Shalala*, 30 F.3d 1057, 1073-74 (9th Cir.1994) (quoting *State Farm*, 463 U.S. at 43, 50).

5        Defendants fail this basic test. The administrative record contains no explanation

6    whatsoever for USCIS's adoption and implementation of CARRP, let alone the requisite

7    reasoned explanation. The administrative record is devoid of reasons, evidence, or analysis to

8    justify the new policy. The administrative record contains only the CARRP policies themselves

9    and training documents about how to implement the program. *See* Dkt. 286, 287 (CAR); **Ex. 8**

10   (USCIS Dep.) 20:18–21:2.

11       The absence of any explanation, evaluation, or analysis in the administrative record

12   reflects USCIS's failure to *undertake* such measures—especially considering Congress's

13   determination not to enact similar provisions. In developing and adopting CARRP, USCIS

14   conducted no studies, drafted no reports, and considered no information other than the INA and

15   the "on-the-job" experience of individuals at USCIS. **Ex. 8** (USCIS Dep.) 34:4-35:16, 42:13-

16   43:3. No person outside of USCIS—not a single official from law enforcement or any other DHS

17   agency—participated in the formulation of CARRP. *Id.* 32:10-34:3.

18       The administrative record also lacks any indication that USCIS identified or evaluated

19   alternatives to CARRP—an omission that alone is fatal. *See Yakima Valley Cablevision, Inc. v.*

20   *FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious

21   alternatives has led uniformly to reversal." (citing cases)).

22                **b.    USCIS Ignored Crucial Considerations in Adopting CARRP**

23       Failure to consider "important aspects of the problem" also renders agency action

24   arbitrary and capricious. *Regents*, 140 S. Ct. at 1913. Having failed to conduct even a cursory

25   evaluation or analysis prior to instituting CARRP, USCIS disregarded multiple issues critical to

26   determining whether the program was necessary, fair, or logical.

27       *First*, USCIS failed to consider the severe consequences of CARRP for those seeking to

28

1   naturalize and adjust status. An agency may not simply decline to consider the potential costs

2   and harms associated with a policy, even if they are "difficult to predict." *City & Cty. of San S.*

3   *F. v. USCIS*, 981 F.3d 742, 759 (9th Cir. 2020). Courts have repeatedly rejected as arbitrary and

4   capricious USCIS's attempts to ignore or downplay harms to individuals and organizations

5   subject to its programs. *See, e.g.*, *Nio*, 385 F. Supp. 3d at 63-68 (USCIS disregarded "central"

6   issue that its policy could prompt "uncharacterized discharge" from the military and render

7   applicant ineligible to naturalize); *San Francisco*, 981 F.3d at 759-61 (USCIS "provided no

8   analysis of" and "impermissibly . . . declined to engage with" the likely effects of a proposed rule

9   to expand the definition of "public charge" under the INA).

10        The harms CARRP inflicts on applicants are acute and plainly foreseeable. Significant

11  delay is an obvious outcome of a policy that withholds approval of eligible applications with

12  "unresolved" NS concerns, and that subjects applications to onerous, multi-stage vetting and

13  review processes, numerous systems checks, ongoing consultation with outside agencies, and

14  detailed documentation. *See, e.g.*, **Ex. 29** at CAR000010-35. Pretextual denial is also the natural

15  result of a policy that directs officers to look for any basis to deny an application at each stage,

16  while at the same time withholding from the applicant the fact of her referral to CARRP and the

17  true nature of USCIS's concern. *See supra* Part II(B), (C)(4), (D). Defendants do not dispute that

18  applications subject to CARRP take significantly longer to process than those not subject to

19  CARRP. **Ex. 57** (July 7, 2020 Kruskol Rep.) ¶¶7b, 8a; **Ex. 68** at Siskin Dep. Tr. 28:14–17.[20] Nor

20  can they dispute that ███████████████████████████. *See supra* Part

21  II(D)(Table 2). It is also entirely foreseeable that the delay and uncertainty created by CARRP

22  "can result in loss of employment, loss of social security benefits, loss of professional

23  opportunities, separation from spouses/children, inability to sponsor family members for

24  immigration benefits, inability to vote or participate in other civic activities, anxiety, stress,

25  paranoia, and a persistent sense of frustration." **Ex. 89** (Ragland Rep.) ¶128; *see also* **Ex. 76**

---

26

27        [20] While APA review is generally limited to the administrative record, a court may consider extra-record evidence to determine "whether the agency has considered all relevant factors and has explained its decision." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 38
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  (Gairson Rep.) ¶¶34, 123-24, 136, 139, 151, 173, 191, 195, 202, 228, 252-53; **Ex. 9** (Arastu

2  Rep.) ¶¶92-120. The named Plaintiffs' experiences bear this out. *See* Part II(E).

3       USCIS never considered these harms. The administrative record lacks any

4  acknowledgment of, let alone attempt to grapple with, the devastating consequences of CARRP

5  borne by applicants, their families, and their communities. That silence is as glaring as it is

6  unexplained, and it demonstrates that, in adopting a sweeping policy that up-ends tens of

7  thousands of lives, USCIS violated the APA.

8       *Second*, USCIS failed to consider that CARRP does not yield meaningful benefit. The

9  Supreme Court has cautioned that failure to consider a program's scant benefits can render it

10  arbitrary and capricious. *See Michigan v. EPA*, 576 U.S. 743, 752 (2015). USCIS failed to

11  consider whether CARRP delivers meaningful value *at all*, let alone assess any such value

12  against the program's substantial harms.

13       As a threshold matter, the administrative record lacks any clear articulation of CARRP's

14  purpose or supposed benefits. CARRP guidance states vaguely that it is USCIS's mission to

15  "preserve the safety of our homeland . . . and mitigate potential risks to national security," and

16  that "USCIS seeks to ensure that immigration benefits are not granted to individuals . . . that pose

17  a threat to national security." CAR 8, 84. But to the extent Defendants assert that *CARRP's*

18  purpose is to protect national security, the administrative record never states as much explicitly,

19  falling short of the basic requirement that there be "good reasons" for a policy. *See Fox*

20  *Television*, 556 U.S. at 515.

21       Nor does the administrative record contain any sign that CARRP furthers national

22  security. Rather, logic dictates the opposite: Class members already reside in the United States,

23  and whether USCIS grants them green cards or citizenship has no bearing on their ability or

24  inability to do anything harmful to national security. *See* **Ex. 37** (Sageman Rep.) ¶13; *see also*

25  **Ex. 71** (Chertoff Statement) at 2 ("If you're going to do something bad, you're still here legally"

26  whether or not you get a green card); **Ex. 16** at DEF-00116759.0019 ("Aren't people just going

27  to refile?" and answers "PROBABLY, BUT. . .they won't necessarily again immediately."). All

28

1    class members, like anyone living in the United States, are subject to criminal investigation and

2    prosecution. And approved adjustment of status applicants are subject to removal if they engage

3    in activities that create security risks. *See* 8 U.S.C. § 1227(a)(4).

4         Courts have rejected similarly specious invocations of national security in analogous

5    contexts. For example, in *Kirwa v. Dep't of Def.*, the court discounted the government's *post hoc*

6    explanation that a policy delaying service members' ability to naturalize was for "national

7    security purposes," because "DOD has given no reasoned justification why certifying a form N-

8    426 for immigration and naturalization purposes implicates our national security." 285 F. Supp.

9    3d 21, 39, 44 (D.D.C. 2017); *see also Santillan v. Gonzalez*, 388 F. Supp. 2d 1065, 1080 (N.D.

10   Cal. 2005) ("[I]t is unclear on this record that depriving aliens already present in the United

11   States of status documentation furthers national security interests.").

12        Little else in the administrative record suggests actual national security benefits of

13   CARRP. A training slide states that the program "provides additional resources to work a

14   national security case" and "results in highly detailed, consistent documentation." **Ex. 64** at

15   CAR000685; *see* **Ex. 29** at CAR000013. But this conclusory statement identifies no "facts

16   found," *see State Farm*, 463 U.S. at 43, draws no "rational connection" to the choice to

17   implement CARRP, *see id.*, and includes no "reasoned analysis" of relevant factors, *see Regents*,

18   140 S. Ct. at 1913, to explain why CARRP is necessary or important to national security. Indeed,

19   training materials in the administrative record suggest a different motivation altogether: USCIS's

20   reputation. USCIS trains CARRP officers to apply the "New York Times Test," in determining

21   whether to approve a benefit, by speculating, "How will whatever you're about to do look on the

22   cover of the New York Times?" **Ex. 72** at CAR001699-1700.

23        *Third*, USCIS designed and implemented CARRP without consulting research and

24   empirical evidence indicating that the program would frequently misidentify applicants as NS

25   concerns. Policies must be grounded in valid methods and reliable information. *See State Farm*,

26   463 U.S. at 43, 52 (agencies "must examine the relevant data" and "explain the evidence which

27   is available"). USCIS conducted no research; received no input from law enforcement, the

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 40
151538082.9

1   academic community, or outside experts; and reviewed no reports or data in formulating its

2   definition and indicators of an NS concern. **Ex. 8** (USCIS Dep.) 32:10-35:16, 42:13-43:3.

3   Instead, it based the indicators only on its internal "on-the-job" experience. *Id.* But USCIS's "on-

4   the-job" experience—as adjudicators of immigration benefits, not national security experts—

5   gives it no basis to decide what constitutes an NS concern. *See* **Ex. 37** (Sageman Rep.) ¶¶14,

6   103; **Ex. 38** (Danik Rep.) ¶100; *see also San Francisco*, 981 F.3d at 760 (noting that "DHS

7   claims no expertise in public health," unlike the outside experts who opposed the rule at issue).

8   　　　USCIS's criteria for identifying NS concerns reflect its failure to consider reliable data

9   and research. The indicators typecast applicants as concerns based on whether they fit a profile—

10   their national origins, professions, technical expertise, travel histories, and associations. But

11   decades of terrorism research have yielded no "terrorist profile" or "reliable set of behaviors that

12   can, with any acceptable degree of validity, enable predictions about whether someone will

13   engage in political violence." **Ex. 37** (Sageman Rep.) ¶95. The indicators, moreover, are vague,

14   overbroad, and wholly consistent with innocent conduct. *Id.* ¶96; **Ex. 38** (Danik Rep.) ¶59. They

15   give rise to subjective assessments, as USCIS acknowledges, **Ex. 36** at CAR000815, **Ex. 73** at

16   CAR001123, **Ex. 90** at CAR001916, made without having undergone any training on anti-

17   discrimination or law enforcement training on national security issues. **Ex. 8** (USCIS Dep.)

18   101:13-102:18; 103:5-11. Coupled with "the extremely low threshold USCIS uses for identifying

19   'national security concerns,'" the indicators "raise the risk that CARRP processing is a function

20   of officers' arbitrary suspicions and biases, not of valid science or any attempt to assess risk

21   objectively with an estimated rate of error." **Ex. 37** (Sageman Rep.) ¶¶12, 97. And because

22   conduct dangerous to national security is exceedingly rare as an empirical matter, any

23   government agency "attempting to identify terrorists" will almost certainly be "flooded with

24   false positives or false alarms." *Id.* ¶64; *see also id.* ¶¶60-68. But USCIS neither studied the

25   matter nor grappled with the inevitability that many people, who pose no threat at all, would be

26   branded as NS concerns.

27   　　　USCIS's reliance on the Watchlist and other law enforcement databases for identifying

28

1    NS concerns reflects the same failure to consider reliable data or research. ████████

2    ███████████████████████████████████████████████████████████

3    ██████████████████. **Ex. 36** at CAR000822 (██████████████████████

4    █████████); CAR 826. It then bars the—so-called KSTs—from being approved absent

5    consent of the USCIS Deputy Director, which is rarely granted. **Ex. 32** (May 3, 2021 Kruskol

6    Rep.) ¶18(c). USCIS "[doesn't] question why" applicants are placed on the Watchlist, and thus

7    cannot know whether the underlying information impacts eligibility or is sufficiently probative.

8    *See* CAR 854, 907-08 ("KSTs absolutely rise to the level of articulable link, but in those cases,

9    we're not the ones weighing the evidence to make a link").

10       Despite this unquestioning reliance on the Watchlist, USCIS has made no effort to

11   research or study the database's accuracy. **Ex. 8** (USCIS Dep.) 162:20-22. Nor has it considered

12   substantial evidence of unreliability. A 2006 Government Accountability Office study found that

13   *half* of all names initially identified by federal agencies as being on the Watchlist were

14   *misidentifications*, because of incorrect name matching, inaccurate or incomplete data, or

15   mistaken placement on the Watchlist. **Ex. 92** (GAO Watchlist Study) at 1, 19-20. A 2008 audit

16   by the Department of Justice inspector general concluded that weak quality control in

17   watchlisting procedures created the potential "for the watchlist nominations to be inappropriate,

18   inaccurate, or outdated because watchlist records are not appropriately generated, updated or

19   removed as required." **Ex. 95** (DOJ Watchlist Audit) at 10. Because of numerous factors,

20   including poor quality control, the absence of "science-based safeguards against error," and the

21   lack of notice or accountability in available redress procedures, "it is highly likely that the

22   watchlist contains an overwhelming number of false positives: people who are not, and will not

23   be, threats to national security but are nonetheless designated as such and included on the

24   watchlist." *See* **Ex. 37** (Sageman Rep.) ¶¶11, 45, 54, 60, 68, 99.

25       USCIS considered none of these factors. The administrative record lacks any recognition

26   of the risk of error or any explanation why USCIS thought it appropriate to treat placement on

27   the Watchlist as a conclusive indicator of an NS concern. Instead, USCIS considered *only* the

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 42
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    reasonable suspicion standard for placement on the Watchlist. **Ex. 8** (USCIS Dep.) 36:7-37:8.

2    But that very low threshold is one reason why the Watchlist is "fundamentally overbroad and

3    unreliable," **Ex. 37** (Sageman Rep.) ¶11, and ████████████████████████████████

4    ████████████████████████████████████████████. *See supra* Part II(C)(2);

5    *see also Latif v. Holder*, 28 F. Supp. 3d 1134, 1152-53 (D. Or. 2014) (reasonable suspicion

6    standard for placement in Watchlist is a "low evidentiary threshold" that drives "high risk" of

7    error); *Elhady*, 391 F. Supp. 3d at 581. USCIS's decision to make Watchlist status determinative

8    of CARRP status is arbitrary and capricious. *See Nio*, 385 F. Supp. 3d at 68 (USCIS policy of

9    treating a Defense Department military suitability determination as a proxy for whether

10   naturalization applicant met good moral character requirement was arbitrary and capricious).

11           USCIS also did not consider that the FBI Name Check and TECS databases are not

12   reliable in identifying NS concerns. **Ex. 38** (Danik Rep.) ¶¶50, 84. Audits of both these

13   databases, moreover, have raised considerable reliability concerns. **Ex. 96**. (DOJ Audit) at 33-34,

14   17; **Ex. 97** (USCIS-commissioned Report) at A-17 (describing TECS as the "most error prone

15   database").

16           Thus, USCIS failed to consider that its NS concern assessments are inherently error-

17   prone and unreliable, rendering them the kind of "sport of chance" that "the APA's arbitrary and

18   capricious standard is designed to thwart." *See Judulang*, 565 U.S. at 58-59.

19   **B.     CARRP Violates the Procedural Due Process Rights of the Naturalization Class**

20           Procedural due process is a bulwark against unfair government action. *Greene v.*

21   *McElroy*, 360 U.S. 474, 496 (1959). An administrative agency violates the right to procedural

22   due process when it deprives a person of a protected liberty or property interest without

23   providing adequate procedural protections. *Pinnacle Armor, Inc. v. U. S.*, 648 F.3d 708, 716 (9th

24   Cir. 2011). This Court has already recognized that "naturalization applicants have a property

25   interest in seeing their applications adjudicated lawfully." Dkt. 69 at 16 (citing *Brown v. Holder*,

26   763 F.3d 1141, 1147 (9th Cir. 2014)). The only remaining question is whether Defendants have

27

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 43
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

provided adequate process to the Naturalization Class.[21] The answer is clear at the outset: CARRP provides *no* process, let alone adequate process.

Defendants admit that "applicants are not informed whether their applications raise national security concerns or are being handled under CARRP, nor are applicants provided with an opportunity to challenge the handing of an application under CARRP." Dkt. 74 (Answer) at 29; *see* **Ex. 7** (RFAs) Nos. 23 & 24; **Ex. 8** (USCIS Dep.) 271:18-272:20. Thus, CARRP lacks both of the twin pillars of due process: "notice and an opportunity to contest the relevant determination at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). The Naturalization Class is plainly entitled to summary judgment on its procedural due process claim.

In determining what process is due, courts weigh three factors: (1) the private interest affected by the government's action; (2) the risk of erroneous deprivation of that interest through the procedures used, and the "probable value, if any, of additional procedural safeguards"; and (3) the "Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail." *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, each factor favors Plaintiffs.

### 1.     The Naturalization Class Members' Interests Are Significant

It is beyond reasonable dispute that Naturalization Class members have a strong interest in the timely and lawful adjudication of their applications. *See, e.g.*, *Roshandel v. Chertoff*, 554 F. Supp. 2d 1194, 1201 (W.D. Wash. 2008) (plaintiffs "have a right to a prompt adjudication of their naturalization application."); *Kirwa*, 285 F. Supp. 3d at 42 ("[D]elaying naturalization applications . . . constitutes irreparable harm."). The ability to obtain U.S. citizenship in a timely and lawful manner carries immense value. Delayed and denied applicants are "unable to vote or serve on juries, they are unable to travel abroad without fear of being denied re-entry into the United States, and they are ineligible for jobs for which they are qualified," *Roshandel*, 554 F. Supp. 2d at 1201. Nor can they petition for immediate relatives abroad, *Ching v. Mayorkas*, 725

---

[21] The Court dismissed Plaintiffs' procedural due process claim for the Adjustment Class. Dkt. 69 at 17.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 44
151538082.9

F.3d 1149, 1157 (9th Cir. 2013), and they can lose their social security benefits. 8 U.S.C. § 1612.

The named Plaintiffs' experiences demonstrate the scale of this interest. Plaintiff Abraham lost his social security benefits in 2015 due to the years-long delay in adjudicating his naturalization application—benefits he and his family depended on as he was undergoing chemotherapy for leukemia. *See supra* Part II(E). Plaintiff Wagafe was separated from his wife while Defendants delayed adjudicating his naturalization application. *See id*.; *Ching*, 725 F.3d at 1157 (an individual's "right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process") (quoting *Landon v. Plasencia*, 459 U.S. 21, 34-35 (1982)). Additionally, persistent delays or wrongful denials naturally cause "anxiety, stress, paranoia, and a persistent sense of frustration." **Ex. 89** (Ragland Rep.) ¶128.

### 2. CARRP Entails a High Risk of Erroneous Deprivation

When considering the risk of erroneous deprivation, courts consider both the substantive standard and the procedures the government uses to make determinations. *See Santosky v. Kramer*, 455 U.S. 745, 761-64 (1982). Here, both factors contribute to an enormous risk of erroneous deprivation of Naturalization Class members' interest in the timely, lawful adjudication of their applications.

*First*, as described above, the substantive standard for referral to CARRP that causes unreasonable delays and pretextual denials—the identification of an NS concern—is extraordinarily broad and imprecise. The "articulable link" standard set forth in CARRP guidance scarcely constitutes a standard at all, merely requiring a link that can be put to words. On its face, the "articulable link" standard "encompasses people who have some incidental, indirect, or unknowing connection" to activity of potential NS concern. **Ex. 37** (Sageman Rep.) ¶93. Even so, USCIS does not even require such a link for referral to CARRP. Instead, applicants are referred based only on the presence of one or more indicators, even where there are no identified "articulable links." *See supra* Part II(C)(1). This virtually standardless approach inevitably means applicants who pose no threat are flagged as NS concerns. **Ex. 37** (Sageman

1   Rep.) ¶94. *See Santosky*, 455 U.S. at 763-64 ("imprecise substantive standards" leave

2   determinations open to "subjective values" and elevate the risk of error).

3       USCIS's use of the Watchlist as a basis for automatic referral to CARRP fares no better.

4   Courts have already held that the low evidentiary threshold for placement on the Watchlist, lack

5   of independent review of nominations, and inadequate notice or opportunity to contest placement

6   give rise to a substantial risk of error. *See Elhady*, 391 F. Supp. 3d at 581-82 (Watchlist redress

7   process violates procedural due process); *Mohamed v. Holder*, No. CV-50 (AJT/MSN) 2015 WL

8   4394958 at *8 (E.D. Va. July 16, 2015); *Latif*, 28 F. Supp. 3d at 1151. *See also* **Ex. 37** (Sageman

9   Rep.) ¶100 ("By automatically designating anyone on the watchlist as a KST who is subjected to

10  CARRP, USCIS incorporates the unreliability and very high risk of error associated with the

11  watchlist.").

12      *Second*, the complete lack of notice or any meaningful opportunity to respond to the

13  information that prompts referral to CARRP further elevates the risk of error. This conclusion is

14  borne of simple logic: Fundamentally, an individual cannot respond to unknown allegations.

15  USCIS's withholding of the most basic rudiments of due process inevitably increases the risk of

16  error in CARRP referrals. *See Zerezghi v. USCIS*, 955 F.3d 802, 804 (9th Cir. 2020) (USCIS

17  "violated due process by relying on undisclosed evidence that [plaintiffs] did not have an

18  opportunity to rebut"); *Al Haramain Islamic Found. v. Dep't of Treasury*, 686 F.3d 965, 986 (9th

19  Cir. 2012) ("[B]ecause AHIF-Oregon could only *guess* (partly incorrectly) as to the reasons for

20  the investigation, the risk of erroneous deprivation was high."); *Kaur v. Holder*, 561 F.3d 957,

21  962 (9th Cir. 2009) (due process violated where noncitizen "cannot rebut what has not been

22  alleged" regarding national security concerns).

23      By the same token, the probative value of additional procedural safeguards—including

24  providing members of the Naturalization Class with notice of, and the reasons for, their referral

25  to CARRP—is very high. With notice and an opportunity to be heard, people can "clear up

26  simple misunderstandings or rebut erroneous inferences," *Gete v. INS*, 121 F.3d 1285, 1297 (9th

27  Cir. 1997), provide "potentially easy, ready, and persuasive explanations" to factual errors, *Al*

28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    *Haramain*, 686 F.3d at 982, or tailor responses to the true reasons for the government's action,

2    *Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 320 (D.C. Cir. 2014). *See also Latif*, 28 F.

3    Supp. 3d at 1153 ("Clearly, additional procedural safeguards would provide significant probative

4    value" where process lacks notice or a hearing). Experience demonstrates, moreover, that when

5    given the opportunity to respond, applicants can successfully clarify misunderstandings and

6    refute misinformation. **Ex. 89** (Ragland Rep.) ¶¶58-66; **Ex. 76** (Gairson Rep.) ¶¶30-32, 35-36.

7            **3.      Defendants' Burden in Adopting Additional Safeguards Is Low**

8            The third *Mathews* factor—the government's interest and any administrative burdens that

9    the additional procedures would entail—also weighs in Plaintiffs' favor. Defendants have no

10   valid interest in withholding from Plaintiffs what the Constitution and federal law require them

11   to provide: notice and an opportunity to challenge their CARRP designation to ensure the timely

12   and lawful adjudication of their naturalization applications. Courts have repeatedly held that the

13   Due Process Clause requires the government to provide noncitizens with undisclosed derogatory

14   information in immigration proceedings, even if that information is from third agencies, highly

15   sensitive, or classified. *See, e.g.*, *Kaur*, 561 F.3d at 962 (the "use of [classified] secret evidence

16   without giving Kaur a proper summary of that evidence was fundamentally unfair and violated

17   her due process rights"); *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1070 (9th

18   Cir. 1995) (the "use of undisclosed classified information . . . violates due process" because

19   "[w]e cannot in good conscience find that the President's broad generalization regarding a

20   distant foreign policy concern and a related national security threat suffices to support a process

21   that is inherently unfair because of the enormous risk of error and the substantial personal

22   interests involved"); *Kiareldeen v. Reno*, 71 F. Supp. 2d 402, 404, 414 (D.N.J. 1999)

23   ("government's reliance on secret evidence . . . violates the due process protections" even where

24   "Kiareldeen was a suspected member of a terrorist organization and a threat to the national

25   security"); *Rafeedie v. INS*, 795 F. Supp. 13, 19, 24 (D.D.C. 1992) ("by authorizing defendants to

26   rely on undisclosed confidential information . . . the Court cannot conclude that the processes

27   that have been afforded Rafeedie satisfy the basic and fundamental standard of due process");

28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   *see also Latif*, 28 F. Supp. 3d at 1141 (due process requires the disclosure of underlying

2   information to individuals placed on the No Fly List, a subset of the Watchlist). To address these

3   due process concerns, USCIS regulations already incorporate procedural safeguards, discussed

4   *supra* Part IV(1)(b). 8 C.F.R. § 103.2(b)(16).

5        Any purported law enforcement interest, moreover, has no merit. USCIS is not a law

6   enforcement agency. Naturalization Class members are subject to criminal investigation and

7   prosecution to the extent they engage in unlawful conduct, and the granting or denial of their

8   citizenship applications has no bearing on their ability to remain in the country and thus do

9   anything harmful to national security. *See supra* Part IV(A)(4).

10   **C.      CARRP Denies Class Members Equal Protection**

11        Government action that singles out individuals or groups for adverse treatment based on a

12   suspect characteristic—such as religion or national origin—is subject to strict scrutiny. *Ball v.*

13   *Massanari*, 254 F.3d 817, 823 (9th Cir. 2001). Strict scrutiny applies even to facially neutral

14   government action that has an adverse effect on a suspect class and is motivated at least in part

15   by discriminatory animus, or is "unexplainable on grounds other than" the suspect characteristic.

16   *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999); *Tiwari v. Mattis*, 363 F. Supp. 3d 1154, 1166

17   (W.D. Wash. 2019). Determining whether invidious discrimination was a "motivating factor"

18   requires inquiry into whether the policy "bears more heavily on one [suspect class] than another"

19   and whether the policy's "historical background . . . reveals a series of official actions taken for

20   invidious purposes." *Ramos v. Wolf*, 975 F.3d 872, 897 (9th Cir. 2020) (citing *Village of*

21   *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

22        Here, there is no dispute that CARRP adversely affects applicants. The parties' experts

23   agree: overall, CARRP applications take more than twice as long to adjudicate, and are more

24   than twice as likely to be denied, than applications not subject to CARRP. **Ex. 57** (July 7, 2020

25   Kruskol Rep.) ¶¶7b, 8a; **Ex. 68** at Siskin Dep. Tr. 28:14–17; 46:6–15, 34:9–12.

26        It is similarly clear that CARRP has a grossly disproportionate impact on applicants from

27   Muslim-majority countries. *See* **Ex. 56** (July 7, 2020 Siskin Rep.) at 29. As Defendants admit,

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(NO. 2:17-CV-00094-RAJ) – 48
151538082.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  naturalization applicants from Muslim-majority countries are subjected to CARRP at *12 times*

2  the rate of applicants from non-Muslim-majority countries, and adjustment applicants at *over 10*

3  *times* the rate. **Ex. 57** (July 7, 2020 Kruskol Rep.) ¶9(g)-(h); **Ex. 68** at Siskin Dep. Tr. 28:14–17.

4  This undisputed statistical disparity is so great that it is sufficient in and of itself to establish

5  discriminatory animus. *See The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583

6  F.3d 690, 703 (9th Cir. 2009) (evidence of "gross statistical disparities" impacting a suspect class

7  can satisfy the intent requirement). Defendants can offer no valid or plausible reason for the stark

8  differential in referrals to CARRP, which spans years of data and tens of thousands of applicants,

9  and is therefore unexplainable on grounds other than applicants' status as nationals of Muslim-

10  majority countries. *See Hunt*, 526 U.S. at 546.

11  CARRP's background and administrative history also reflect an intent to discriminate

12  based on national origin and religion. First, CARRP was developed and adopted in the years

13  following September 11, 2001, as part of the "corpus of immigration law and law enforcement

14  policy that by design or effect applie[d] almost exclusively to Arabs, Muslims, and South

15  Asians," including programs that targeted Muslim noncitizens for "special registration,"

16  detention, surveillance, and undue scrutiny. *See* Muneer I. Ahmad, *A Rage Shared by Law: Post*

17  *September 11 Racial Violence as Crimes of Passion*, 92 Cal. L. Rev. 1259, 1262 (2004); **Ex. 9.**

18  (Arastu Rep.) ¶¶66, 113-121; **Ex. 37** (Sageman Rep.) ¶78; **Ex. 98** (Sageman Responsive Rep.)

19  ¶24. Second, ███████████████████████████████████████████████████████

20  ████████████████████████████████████████████████. *See supra* Part

21  II(C)(3)(a). ████████████████████████████████████████████████

22  ████████████████████████████████████████████. *See* **Ex. 35** at CAR000086;

23  **Ex. 99** at DEF-00133753 (███████████████████████████████████████

24  ███████████████████); *supra* Part II(C)(3)(a).

25  ████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████

27  ███████████████████████ *See supra* Part II(C)(3)(b); **Ex. 26** at DEF-00022467,

28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   76. By failing to train its officers in religious practices, country conditions, and anti-

2   discrimination, USCIS allows officers' inherent biases to govern. *See supra* Part II(B); **Ex. 37**

3   (Sageman Rep.) ¶78. Finally, a study of federal district court cases in which USCIS alleged an

4   applicant was ineligible due to false testimony found that nearly every case that followed

5   CARRP's playbook of pretextual denials—faulting applicants for trivial and innocuous

6   omissions having nothing to do with statutory eligibility—involve applicants from a Muslim-

7   majority country or whose name indicated Muslim origin. **Ex. 9.** (Arastu Rep.) at ¶¶82-84;

8   Arastu, *Aspiring Americans Thrown Out in the Cold: The Discriminatory Use of False*

9   *Testimony Allegations to Deny Naturalization*, 66 UCLA L. Rev. 1078, 1114-16 (2019).

10          Because CARRP is subject to strict scrutiny, it must be "precisely tailored to serve a

11   compelling governmental interest." *Plyler v. Doe*, 457 U.S. 202, 217 (1982). It is not. As

12   described above, USCIS can identify little benefit from CARRP at all, much less a compelling

13   one, and any claim that CARRP furthers national security is unsupported by any record evidence.

14   *See supra* Part IV(A)(4). Moreover, as this Court has previously explained, the government has a

15   "panoply of options" for addressing genuine national security concerns; but delaying

16   adjudication by years and denying eligible U.S. residents their citizenship and green cards is not

17   one of them. *Mukasey*, 2008 WL 682257, at *4; *see also Singh*, 470 F. Supp. 2d at 1070–71.

18          Nor is CARRP narrowly tailored. CARRP is *designed* to be drastically overinclusive and

19   are ineffective at identifying legitimate threats to national security. *See, e.g.*, *supra* Part II(C)(4)

20   (urging officers to "over-refer" to CARRP). USCIS could not even confirm 96% of the

21   "concerns" it referred to CARRP under its own broad definition of an NS concern. *See supra*

22   Part II(D). Because CARRP is motivated at least in part by discriminatory animus and cannot

23   survive strict scrutiny, summary judgment is warranted on Plaintiffs' equal protection claim.

**V.     CONCLUSION**

24

25          For the reasons set forth above, the Court should enter summary judgment for Plaintiffs

26   and class members. Plaintiffs will address appropriate remedies once a legal determination has

27   been made on their claims.

28

Respectfully submitted,

DATED: March 25, 2021

s/ Jennifer Pasquarella
s/ Liga Chia
Jennifer Pasquarella (admitted pro hac vice)
Liga Chia (admitted pro hac vice)
**ACLU Foundation of Southern California**
1313 W. 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236
jpasquarella@aclusocal.org
mcho@aclusocal.org
lchia@aclusocal.org

s/ Matt Adams
Matt Adams #28287
**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98122
Telephone: (206) 957-8611
matt@nwirp.org

s/ Stacy Tolchin
Stacy Tolchin (admitted pro hac vice)
**Law Offices of Stacy Tolchin**
634 S. Spring St. Suite 500A
Los Angeles, CA 90014
Telephone: (213) 622-7450
Stacy@tolchinimmigration.com

s/ Hugh Handeyside
s/ Lee Gelernt
s/ Hina Shamsi
s/ Charles Hogle
Hugh Handeyside #39792
Lee Gelernt (admitted pro hac vice)
Hina Shamsi (admitted pro hac vice)
Charles Hogle (admitted pro hac vice)
**American Civil Liberties Union Foundation**
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2616
hhandeyside@aclu.org
lgelernt@aclu.org
hshamsi@aclu.org
chogle@aclu.org

s/ Harry H. Schneider, Jr.
s/ Nicholas P. Gellert
s/ David A. Perez
s/ Heath L. Hyatt
s/ Paige L. Whidbee
Harry H. Schneider, Jr. #9404
Nicholas P. Gellert #18041
David A. Perez #43959
Heath L. Hyatt #54141
Paige L. Whidbee #55072
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
HSchneider@perkinscoie.com
Ngellert@perkinscoie.com
Dperez@perkinscoie.com
Hhyatt@perkinscoie.com
Pwhidbee@perkinscoie.com

s/ John Midgley
John Midgley #6511
**ACLU of Washington**
P.O. Box 2728
Seattle, WA 98111
Telephone: (206) 624-2184
jmidgley@aclu-wa.org

s/ Sameer Ahmed
s/ Sabrineh Ardalan
Sameer Ahmed (admitted pro hac vice)
Sabrineh Ardalan (admitted pro hac vice)
**Harvard Immigration and Refugee Clinical Program**
Harvard Law School
6 Everett Street; Suite 3105
Cambridge, MA 02138
Telephone: (617) 495-0638
sahmed@law.harvard.edu
sardalan@law.harvard.edu

*Counsel for Plaintiffs*