# Exhibit B

THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ABDIQAFAR WAGAFE, *et al.*,
on behalf of themselves and others
similarly situated,

          Plaintiffs,

vs.

JOSEPH R. BIDEN, President of the
United States; *et al.*,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:17-cv-00094-RAJ

CONSOLIDATED MEMORANDUM OF
POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND IN
SUPPORT OF DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT

**Note on Motion Calendar:
July 2, 2021**

1

**TABLE OF CONTENTS**

2  I.   INTRODUCTION..................................................................................................1

3  II.  FACTUAL BACKGROUND..................................................................................2

4       A.   CARRP: USCIS' PROCESS FOR VETTING POTENTIAL NS CONCERNS
            IN BENEFIT APPLICATIONS......................................................................2

5
6            1.   Origins and Purposes of CARRP..................................................2

7            2.   Structure of CARRP Processes and USCIS Officers' Training in
                  CARRP...........................................................................................5

8            3.   Day-to-Day USCIS Operations Under CARRP............................20

9            4.   An Overview of CARRP-Related Statistics.................................23

10      B.   PLAINTIFFS' LAWSUIT CHALLENGING CARRP...................................25

11           1.   Identities and Status of Individual Named Plaintiffs..................25

12           2.   The Two Certified Plaintiff Classes............................................27

13           3.   Plaintiffs' Claims........................................................................28

14  III. LEGAL BACKGROUND.....................................................................................28

15      A.   STATUTORY ELIGIBILITY CRITERIA AND USCIS' DECISION-
            MAKING AUTHORITY...............................................................................29

16
17           1.   Adjustment of Status....................................................................29

18           2.   Naturalization...............................................................................30

19      B.   PER STATUTE, REGULATION, AND JUDICIAL PRECEDENTS, USCIS
            HAS BROAD AUTHORITY IN PROCESSING BENEFIT APPLICATIONS,
20           INCLUDING MAKING WIDE-RANGING INQUIRIES.............................32

21           1.   General Provisions Conferring Benefit Processing Authority on USCIS...........32

22           2.   Authority to Inquire.....................................................................33

23           3.   Additional Processing Rules and Authority Under 8 C.F.R. § 103.2.................34

24  IV.  LEGAL STANDARDS GOVERNING THIS SUMMARY JUDGMENT CROSS-

25  MOTION AND OPPOSITION..........................................................................37

26  V.   ARGUMENT........................................................................................................39

27      A.   SUMMARY JUDGMENT FOR DEFENDANTS ON THE EQUAL
            PROTECTION CLAIM IS WARRANTED:  PLAINTIFFS LACK
28           SUFFICIENT EVIDENCE OF INTENTIONAL DISCRIMINATION AND

DEFENDANTS' EVIDENCE SHOWS THERE IS NONE. ..........................................39

1.    Direct Evidence Shows There is No Intentional Discrimination in USCIS' Implementation of CARRP .................................................40

2.    Statistical Evidence Negates Inferring that CARRP Intentionally Discriminates.................................................................................41

3.    Plaintiffs' Remaining Circumstantial Evidence Fails to Raise a Genuine Issue of Discriminatory Intent. .................................................45

4.    CARRP is Facially Legitimate and has a Rational Basis. ...................52

5.    Genuine Issues Would Exist if a Higher Level of Scrutiny Applied. ..................54

B.    PLAINTIFFS' APA ARBITRARY AND CAPRICIOUS CLAIM FAILS BECAUSE IT IS A NON-COGNIZABLE PROGRAMMATIC CHALLENGE, IT CONCERNS NON-FINAL AGENCY ACTION AND UNREVIEWABLE AGENCY DISCRETION, AND IT FAILS TO ESTABLISH BASED ON THE ADMINISTRATIVE RECORD THAT THE DECISION TO IMPLEMENT CARRP WAS ARBITRARY AND CAPRICIOUS. ..........................................................................55

1.    CARRP is Neither "Agency Action" nor "Final Agency Action," Precluding Review.......................................................................55

VI.   CARRP IS NOT A "FINAL AGENCY ACTION." .......................................57

1.    CARRP is an Unreviewable Action Committed to Agency Discretion by Law. ......................................................................................59

2.    The Decision to Adopt CARRP was Not Arbitrary and Capricious. ..................60

VII.   APA REVIEW IS LIMITED TO THE ADMINISTRATIVE RECORD.................................60

VIII.   USCIS' DECISION TO ADOPT AND IMPLEMENT CARRP WAS NOT ARBITRARY AND CAPRICIOUS..........................................................61

A.    BECAUSE CARRP ONLY ESTABLISHES AN INTERNAL AGENCY PROCESS FOR IDENTIFYING AND VETTING APPLICATIONS THAT RAISE NS CONCERNS AND DOES NOT ESTABLISH ANY SUBSTANTIVE STANDARDS FOR DETERMINING WHETHER IMMIGRATION BENEFITS SHOULD BE GRANTED OR DENIED, APA NOTICE AND COMMENT RULEMAKING WAS NOT REQUIRED......................63

B.    PLAINTIFFS' CLAIM THAT THE AGENCY HAS UNREASONABLY WITHELD OR DELAYED AGENCY ACTION IS NOT BASED ON DISCRETE CLAIMS OF AGENCY INACTION. ........................................64

C.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PROCEDURAL DUE PROCESS CLAIM........................................66

1             1.      Plaintiffs' Constitutionally Protected Interest is Narrowly Circumscribed. ........................................................................ 66

2.      Plaintiffs Can Raise No Genuine Issue of Systemic Misconduct Within CARRP.......................................................................... 67

3.      Even Under *Mathews*, Plaintiffs Cannot Prove Their Procedural Due Process Claim. ..................................................................... 68

IX.      CONCLUSION......................................................................... 70

## I.  INTRODUCTION

Plaintiffs challenge USCIS' internal process for vetting and adjudicating the very small portion of green card and naturalization applications that raise potential national security concerns – a process first implemented in 2008, but which traces its roots to the 9/11 terrorist attacks. The attacks spurred profound changes in the intelligence and security apparatus of the United States, dramatically increasing the flow of potential derogatory information shared among government components charged with protecting the United States. To discharge its statutory duty, USCIS harnessed this new infusion of information to evaluate potential national security ("NS") concerns affecting eligibility for significant immigration benefits. As was the case with many governmental agencies charged with safeguarding the national security interests of the United States, USCIS had to scale-up a necessarily broad and complex process to meet demands posed by increased information sharing and the ever-changing risk environment, all without compromising its mission of efficiently and fairly adjudicating immigration benefit applications. Plaintiffs attack that process, the Controlled Application Review and Resolution Program (known as "CARRP"), as simply an unlawful tool of religious discrimination. But the undisputed record evidence flatly contradicts that allegation, warranting summary judgment for Defendants.

The task of assessing benefit eligibility in light of potential NS concerns is neither as simple nor detrimental as Plaintiffs assert. USCIS determines the eligibility of each of millions of individuals seeking either permanent residence or naturalization to citizenship. Yet Plaintiffs' lawsuit concerns a program that vets only a miniscule fraction of those millions (0.266%, or about one in every 375), and of that fractional caseload, over 75% are approved. Plaintiffs complain that the process takes longer than average benefit processing. This is both true and reasonable given then nature of the concerns at issue. CARRP proceeds with necessary deliberation in tackling the array of information USCIS must consider in evaluating a benefit applicant's eligibility, "connecting dots" which may not easily discerned. *Cf. 9/11 Comm'n Rep.* (2004), §§ 13.1-.3, at 400, 408, 416-17. In short, the voluminous evidence developed in this case over many years of discovery shows that CARRP is a lawful internal agency process with a monumental and important task. It is not a means for delay or unlawfully-motivated denial of benefit

applications.  To the contrary, CARRP is a rational measure assuring that applicants are indeed eligible for the immigration benefits they seek when applications raise questions concerning national security.

## II.   FACTUAL BACKGROUND

## A.   CARRP: USCIS' PROCESS FOR VETTING POTENTIAL NS CONCERNS IN BENEFIT APPLICATIONS.

CARRP is USCIS' internal "policy for identifying and processing cases with national security ("NS") concerns." Ex. 1, Policy for Vetting and Adjudicating Cases with National Security Concerns, at CAR000001. Under CARRP, an "NS concern exists when an individual or organization has been determined to have an articulable link to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4) (A) or (B) of the INA." *Id*. Broadly speaking, USCIS utilizes CARRP to process all types of immigration benefit applications, including applications for adjustment of status and naturalization. Ex. 2, Rule 30(b)(6) Deposition of Kevin Quinn, at 134:5-8. The legal requirements for these two types of applications are set out in more detail below, but two points of law are notable at the outset. First, noncitizens affirmatively apply to USCIS for these benefits; thus, they bear the burden of proving their eligibility. *See* 8 C.F.R. §§ 245.2(a)(1), (3)(i), 316.4(a). Second, they may be ineligible if they are inadmissible or removable under sections 212(a)(3)(A), (B), or (F), or 237(a)(4) (A) or (B) of the INA, which generally address terrorism, espionage, and other activities that Congress has deemed to threaten national security. *See* 8 U.S.C. §§ 1182(a)(3)(A), (B), (F), 1227(a)(4)(A), (B); *see also* 8 U.S.C. §§ 1255(a)(2) (admissibility a criterion for adjustment), 1427(a) (requirements for naturalization include "good moral character," and being "attached to the principles of the Constitution . . . and well disposed to the good order and happiness of the United States"). To fully understand CARRP, it is necessary to consider its origins, structure, and operation on a day-to-day basis. A brief review of relevant statistics will also provide useful perspective.

### 1.   Origins and Purposes of CARRP.

USCIS adopted and implemented CARRP in 2008, but it was developed based on knowledge and experience that the agency acquired following 9/11. *See* Declaration of Ronald Alan Atkinson, at ¶8. One

major lesson of 9/11 was that agencies across the federal government needed to share with one another individual data points that, although seemingly insignificant when viewed in isolation, could reveal national security threats when considered as a whole. In the years immediately following 9/11, however, there was a significant disparity between the new initiative of information-sharing across federal agencies and the operational capacity, know-how, and inter-agency trust needed to realize it. *Id.* This push for increased information sharing had a significant impact on USCIS' processing of immigration benefit applications. *Id.* at ¶17. USCIS recognized that law enforcement and intelligence agencies could possess information about individuals and organizations that might be relevant to the adjudication of immigration benefit applications. *Id.* Thus, USCIS expanded its access to and utilization of these records. *Id.* In particular, USCIS required additional security checks on applicants, including FBI name checks and TECS checks. *Id.* at ¶18. TECS is a platform that facilitates information-sharing among federal, state, and local agencies, commercial organizations, and foreign governments. *Id.* FBI name check provides information on investigations and often allows for a more complete picture of individuals, their activities, and associates. *Id.*

Increased information sharing did not come without costs, particularly in the years immediately following 9/11, when agencies were still figuring out how to share information with one another efficiently and lawfully. USCIS encountered several information-sharing-related problems at this time. First, USCIS' case workload increased as new processes for conducting, reviewing, and resolving checks were introduced to the adjudications process. *Id.* at ¶ 21. Second, record-producing agencies like the FBI were not equipped to respond to the marked increase in the volume of new requests from USCIS, and USCIS adjudicators were often unable to obtain security check records containing NS information in a timely fashion. *Id.* at 20. Third, when adjudicators were able to access these records, there was very little internal expertise within USCIS to interpret these records, and there was no ordered system for USCIS adjudicators to seek assistance in interpreting the records and understanding their significance. *Id.* at 21.

In 2004, USCIS created the Fraud Detection and National Security Directorate ("FDNS") as part of an effort to develop internal expertise handling law enforcement and intelligence information within

USCIS. *Id.* at ¶22. While FDNS was headquartered in Washington, D.C., FDNS officers were also stationed in USCIS offices across the country. *Id.* Yet, in the initial years after its creation, FDNS had only a small number of field officers and little capacity to assist adjudicators. *Id.* Additionally, following 9/11, ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.*

In an attempt to address the shortage of resources at the field level and afford specialized expertise to a growing number of more complex cases, in 2004, FDNS instituted a new policy directing that all cases raising potential NS concerns be sent to Headquarters for adjudication. Atkinson Decl. at ¶23. This initiative, known as FOCUS, was staffed by a small number of adjudicators who had high security clearances and points of contact at law enforcement agencies. *Id.* at 23. However, there were simply not enough adjudicators in FOCUS to handle all the cases with potential NS concerns. *Id.* at ¶24. With an insufficient number of Headquarters-based adjudicators, a backlog of cases with NS concerns arose within months. *Id.* at 25. To reduce the backlog without compromising consistent outcomes, USCIS needed to disperse case processing responsibilities across a larger pool of officers while ensuring they had a blueprint to utilize and replicate best practices. *Id.* In response, USCIS began to lay the groundwork for a standardized process to identify, process, and adjudicate cases with potential NS concerns at Field Offices across the country, which was later formalized under the acronym CARRP. *Id.*

In or about 2006, FDNS created its National Security Branch (NSB) to strengthen the whole agency approach to NS issues. Atkinson Decl. at ¶26. In organizing NSB, USCIS sought to develop several capabilities within the agency: field officers prepared to handle and consider NS information; an increased agency capacity to access and control classified information; and a commitment from external law enforcement and intelligence partners to share relevant information. *Id.* Further, the newly-formed NSB emphasized the importance of building individual relationships with law enforcement agency partners to strengthen the exchange of timely and reliable information between USCIS and the law

enforcement community, which would ultimately aid the agency's effort to make fully informed decisions on the underlying benefit applications. *Id.* at ¶27.

In 2008, USCIS issued the CARRP policy in a series of memoranda. *Id.* at ¶30; CAR 1-57. Over the coming years, the CARRP initiative allowed the agency to achieve many of the objectives mentioned above. Atkinson Decl. at ¶30. First, USCIS was able to assign many more adjudicators to work on NS cases and process cases more expeditiously, which gradually reduced the backlog at Headquarters. *Id.* Second, by dividing case-processing responsibilities between CARRP-trained adjudicators and CARRP-trained FDNS investigators, each officer became better equipped to bring his or her unique skill set and credentials to bear on a case. *Id.* Ultimately, the collaboration brought more efficiency to case processing, promoting greater confidence in the final determination so that the application could move forward, whether that be an approval or denial. *Id.* Third, CARRP fostered the development of trusting relationships with law enforcement agencies that USCIS had identified as instrumental to understanding the true significance of national security-related information to a case. *Id.* As a result of the meaningful information sharing facilitated through CARRP, the vetting of cases raising NS concerns is now more reliable. *Id.* Fourth, CARRP gave leadership and officers at every level of USCIS a sense of ownership. *Id.* Through training, and then through practice, CARRP allowed USCIS staff to understand the factors that lead to the identification of a potential NS concern, the sources of information and processes for accessing information related to such a concern, and the need to proceed systematically when resolving that concern. *Id.* Perhaps most significantly, CARRP facilitated effective partnerships where needed most—between Field Offices and Headquarters, FDNS and law enforcement agencies, and Immigration Officers ("IOs") vetting CARRP cases and the CARRP-trained Immigration Services Officers ("ISOs") adjudicating them. *Id.*

## 2.    Structure of CARRP Processes and USCIS Officers' Training in CARRP.

### a.    Identification of Potential NS Concerns.

CARRP is concerned not only with processing and adjudicating applications that involve potential NS concerns but with identifying such cases as well. *See* Ex. 3, ECF 126-1, at 3 (Emrich Decl.).

Individuals identified as "known or suspected terrorists" raise NS concerns, and so their benefit applications are processed in CARRP. *See id.* at 4-5. These individuals, known as "KSTs," are identified by their nomination and placement in the Terrorism Screening Database ("TSDB"), entry on the Terrorism Watchlist, and inclusion as a designated "KST" in the TECS system. *See id.*; *Elhady v. Kable*, Nos. 20-1119, -1311, --- F.3d ----, 2021 WL 1181270, at *2 (4th Cir. Mar. 30, 2021) (regarding nomination process). ▮▮▮▮▮▮ of CARRP referrals are KSTs. *See* Siskin Declaration at ¶11. The remaining category of applicants of potential concern, known as "non-KSTs," is also subject to CARRP. Ex. 3 at 4 (Emrich Decl.). USCIS' identification of non-KSTs involves consideration of information from the following sources: TECS; FBI name and fingerprint checks; databases of other agencies, the applicant, either through testimony or in completing the application; and any other relevant source. *See id.*

In the case of a potential non-KST, an NS concern is present when a determination is made that an "articulable link" exists between a person or organization and a prior, current, or planned involvement in, or association with, an activity, individual, or organization described in the national-security-related inadmissibility and removal provisions at 8 U.S.C. §§ 1182(a)(3)(A), (B), or (F), or 1227(a)(4)(A) or (B). *See* Ex. 3 at 3-4 (Emrich Decl.). Indicators of a possible NS concern can prompt these determinations, which in turn govern whether processing of an application will continue under CARRP. *See id.* at 3-5. If indicators turn out not to relate to the applicant or a determination is made that no articulable link exists despite an indicator, then the application "is not subject to the CARRP policy" to any further extent. *See id.* at 3. Further, even after an individual is identified as a NS concern, that identification can change during the remaining phases of CARRP such that the person would no longer be considered an NS concern and would no longer be processed in CARRP. *See id.* at 5.

### i. NS Indicators.

Indicators, which CARRP training explains are synonymous with "facts" or "evidence," are an important investigative tool to flag information that might warrant further agency review depending on the circumstances. Ex. 4, CARRP Module 2 (2020), at DEF-00431102. Although CARRP training provides a

non-exhaustive list of potential indicators, it also explicitly states that ████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

██████████████ *Id.* at DEF-00431088 (emphasis in original). Critically, any discussion of indicators in

CARRP training documents is intertwined with the context in which they are taught to be considered: as

discrete pieces of information whose significance is entirely dependent on other surrounding information

in the record. Ex. 5, CARRP Module 3 (2020), at DEF-00431412, 00431420; Ex. 6, Attachment A, at

CAR000084-92. This "totality of the circumstances" standard is emphasized so frequently and forcefully

in the training documents that no sincere read of those documents could overlook it. *See* Ex. 7, CARRP

Module 4 (Dec. 2017), at DEF-00429651 ████████████████████████████████████████████

████████████ Ex. 8, CARRP Module 5 (Dec. 2017), at DEF-00429772 ████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████ Ex. 5 at DEF-00431417 ████████████████████████████████████

████████████████████████████ The training content calls officers' attention to the

important reality that the evaluation of evidence against a standard often requires human judgment, and, as

such, "it is critical that the evidence is weighed based on the totality of the circumstances." *See*

Declaration of Kevin Quinn, at ¶ 22; Ex. 5 at DEF-431393.

   And yet, although Plaintiffs dedicate significant portions of their "statement of facts" to assailing

the merits of USCIS' use of indicators, not once do they acknowledge this fundamental context. Plaintiffs

allege, for example that, "USCIS puts applications in CARRP the moment an indicator of an NS concern

is identified." *See* Pl's MSJ at 4. As illustrated above, with the possible exception of KSTs (as noted, ████

████████ of CARRP referrals), this is demonstrably false. *See* Ex. 7 at DEF-00429651. Similarly, citing

CARRP guidance for identifying NS concerns, entitled Attachment A, Plaintiffs allege that "[t]o identify

a non-KST, CARRP instructs officers to look for any indicator of an NS concern." *See* P's MSJ at 10. It

is hard to divine what language Plaintiffs are referring to, but no language in the document guides

officers to look for "any" indicator. *See* Pl's MSJ. at 086. Notably, appearing frequently in Attachment A

is the word "may," caveating the guidance concerning potential indicators of an NS concern to be circumstance specific, though this is not mentioned by Plaintiffs. *See* Pl's MSJ at 086 ("Certain types of employment, training, government affiliation, and/or behavior *may* (or *may not*) be indicators of any NS concern, depending on the circumstances of the case, and require additional scrutiny to determine whether an NS concern exists.") (emphasis added). That USCIS uses this "totality of the circumstances" standard for evaluating potential indicators of NS concerns is so plainly obvious that one of Plaintiffs' own proffered experts—a former FBI official—acknowledged as much. *See* deposition of Jeffrey Danik at 128:14-18.

Similar to USCIS, ███████████████████████████████████████████████████████████ ███████████. Ex. 10, Expert Report of Kelli Ann Burriesci at 11. This is true ███████████████ ███████████████████████████ focused on preventing terrorism and national security threats. *Id*. USCIS and other federal agencies "cannot effectively protect U.S. persons and interests from acts of terrorism if it does not consider information that indicates a national security concern, or if it recognizes that a national security indicator exists but ignores it." *Id*.

### ii. Third Agency Record Holder Information.

Although Plaintiffs suggest that USCIS officers commonly refer applications to CARRP based on information gleaned from an applicant's biographic background information, this is far from the case. "CARRP referrals are based primarily on positive security check results from third agencies." Declaration of Russ Webb, at ¶ 19. In fact, data produced to Plaintiffs in this case establishes that ██████████████████ of CARRP referrals are sourced to information from Third Agency record holders. *See* Ex. 11, Expert Report of Bernard Siskin, at 29, 39, 49.

Plaintiffs complain that USCIS officers' "on the-job experience as adjudicators of immigration benefits, not national security experts," leaves them unqualified to "decide what constitutes an NS concern." Pl's MSJ at 41. However, pre-processing triage of applications performed by the National Benefit Center ("NBC") builds in correspondence with government officials who specialize in preventing terrorism, including law enforcement agents and the Joint Terrorism Task Force ("JTTF"). The result is

1   that, from the outset of the NS identification process, law enforcement agencies provide USCIS with

2   direct input concerning the meaning of certain NS indicators, allowing USCIS to make an informed

3   determination concerning whether such indicators warrant further scrutiny in CARRP. *See* Webb Decl. at

4   ¶¶10-14, 16. Further, when referrals to CARRP are made at the field level (as opposed to the NBC), they

5   are made by FDNS IOs trained and experienced in collaborating with Third Agency record owners

6   concerning the significance or insignificance of derogatory information, and the IOs can make follow-up

7   inquiries as needed. Declaration of Matthew Relph at ¶¶ 10-12. Thus, even beyond the fact that

8   Plaintiffs' characterization of indicators distorts the way USCIS teaches its officers to consider them,

9   those officers are not referring applications to CARRP in the type of vacuum Plaintiffs suggest. Instead,

10  the meaningful partnerships USCIS fosters with law enforcement and intelligence agencies are called

11  upon across the lifecycle of application processing to ensure informed decisions are made concerning

12  whether further review of national security information is needed.

13          Plaintiffs also criticize USCIS' practice of screening applicants against the TSDB (the Terrorism

14  Screening Database) to determine whether the applicants may pose NS concerns. Initially, in their

15  Statement of Facts, Plaintiffs contend that USCIS treats ███████████████████████████████

16  ████████████████████████████████████████ Pl's MSJ at 9, 10. This is

17  incorrect. As the training makes clear, ██████████████████████████████████ Ex. 5 at

18  DEF-431327; *see id.* at DEF-431342 ███████████████████████████

19          USCIS does ██████████████████████████████████, which means that their

20  benefit eligibility ████████████████████████████████. However, as explained by

21  Defendants' national security expert, Kelli Ann Burriesci—currently an Acting Under Secretary at the

22  Department of Homeland Security; former Principal Deputy Director of the FBI's Terrorist Screening

23  Center ("TSC"); and supervisor of more than twenty enrollment and vetting programs impacting the

24  transportation system—it is common practice for federal agencies to ████████████████████

25  ████████████████ Ex. 10 at 1, 9. ████████████████████████████████████

26  ████████████████████████████████████████████████████████████

27

28

1  ███████████████ *Id*. at 10. Plaintiffs' own proffered expert Jeffrey Danik describes the TSDB ███

2  ████████████████████████████████████████████████████████████████

3  ████████████████████████████ Ex. 9 at 159:23-160:3.

4  **iii. Articulable Link.**

5  ██████████████████████████████████████████████████████

6  █████████████████████████ Ex. 12, Studies in Nat. Security, Art. Link Writing 101, at DEF-0095247.

7  According to Matthew Relph, an Immigration Officer ("IO") assigned to the Norfolk Field Office who

8  has completed vetting for approximately 120 CARRP cases, "most potential CARRP cases have a clear

9  articulable link by the time that they arrive at the FO [Field Office] due to the comprehensive work

10  already done at the NBC." Relph Decl. at ¶7. That work, as described above, is done in close consultation

11  with Third Agency record holders. *See Id*. That said, the IO conducts an "independent review of that

12  derogatory information to evaluate if it establishes an articulable link between the applicant and a

13  category of national security concerns set out in the Immigration and Nationality Act." *Id*. at ¶¶ 6, 7.

14  Plaintiffs contend "the 'articulable link' standard encompasses people who have some incidental,

15  indirect, or unknowing connection" to activity of potential NS concern. *See* Pl's MSJ at 37. But this is

16  false. Particularly where the nexus between the applicant and the NS information is relationship-based,

17  CARRP training instructs officers ████████████████████████████████████

18  ████████████████████████████████████████████████████████████████

19  █████████████████████████████ Ex. 5 at DEF-00431427. Thus, the applicant's ████████████

20  ████████████████████████████████████████████████████████████████

21  ██████████████████████████████████ *See* Ex. 12 at DEF-0095247

22  ████████████████████████████████████████████████████████████████

23  ██████████████████████████████████████

24  In fact, Plaintiffs' own exhibit refutes Sageman's contention that articulable links are typically

25  based on the applicant's "unknowing" actions or connections to the NS activity. *See* Pl's MSJ Ex. 42 at

.0175 (framing the operative question as, ███████████████████████████████████

███████████████████████████

This same exhibit, in fact—a 2017 CARRP training module—illustrates Plaintiffs' tactic of dismissing the most obvious context in a document in favor of highlighting a suggestive word or phrase that might support their assertion. Here, for example, Plaintiffs highlight the phrase "gut feeling" on a particular slide in the training module and use it for the proposition that, "NS Concerns often amount to nothing more than speculation, suspicion and profiling—not actual evidence." Pls' MSJ at 31. In actuality, the same slide advises that the ██████████████████████████████████████████

████████████████████████████████ Pls' MSJ Ex. 42 0159 (emph. added).

**b. Eligibility Assessment/Internal Vetting.**

CARRP's second stage, eligibility assessment and internal vetting, ████████████████

███████████████████████████████████████████████

██████████ Ex. 4 at DEF-00431129. ███████████████████████████████ *Id*. CARRP policy documents note that the eligibility assessment serves to "to ensure that valuable time and resources are not unnecessarily expended vetting a case with a record owner when the individual is otherwise ineligible for the benefit sought." Ex. 1 at CAR 005. Perhaps predictably, Plaintiffs reconstitute this practical policy to read its purpose negatively as "to 'ensure that valuable time and resources are not unnecessarily expended' vetting an NS concern when the individual can be denied." Pls' MSJ at 5.

In reality, the practice is a common sense efficiency measure for all parties involved. ISOs review the applicant's entire immigration file ("A-file") and all available information to assess whether there are any obvious facts that would disqualify the applicant from eligibility for the immigration benefit sought. Relph Decl. at ¶ 9. Even if the ISO determines that the applicant is ineligible for the benefit, depending on the type of application at issue, the applicant may still be referred for an interview and have an opportunity to refute the apparent basis for denial. *Id*. All naturalization applicants must be interviewed and many adjustment-of-status applicants are interviewed, depending on current USCIS policies and priorities. *Id*. This is quite distinct from Plaintiffs' "factual" contention that "denial is the favored

outcome before USCIS has even attempted to resolve the concern through external vetting." Pls' MSJ at 5. Alex Cook, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 13, Deposition of Alexander Cook at 120:16-121:14. ████████████████████████████████████████████████████ *Id.* at 121:15-122:5. ████████████████████████████████████████████████████████

*Id.* at 122:18-21. ████████████████████████████████████████████████████████████████ *Id.* at 122:22-123:7.

Because national security information potentially impacting an applicant's eligibility has typically already been identified by the time the eligibility assessment is performed, the assessment also functions as a means of informing the vetting process that follows. Quinn decl. at ¶30. But, contrary to Plaintiffs' assertion, this only portends that the national security information's impact if any on eligibility will be determined in external vetting, not during the eligibility assessment. "As an adjudicator, an officer may have ████████████████████████████████████████████████████████████████ Ex. 14, CARRP Module 5 (2020), at DEF-00432008.

True, the eligibility assessment functions as something less than a rubber stamp. But the process of evaluating and making inquiry into an applicant's eligibility is so unremarkable that one of Plaintiffs' own immigration experts acknowledged its legitimacy. *See* Ex. 15, Deposition of Thomas Ragland, at 259:4-13 (agreeing that USCIS has the authority to investigate an applicant's eligibility for relief and obtain information from law enforcement agencies in determining eligibility for relief).

During internal vetting, checks are run on all internal DHS computer systems, commercial systems, and public databases for information on the applicant. Relph Decl. at ¶10. It is rare that these systems uncover derogatory information previously unknown, and thus rare at this stage to learn information that would resolve a NS concern or render an applicant ineligible for the benefit sought. *Id.* at ¶10. Even still, internal vetting allows the CARRP IO to gather information about the applicant to fully prepare for the discussions with Third Agencies that follow. *Id.*

### c. External Vetting.

During external vetting, the FDNS IO makes contact with the record holder of the derogatory information "to explore the details of the agency's records that may identify or shed light on the NS concern and determine if various steps USCIS would take in the vetting and adjudication processes would interfere with third-agency activities." Relph Decl. at ¶12. NS concerns are often resolved after an FDNS IO has the chance to communicate with record holders and understand the extent of the relationship between the applicant and the activity of concern. *Id.* at ¶ 16.

Plaintiffs allege that if the external vetting process does not "conclusively disprove [the concern] the focus shifts to denying the application," Pls' MSJ at 6, this is false. "Particularly. . .where the link between ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ Relph Decl. at ¶16. While the final assessment is USCIS', the evaluation and feedback of the law enforcement record holder is heavily relied upon in making this determination, as "their experience in national security investigations is an invaluable resource." *Id.* at ¶17. After the IO has spoken to every record holder, and everyone who has an equity in the application, and has documented all steps and the information received, then the vetting process is complete. *Id.* at ¶19.

### d. Adjudication.

At the conclusion of external vetting, if the NS concern has been resolved, the case is released for routine adjudication. If the NS concern still remains unresolved, and there are apparent bases of

1  ineligibility, the FDNS IO will send the case back to the field for a CARRP-trained ISO to adjudicate the

2  application.  Relph Decl. at ¶19.  Where the NS concern is unresolved but the applicant is eligible, the ISO

3  and his/her supervisor will recommend the application for approval and the benefit will issue if the Field

4  Office Director or Senior Leadership Review Board concur. *Id.*

5      USCIS trains its officers not to overlook any potential grounds for ineligibility when adjudicating

6  CARRP applications that still pose NS concerns after vetting. Plaintiffs variously argue that these

7  potential grounds of ineligibility are "trivial" or "miniscule" or "pretextual." *See* Pls' MSJ at 6

8  (complaining that USCIS should not fault applicants for failing to disclose prior addresses, group

9  memberships, or charitable donations). These allegations are misplaced. First, Plaintiffs' complaint lies

10  with Congress, not USCIS, as Congress set forth the requirements for applicants to receive immigration

11  benefits, and USCIS instructs its officers to enforce Congress' requirements. *See* Quinn decl. at ¶40.

12  Second, these allegedly "trivial," "miniscule," and "pretextual" grounds for ineligibility often have

13  greater significance in CARRP cases than they have in "routine" cases. *Id.* ████████████

14  ████████████████████████████████████████

15  ████████████████████████████████████████

16  ████████████████████████████████████████

17  ████████████████████████████████████████

18  ████████████████████████████ *Id.* Finally, in many CARRP cases where

19  vetting is complete and the NS concern is still unresolved, USCIS is aware of information that makes an

20  applicant ineligible for a benefit, but cannot disclose that information to the applicant because it might

21  compromise United States government interests. *Id.* Thus, USCIS trains its officers to explore alternative

22  options to reach the same result without disclosing such information. *Id.* However, as stated above, in all

23  cases (CARRP or non-CARRP), USCIS explicitly requires that any denial be based on statutory or

24  regulatory grounds of ineligibility that are legally sufficient and can be cited in a decision. *Id.*

25      It bears noting that, although Plaintiffs deposed six USCIS adjudicators during discovery, they do

26  not cite the testimony of a single one for their factual contentions regarding alleged pre-textual denials.

27  The glaring omission is understandable, as the testimony refutes Plaintiffs' assertions. ████ adjudicator

asked whether ████ ever denied or referred (to immigration court) a CARRP case by relying on statutory grounds such as an applicant's failure to notify USCIS of a change of address, returning to country of claimed persecution, or lack of attachment to the constitution, responded ████ not. Ex. 16, Deposition of Kristen Averill, at 201:12-18; Ex. 17, Deposition of Kelly Costello at 246:10-247:15. Kristen Averill, a supervisory asylum officer in Los Angeles with more than six years of experience as an adjudicator, testified that she has never supervised an officer who denied or referred a CARRP case based on a ground of denial that would not be used in a non-CARRP case, nor has she ever done so in the cases she has personally adjudicated. Ex. 16 at 89:8-11. Ms. Averill further testified that minor mistakes, omissions, or inconsistencies would have no impact on applications she adjudicates, and she has never denied an application in this manner. *Id*. at 264:13-22, 267:14-22. Thus, Plaintiffs' assertions that the CARRP process is designed to find trivial reasons to deny cases with unresolved NS concerns is belied not only by the CARRP training instruction, but the adjudicators who apply its guidance day in and day out at Field Offices across the country.

### e.   Training USCIS Officers in CARRP Analysis and Procedures.

USCIS requires officers who will be responsible for vetting and adjudicating CARRP cases to receive several days of CARRP-focused training before they can begin working on CARRP cases. Quinn Decl. at ¶6. USCIS first developed a CARRP training curriculum in 2008 and has made the completion of a training regimen a mandatory pre-requisite for officers working CARRP cases since that time. *Id*. Given the complexity and potential significance of applications involving potential NS concerns, USCIS believes that all officers should receive significant classroom training experience before being entrusted with handling cases involving potential NS concerns. *Id*. Additionally, since approximately 2011, all CARRP-trained ISOs and FDNS IOs are required to complete a cultural sensitivity and awareness training prior to working CARRP cases. *Id*. at ¶12. The training, created at the direction of FDNS headquarters, addresses important cultural differences in the context of interpersonal communication for the purpose of raising awareness of such differences before officers conduct interviews or site visits concerning immigration benefit applications. *Id*.

Importantly, the evaluation of officers handling CARRP cases does not end with their successful completion of training. Quinn Decl. at ¶13. After an officer passes the final exam to become CARRP certified, he or she will also receive ongoing evaluation in their home Field Office from their supervisor once they begin working CARRP cases. *Id.*. Those supervisors to provide additional case-processing guidance as needed and consistent with the CARRP policy concerning circumstances that are unique to a particular CARRP case. *Id.* at ¶15. Further, a review structure is built into the CARRP process itself. *Id.* at ¶13. Officers are required to document case actions in FDNS-DS, USCIS' database for tracking FDNS workflow including CARRP cases, and supervisors conduct mandatory review of aspects of their work to ensure that it meets requirements *Id.* at ¶13.

Presently, the specialized (certification-based) CARRP training course is comprised of six training modules, live lectures, reading assignments, quizzes, and interactive exercises. Quinn Decl. at ¶14. The course instructor may either be an officer from FDNS headquarters or a field officer who is experienced in providing CARRP training. *Id.* As CARRP is USCIS' standardized process for vetting and adjudicating cases involving potential NS concerns, it is important that the CARRP training content also be standardized. *Id.* at ¶15. "This helps ensure that every officer who handles a CARRP case will have a fundamental understanding of CARRP's end to end process and familiarity with documenting his or her work in the FDNS database (FDNS-DS)." *Id.* Further, the training sets forth a series of steps that CARRP-trained officers can follow each time they handle a case with national security information, which promotes consistency, thoroughness, and efficiency in their work product. *Id.*

Individually, most of the training modules explain a core component of the CARRP process. Collectively, the lessons are designed to facilitate discussion and critical thinking about what is and is not an NS concern and give adjudicators the skill set to assess how the national security information may affect an applicant's eligibility for a benefit. Quinn Decl. at ¶16. For example, through instructor-led group discussion of common fact patterns, officers in training learn to synthesize discrete points of information, identify unanswered questions about an applicant, and assess the sufficiency of evidence relative to CARRP referral standards. *Id.* at ¶17. Hypotheticals cover scenarios both where the available

1  evidence of record is sufficient to show an articulable link to a national security ground and where the

2  evidence is insufficient to meet the articulable link standard under which an NS concern will be

3  considered "confirmed" for purposes of CARRP. *Id*. Following are three important themes emphasized

4  throughout the CARRP training curriculum.

5        **i.**    **NS Concern Determinations are Statute-Based But Not Dispositive of Eligibility.**

6        The CARRP training makes clear that, while non-statutory indicators (that is, those that may be

7  part of a link to a statutory ground) such as familial relationships may be relevant to the nexus analysis,

8  USCIS' definition of a "national security concern" is tethered to the national security-related statutory

9  grounds set forth in the INA. Quinn Decl. at ¶18; Ex. 6 at DEF-00431076. ("Current guidance talks about

10  statutory versus non-statutory indicators. The statutory part of our concerns are the NS inadmissibility

11  and removability sections from the INA…. The non-statutory part is the connection – everything that

12  links the person to the ground."). Officers in training are introduced to the list of national security-related

13  grounds in the INA and instructed that, "[i]n order to have an NS concern, one of these INA NS grounds.

14  . . MUST be present." Quinn Decl. at ¶18; Ex. 4 at DEF-00431076 (emphasis in original).

15

16        Further, the training curriculum makes plain that CARRP is an evidence-based vetting process.

17  *See* Ex. 5 at DEF-00431435 ███████████████████████████████████████████

18  ████████████████████████████ The significance of an application's status as a CARRP

19  case is only that it requires a certain process, not a certain adjudicative result. Quinn Decl. at ¶25. As an

20  introductory training module notes, "[m]any, in fact the majority of subjects, do emerge from CARRP

21  cleared of any concerns." *Id.*; Ex. 4 at DEF-00431142. Instruction later in the training reinforces the

22  principle that "a connection for the purposes of starting our CARRP process isn't the same as a statutory

23  ineligibility." *Id*. at ¶26; Ex. 18. It explains that ███████████████████████████████████

24  ██████████████████████ Quinn Decl. at ¶26; Ex. 5 at DEF-00431091; and further cautions

25  officers in training that ███████████████████████████████████████████

26  █████████████████████████████████████████████████████████████

27  ████████████████████████████ Ex. 5 at DEF-00431351. Crucially, this

28

instruction clarifies for officers in training who will be applying the CARRP policy that "although the information behind an NS concern determination may reveal at the conclusion of vetting that an applicant *is* statutorily ineligible for the underlying benefit, the applicant's status as an "NS concern" in the CARRP process is not an independent basis for denial and will not be regarded as one." Quinn Decl. at ¶26.

### ii. Eligibility is Not Conclusively Determined Until Adjudication.

As "the nature of vetting cases with potential national security concerns is such that information illuminating eligibility can and does come from a variety of different sources at many different points in time," CARRP training "instructs that the determination of an applicant's eligibility is the culmination of a process that is only fairly regarded as complete immediately prior to adjudication." Quinn Decl. at ¶28. A training module covering eligibility assessments clearly communicates that the assessment is only a starting point designed to yield a preliminary determination. *Id.* at ¶29. "First, is an initial review to determine if the applicant is eligible for the benefit, which is known as the prima facie review. Second, there's a continuing assessment based on vetting results and collective case factors prior to the final decision." *Id.* at ¶29; Ex. 19 at DEF-00431855. In fact, the training instructs adjudicators that this continuing eligibility assessment is an essential part of the adjudication process. Thus, "when training instruction covering the vetting process describes an applicant as 'eligible,' or 'otherwise eligible,' it is referring to this preliminary or prima facie eligibility determination, as no determination is final and complete until the time of decision." Quinn Decl. at ¶30.

The training curriculum prepares adjudicators to be receptive to new leads at all times and to avoid forming any preconceptions concerning final eligibility—regardless of the status of the NS concern associated with the applicant. Quinn Decl. at ¶31; Ex. 14 at DEF-00432012 ██████████████ ███████████████████████████████████████████████████████████████████ ████████████ ; *id.* at DEF-00432022 ██████████████████████████████ █████████████████████████████████████████████ .

### iii. Classified Information May Impact Primary Grounds for Denial.

A high percentage of NS concerns are identified through information supplied by law enforcement agencies such as the FBI, CBP, and ICE. Ex. Quinn Decl. at ¶35. Sometimes, the information USCIS receives is classified or law enforcement sensitive. *Id.* USCIS is generally prohibited from disclosing classified information or law enforcement-sensitive information to applicants without permission from the record owners because disclosure may impact an ongoing investigation or cause collateral harm to USG interests. *Id.* In circumstances where non-disclosable information indicates the applicant's ineligibility for the benefit, USCIS may face having to grant a benefit to an ineligible applicant unless there is other disclosable evidence providing another genuine basis for denial. *Id.*

There are instances, therefore, when USCIS considers it appropriate to rely on other evidence in issuing a denial, provided that such evidence provides a legally sufficient basis on which to deny the application. *Id.* This rather complex concept is a key point of instruction in CARRP training. Ex. 5 at DEF-00431408 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. However, the instruction cautions officers that ████████████████████████████████ ████████████████████████ *Id.* at DEF-00431438.

Plaintiffs' Statement of Facts cites to CARRP training slides as "factual" support for their argument that USCIS teaches its officers that the goal of CARRP is to deny benefit applications with identified NS concerns. PLs' MSJ. But such a reading of the training could only be reached by disregarding a voluminous amount of content and context that disallows this interpretation. Ex. 4 at DEF-00431075 ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████

█████████████████████████████████████. Testimony from USCIS CARRP adjudicators reinforces the effectiveness of this training message. ISO Alex Cook testified that he was told "over and over again" by his instructor during his CARRP training that "[CARRP] is not a denial program." Ex. 13 at 208: 7- 209:14. Also, the undisputed fact that over 75% of applications adjudicated after referral to CARRP are approved, not denied, likewise refutes Plaintiffs' fiction that CARRP's goal is to deny benefits to applicants who are the subject of NS concerns. Ex. 11 at 50.

Finally, USCIS trains officers that when vetting is complete, there are two possible outcomes for adjudication: (1) where eligible, approve the application (despite the continued existence of the NS concern) after receiving proper supervisory approval, or (2) where not, deny the application based on statutory or regulatory grounds of ineligibility that are legally sufficient and can be cited in a decision. Quinn Decl. at ¶38; Ex. 14 at DEF-00432008. "In other words, USCIS instructs its officers to recommend approval of eligible applications and denial of ineligible applications"—a framework for adjudications that is no different from USCIS' so-called "routine processing." Quinn Decl. at ¶38. "Although every reason informing the agency's decision in a given case may not be provided in the decision, the stated grounds must nonetheless be based on adequate evidence from the record, accurately reflect reasons that factored into the decision, and be sufficient under the law." *Id*. at 40.

### 3. Day-to-Day USCIS Operations Under CARRP.

The National Benefit Center: The National Benefits Center ("NBC"), a component of USCIS' Field Office Directorate, is USCIS' central pre-processing facility for N-400 forms (Application for Naturalization) and I-485 forms (Application for Adjustment of Status) before they are sent to the field for interviews and adjudication. Declaration of Russell Webb at ¶4. Pre-processing typically includes running basic background and security checks on all applicants, ensuring that all required evidence and information has been submitted with an application, and preparing the file for the Field before an applicant is scheduled for an interview and an adjudicator assesses the application. *Id*. In addition to its role pre-processing immigration forms, the NBC also receives from the FBI all "Letterhead Memoranda" ("LHMs") reporting name check results. *Id*. at ¶¶ 5, 13.

All applicants whose forms are pre-processed at the NBC undergo certain security checks, including checks against TECS records and FBI name checks. *Id.* Officers within the National Security Section of the NBC "triage" all applications in which information about the applicant is identified in TECS or positive FBI name check indicates the existence of a potential NS concern. *Id.* If the triage officer determines that the NS indicators present a potential NS concern, the officer will forward the application to one of the National Security Section's two CARRP teams—one team dedicated to reviewing LHMs and one dedicated to reviewing relevant TECS records. *Id.* at ¶¶8, 9, 10, 13, 14. An applicant's national origin, country of citizenship, or religion are not regarded or treated as NS indicators. *Id.* at ¶ 9.

TECS records: With regard to information about applicants appearing in TECS records, NBC triage officers find that about 30-40% of applications they review lack the NS indicators required to be referred for CARRP review and generally return such cases to standard processing within seven days. Webb Decl. at ¶9. For applicants for whom relevant TECS records do contain indicators of a potential NS concern, the CARRP TECS Team at the NBC will refer them to CARRP by creating a NS Case Management Entry ("CME") in FDNS-DS; they will then proceed with reviewing the application in accordance with the first steps of the CARRP policy by reaching out to the law enforcement or intelligence agency that owns the relevant record indicated by TECS, or to the local Joint Terrorism Task Force ("JTTF"), to confirm that the TECS record relates to the applicant in question and obtain additional information regarding the nature of the TECS record. *Id.* at ¶10. Engaging in this identity confirmation and deconfliction (colloquially referred to at the NBC as "ID & D") with the agency record owner or JTTF is important because, while an initial TECS check on an applicant may yield a record indicative of a potential NS concern, further inquiry with the record holder could reveal new or previously unknown information that may change the National Security Section's assessment of whether a case actually presents such a concern. *Id.* at ¶10. If information from the agency record owner or JTTF indicates to the CARRP TECS Team that the case does not involve, or no longer, involves, a potential NS concern, the CARRP TECS Team will close the CME in FDNS-DS and return the application to standard processing.

1   *Id.* at ¶11. Through the ID & D process, the Team closes roughly 70% of the leads it receives within two
2   months, and such cases are not ultimately referred to CARRP. *Id.* at ¶11. Alternatively, if information
3   from the agency record owner or JTTF indicates that there may be a potential NS concern regarding the
4   applicant, or if neither responds to the Team's outreach, the application will be sent to the appropriate
5   Field Office for further vetting under CARRP. *Id.* at ¶12.

6           *LHMs:* The NBC triage process for LHMs works much the same way it does for TECS. But, even
7   before LHMs are triaged, they are reviewed and placed into one of several categories, one of which is
8   "national security." Webb Decl. at ¶13. Those applications with LHMs triaged as having NS indicators
9   necessitating further review are sent to the CARRP LHM Team for entry into CARRP processing
10  through the creation of a CME in FDNS-DS. *Id.* The Team will then seek additional information about
11  the nature of the potential NS concern from the JTTF within the jurisdictional area of the appropriate
12  Field Office. *Id.* The Team resolves approximately 50% of LHM-based CARRP referrals as "non-NS"
13  and closes the CME in FDNS-DS within two months of referral to CARRP. *Id.* at ¶14. Such cases are
14  returned to the standard processing track by being placed back in the interview at queue. *Id.* Cases with
15  potential NS concerns that the CARRP LHM Team is unable to resolve are forwarded to the appropriate
16  Field Office for further vetting under CARRP. *Id.* at ¶15.
17

18          The NBC's early screening and engagement with JTTFs and other record owners allows USCIS
19  to quickly resolve potential NS concerns for the substantial majority of applications that present such
20  concerns. Webb Decl. at ¶16. The National Security Section diverts a large percentage of applications
21  from full CARRP processing in the field, and its triage process quickly diverts a smaller number from
22  having to undergo CARRP review at all. *Id.* By extension, the substantial majority of applications sent on
23  to the field for further vetting under CARRP are those in which the nature or extent of the potential NS
24  concern can only be adequately understood through additional inquiries, which may require extended
25  time to complete. *Id.* at ¶6.
26

27

28

### 4.    An Overview of CARRP-Related Statistics.

During fiscal years 2013-2019, USCIS received more than 10.6 million applications for adjustment of status and naturalization. *See* Ex. 11 at 2, 32-33, 130-31. USCIS identified only 0.3% of those applications as potential national security concerns requiring further CARRP processing. *Id.* at 32-33. That leaves more than 99.7% of these applications outside of the CARRP policy. This information derives from a data set produced by USCIS, containing anonymized information for and application, and analyzed by Defendants' statistical expert, Bernard R. Siskin, Ph.D. *See id.* at 1-2, 6-7, App'x A (CV); Ex. 20, Rule 30(b)(6) Deposition of Kevin Shinaberry at 25-26. The data does not identify applicants' religion because USCIS does not request or record for adjustment of status or naturalization applications. *See* Ex. 15 at 21. However, Plaintiffs repeatedly link applicants' Muslim religion with their originating from Muslim-majority countries, *see* ECF 47 ¶¶ 7, 12, 19, 108, 120, 137, 241, 267-72. Accordingly, Dr. Siskin used countries-of-birth as a indicating whether they identified as Muslim, based on Muslim-majority countries (alternatively, when country of citizenship was used, the results were essentially the same). *See* Ex. 11 at 21-23. Dr. Siskin made several findings—none of which Plaintiffs' expert Mr. Sean Kruskol questions—regarding the rates at which applications were approved, the amount of time it took to adjudicate them, and whether the attributed Muslim religion of applicants had any bearing on these measurements. Dr. Siskin also examined the information sources that prompted USCIS referrals of applicants to CARRP.

The data establishes the following undisputed facts: (1) of the over 10.6 million applications filed in FY 2013-2019, there were 1,444,306 applicants from Muslim-majority countries, yet only 1.27% of these – that is, 18,403 applications -- were processed under CARRP, Ex. 11 at 3, 28; (2) over 75% of all FY 2013-2019 adjustment and naturalization applications processed in CARRP were approved, *id.* at 50; (3) ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ ; and (4) the data shows no bias against Muslims, or shows differences explainable by

Defs.' Cross-Mot. For Summ. J. & Opp'n To Pls.'
Summ. J. Mot.; Case No. 2:17-cv-00094 - 23

U.S. Dep't Of Justice, OIL/A, 450 5th St. NW,
Washington DC 20001; 202-616-2186

1   means other than bias, in the referral rate, approval rate, and rate of adjudication in CARRP; *id*. at 2-5,

2   28-31; Siskin Decl. ¶¶ 4,6-8,11.

3       As of March 2018, the average time for USCIS to adjudicate applications for naturalization and

4   adjustment of status was approximately ten months. *See* Ex. 3 at 6 (Emrich Decl.). Since the average

5   would reflect only a mean or median value, the time required for adjudicating applications for both non-

6   CARRP and CARRP cases would fall outside this average. For example, among adjustment applications

7   filed in FY 2013 (the first year of the period studied) and not processed in CARRP, 89.1% were

8   completed (and 84.4% approved) by the end of the following fiscal year, although 5.25% of these

9   applications remained pending at the end of the seven-year study period. *See* Ex. 11 at 57, 63.

10  Meanwhile, the equivalent data for adjustment applicants processed in CARRP shows that 63.7% were

11  completed (and 54.7% approved) by the end of the following fiscal year, while only 3.62% (less than for

12  the non-CARRP applications) remained pending at the end of FY 2019. *Id*. For naturalization

13  applications, the equivalent data are: among non-CARRP applications filed in 2013, 98.4% were

14  completed (and 90.8% approved) by the end of the following fiscal year, with 0.06% still pending in

15  2019; among CARRP cases, 72.7% were completed (and 62.2% approved) by the end of the following

16  fiscal year, with 1.14% still pending in 2019. *Id*. at 58, 65. Looking at applications filed throughout the

17  seven-year study period, between 22% and 64% adjustment applications processed in CARRP were

18  completed by the end of the next fiscal year after they were filed; for naturalization applications, between

19  23% and 73%. *See id*. at 57-58.

20      Moving beyond the FY 2013-2019 applications, more recent data reflects that 62% of adjustment

21  and naturalization applications pending six months or more as of September 30, 2019, were no longer

22  pending by January 21, 2021. *See* Evans Decl. at ¶ 3. With respect to the longest pending applications,

23  the data shows that seemingly older applications may not immediately be subject to CARRP (and thus

24  may first appear in CARRP statistics later in their processing), and that CARRP is an ongoing, dynamic

25  process even as to older cases. *Id*. at ¶ 5. In other words, applications may come into CARRP after

26  pending for some time, and then they may also quickly exit CARRP. *See id*. On the most recent list of

class members from this year, the oldest naturalization application was received in 2013; only five naturalization cases have receipt dates older than five years. *See id.* ¶ 4.

**B.     PLAINTIFFS' LAWSUIT CHALLENGING CARRP.**

Plaintiffs' operative complaint alleges ten causes of action brought by various permutations of individual named Plaintiffs and classes. *See* ECF 47, at 45-50. Relevant facts and allegations relating to the five named Plaintiffs, the two certified Plaintiff classes, and named Defendants are set out below.

**1.     Identities and Status of Individual Named Plaintiffs.**

Plaintiff Abdiqafar Wagafe, formerly a Somalian citizen, became a United States citizen on March 2, 2017, *see* Ex. 21, Wagafe A-File Excerpts, at DEF-00422653.0002, following USCIS' approval of his second naturalization application which the agency received in November 2013, *see id.* at DEF-422653.0009-.0018. USCIS, he was represented by counsel (now Plaintiffs' expert, who also represented three other named Plaintiffs before the agency). *See* Ex. 22, Deposition of Jay Gairson at 26-27, 30. The processing of Mr. Wagafe's application took place within the context of USCIS handling many other naturalization applications. For example, when Mr. Wagafe filed his second naturalization application in FY 2014, USCIS received 77,792 naturalization applications that year from noncitizens born in countries like Somalia with a greater-than-90% Muslim population – yet only 1,973 were processed in CARRP. Ex. 11 at 72 & App'x B. By the end of FY 2017, the year USCIS approved Mr. Wagafe's second application, USCIS had completed 90.86% of all the FY 2014 naturalization applications processed in CARRP. *Id.* at 58. Among the FY 2014 naturalization applications processed in CARRP concerning applicants from countries with a population >90% Muslim and decided by FY 2019 (the end of the study period), USCIS approved 77.59% of these applications; for applicants from non-majority Muslim countries, 80.13% were approved. *Id.* at 107.

Plaintiff Mehdi Ostadhassan, an Iranian citizen, applied to adjust his status to permanent resident in February 2014, and obtained representation by counsel before USCIS in September 2015. Ex. 23, Ostadhassan A-File Excerpts, at DEF-00422120.0157-.0167. USCIS denied his application on October 27, 2017, in the exercise of discretion because, *inter alia*, he failed previously to disclose that he (1) had

served in the Iranian military,  (2) ███████████████████████████ , and (3) was

formerly a member of the Basij, a group engaged in human rights violations.[1]  *Id.* at DEF-

00422120.0001-.0005.  He reapplied in December 2017; that application was denied on April 10, 2019.

Ex. 24, Ostadhassan Supplemental File Excerpts, at DEF-00427012.0001-.0011. ███████████

███████████████████████████████████████████ Ex. 2 at 263:17 – 264:3.  After filing this

lawsuit, Mr. Ostadhassan departed the United States without first securing any lawful means of return,

*see* ECF 31, 343, Joint Stipulation at 1, and he remains outside the United States, *see* Ex. 26, ECF 466

at 9, Declaration of Mehdi Ostadhassan, at ¶ 42.

 Plaintiff Hanin Omar Bengezi, a Canadian citizen, applied to adjust her status to permanent

resident in February 2015; USCIS granted the application on May 9, 2017 Ex. 27, Bengezi A-File

Excerpts, at DEF-00419977.  She was represented by counsel before USCIS. *See* Ex. 22 at 26, 30. ████

█████████████████████████████████████ *See* Ex. 2 at 266:5-11. ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ *Id.* at 257:18-22,  260:2-11.

 Plaintiff Noah Abraham, formerly an Iraqi citizen and formerly known as Mushtaq Abed Jihad,

became a United States citizen on May 22, 2017, based on USCIS' approval of his naturalization

application received in July 2013 Ex. 28, Abraham A-File Excerpts, at DEF-00420731.0002,  .0017-

.0027. Mr. Abraham's application for adjustment of status to permanent resident in January 2010,  within

three months of receipt *Id.* at DEF -00420731.0142-.0147.  He was represented by counsel before USCIS.

*See* Ex. 22 at 26, 30. ███████████████████████████████████ *See* Ex. 2 at

266:14-22.

---

[1]  Initially, Ostadhassan did not disclose that he had any affiliation with the Basij. Ex. 29 at DEF-00422120.0002.  Later, after the FBI attempted to interview him, Ex. 26 at ¶¶ 27-28, he disclosed for the first time that he belonged to the "Basij Students," Ex. 23 at DEF-00422120.0004. ████████████████████████████████████ *Id.* at DEF-00422120.0003-.0005. In 2019, the United States designated the Basij a foreign terrorist organization pursuant to 8 U.S.C. § 1189. *See* 84 Fed. Reg. 15278.

1   Finally, Plaintiff Sajeel Manzoor, formerly a Pakistani citizen, became a United States citizen on
2   May 1, 2017, based on USCIS' approval of his naturalization application received in November 2015 Ex.
3   29, Manzoor A-File Excerpts, at DEF-00421322.0002, .0011-.0031. Previously USCIS approved his
4   application for adjustment of states to permanent resident in September 2010. *Id.* at DEF- 7-
5   00421322.0350-.0353. This lawsuit concerns only his naturalization application, ▮▮▮▮▮▮▮
6   ▮▮▮▮▮. *See* ECF 47, at 2, 8, 41, 50; Ex. 30, ECF 386, Exh. A, Davidson Decl., at 2; Ex. 2 at 268:18-
7   269:6. Mr. Manzoor's adjustment application (not at issue here, having been approved in 2010) ▮▮▮
8   ▮▮▮▮▮▮▮▮▮. *See* Ex. 2 at 268:18 – 269:6. Statistics about those years, however, pre-date the
9   period studied by Dr. Siskin. Mr. Manzoor was represented by counsel before USCIS. *See* Ex. 22 at 27,
10  30.

11  **2.     The Two Certified Plaintiff Classes.**

12  In 2017, the Court certified two plaintiff classes, the "Adjustment Class" and the "Naturalization
13  Class," under FRCP 23(b)(2). Ex. 31, ECF 69, Certification Order, at 8, 31. A Rule 23(b)(2) class can
14  only be granted equitable relief when all class members are entitled to it. *See Jennings v. Rodriguez*, 138
15  S. Ct. 830, 852 (2018) ("'Rule 23(b)(2) applies only when a single injunction or declaratory judgment
16  would provide relief to each member of the class.'") (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.
17  338, 360 (2011)). By definition, an individual's class membership arises whenever an adjustment-of-
18  status or naturalization application is "subject to CARRP" or a successor policy (and has been pending
19  for six months or more), and terminates upon adjudication of the application. *See* Ex. 31 at 8. Class
20  membership does not terminate earlier than adjudication, and it does not continue beyond adjudication.
21  *Compare* Ex. 3 at 4-5 (Emrich Decl.) *with* Ex. 32, ECF 127, Pls' Response to Defs' Mot. for Protective
22  Order, at 10 n.4. The classes certified by the Court are not limited to individuals alleged to be, or
23  established as, eligible for the benefits they seek. *See* ECF 69, at 8. Plaintiffs also alleged a "Muslim Ban
24  Class," ECF 47, at 41, but did not pursue its certification; it therefore is not relevant. *See* Ex. 31 at 8 n.3.

### 3.    Plaintiffs' Claims.

In ruling on Defendants' motion to dismiss, the Court made clear that this case is about the lawfulness of the CARRP policy. *See* Ex. 31 at 15, 25, 30; *see also id.* at 8 n.2. The Court's ruling took as true Plaintiffs' allegations and "construe[d] them in the light most favorable" to Plaintiffs. *See id.* at 9-10; *see also id.* at 21-22. In particular, the assumed truth of three of the Plaintiffs' allegations was important to the Court's decision: (a) that Plaintiffs are eligible for the immigration benefits they seek; (b) that CARRP imposes extra-statutory requirements for immigration benefits; and (c) that CARRP indefinitely delays or denies applications. *See id.* at 12, 14, 16-17, 19, 21.

In the course of ruling on Defendants' motion to dismiss, the Court considered to a certain extent the consequences of USCIS "hav[ing] now acted on all of the applications of the named Plaintiffs, after up to three and a half years of inactivity." *Id.* at 13. The Court's analysis only considered, however, whether the apparent *end of delays* in the adjudication of the named Plaintiffs' applications mooted their claims, rather than whether the adjudications and termination of administrative proceedings mooted the claims. *See id.* Indeed, the document cited by the Court as indicating that "USCIS has now acted" referred to three applications that, despite some action by USCIS, remained pending. *See id.* (citing ECF 58 at 11-12). Meanwhile, when considering Plaintiffs' class certification motion, the Court recognized that the adjudication of the named Plaintiffs' applications mooted their individual claims but ruled that this supported certification. *See id.* at 28-30.

## III.    LEGAL BACKGROUND

USCIS derives its ability to create and implement CARRP from its broad statutory authority. To show this, the substantive eligibility requirements for adjustment of status and naturalization are set out, as well as the general decision-making authority regarding these applications, before turning to the agency's specific authority for assessing and adjudicating benefit applications.

**A.    STATUTORY ELIGIBILITY CRITERIA AND USCIS' DECISION-MAKING AUTHORITY.**

   **1.    Adjustment of Status.**

      **a.    Eligibility Criteria.**

The adjustment-of-status statute, 8 U.S.C. § 1255, confers on the Secretary of Homeland Security (and USCIS, as described further below) "the discretionary authority to adjust a[n] [applicant's] status to lawful permanent resident provided that '(1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.'" *Ma v. Sessions*, 907 F.3d 1191, 1197 (9th Cir. 2018) (quoting 8 U.S.C. § 1255(a)).[2] The applicant has the burden to demonstrate eligibility for the benefit, including admissibility, and that he merits a favorable exercise of discretion. *See* 8 C.F.R. § 103.2(b)(1); *Rashtabadi v. INS*, 23 F.3d 1562, 1567-68 (9th Cir. 1994); *Matter of Hashmi*, 24 I. & N. Dec. 785, 789 (BIA 2009). The applicant must prove admissibility "'clearly and beyond doubt.'" *Valadez-Munoz v. Holder*, 623 F.3d 1304, 1308 (9th Cir. 2010) (quoting 8 U.S.C. § 1229a(c)(2)(A)).

Although the adjustment applicant may already be in the United States following a formal admission, admissibility to the United States for permanent residence is still assessed. *See New York v. United States DHS*, 969 F.3d 42, 51-52 (2d Cir. 2020). There are numerous grounds of inadmissibility which may preclude an adjustment applicant from meeting their burden of proving eligibility for the benefit. *See generally* 8 U.S.C. § 1182(a). Relevant here are the inadmissibility provisions codified at 8 U.S.C. § 1182(a)(3)(A) (espionage, sabotage, violating or evading export laws, and the overthrow of the United States government), (B) (terrorist activities), and (F) (associations with terrorist organizations).

      **b.    Adjustment-of-Status Decision-Making Authority and Judicial Review.**

USCIS generally has jurisdiction over noncitizens' applications to adjust status. *See* 8 C.F.R. § 245.2(a)(1). While Congress has enacted its "sense . . . that the processing of an immigration benefit

---

[2]  Section 1255 refers to the Attorney General but, following transfer of certain functions, residual statutory references to the Attorney General are deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. §§ 251, 271(b), 542 note, 557; 8 U.S.C. § 1551 note.

application should be completed not later than 180 days after the initial filing of the application," 8

U.S.C. § 1571(b), such pronouncements "do not in themselves create . . . any enforceable law," *Orkin v.*

*Taylor*, 487 F.3d 734, 739 (9th Cir. 2007). The Supreme Court has recognized that "[b]oth the number of

[adjustment] applications received by the [agency] and the need to investigate their validity may make it

difficult for the agency to process an application as promptly as may be desirable." *INS v. Miranda*, 459

U.S. 14, 18 (1982) (per curiam). Where adjustment-of-status applications have been pending for an

unreasonable period, recourse may be available by way of mandamus or review under 5 U.S.C. § 706(1).

When USCIS decides adjustment applications, applicants are notified and the agency must

explain its denials. *See* 8 C.F.R. §§ 103.2(b)(19), .3(a)(1)(i), 245.2(a)(5). No administrative appeal is

available when USCIS denies adjustment, but applicants can move to reopen or reconsider, file new

adjustment applications with USCIS, or renew their applications before an Immigration Judge if they are

placed in removal proceedings. *See* 8 C.F.R. §§ 103.5(a), 245.2(a)(5)(ii). If the application is denied in

removal proceedings, judicial review would be available on a petition for review pursuant to 8 U.S.C.

§ 1252(a)(1). If removal proceedings are not initiated, judicial review of USCIS' adjustment denial

would be in district court pursuant to the Administrative Procedure Act ("APA"). *See Mamigonian v.*

*Biggs*, 710 F.3d 936, 945-46 (9th Cir. 2013). In either instance, review would extend to nondiscretionary

decisions, constitutional claims, and questions of law. *See id.*; *see also* 8 U.S.C. § 1252(a)(2)(B), (D);

*Hassan v. Chertoff*, 593 F.3d 785, 789 (9th Cir. 2010) (per curiam); *Abdur-Rahman v. Napolitano*, 814 F.

Supp. 2d 1087, 1095 (W.D. Wash. 2010).

### 2. Naturalization.

#### a. Eligibility Criteria.

To become a naturalized United States citizen, an applicant usually must show (1) that, after

becoming a lawfully admitted permanent resident, she continuously resided in the United States for at

least five years before filing her naturalization application, (2) that she meets other residence and

physical presence requirements, and (3) that she "has been and still is a person of good moral character,

attached to the principles of the Constitution of the United States, and well disposed to the good order

and happiness of the United States." 8 U.S.C. § 1427(a); *see* 8 C.F.R. § 316.2(a). Those who advocate assault on any organized government's official or the destruction of property, among other unlawful activity within ten years preceding an application or final oath are barred from naturalizing. *See* 8 U.S.C. § 1424(a)(4), (c). The requirement of lawful admission to permanent residence means that the admission was not just procedurally regular but also substantively lawful. *See Segura v. Holder*, 605 F.3d 1063, 1067 (9th Cir. 2010); *Malkandi v. Corsano*, No. C12-36 RSM, 2012 WL 6675090, at *5 (W.D. Wash. Dec. 20, 2012). Thus, when naturalization is sought, USCIS reviews the legality of the original grant of permanent resident status – including potential inadmissibility on national-security-related grounds – as well as subsequent events.

Good moral character is partially defined to exclude "one who has given false testimony for the purpose of obtaining any [immigration benefit]." 8 U.S.C. § 1101(f)(6). This eligibility requirement is assessed on a case-by-case basis looking to all relevant factors, and may consider events not only during the five-year period preceding the filing of an application and the period then leading up to the oath of allegiance, but also events preceding the application filing. *See* 8 U.S.C. §§ 1101(f), 1427(a), (e); 8 C.F.R. § 316.10(a)(2); *Hussein v. Barrett*, 820 F.3d 1083, 1088-89 (9th Cir. 2016). Thus, membership in or financial contributions to a terrorist organization, for example, may make an applicant not only inadmissible, removable, or subject to a statutory bar, but may also reflect adversely on an applicant's good moral character or the "well disposed" eligibility requirement. *See Nio v. United States DHS*, 270 F. Supp. 3d 49, 64 (D.D.C. 2017).

"[I]t has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect." *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967). "[D]oubts should be resolved in favor of the United States and against the claimant." *Id.* (internal marks and citation omitted); *see also United States v. Hovsepian*, 359 F.3d 1144, 1168 (9th Cir. 2004) (en banc) ("applicant must 'bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization'") (quoting 8 C.F.R. § 316.2(b)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    **b.  Naturalization Decision-Making Authority and Judicial Review.**

The Secretary of Homeland Security has "sole authority to naturalize persons as citizens of the United States." 8 U.S.C. § 1421(a); *see* 6 U.S.C. § 557. USCIS implements this authority. *See* 8 C.F.R. § 310.1(b); *see also* 6 U.S.C. § 271(b) (Supp. II 2002). If USCIS does not decide a naturalization application within 120 days following the applicant's examination, the applicant may sue in district court to obtain a determination on the application. 8 U.S.C. § 1447(b). If USCIS denies an application, the applicant may request a hearing before an immigration officer. 8 U.S.C. § 1447(a); 8 C.F.R. § 336.2(b). If USCIS denies the administrative appeal, the applicant may seek de novo review of the denial in district court. 8 U.S.C. § 1421(c).

**B.    PER STATUTE, REGULATION, AND JUDICIAL PRECEDENTS, USCIS HAS BROAD AUTHORITY IN PROCESSING BENEFIT APPLICATIONS, INCLUDING MAKING WIDE-RANGING INQUIRIES.**

Beyond law governing substantive eligibility criteria and decision-making authority, there remains the law concerning how USCIS processes and assesses an application.

    **1.    General Provisions Conferring Benefit Processing Authority on USCIS.**

When USCIS was created in 2002, Congress assigned to it the functions previously carried out by the Commissioner of the former INS, including all adjudications previously performed by the INS. *See* 6 U.S.C. § 271(b) (Supp. II 2002). The Commissioner had acted in such matters with the broad authority of the Attorney General. *See* 8 U.S.C. § 1103(a), (c) (2000); 8 C.F.R. §§ 2.1, 100.2(a), 310.1(b) (2002); 28 C.F.R. 0.105 (2002). That authority consisted of being "charged with the administration and enforcement of [8 U.S.C. §§ 1101-1537]," and included "issu[ing] such instructions[] and perform[ing] such other acts as he deems necessary for carrying out his authority under the provisions of [8 U.S.C. §§ 1101-1537]." 8 U.S.C. § 1103(a)(1), (3) (2000). The APA recognizes that the agency may create "interpretive rules, general statements of policy, or rules or agency organization, procedure, or practice" without engaging in notice and comment rulemaking unless required by a specific statute. 5 U.S.C. § 553(b)(3)(A).

## 2.    Authority to Inquire.

When conducting adjudications, USCIS officers are expressly authorized to, among other things, "take and consider evidence concerning the privilege of any person to . . . reside in the United States, or concerning any matter which is material or relevant to the enforcement of [8 U.S.C. §§ 1101-1537] and the administration of the Service." 8 U.S.C. § 1357(b); *see also id.* § 1101(a)(34) ("Service" defined); 6 U.S.C. §§ 271(b), 557 (regarding transfer of authority); 8 C.F.R. § 103.2(b)(7) ("USCIS may require the taking of testimony, and may direct any necessary investigation."). Relatedly, immigration officers "have the power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents" to the same broad extent as their authority to "take and consider evidence." *See* 8 U.S.C. § 1225(d)(4)(A); 8 C.F.R § 287.4(a)(2)(i); *see also United States v. Minker*, 350 U.S. 179, 184-86 (1956) (explaining broad applicability of statutory subpoena provision); *Peters v. United States*, 853 F.2d 692, 695-96 (9th Cir. 1988) (same). The breadth of USCIS' subpoena authority further indicates its wide-ranging general ability to make inquiries regarding benefit applications, as well as the corresponding narrow scope of judicial review of such inquiries. *See Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988). The agency's subpoena power extends to information that would be "relevant and material to the investigation." *Id.* at 699; *see id.* at 696, 699-700. Relevance for this purpose is determined by the "terms of the investigation rather than in terms of evidentiary relevance." *EEOC v. Federal Exp. Corp.*, 558 F.3d 842, 854 (9th Cir. 2009).

Regarding naturalization, USCIS is authorized to "conduct a personal investigation" of where applicants have lived and worked and to make other inquiries. 8 U.S.C. § 1446(a); *see* 8 C.F.R. § 335.1; Pub. L. No. 105-119, Title I, 111 Stat. 2448 (Nov. 26, 1997) (codified at 8 U.S.C. § 1446 note). Designated USCIS employees are also empowered "to conduct examinations upon applications for naturalization," and may "take testimony concerning any matter touching or in any way affecting the admissibility of any applicant for naturalization." 8 U.S.C. § 1446(b); *cf. id.* § 1443(a) (specifying outer limits of examination); *Price v. United States INS*, 962 F.2d 836, 839-40 (9th Cir. 1992) (noting relationship between Sections 1443 and 1446, and remarking that "the Attorney General is given very

broad authority to make inquiries as long as they are related in some way to the naturalization requirements"). The agency's express statutory authority in such proceedings extends to issuing subpoenas to witnesses and to obtain "the production of relevant books, papers, and documents." 8 U.S.C. § 1446(b); *see also* 8 C.F.R. § 335.2(d)(1); *Rajput v. Mukasey*, No. C07-1029RAJ, 2008 WL 2519919, at *3 (W.D. Wash. June 20, 2008) (noting extent of agency's evidence-gathering authority). These powers are consistent with the government's authority "to know of any facts that may bear on an applicant's statutory eligibility for citizenship." *Berenyi v. District Director, INS*, 385 U.S. 630, 638 (1967); *accord Price*, 962 F.2d at 840.

Relatedly, the agency can develop its own procedures for exercising this authority. The Supreme Court in *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978), declared that "the formulation of procedures [is] basically to be left within the discretion of the agencies to which Congress has confided the responsibility for substantive judgments." *Id.* at 524; *see id.* at 543-44 & n.18 (stating Court has "upheld this principle in a variety of applications," citing *Civil Aeronautics Bd. v. Hermann*, 353 U.S. 322 (1957) (per curiam); *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186 (1946); and *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501 (1943), which preclude courts from imposing procedures on agencies governing their use of subpoenas). It follows from *Vermont Yankee* and the subpoena cases on which it relies that agencies conducting lawful inquiries have wide latitude to develop policies governing such inquiries. *See also Hawaii*, 138 S. Ct. at 2411 ("the INA certainly does not require that systemic problems . . . be addressed only in a progression of case-by-case admissibility determinations"); *Skalka v. Kelly*, 246 F. Supp. 3d 147, 153 (D.D.C. 2017) (referring to "inherent discretion that the agencies have to manage the procedures for handling the large number of visa petitions they receive").

### 3.    Additional Processing Rules and Authority Under 8 C.F.R. § 103.2.

Many of the processing procedures for immigration benefit applications submitted to USCIS are governed by 8 C.F.R. § 103.2. *See id.* § 1.2.

Defs.' Cross-Mot. For Summ. J. & Opp'n To Pls.'
Summ. J. Mot.; Case No. 2:17-cv-00094 - 34

U.S. Dep't Of Justice, OIL/A, 450 5th St. NW,
Washington DC 20001; 202-616-2186

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### a. Eligibility is Not Determined Until a Formal Decision is Made on an Application.

The eligibility of an applicant for adjustment-of-status or naturalization is not resolved until USCIS makes a final decision on the application. *See* 8 C.F.R. § 103.2(b)(1); *see also* 76 Fed. Reg. 53,764, 53770 (Aug. 29, 2011); *see also* 8 C.F.R. § 316.10(a)(1) (good moral character requirement for naturalization "includes the period between the examination and the administration of the oath of allegiance"); *United States v. Dang*, 488 F.3d 1135, 1137-38 (9th Cir. 2007) (events precluding good moral character occurred after filing of naturalization application). The absence of any interim status prior to formal adjudication is consistent with the burdens of proof upon applicants, as well as with the absence of any legal presumptions of eligibility or credibility associated with pending benefit applications. *See also Almakalani v. McAleenan*, No. 18-CV-398 (NGG) (CLP), --- F. Supp. 3d ----, 2021 WL 980846, at *7 (E.D.N.Y. Mar. 16, 2021) (burden on petitioners means beneficiaries of petitions are "presumptively ineligible").

### b. USCIS May Withhold Adjudication of an Application.

Section 103.2 specifically authorizes USCIS to hold an application in abeyance under the following circumstances:

> USCIS determines that an investigation has been undertaken involving a matter relating to eligibility or the exercise of discretion, where applicable, in connection with [a] benefit request, and that the disclosure of information to the applicant or petitioner in connection with the adjudication of the benefit request would prejudice the ongoing investigation.

8 C.F.R. § 103.2(b)(18). Notably, the investigation need not be conducted by any particular agency. *See id.*; *see also* Ex. 33, The Withholding of Adjudication (Abeyance) Regulation Contained at 8 C.F.R. § 103.2(b)(18), at CAR000352-53. Abeyances last for up to six months, and are then subject to review. *See* 8 C.F.R. § 103.2(b)(18); *see also* Ex. 33 at CAR000353-54. This regulation allows USCIS to suspend the adjudication of an application during the pendency of an ongoing investigation if the investigation might uncover information affecting USCIS' decision, and if disclosure of the investigation to the applicant would prejudice the investigation. *Id.* USCIS uses this regulation in CARRP cases and non-CARRP cases, and USCIS has issued guidance to implement this regulation. *See* Ex. 33 at CAR000349. Under

the guidance, supervisory approval is required to hold a case in abeyance, and extending abeyances beyond one year requires a USCIS District Director to obtain a Regional Director's approval; beyond 18 months, the joint approval of two headquarters directorates. *See id.* at CAR000354, 356. Abeyance decisions under the regulation are thoroughly documented. *See id.* at CAR000354-56.

Abeyances may also occur under other circumstances, but would not be governed by the regulation. *See Ayyoubi v. Holder*, 712 F.3d 387, 390 (8th Cir. 2013); Ex. 33 at CAR 000356 n.3. One example is applications formerly subject to the "TRIG hold" policy, which was separate from CARRP. *See* USCIS Policy Memorandum 602-0150, Revised Guidance for Processing Cases Subject to Terrorism-Related Inadmissibility Grounds and Rescission of the Prior Hold Policy for Such Cases (Oct. 19, 2017), *available at* https://www.uscis.gov/sites/default/files/document/memos/2017-1019-Rescission-of-TRIG-Hold-Policy-PM-602-0150.pdf, and prior memoranda cited therein. These holds ended in October 2017, potentially bringing into CARRP cases that had already been pending for a long time – but where the delays had been considered advantageous for the applicant. *See id.*; *see also Singh v. Heinauer*, No. C07-1151RAJ, 2008 WL 5110862, at *1 (W.D. Wash. Dec. 3, 2008); ); Ex. 35, Fact Sheet – Frequently Asked Questions (FAQ) CARRP Policy and Operational Guidance, at CAR000307; *see also* Ex. 4 at DEF-00431137 to -00431141. Apart from formal abeyances, the adjudication of cases may be delayed for other reasons. For example, applicants may fail to respond to a request for evidence under 8 C.F.R. § 103.2(b)(8). ██████████████████████████ Ex. 2 at 210:19 – 211:10; *see* Ex. 36, ████████████████████ at DEF-00436897.

### c. USCIS' Has Only Certain Narrow Duties to Disclose Information in Benefit Proceedings.

Section 103.2 generally requires USCIS to inform an applicant about derogatory information of which the applicant is unaware and provide the applicant an opportunity to respond – but the provision only applies if the derogatory information will form a basis of the agency's decision. *See* 8 C.F.R. § 103.2(b)(16)(i)-(ii); *Naiker v. USCIS*, 352 F. Supp. 3d 1067, 1075-79 (W.D. Wash. 2018). If information not legally relevant to the basis for decision happens to inform USCIS' decision – for example, by prompting the agency to look more closely at evidence that is relevant to the disclosed basis

1    for decision – disclosure of those tangential considerations would not be required. *See Dep't of*

2    *Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) ("a court may not reject an agency's stated reasons

3    for acting simply because the agency might also have other unstated reasons"); *see also INS v.*

4    *Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("agencies are not required to make findings on issues

5    the decision of which is unnecessary to the results they reach"); *Guiney v. Bonham*, 261 F. 582, 585-86

6    (9th Cir. 1919) (upholding the agency's consideration of undisclosed derogatory information about a

7    noncitizen where the agency did not rely on such information in ordering deportation).

8        Apart from providing an opportunity to respond to derogatory information in certain

9    circumstances, USCIS' only other disclosure obligation is to "specify . . . the bases for [a] proposed

10   denial sufficient to give the applicant or petitioner adequate notice and sufficient information to respond,"

11   if the agency decides to notify an applicant of its intention to deny, 8 C.F.R. § 103.2(b)(8)(iii)-(iv), and

12   then the agency must "explain in writing the specific reasons for denial" of an application, *id.*

13   § 103.3(a)(1)(i). Otherwise, USCIS is not generally obligated to disclose to applicants any other

14   information—including the agency's investigative strategies, specific inquiries and their results, and

15   preliminary assessments. *See Kelly v. United States EPA*, 203 F.3d 519, 523 (7th Cir. 2000).

16

17   **IV.    LEGAL STANDARDS GOVERNING THIS CROSS-MOTION AND OPPOSITION.**

18       Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the

19   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the

20   initial responsibility of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp.*

21   *v. Catrett*, 477 U.S. 317, 323 (1986). On issues where the nonmoving party will bear the burden of proof

22   at trial, the moving party can prevail on summary judgment merely by pointing out to the district court

23   that there is an absence of evidence to support the non-moving party's case. *See id*. at 325; *see also*

24   *Citizens' Alliance for Property Rights v. City of Duvall*, No. C12-1093RAJ, 2014 WL 1379575, at *4

25   (W.D. Wash. Apr. 8, 2014), *aff'd*, 636 F. App'x 430 (9th Cir. 2016). By contrast, where the moving party

26   will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact

27   could find other than for the moving party. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

28

Cir. 2007). If the moving party meets its initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Duett v. State Farm Mut. Auto. Ins. Co.*, No. 2:19-cv-01917-RAJ, 2020 WL 5798394, at *1 (W.D. Wash. Sept. 29, 2020) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000)). Here, Plaintiffs bear the burden of proving each of their claims at trial.[3] Thus, Defendants may seek summary judgment either by showing that Plaintiffs lack evidence essential to a claim, or that Defendants' evidence entitles them to judgment as a matter of law because Plaintiffs' evidence does not raise a genuine issue. *See Jones v. Williams*, 791 F.3d 1023, 1030-31 (9th Cir. 2015).

Although summary judgment is the correct mechanism by which to adjudicate Plaintiffs' APA claim that the decision implementing CARRP was an "arbitrary and capricious" final agency action, the summary judgment standard is somewhat modified because the agency, not the Court, is the finder of fact and the evidence considered by the Court is confined to what is contained in the administrative record. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). The Court's task in judicial review under the APA is not to determine whether genuine issues of material fact preclude summary judgment, but to determine only "whether the agency could reasonably have found the facts as it did." *Id.*

In this case, the Court certified the two classes under Fed. R. Civ. P. 23(b)(2). *See* ECF 69, at 30-31. Consequently, the relief Plaintiffs seek for the certified classes must redress an injury suffered or foreseen by every class member. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018) ("'Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.'") (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)); *see also* ECF 69, at 30.

---

[3] This is true for the claims on which they seek summary judgment. *See Wayte v. United States,* 470 U.S. 598, 608 (1985) (equal protection); *Dent v. Sessions,* 900 F.3d 1075, 1083 (9th Cir. 2018) (naturalization-related due process claim); *Sierra Club v. McLerran,* No. 11-CV-1759, 2015 WL 1188522, at *9 (W.D. Wash. Mar. 16, 2015) (APA claim), *appeals dismissed* (9th Cir.) (Nos. 15-35380, etc.). And it is true for the remaining claims in their complaint. *See Or. Nat. Resources Coun. Action v. U.S. Forest Serv.,* 59 F. Supp.2d 1085, 1096 (W.D. 1999) (mandamus); *PLANS, Inc. v. Sacramento City Unified Sch. Dist.,* 752 F. Supp.2d 1136, 1140 (E.D. Cal. 2010) (Establishment Clause), *aff'd,* 476 F. App'x 684 (9th Cir. 2012); *Hotop v. City of San Jose,* 982 F.3d 710, 718 (9th Cir. 2020) (substantive due process).

1    Accordingly, where the absence of class-wide injury makes class-wide relief unnecessary, summary

2    judgment against the class is warranted. *See Trinh v. Homan*, 466 F. Supp. 3d 1077, 1089-90, 1093, 1095

3    (S.D. Cal. 2020). Additionally, the Supreme Court's decisions in *Wal-Mart*, where it rejected "Trial by

4    Formula," *see* 564 U.S. at 367, and *Tyson Foods, Inc. v. Bouaphakeo*, where it approved certain

5    "representative evidence," *see* 136 S. Ct. 1036, 1046-47 (2016), show that class actions cannot be tried in

6    a manner that alters a party's substantive rights relative to its rights if cases were tried individually. This

7    principle derives from the Rules Enabling Act, which provides that rules such as Fed. R. Civ. P. 23

8    cannot "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b); *see Tyson Foods*, 136 S.

9    Ct. at 1048; *Wal-Mart*, 564 U.S. at 367.

10   **V.    ARGUMENT**

11       Defendants cross-move for summary judgment on Plaintiffs' claims surviving Defendants'

12   motion to dismiss: Plaintiffs' First through Tenth Claims, excepting the Fourth Claim regarding

13   adjustment of status. *See* ECF 47 at 45-50; Ex. 31 at 22.

14   **A.    SUMMARY JUDGMENT FOR DEFENDANTS ON THE EQUAL PROTECTION CLAIM**
15   **IS WARRANTED: PLAINTIFFS LACK SUFFICIENT EVIDENCE OF INTENTIONAL**
     **DISCRIMINATION AND DEFENDANTS' EVIDENCE SHOWS THERE IS NONE.**
16

17       Plaintiffs' complaint premised its theory that CARRP unlawfully discriminates mainly on the

18   fiction that CARRP would be modified in response to the 2017 Executive Orders 13769 and 13780

19   (which are now rescinded, *see infra* note 5). The complaint focused on alleged discrimination in the

20   Executive Orders, ECF 47, at 5, 20-30, 43, 46-48, while the few assertions that CARRP unlawfully

21   discriminates stemmed mainly from Plaintiffs' mistaken belief that the Executive Orders would affect

22   CARRP, *see id.* at 5, 30-31, 34, 41, 43, 48. Yet Plaintiffs' motion is entirely silent regarding Executive

23   Orders, and waits until the last three pages to argue that CARRP has violated equal protection since its

24   inception. *See* Pls' MSJ at 48-50. Defendants' evidence affirmatively shows that Defendants are entitled

25   to summary judgment on the Sixth Claim.

26       To establish a violation of the equal protection component of the Fifth Amendment, Plaintiffs

27   must show both that CARRP has a discriminatory effect, and that USCIS had a discriminatory intent or

28

1  purpose in implementing it. *See Wayte*, 470 U.S. at 608 & n.9; *Mendiola-Martinez v. Arpaio*, 836 F.3d

2  1239, 1260-61 (9th Cir. 2016). Absent intentional discrimination, a court will consider only whether the

3  challenged action is "rationally related to a legitimate government interest." *Id.* at 1261. In the context of

4  immigration-related national security initiatives, the equal protection analysis considers at least whether

5  the reason for the government's decision is facially legitimate and bona fide or, at most, has a rational

6  basis. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2418-20 (2018).

7        **1.**     **Direct Evidence Shows There is No Intentional Discrimination in USCIS'**

8                     **Implementation of CARRP.**

9        As Plaintiffs implicitly concede by relying only on circumstantial evidence, *see* Pls' MSJ at 48-

10  50, CARRP does not expressly discriminate on the basis of any protected ground, including race,

11  religion, or national origin. CARRP policy and training documents are entirely devoid of statements and

12  instructions indicating that any protected ground is a reason to deem an individual a national security

13  risk, to process an immigration benefit application in CARRP, or to delay adjudication or deny an

14  application. *See* Ex. 1 at CAR000001-000007 (initial CARRP policy); *see generally* ECF 286, 287

15  (administrative record). There is no evidence that USCIS has or had a discriminatory intent or purpose in

16  implementing CARRP. To the contrary, sworn statements from numerous government witnesses show

17  that CARRP does not purposefully or intentionally discriminate on the basis of race, religion, national

18  origin or other protected ground. *See* Webb Decl. at ¶19; Relph Decl. 17 at ¶18; *see also* Ex. 37,

19  Deposition of Daniel Renaud at 204:21-206:1; 208:5-13; 209:20-211:9; 211:18-212:3; 222:12-17; Ex. 38,

20  Deposition of Matthew Emrich at 132:15-18; Ex. 18 at 34:15 – 35:3. Furthermore, USCIS promotes a

21  bias-free perspective among officers working on CARRP cases by requiring cultural sensitivity and

22  awareness training. Quinn Decl. at ¶ 12, and being prepared to intervene if an adjudicator were to

23  propose a discriminatory decision, Declaration of Daniel Renaud, at ¶7. Ultimately, Defendants are

24  entitled to summary judgment because Plaintiffs cannot show that CARRP was created and operates with

25  discriminatory intent.

26

27

28

2.       **Statistical Evidence Negates Inferring that CARRP Intentionally Discriminates.**

The law recognizes that, even without direct evidence, circumstantial evidence could prove the necessary intent element. *See Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 522-23 (9th Cir. 2011). Such evidence might include (1) discriminatory impact, (2) historical background, and (3) administrative history. *See id.* But for this purpose, discriminatory impact shown by statistics must amount to "gross statistical disparities," and only in "rare case[s]" would such disparities by themselves prove intent. *Comm. Concerning Comm'ty Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009) ("*CCCI*"). While it suffices for a plaintiff to show that unlawful discrimination was at least a motivating factor in a challenged decision, *see Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020), a plaintiff intent on avoiding summary judgment must present sufficient evidence that the defendant "acted at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Darensburg*, 636 F.3d at 523 (internal marks and citation omitted). Defendants will show that record evidence negates disparate impact, and that Plaintiffs' attempt to infer intent creates no genuine issue precluding summary disposition of their claim.

a.       **Statistics Completely Undermine Plaintiffs' Claim.**

Extensive statistical evidence overwhelmingly establishes as an undisputed fact that CARRP lacks a significant discriminatory impact. To address Plaintiffs' allegations of CARRP's discriminatory impact, Defendants' statistical expert, Dr. Siskin, analyzed USCIS' data on adjustment of status and naturalization applications submitted between FY 2013 and FY 2019. *See* Ex. 11 at 9, 18-28. Dr. Siskin is highly qualified to perform this analysis based on his specialization "in the application of statistics to the analysis of whether [employer] data provides valid statistical support for a claim of discrimination." *Id.* at 6. The undisputed findings from the data defeat a claim based on discriminatory impact.

Between FY 2013 and FY 2019, "[o]nly a small percentage of applicants from majority Muslim countries had [adjustment of status and naturalization] applications processed under CARRP – 1.27% or only 18,403 of 1,444,306 applications." *See* Ex. 11 at 3; *see also id.* at 28, 71-72. To the extent that this referral rate is higher than for applicants from non-majority Muslim countries, *see id.* at 72-73, mere

correlation between a country's Muslim-majority status and the possibility that applicants from that country will have their applications processed in CARRP does not prove causation for a discriminatory impact claim. *See id*. at 2, 5, 109. "[T]he likelihood of Third Agency information or USCIS information raising NS concerns is both caused by, and hence correlated with, certain factors," but these factors "are themselves correlated with but *not* caused by the percent Muslim [population] of the country." *Id*. at 111; *see also id*. at 2, 5.

Dr. Siskin conducted a regression analysis to determine whether "the extent of terrorist events that take place" in a country "may cause the number of referrals to CARRP from [that] country." Ex. 11 at 112-13. The underlying premise is that "the more terrorist events that occur in a country, the more likely it is [statistically] that an applicant from that country will have some association with terrorist actors and/or events, thereby increasing the likelihood that the applicant would be identified as a NS concern and processed in CARRP." *Id*. at 113. CARRP referral data was analyzed in relation to the level of terrorism in applicants' countries of origin as tracked by the Global Terrorism Database ("GTD"), "the most comprehensive unclassified database of terrorist attacks in the world." *See id*. at 114-20. The analysis "shows that the different levels of terrorist events among . . . majority Muslim [countries] and non-majority Muslim countries, and the disparity of terrorist events by Muslim status, can explain the disproportionate number of CARRP referrals from majority Muslim countries." *Id*. at 121; *see also id*. at 125-26. Fully 59% of the variance and increased CARRP referrals from Muslim-majority countries is explained by the higher level of terrorist events in the applicants' countries of origin, and not by "the difference in the countries' Muslim population percentage," which explains only 10.8% of the variance.[4] When comparing countries similarly situated with respect to the number of terrorist events and the number of applications, there is "no meaningful difference in the number of referrals to CARRP" based on the country's Muslim population percent. *Id*. at 127. "The percent of a country's population that is Muslim is irrelevant to being referred to CARRP," and "inconsistent with a claim of anti-Muslim bias."

---

[4] As Dr. Siskin notes, the "strong correlation between the percentage of referrals to CARRP by applicants from majority Muslim countries and the percentage of reported terrorism events occurring" in those countries "should not be viewed as implying that being Muslim or being born in a majority Muslim country causes terrorist events." Ex. 11 at 122.

*Id.* at 127. A country's Muslim population percent has only a small and statistically non-significant impact on the number of CARRP referrals from a country, while "the number of terrorist events is the dominant predictor of the number of CARRP referrals for applications from a country." *Id.* at 130; *see also* Siskin Decl. at ¶4.

In addition to refuting claims of discrimination in the *referral* of applications to CARRP, the FY 2013-19 data also disproves any claim of discrimination against applicants from majority Muslim countries *within* CARRP processing. There is no statistically significant difference in approval rates for CARRP-referred adjustment-of-status and naturalization applications when comparing applicants from majority Muslim and non-majority Muslim countries. *See* Ex. 11 at 3-4, 96-98; *see also* Siskin Decl. ¶¶ 8-9. Likewise, the data for CARRP-referred application adjudication times are generally consistent when comparing applicants from majority Muslim countries and non-majority Muslim countries. *See* Ex. 11 at 3-4, 101; *see also* Ex. 5 at ¶¶ 8-10. After FY 2015, there was no statistically significant difference in adjudication times impacting applicants from majority Muslim countries adversely (*i.e.*, longer processing times). *See* Ex. 11 at 99-102.

### b. There is No "Gross Statistical Disparity" from Which to Infer Intent.

Despite overwhelming evidence negating their equal protection claim, Plaintiffs argue that there is a "gross statistical disparity" which infers discriminatory intent. Their argument is premised on comparing the referral rates to CARRP of applications from countries which have, or do not have, a Muslim-majority. *See Pls'* MSJ at 48-49.[5] The argument falls short for two main reasons. First, only a minute fraction of applications are referred to CARRP: less than 0.3% of adjustment and naturalization applications received during FY 2013-19. Ex. 11 at 2, 32-33.] Plaintiffs' alleged "gross statistical disparity" concerns the difference between the 0.97% of Muslim majority adjustment applications referred to CARRP (compared to 0.09% of non-Muslim majority adjustment applications); and the 1.46%

---

[5] Plaintiffs refer to the statistical disparity on which they rely as concerning only "applicants' status as nationals of Muslim-majority countries." MSJ at 49. Yet they rely on the disparity as the only statistical evidence supporting their theories of both national origin discrimination and religion discrimination. *See id.* at 48-49. Without equating religion with Muslim-majority citizenship or country-of-birth, Plaintiffs have no evidence at all of statistical disparity based on religion; they treat these protected grounds as equivalent. Dr. Siskin's analyses address equally Plaintiffs' claims of discrimination based on an applicant's birth or citizenship in a Muslim-majority country, and on the basis of religion. *See* Ex. 11 at 21.

of Muslim-majority naturalization applications referred (compared to 0.12% of non-Muslim-majority naturalization applications). *See* Pls' MSJ at 48-49; Pls. Ex 57 ¶¶ 45, 50. The differential in these numbers shows little.

Dr. Siskin's regression analysis shows that, in light of the "level of terrorism" and certain other variables, "[t]he percent of a country's population that is Muslim has only a small and statistically non-significant impact on the number of CARRP referrals from a country." Ex. 15 at 130; *see also id.* at 5, 30-31, 134; *see generally id.* at 109-30. "[T]he disproportionate share of referrals to CARRP of applications from applicants born in countries whose population is majority Muslim is *not valid evidence* of anti-Muslim bias in referring applicants to CARRP." *Id.* at 134 (emphasis added). Instead, the disproportionate referral rate "is a result of a high level of terrorist events" in Muslim-majority countries. *Id.* at 30. The differences in referral rates, uncorrected for the level of terrorism in the applicant's country of origin, creates no inference of intentional discrimination.

Second, if CARRP referrals were made in an erroneous and unlawfully discriminating manner, one would expect a higher approval rate among applicants referred to CARRP once their applications are adjudicated with no genuine national security issues arising. As Dr. Siskin put it:

> Assuming that most applicants referred to CARRP that were approved are not a national security concern, Plaintiff's allegation [that applications from applicants born in Muslim countries are more likely to be referred to CARRP when they are not actual national security concerns] would imply that the approval rate should be higher for Muslim applications.

Ex. 15 at 98 (footnote omitted). But this is *not* what happens – there is not a markedly higher approval rate for CARRP referred applicants from Muslim-majority countries. Instead, after referral to CARRP, there is little difference regarding duration and outcome based on whether the applicant is from a Muslim-majority country. *See id.* at 95-108. This indicates that CARRP referrals have been based on true NS concerns rather than an anti-Muslim animus. *See id.* at 98.

In addition, it is notable that the referral of cases to CARRP is ███████████████ ███████████████████████████████████████████████████████ of CARRP referrals, the first or only information source for referring the application to CARRP is a Third Agency

1
2
3
4

that provides information to USCIS, and not USCIS information. *See* Ex. 15 at 3, 29, 39-49, 83-94, 131-32, 135-36. For the last three years for which data is available, FY 2017-FY 2019, even for those instances when USCIS was the first or only information source prompting a CARRP referral, the applicant was more likely to be from a *non*-Muslim-majority country. *See id.* at 3, 29, 87, 135.

5
6
7
8
9
10

In sum, Plaintiffs' cursory statistical evidence shows no intent by Defendants to discriminate. As stated by the precedent they cite when asserting that their statistics alone suffice to show intent, *see* MSJ at 49, it would only be the "rare case" in which that is true. *CCCI*, 583 F.3d at 703. *CCCI* was not such a case, *see id.* at 705, 707, 709-11, and neither is the present matter. In light of the evidence substantially negating claims of CARRP's discriminatory impact, Plaintiffs cannot raise a genuine issue that discriminatory intent may be inferred from disparate impact.[6]

11
12

### 3.    Plaintiffs' Remaining Circumstantial Evidence Fails to Raise a Genuine Issue of Discriminatory Intent.

13
14
15
16
17
18
19
20

As their remaining circumstantial evidence of USCIS' alleged discriminatory intent or purpose, Plaintiffs cite to four instances of "background and administrative history." Pls' MSJ at 49-50. These arguments must be assessed against the presumption of regularity attaching to agency actions. *See United States Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977) (official action is not unconstitutional solely because of disproportionate impact); *cf. Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489-91 (1999). None begin to overcome this presumption to raise a genuine issue.

21
22
23
24
25
26
27
28

---

[6] This is true with respect to all aspects of Plaintiffs' Sixth Claim, whether based on CARRP from its inception or as allegedly revised based on the 2017 Executive Orders. Plaintiffs' summary judgment motion does not mention the latter theories for the claim, but they fail in any event. In the years preceding and following the Executive Orders, no notable change appeared in CARRP statistics. *See* Siskin 7/17/20 Rpt. at 2, 4, 29-30, 38, 62, 69, 73-74, 83, 86-87, 91, 93-94, 102, 108, 132, 134-136. Also, record evidence shows that the Executive Orders had no effect on CARRP. *See* ECF 94-9 at 3-4. Even after Defendants produced information about generally applicable programs implementing the second order, ECF 205 at 2, Plaintiffs admitted to being unable to identify any document showing the existence or intention of a "'successor "extreme vetting" program' to CARRP." Ex. 41, Pls' Responses to Defs' Requests for Admission, at RFA No. 11. In addition, Plaintiffs' claims and theories regarding the suspension of adjudications caused by the Executive Orders are also meritless. The lone suspension affected all applications related to certain countries regardless of CARRP status, and it was *de minimus*, lasting no more than one week; Plaintiffs admit they have no further evidence regarding the Executive Orders suspending adjudication. *See* Ex. 43 at 99:6-101:6; RFA Nos. 4, 7. The Executive Orders have also been rescinded. *See* 86 Fed. Reg. 7005 (Jan. 20, 2021); 82 Fed. Reg. 13,209, 13,218 (Mar. 6, 2017). In addition to disposing of all portions of Plaintiffs' Sixth Claim, these facts show that summary disposition is appropriate on Plaintiffs' First through Third Claims, which also concern the Executive Orders.

### i.       Prior Laws and Policies Do Not Indicate Discrimination.

First, Plaintiffs quote an article predating CARRP to contend the process "was developed and adopted in the years following September 11, 2001, as part of the 'corpus of immigration law and law enforcement policy that by design or effect applie[d] almost exclusively to Arabs, Muslims, and South Asians.'" Pls' MSJ at 49. This statement is circular and conclusory as applied to CARRP, given that CARRP is not discriminatory. The quote is also simply wrong to suggest that CARRP applies "almost exclusively" to certain ethnicities, when between 25% and 50% of applicants processed in CARRP during FY 2013-19 were from *non*-Muslim countries. *See* Ex. 11 at 71-72.

Plaintiffs also cite exhibit passages discussing anecdotal material and generalizations, *see* Pls' MSJ at 49 (citing Ps Exs. 9, 37, 98), rather than specific "immigration law and law enforcement policy" relevant to their assertion. The few initiatives mentioned with any relation to Defendants—NSEERs and the TSDB—were both upheld by appellate courts. *See Trump v. Hawaii*, 138 S. Ct. at 2419 (favorably citing Second Circuit decision upholding NSEERS); *Elhady v. Kable*, Nos. 20-1119, -1311, --- F.3d ----, 2021 WL 1181270, at *1, 9 (4th Cir. Mar. 30, 2021) (siding with two other circuits in upholding TSDB). Criticism of NSEERS and the TSDB therefore does not constitute evidence from which unlawful intent could be inferred in CARRP.

### ii. ██████████████████ Do Not Suggest Discrimination.

Plaintiffs' second reference to history and background concerns the prior use of ████████ ██████████ Pls' MSJ at 49. Besides asserting that the countries in question are "almost all" Muslim-majority, Plaintiffs fail to provide any analysis ████████ or why considering them would have been unlawfully discriminatory. The ████████ Plaintiffs refer include non-Muslim-majority countries and exclude some Muslim-majority countries. *Compare* Pls' Ex. 22 at DEF-00052177.0078 to .0079 *and* Pls' Ex. 50 at DEF-0088111-12 *with* Ex. 11 at App'x B. Plaintiffs cite no judicial decision, and none appears, ruling that use ████████ by immigration officials was unlawfully discriminatory. At best, Plaintiffs refer only to internal government documents indicating that ████████████████ ██████████ *See* Pls' MSJ 11 n.6.

Additionally, Plaintiffs cite no evidence showing that ███████ automatically resulted in anything more than requiring USCIS to contact a "record owner." Pls' Ex. 28 at DEF-00003603. Instead, ████ were considered together with other facts. *See* Pls' Ex. 51 at DEF-00126210. Finally, Plaintiffs refer, in connection with ████████████████████ to Defendants' practices today. *See* Pls' MSJ at 49. But when Plaintiffs argue that ███████████████████ as used in USCIS documents, is a "thin metonym for certain Muslim-majority countries," *id*., it is Plaintiffs, not USCIS, who are stereotyping. They cite no evidence for their "thin metonym" assertion, and the evidence they do cite speaks not of "target[ing]" but of the need for "additional scrutiny to determine if an NS concern exists" when there are "[u]nusual travel patterns and travel through or residence in areas of known terrorist activity." Pls' Ex. 35 at CAR000086. This evidence does not refer to an applicant being "from" certain areas (as Plaintiffs contend); rather, it refers specifically to "travel through or residence in areas of known terrorist activity." *Id*. At bottom, there is no basis for Plaintiffs' allegation that inquiry into physical connections with "areas of known terrorist activity" constitutes discrimination based on national origin.

### iii. Religion-Related Inquiries are Not Discriminatory.

Plaintiffs' third type of background evidence concerns directions to inquire into religious affiliations. *See* Pls' MSJ at 49. The evidence they quote ██████████████████ Pls' Ex. 26 at DEF-00022464, ████████████████████████████████████████ Pls' MSJ at 49. ████████████████████████████████████████████████ ██████████████████████ Pls' Ex. 26 at DEF-00022476; *see also id*. at DEF-00022467 (to same effect); MSJ at 12 (citing, in addition to Pls' Ex. 26, Pls' Ex. 25 at DEF-00095009.0016; Pls' Ex. 43 at DEF-0094409-10; Pls' Ex. 58 at DEF-0076056, 059). ████████████████████████████████████████████████████ ██████████ the inquiry *upheld* by the Ninth Circuit over a naturalization applicant's objections that being asked to list his organizational affiliations exceeded statutory authority and infringed constitutional

1  rights. *See Price v. United States INS*, 962 F.2d 836, 839-44 (9th Cir. 1991). As a matter of law, these

2  questions do not infer discrimination against Muslims or applicants from Muslim-majority countries.

3      Plaintiffs' claim that CARRP "encourages the false association between lawful Islamic practices

4  and 'national security concerns,'" Pls' MSJ at 49, is spurious. Referring to USCIS' interest in ██████

5  ████████████ *see id.* (cross-referencing page 12), Plaintiffs describe █████████████████

6  ███████████████████████████████ *see id.* at 12. None of the evidence

7  Plaintiffs cite, however, shows that USCIS' concern with ████████████ has anything to do with the

8  system being based on Islamic principles. Instead, the materials note █████████████████████

9  ████████████████████████████████████████████████████

10  ███ *See* Pls' Ex. 59 at DEF-00095871.0045-47; Pls' Ex. 60 at DEF-00036345-46; Pls' Ex. 61 at DEF-

11  00095760.0046-50. The materials also indicate that ████████████████████████

12  ██████████████ P Ex. 61 at DEF-00095760.0046. Any doubt about that possibility or about

13  the legitimacy of USCIS appropriately ████████████████ within CARRP should be allayed

14  by *United States v. Moalin*, 973 F.3d 977 (9th Cir. 2020). There, the Ninth Circuit recounted ██████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████

18      As for whether USCIS "allows officers' inherent biases to govern" when they are considering

19  ████████████████ or other matters that might touch on religion, *see* Pls' MSJ at 50, Plaintiffs cite no

20  evidence for this. They instead refer to "natural biases" in connection with TSDB investigators, who are

21  not USCIS officers, *see* Pls' MSJ at 50 (citing Pls' Ex. 37 ¶78), and to a "risk" that CARRP is a function

22  of officer bias, Pls' MSJ at 41. But nothing here overcomes the presumption of regularity attaching to

23  CARRP or agency actions under the policy. *See Gregory*, 534 U.S. at 10 (referring to presumption).

24  There is no obligation to provide "inherent bias" training before an agency is entitled to the presumption

25  of regularity. *Cf.* MSJ at 50. Moreover, the presumption is reasonable in part because USCIS officers

26  who work on CARRP cases receive cultural awareness training. *See* Quinn Decl. at ¶12; Pls' Ex. 33, at

136:8-21. Nothing about "inherent biases," therefore, enables Plaintiffs to raise a genuine issue regarding the possibility of discriminatory intent or purpose in USCIS' implementation of CARRP.

        **iv.**    **Prof. Arastu's Report is Inadmissible, and Its Undefined Use of the Term "Pretextual" Precludes an Inference of Discrimination.**

      Plaintiffs' final source for an alleged inference that CARRP is discriminatory is their expert's study of federal district court cases challenging naturalization denials. *See* Pls' MSJ at 50. Defendants maintain on *Daubert* grounds that Prof. Arastu's report should be entirely disregarded. *See* ECF 477 at 11-14; ECF 504 at 4-5. Moreover, for two reasons Prof. Arastu's report and related article are wholly inadequate to support an inference of intentional discrimination in the implementation of CARRP.

      First, Plaintiffs do not suggest that Prof. Arastu's report or article establish a "gross statistical disparity" for inferring discrimination. Nor could they, as Prof. Arastu concedes that she does not know whether the cases she studied concerned applications processed in CARRP. *See* ECF 477, Ex. D at 236, lns. 16-20. Her study suffers from the same problem as in *Darensburg*, where the Plaintiffs "fail[ed] to provide an appropriately tailored statistical measure" to show disparate impact. 636 F.3d at 522. Second, Plaintiffs attempt to overcome the statistical failings of Prof. Arastu's report by vaguely asserting that certain cases she studied "followed CARRP's playbook of pretextual denials." Pls' MSJ at 50. This contention is meaningless because neither Prof. Arastu nor Plaintiffs provide any definition for their oft-repeated expression "pretextual denial" – or explain how such a denial might be invalid or otherwise significant. *E.g.*, Pls' MSJ at 6, 21, 38, 45, 50; Pls' Ex. 9, at 20, 28, 30, 34, 36. There are, in fact, specific definitions of the expression; consideration of the term "pretextual" is therefore warranted to show (1) its meanings, (2) the term's inapplicability to CARRP, and (3) the irrelevancy of Plaintiffs' "pretextual playbook" reference.

      In *Whren v. United States*, 517 U.S. 806 (1996), the Supreme Court distinguished between an issue concerning, on one hand, police motivations for traffic stops and whether they might have some other law enforcement purpose and, on the other hand, claims of "selective enforcement of the law based on considerations such as race" giving rise to equal protection claims. *See id.* at 813. An analogous distinction exists in the context of administrative decisions, yet Plaintiffs fail to acknowledge this – nor

do they recognize that administrative decisions motivated in part by unstated, nondiscriminatory considerations are nevertheless valid. The law on this point bears emphasis.

USCIS has broad discretion when deciding upon possible grounds for its decisions. *See A.A. v. Att'y Gen. of the United States*, 973 F.3d 171, 186-88 (3d Cir. 2020) (government's decision regarding the particular ground or grounds on which to rely in denying an immigration benefit is a matter of unreviewable discretion); *see also INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam). Generally speaking, if the stated basis for a decision is correct, claims that the decision is "pretextual" fail. *See Al-Saadoon v. Barr*, 973 F.3d 794, 798, 804 (8th Cir. 2020); *see also Hamdi v. USCIS*, No. EDCV 10-00894 VAP(DTBx), 2012 WL 13135302, at *5, 13 (C.D. Cal. Aug. 29, 2012); *cf. Abel v. United States*, 362 U.S. 217, 222, 225-30 (1960) (administrative warrant, based on noncitizen's failure to provide address, was "bona fide preliminary step in a deportation proceeding" and not a sham); *United States v. Posada Carriles*, 541 F.3d 344, 356-61 (5th Cir. 2008) (naturalization interview was not pretextual, partly due to "careful consideration USCIS gave" to dispositive issue).

Recently, the Supreme Court considered whether an agency decision "rested on a pretextual basis" such that it would be set aside notwithstanding the foregoing principles. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019). Like *Wren*, the case specifically did not concern "pretext" in the sense of unlawful discrimination. *See id.* at 2564-65; *id.* at 2579 n.4 (Thomas, J., concurring in part and dissenting in part). The *Department of Commerce* Court reaffirmed that, "in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Id.* at 2573. Further (and importantly here), "a court may not reject an agency's stated reasons for acting simply because the agency might also have other unstated reasons" – including "unstated considerations of . . . national security concerns." *Id*; *see also id.* at 2575 (referring to "a typical case in which an agency may have both stated and unstated reasons for a decision"). Indeed, the *Department of Commerce* Court referred approvingly to a court of appeals rejecting an argument that an "agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion." *Id.* at 2573 (internal marks and

citation omitted). And the Supreme Court explained that inquiring into "the mental processes of administrative decisionmakers" is permissible only upon "a strong showing of bad faith or improper behavior." *Id.* at 2573-74 (internal marks and citation omitted).

That criterion was met in *Department of Commerce* after the Secretary of Commerce had explained a 2018 decision to reinstate a citizenship question on the census by "stat[ing] that he was acting at the request of the Department of Justice (DOJ), which sought improved data about citizen voting-age population purposes of enforcing the Voting Rights Act (or VRA)." *Id.* at 2562. Ultimately, the Court ruled that the evidence showed that "the decision to reinstate a citizenship question cannot be adequately explained in terms of DOJ's request for improved citizenship data to better enforce the VRA." *Id.* at 2575. Rather than a "genuine justification" for the agency decision, the Court concluded that "the sole stated reason—seem[ed] to have been contrived." *Id.*; *see also id.* (referring to "a significant mismatch"; "an explanation for agency action that is incongruent"; and to a "disconnect between the decision made and the explanation given").

The *Department of Commerce* case shows two things important to the present case. First, the term "pretextual" can have multiple meanings, and neither Plaintiffs nor Prof. Arastu have shown that they use the term in a legally defined sense. Second, to the extent that, by "pretextual," Plaintiffs and Prof. Arastu mean a USCIS decision arising after the agency considered multiple statutorily authorized grounds for decision but not all were reflected in the decision, they also fail to distinguish between such decisions that would still be valid under *Department of Commerce* (as clearly most are) and those that would not be. These failings show that, when Plaintiffs cite to Prof. Arastu's report as reflecting some purported effect of "CARRP's playbook of pretextual denials," the assertion is meaningless because the term "pretextual denial" is undefined and could mean several things, many lawful. Her report, therefore, provides no support for an inference of intentional or purposeful discrimination by USCIS in implementing CARRP. Indeed, none of Plaintiffs' evidence does.

4.      **CARRP is Facially Legitimate and has a Rational Basis.**

In addition, CARRP is lawful because it is facially legitimate and bona fide. In *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), the Supreme Court considered an executive proclamation following Executive Order 13780 that limited entry into the United States of noncitizens from eight (later seven) foreign states. *See id.* at 2404, 2406. The plaintiffs claimed the proclamation violated the Establishment Clause "because it was motivated not by concerns pertaining to national security but by animus toward Muslims," *see id.* at 2406. The Court indicated that, to defeat this claim, it was sufficient that the proclamation was "facially legitimate and bona fide." *Id.* at 2419-20. Discussing this deferential standard, the Supreme Court noted the long history of immunity from judicial control held by decisions of "the Government's political departments" in matters of admitting and excluding foreign nationals. *Id.* at 2418-19. The Court explained that it has "reaffirmed and applied [this] deferential standard of review across different contexts and constitutional claims," and it cited favorably the Second Circuit's application of the standard in upholding NSEERS, a national-security-related program applicable to certain individuals with lawful immigration status. *Id.* at 2419 (citing *Rajah v. Mukasey*, 544 F.3d 427, 433, 438-39 (2d Cir. 2008)). The Supreme Court stated that the standard "has particular force in admission *and* immigration cases that overlap with the areas of national security." *Id.* (internal marks and citation omitted; emphasis added); *see also id.* at 2420 ("our inquiry into matters of entry *and* national security is highly constrained") (emphasis added). Supporting a narrow standard of review in national security cases, the Court noted both separation-of-powers concerns as well courts' marked lack of competence "when it comes to collecting evidence and drawing inferences on questions of national security." *Id.* (internal marks and citations omitted); *see also Mathews v. Diaz*, 426 U.S. 67, 81-84 (1976) (upholding as "not wholly irrational" federal distinctions drawn within groups of noncitizen including lawful residents).

Applying the "facially legitimate and bona fide" standard, the *Trump v. Hawaii* Court would have quickly rejected the constitutional claim. *See id.* at 2420; *see id.* at 2421 (proclamation "expressly premised on legitimate purposes: preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices"); *see also Price v. United States INS*, 962 F.2d 836,

841-44 (9th Cir. 1991) (recognizing that "facially legitimate" review applies to constitutional challenges of permanent residents seeking citizenship against government inquiries relating to their applications). At the government's suggestion, the Court also considered whether the proclamation withstood "rational basis review," and ruled that it did. *Id.* (remarking that most policies do so unless "the laws at issue lack any purpose other than a bare desire to harm a politically unpopular group").

CARRP is entitled to the same deferential review applied in *Trump v. Hawaii*. Congress enacted many of the national security grounds of inadmissibility to which CARRP is keyed in response to 9/11, and CARRP itself was developed to implement these provisions and to address the same concerns. *See* Cong. Rsch. Serv., RL32754, Immigration: Analysis of the Major Provisions of the REAL ID Act of 2005, summ., 1, 17-26, 28-30 (2005) (describing expansion of relevant removal grounds and connection to 9/11); Atkinson Decl. at ¶¶8, 16-30; Ex. 1 at CAR000001 n.1. CARRP is facially neutral, and any disproportionate effect on noncitizens from Muslim-majority counties affects only a very small percentage of all benefit applicants from these countries – and, even then, benefit applicants from all countries are affected. CARRP detains no one, and many who are subject to the policy are not yet lawful permanent residents. Thus, CARRP easily satisfies deferential review given its sound national security basis. *Trump v. Hawaii*, 138 S. Ct. at 2420.[7]

CARRP also satisfies rational basis review. "[T]he Government's interest in combatting terrorism is an urgent objective of the highest order," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010), and Congress is broadly empowered to enact criteria for adjustment of status and naturalization, *see Fiallo v. Bell*, 430 U.S. 787, 792 (1977). As just noted, Congress amended several of the INA's national security removal grounds in response to 9/11, and CARRP is keyed to those grounds. *See* CAR000001 n.1. Those grounds impose express bars to adjustment of status. *See* 8 U.S.C. § 1255(a)(2). They also

---

[7]  The Ninth Circuit distinguished *Trump v. Hawaii* in *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), but *Ramos* does not apply here. In *Ramos*, the program at issue "involve[d] foreign policy and national security implications . . . to a lesser extent than . . . in *Trump v. Hawaii*." *Id.* at 896. Those "implications" took the form of foreign governments possibly "tak[ing] retaliatory actions counter to [the United States'] longstanding national security and economic interests." Appellants' Br. at 52, *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020) (No. 18-16981), 2019 WL 957053, at *52. By contrast, in *Trump v. Hawaii*, in *Rajah*, and under CARRP, the national security concerns relate to specific individuals and their immigration status, or potential status, within the United States.

---

may preclude naturalization eligibility by rendering an applicant unable to demonstrate good moral character or attachment to the Constitution, *see Nio v. United States DHS*, 270 F. Supp. 3d 49, 64 (D.D.C. 2017), or to show he had previously adjusted lawfully to permanent resident status, *see* 8 U.S.C. § 1429. Furthermore, Congress conferred broad inquiry authority on USCIS, enabling the agency to ask a wide variety of questions and to pursue the answers when assessing an adjustment or naturalization application. *See*, *e.g.*, *Nio*, 270 F. Supp. 3d at 63-64; *supra* Pt. III.B.

The document creating CARRP "outlines USCIS policy for identifying and processing cases with national security (NS) concerns," defined in terms of the relevant INA removal grounds. Ex. 1 at CAR000001; *see also id.* CAR000003-000007 (setting out policy). According to USCIS officials, NS concerns reflect on applicants' benefit eligibility, and CARRP provides both consistency in addressing NS concerns and a means of assuring that an application raising an NS concern is not ineligible for a benefit. *See* Atkinson Decl. at ¶¶ 7, 29-30; Renaud Decl. at ¶ 15; Relph Decl. at ¶¶ 23-24. Defendants' national security expert, DHS Acting Under Secretary and former TSA Assistant Administrator Kelli Ann Burriesci, agrees: "identifying whether an individual poses a national security concern" is "[a]n important part" of determining eligibility for adjustment and naturalization. *See* Ex. 10 at 8. She explains that "CARRP is USCIS' policy to ensure that national security concerns are consistently identified, processed, and adjudicated throughout the agency." *Id*. Defendants' national security expert further opines that "the CARRP policy employs best vetting practices that are consistent with those used in other federal screening programs," and that "CARRP serves an important function in protecting national security." *Id*. at 3; see also *id*. at 8-17. Thus, as a policy designed and implemented to guide inquiries into NS-related grounds of ineligibility for immigration benefits, CARRP is rationally related to a legitimate government interest. *Cf. Rajah*, 544 F.3d at 438-39.

### 5. Genuine Issues Would Exist if a Higher Level of Scrutiny Applied.

Plaintiffs contend that the inference of purposeful discrimination they would draw from circumstantial evidence requires that CARRP be reviewed under "strict scrutiny." Pls' MSJ at 50. Not so. The federal government's expansive authority in the immigration context enables it to draw distinctions

among noncitizens along protected lines subject only to rational basis review, not strict scrutiny. *See Ruiz-Diaz v. United States*, 703 F.3d 483, 486-87 (9th Cir. 2012). Plaintiffs cite no case holding that a marginal degree of differential effect, occurring only among noncitizens within the administration of a federal immigration benefits program, merits strict scrutiny. The case on which they rely, *Plyler v. Doe*, 457 U.S. 202 (1982), acknowledged the more lenient standard of "intermediate scrutiny" and considered at length the appropriate level of scrutiny to apply, *see id.* at 216-24 & n.16. Plaintiffs fail to do so. Nor do they address the fact that *Plyler* concerned a state's classification of noncitizens rather than a federal distinction. *See Aleman v. Glickman*, 217 F.3d 1191, 1198 (9th Cir. 2000). Finally, even assuming that a level of scrutiny above rational basis applies, Defendants' showing regarding facial legitimacy and rational basis review would be sufficient to raise genuine issues precluding summary judgment.[8]

## B.    PLAINTIFFS' APA ARBITRARY AND CAPRICIOUS CLAIM FAILS.

Plaintiffs contend that CARRP is an arbitrary and capricious final agency action under the APA and seek summary judgment on that claim. *See* MSJ at 36-43. Instead, the Court should enter summary judgment for Defendants.

### 1.    CARRP is Neither "Agency Action" nor "Final Agency Action," Precluding Review.

Plaintiffs must challenge an "agency action" that is "final" in order to obtain review of CARRP under the APA. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 882 (1990) ("*NWF*"); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800 (9th Cir. 2013); *see also* 5 U.S.C. §§ 702, 704. CARRP is neither. Moreover, to be reviewable under the APA, the action must be one that is "circumscribed" and "discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62-63 (2004). This requirement "precludes [a] broad programmatic attack" on an agency's operations. *Id.* at 64.

---

[8] Plaintiffs contend that "the government has a 'panoply of options' for addressing genuine national security concerns," MSJ at 50, but the options to which they refer address only concerns posed by individual applicants, and not the managerial benefits of CARRP or the risks posed by interfering with third agency investigations. Furthermore, the suggestion of granting an immigration benefit to a potentially ineligible applicant, and then seeking to rescind it, overlooks the challenges the government would face in doing so. For example, the government would bear a heavy burden in removal, denaturalization, and rescission proceedings. *See* 8 U.S.C. § 1229a(c)(3)(A); *Schneiderman v. United States*, 320 U.S. 118, 125 (1943); *Baria v. Reno*, 94 F.3d 1335, 1340 (9th Cir. 1996). In addition, rescinding a benefit after a grant may not even be possible in some cases and, meanwhile, the grant may pose its own national security risks by facilitating access to positions of trust. *See* xx KAB Rpt at 16-17.

a.         **Plaintiffs' Claim Constitutes an Unreviewable Programmatic Challenge.**

Insofar as Plaintiffs seek to challenge CARRP as a whole based on their criticisms of the way the process functions, Plaintiffs fail to contest a discrete "agency action" within the meaning of 5 U.S.C. § 702. In *NWF*, the Supreme Court considered a challenge to "the continuing (and thus constantly changing) operations of the [Bureau of Land Management (BLM)] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the [Federal Land Policy and Management Act]." *Id.*; *see also id.* at 875-78. The program was "no more an identifiable 'agency action'—much less a 'final agency action'"—than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration." *Id.* (internal marks and citation omitted). The Court concluded that the agency itself or Congress, rather than the courts, were the proper bodies before which to seek "programmatic improvements." *Id.* at 891; *see also Norton*, 542 U.S. at 63-64. The *NWF* Court explained that, "[e]xcept where Congress explicitly provides for [judicial] correction of the administrative process at a higher level of generality, [the courts] intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect." 497 U.S. at 89.

These principles foreclose review of USCIS policies like CARRP. For example, in *RCM Technologies, Inc. v. U.S. Dep't of Homeland Security*, 614 F. Supp. 2d 39, 43-45 (D.D.C. 2009), the court followed *NWF* regarding a challenge to an alleged policy of USCIS pertaining to the adjudication of specialty occupation visa petitions. The same course was followed in *Arden Wood, Inc. v. USCIS*, 480 F. Supp. 2d 141, 149-50 (D.D.C. 2007), with respect to another alleged USCIS policy regarding adjudication of religious worker visa petitions. *See also Li v. United States*, No. C10-798 RAJ, 2011 WL 13137104, at *3 n.2 (W.D. Wash. Mar. 16, 2011) (citing *NWF*, court would not determine USCIS' duties based on "the overall structure of the immigrant visa program"), *aff'd*, 710 F.3d 995 (9th Cir. 2013). Like these policies, CARRP is not a discrete "agency action" under 5 U.S.C. § 702. It is an internal vetting process -- an ongoing, day-to-day operation subject to change as USCIS management sees fit. Ex. 1 at CAR000002-000003 (rescinding past policies); Ex. 42, Additional Guidance on Issues Concerning the

Vetting and Adjudication of Cases Involving National Security Concerns, at CAR000075-83; Ex. 6 at CAR000084-92; Ex. 43, National Security Adjudication and Reporting Requirements – Update, at CAR000093-94; Ex. 44, Clarification and Deliniation of Vetting and Adjudication Responsibilities for CARRP Cases in Domestic Field Offices, at CAR000095-000103; Ex. 45, Revision of Responsibilities for CARRP Cases Involving Known or Suspected Terrorists, at CAR000342-44; Ex. 46, Supplemental Guidance: Revision of Responsibilities for CARRP Cases Involving Known or Suspected Terrorists, at CAR000345-48 (all updating CARRP). Most importantly, judicial review exists for each application that may be subject to CARRP either on the basis of delay or denial. While "the 'case-by-case approach' [that *NWF*] require[s] is 'understandably frustrating' when 'across-the-board protection' is sought[,] . . . this is the traditional, and remains the normal, mode of operation of the courts.'" *RCM*, 614 F. Supp. 2d at 45 (quoting *NWF*, 497 U.S. at 894). In sum, Plaintiffs make a programmatic challenge unreviewable under the APA.[9]

## C.    CARRP IS NOT A "FINAL AGENCY ACTION."

The existence of "final agency action" enabling APA review pursuant to 5 U.S.C. § 704 is a prerequisite to the waiver of sovereign immunity under 5 U.S.C. § 702, and therefore is a jurisdictional prerequisite to APA review. *See Gallo Cattle Co. v. United States Dep't of Agric.*, 159 F.3d 1194, 1198-99 (9th Cir. 1998); *see also Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1168-72 (9th Cir. 2017) (discussing *Gallo Cattle*). Plaintiffs contend that when the Court denied dismissal it decided the "final agency action" issue. *See* Pls' MSJ at 26 n.12. This is incorrect. The Court stated only that it assumed the allegations to be true, Ex. 31 at 9, and so when it ruled that CARRP was a "final agency action" in part because it "affects the thousands of applicants whose qualified applications are allegedly indefinitely delayed or denied without explanation," resulting in "distinct legal consequences," the factual predicate of the statement was left open. Returning to that issue, Plaintiffs cannot show either that

---

[9] In *Wild Fish Conservancy*, the Ninth Circuit followed *NWF* while distinguishing another case in which "the challenged Forest Service interpretation . . . was embodied in a memorandum that formally articulated the agency's position." 730 F.3d at 801-02 (discussing *Siskiyou Reg'l Educ. Project v. USFS*, 565 F.3d 545 (9th Cir. 2009)). Even in *Siskiyou*, however, the legal challenge concerned "specific instances of the Forest Service's actions taken pursuant to" the memo at issue. *See* 565 F.3d at 554. That is not the case with the classes here. Moreover, specific policies allegedly existed in *RCM*, *see* 614 F. Supp. 2d at 42, 45, and *Arden Wood*, 480 F. Supp. 2d at 145-46, yet these courts correctly followed *NWF*.

CARRP applies to "qualified applications" or that CARRP itself results in any "distinct legal consequences."

An agency action is considered final only if two elements are met. First, the action must "mark the 'consummation' of the agency's decisionmaking process," and, thus, cannot be tentative or interlocutory. *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (citation omitted); *see also Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006). In other words, to be final and reviewable under the APA, an agency action must "impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process." *Air California v. U.S. Dep't of Transp.*, 654 F.2d 616, 621 (9th Cir. 1981).

Insofar as Plaintiffs' APA claim challenges USCIS' adoption of CARRP, their claim fails because CARRP is not a final agency action as that term is defined under the APA. The decision did not mark the "consummation" of any administrative process whereby the rights of third parties were determined. Rather, CARRP is simply an internal USCIS process to systematize the vetting of certain benefit applications, *i.e.*, those that raise NS concerns, before those applications reach the same adjudicative juncture and legal standards as other applications. *See* Ex. 1 at CAR000006; Ex. 47, Operational Guidance for Vetting and Adjudicating Cases with National Security Concerns (Guidance), at CAR000039; Renaud Decl. at ¶6. Upon the adjudication of applications, USCIS is obligated to provide reasons for decisions when they deny applications, *see* 8 C.F.R. § 103.3(a)(1)(i), and the validity of those reasons are subject to judicial review in a discrete action under the APA. Thus, it cannot be said that CARRP itself, as a process or form of guidance for USCIS Field Offices, is an action "by which rights or obligations [are] determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal marks and citation omitted); *see Mamigonian v. Biggs*, 710 F.3d 936, 941-42 (9th Cir. 2013) (no "final agency action" where "USCIS had not yet made a determination on [the noncitizen's] pending adjustment-of-status applications"); *Broadgate Inc. v. USCIS*, 730 F. Supp. 2d 240, 247 (D.D.C. 2010) (internal guidance used to determine eligibility for H-1B visa program not final agency action).

1    **1.      CARRP is an Unreviewable Action Committed to Agency Discretion by Law.**

2        Assuming CARRP constitutes "agency action," it remains unreviewable under the APA because it

3    "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). In *Heckler v. Chaney*, 470 U.S. 821

4    (1985), the Supreme Court ruled that a decision by an administrative agency, the Food and Drug

5    Administration, not to enforce a statute against the "unapproved use of approved drugs" for capital

6    punishment was presumptively unreviewable and nothing in the relevant statute overcame the

7    presumption. *See id.* at 823-25, 831-38. The *Chaney* Court concluded that, absent a statute

8    "circumscribing an agency's power to discriminate among issues or cases it will pursue," the agency's

9    "exercise of enforcement power" is "committed to agency discretion by law." *Id.* at 833, 835. This bar

10   extends beyond agency decisions in individual cases to include policy-type measures such as

11   implementing CARRP. *See Lincoln v. Vigil*, 508 U.S. 182, 188-95 (1993); *Alaska Fish & Wildlife Fed'n*

12   *& Outdoor Coun. v. Dunkle*, 829 F.2d 933, 935, 938 (9th Cir. 1987) (general "written policy" that game

13   laws would not be enforced during "closed season" held unreviewable).

14       As previously set out, *see supra* III.B, USCIS has broad authority regarding the manner in which

15   it makes inquiries regarding immigration benefit applications. CARRP embodies USCIS' effort to

16   administer its investigative authority to certain cases. Considerations underlying the *Chaney* decision

17   demonstrate that Section 701(a)(2) also applies to agency actions such as CARRP that concern the scope

18   of, and methods, for agency inquiries. Thus, in situations analogous to USCIS' decisions under CARRP

19   to examine more closely certain benefit applications, courts have held that judicial review of the scope of

20   agency investigations is barred by Section 701(a)(2). *See Greer v. Chao*, 492 F.3d 962, 965-66 (8th Cir.

21   2007) (O'Connor, Assoc. J. ret.); *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1127-30 (6th Cir. 1996); *see*

22   *also Garcia v. McCarthy*, 649 F. App'x 589, 591 (9th Cir. 2016) (unpublished); *Nguyen v. Kissinger*, 528

23   F.2d 1194, 1199 (9th Cir. 1975) ("the A.P.A. generally precludes judicial review of the manner in which

24   the Attorney General chooses to inquire into the immigration status of an alien seeking admission");

25   *Skalka v. Kelly*, 246 F. Supp. 3d 147, 153 (D.D.C. 2017) (regulation concerning adoption-related

26   investigations did "nothing to limit the inherent discretion that the agencies have to manage the

27

28

procedures for handling the large number of visa petitions they receive"). These decisions are consistent with *Chaney* because – like questions about whether to investigate or enforce – determining the scope of inquires "often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," and "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." 470 U.S. at 831-32. Section 701(a)(2) therefore squarely applies, barring review of the agency's discretionary decisions adopting and implementing CARRP.

### 2. The Decision to Adopt CARRP was Not Arbitrary and Capricious.

#### a. The Scope of Review Under the APA Is Narrow and Highly Deferential to the Agency's Decision.

Pursuant to the APA, agency decisions may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *accord Family Inc. v. USCIS*, 469 F.3d 1313, 1315 (9th Cir. 2006) (citing *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001)). "The decision how to interpret the [INA] is for other branches of government," and therefore "judicial deference to the Executive Branch is especially appropriate in immigration matters." *Spencer Enterprises, Inc. v. United States*, 229 F. Supp. 2d 1025, 1036 (E.D. Cal. 2001) (citing *INS v. Aguirre–Aguirre,* 526 U.S. 415, 425 (1999)), *aff'd*, 345 F.3d 683 (9th Cir. 2003).

### 3. APA Review is Limited to the Administrative Record.

Review of an agency decision for APA compliance is based solely on the administrative record, absent an exception. *See Department of Commerce*, 138 S. Ct. at 2573-74; *Nw. Ecosys. Alliance v. United States FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007). The mere fact that district court proceedings yield an evidentiary record as to other claims does not make that record relevant to APA review of an administrative decision. *Cf. Afianian v. Duke*, No. CV 17-07643 FMO (RAOx), 2018 WL 9619346, *3-7 (C.D. Cal. Nov. 30, 2018) (denying discovery on APA claim without regard to whether it would be permitted on accompanying constitutional claims). Plaintiffs' memorandum does not comply with this limit on APA review. Seeking an exception, they cite *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005), for the proposition that "a court may consider extra-record evidence to determine 'whether the

agency has considered all relevant factors and has explained its decision.'" Pls' MSJ at 38 n.20. Yet Plaintiffs make no effort to demonstrate that this narrow exception has any application here, even while they bore the burden to do so. *See Univ. of Wa. v. Sebelius*, No. C11-625RSM, 2011 WL 6447806, at *2-3 (W.D. Wash. Dec. 22, 2011). Further, the exception on which they rely is inapplicable here, as it does not permit consideration of "post-decision information . . . advanced as a new rationalization . . . for attacking an agency's decision." *Ctr. for Biological Diversity v. United States FWS*, 450 F.3d 930, 944 (9th Cir. 2006) (internal marks and citation omitted). The Court should confine its review of Plaintiffs' APA claims to the administrative record.[10]

## VI.  USCIS' DECISION TO ADOPT CARRP WAS NOT ARBITRARY AND CAPRICIOUS.

Plaintiffs assert that the Court should set aside CARRP as "arbitrary and capricious." The preceding analysis showing that CARRP has a rational basis largely refutes this contention. *See supra* pt.V.A.3. Nevertheless, Plaintiffs argue that USCIS' rationale for adopting CARRP was inadequate. According to Plaintiffs, "[t]he administrative record contains no explanation whatsoever for USCIS's adoption and implementation of CARRP, let alone the requisite reasoned explanation." MSJ 37. They are incorrect.

The purpose of CARRP is plainly stated in the administrative record. "A central mission of [USCIS] is to protect the integrity of the U.S. immigration system and preserve the safety of our homeland." Ex. 50, Operational Guidance for Vetting and Adjudicating Cases with National Security Concerns (Memo), at CAR000008. Further, "[n]ational security (NS) matters are a primary consideration in USCIS adjudications and measures must be adopted to ensure a consistent approach in resolving these concerns." *Id.* The record notes that, "[p]rior to CARRP, [cases with NS concerns] were being handled at the Headquarters Office of [FDNS]." Ex. 44 at CAR000095. In adopting CARRP, USCIS intended to "delegate[ ] decision-making authority to the field," including "the responsibility for the vetting and adjudication of applications and petitions involving national security concerns." Ex. 50 CAR000008.

---

[10]  Specifically, review of Plaintiffs' APA claims should be limited to record documents, ECF 286, 287, including certain lesser redacted duplicates produced in discovery. *See* ECF 341 at 3 n.1; 341-1. While Plaintiffs refer to some record documents and duplicates in their APA arguments, MSJ at 29-43, they also improperly rely on extra-record material including depositions; expert reports; the results of studies and audits; and documents produced in discovery that are not CAR duplicates, namely, DEF-0045893, DEF-00231014, DEF-00045880, DEF-0094986, DEF-0043897.

1  CARRP's purpose, therefore was "to efficiently process cases with NS issues and mitigate potential risks

2  to national security." Id. This goal would be achieved by "allowing USCIS to leverage field resources

3  and experienced officers for handling these difficult cases." Ex. 44 at CAR000095-96.

4  To that end, CARRP "instituted a disciplined, agency-wide approach for identifying, processing,

5  and adjudicating applications and petitions involving an identified National Security (NS) concern." Ex.

6  42 at CAR000075-76. In conjunction with the operational guidance, CARRP "provides direction to

7  identify and process cases containing NS concerns in the most efficient manner." Ex. 1 at CAR000003.

8  The process was designed to allow[ ] sufficient flexibility to manage the variety of cases encountered by

9  USCIS." Id. Thus, the CARRP Operational Guidance establishes various "Field Management

10  Requirements." See Ex. 47 at CAR 000014-15. Further, CARRP establishes and facilitates information-

11  sharing between government agencies, including those holding NS information. See id. at CAR 000016-

12  17. Plaintiffs are simply incorrect to say that the reasons and rationale for the CARRP program are not

13  stated in the administrative record.

14  Plaintiffs also contend CARRP should be set aside because USCIS did not consider unenacted

15  legislation, "conducted no studies, drafted no reports, and considered no information other than the INA

16  and the 'on-the-job' experience of individuals at USCIS," and did not consult "outside parties" in the

17  formulation of CARRP. The short answer to Plaintiffs' argument is that none of these things are required

18  by the APA of an agency promulgating, as here, a rule of "agency organization, procedure or practice." 5

19  U.S.C § 553(b)(3)(a); see Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 100 (2015) (no more procedure

20  could be imposed on an agency in promulgating an interpretative rule than the APA itself requires).

21  Plaintiffs further argue that USCIS allegedly failed to consider "important aspects of the

22  problem." These arguments constitute thinly-disguised vehicles for questioning the wisdom of CARRP

23  and to attack the decision with post hoc, extra-record evidence. None demonstrate that the decision to

24  adopt CARRP was "arbitrary and capricious." First, Plaintiffs accuse USCIS of "fail[ing] to consider the

25  severe consequences of CARRP for those seeking to naturalize and adjust status." Pls' MSJ, pp. 37-38.

26  Putting aside that Plaintiffs cannot show that CARRP results in "severe consequences" to applicants on a

27  class-wide basis, they impermissibly support this argument with copious citations to extra-record

28  evidence, id. at 38-39, which the Court should disregard. They also attempt to use this extra-record

1  evidence to attack USCIS's decision, which is not permitted even when an exception permitting extra-

2  record evidence exists. *Association of Pacific Fisheries v. Environmental Protection Agency*, 615 F.2d

3  794, 811-812 (9th Cir. 1980).

4      In any event, Plaintiffs' arguments concerning the "severe consequences" of CARRP all tie back

5  to the issue of delay. However, one of the most important purposes of CARRP is to make the process of

6  vetting applications for immigration benefits with NS concerns more efficient by leveraging resources in

7  the field to process such cases. Ex. 1 at CAR000003. Where a fundamental purpose for the action is to

8  create greater efficiency, it can hardly be said that alleviating unnecessary delays in processing such

9  cases was an unconsidered factor. Relatedly, Plaintiffs assert that CARRP is unwise and ineffective. Pls'

10 MSJ at 39-40. Of course, this is not an appropriate arbitrary-and-capricious argument. *See City of Los

11 Angeles v. Barr*, 929 F.3d 1163, 1182-83 (9th Cir. 2019). *Michigan v. EPA*, 576 U.S. 743 (2015), cited by

12 Plaintiffs, is not to the contrary, as the Court simply considered the limits of an agency's authority to

13 regulate under an "appropriate and necessary" standard. *Id*. at 752. Lastly, Plaintiffs assert that

14 Defendants were required to "consult[ ] research and empirical evidence indicating that the program

15 would frequently misidentify applicants as NS concerns." But this is nothing more than a variation of the

16 themes attempted above. In sum, if the issue is reached the Court should uphold USCIS' decision to

17 implement CARRP.[11]

18 **A.    APA NOTICE AND COMMENT RULEMAKING WAS NOT REQUIRED BECAUSE
19         CARRP IS AN INTERNAL AGENCY PROCESS THAT CREATES NO SUBSTANTIVE
          STANDARD.**

20      The APA requires notice-and-comment rulemaking for "substantive" rules, but not for other types

21 of rules and policies. 5 U.S.C. § 553(b)(3); *see Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010).

22 Specifically, the statute exempts from these requirements, *inter alia*, "rules of agency organization,

23 procedure, or practice." *Id*. § 553(b)(3)(A). To be classified as "substantive," a rule must "create rights,

24 impose obligations, or effect a change in existing law pursuant to authority delegated by Congress."

25

---

26 [11] Within the context of their APA claims, Plaintiffs also assert that CARRP is *ultra vires*, Pls' MSJ at 26-32, and that USCIS
27 fails to abide by the regulation, 8 C.F.R. § 103.3(a)(1)(i), requiring an explanation of reasons for denial, *id*. at 32-33. The
   former is another variation on their extra-statutory argument, refuted by USCIS' broad authority to inquire and to develop
   procedures. *See supra* pt. III.B. The latter fails as the regulation does not abrogate the administrative law principle that an
28 agency need not state all its reasons for a decision so long as the stated reasons are lawful. *See Dep't of Com.*, 138 S. Ct. at
   2573.

*Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003). The rights created or obligations imposed must be those of outside parties, not merely changes in the internal functioning of the agency. *See United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1168 (9th Cir. 2000); *Moore v. Apfel*, 216 F.3d 864, 868-69 (9th Cir. 2000).

Here, the non-substantive nature of CARRP is clear. The purpose of CARRP is to improve USCIS' efficiency in handling immigration benefits applications which involve NS concerns by assigning to the field much of the vetting responsibility while adopting procedures designed to ensure that the cases are handled properly with the requisite focus and attention they deserve by specially trained USCIS personnel. Renaud Decl. at ¶6. CARRP does not create any new or substantive standard for the processing of immigration benefits applications. *Id.* CARRP simply creates a separate analytical path for the vetting of applications presenting NS concerns. While Plaintiffs have repeatedly alleged that CARRP creates extra-statutory eligibility criteria, they cannot prove this allegation, particularly in light of CARRP's true character as a means only to administer the agency's broad inquiry authority. *See supra* pt. III.B. In sum, because CARRP is not a substantive rule, notice-and-comment procedures were not required to implement it.

**B.    PLAINTIFFS' CLAIM THAT THE AGENCY HAS UNREASONABLY WITHELD OR DELAYED AGENCY ACTION IS NOT BASED ON DISCRETE CLAIMS OF AGENCY INACTION.**

Plaintiffs motion seeks classwide relief under the APA for allegedly unreasonable "systemic delays" within CARRP. The APA provides no mechanism for such relief. In its "scope of review" provision, the APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). Notably, however, only certain types of agency failures can support a claim under § 706(1). It is well established that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 64 (emphasis in original). These two limitations play different roles: "The limitation to discrete agency action precludes . . . broad programmatic attack[s,]" *id.*, while "[t]he limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law[,]" *id.* at 65 (emphasis in original).

The discreteness limitation precludes using "broad statutory mandates" to attack agency policy, the better to "avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* at 64, 66. A statutory provision "contain[ing] only a general follow-the-law directive . . . flunks *SUWA*'s discreteness test[,]" for example, because it does not prescribe a specific action that a court can competently compel and supervise. *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 891 (D.C. Cir. 2014); *see also Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). The other § 706(1) requirement—that the law must mandate the agency action that the plaintiff seeks to compel—reflects the fact that, prior to the APA, courts compelled executive action via writs of mandamus, which were available only for "specific, unequivocal command[s]" as to which the agency had "no discretion whatever." *SUWA*, 542 U.S. at 63 (internal quotation marks and citations omitted). Thus, "the only agency action that can be compelled under the APA is action legally required." *Id.* (emphasis in original). While the mandatoriness requirement is textually grounded in § 706(1)'s explicit reference to "'agency action *unlawfully* withheld[,]'" *SUWA*, 542 U.S. at 63 (emphasis added by *SUWA*) (quoting 5 U.S.C. § 706(1)), the requirement applies regardless of whether a claim under § 706(1) seeks to compel agency action "unlawfully withheld" or agency action "unreasonably delayed" because "a delay cannot be unreasonable with respect to action that is not required." *Id.* at 63 n.1. In summary, a plaintiff who asks a court to "compel agency action . . . unreasonably delayed" under § 706(1) must pinpoint an agency's failure to take an action that is both discrete and mandatory. *See SUWA*, 542 U.S. at 64. Plaintiffs' motion for summary judgment does neither.

Plaintiffs' motion does not identify any "discrete" agency action that has been unlawfully withheld or delayed by Defendants. Instead, Plaintiffs' argument relies on the antithesis of discrete agency action - "systemic delays." MSJ at 34. According to Plaintiffs, as of August 2020, class members had been waiting on average two-and-a-half years for adjudication. *Id.* Be that as it may, under *SUWA*, Plaintiffs are not permitted by the APA to bundle together discrete alleged claims of unreasonable delay and obtain programmatic relief against Defendants. Rather, in order to obtain relief from Defendants under 5 U.S.C. § 706(1), each claimant is required to bring their own discrete claim for alleged unreasonable delay, and as to each discrete claim, Defendants are to be afforded an opportunity to

demonstrate that the delay was not unreasonable under the circumstances of the individual claimant. For this reason, class-wide resolution of this claim is not possible.

Plaintiffs have also failed to demonstrate that Defendants have "unlawfully" withheld or unreasonably delayed any action. Nowhere in Plaintiffs' motion do they cite a legal requirement that compels Defendants to vet their applications for immigration benefits and to make a determination within a certain period of time. The "sense of Congress" announced in 8 U.S.C. § 1571, that an application for immigration benefits "should be" completed within 180 days, hardly constitutes a "specific, unequivocal command" to Defendants. See *Yang v. California Dep't of Soc. Servs.*, 183 F.3d 953, 961-62 (9th Cir. 1999) (Sense of Congress provision amounts to no more than "non-binding, legislative dicta.") Moreover, in any case in which Defendants failed to render a determination before the time permitted, a claimant upon a showing of specific facts could obtain relief on a discrete claim under 5 U.S.C. § 706(1). Finally, while Plaintiffs correctly point out that USCIS has an obligation to grant or deny an application for adjustment of status within "a reasonable time," whether USCIS has acted unreasonably in any individual case requires a case-by-case determination taking into account the reasons for the "delay," and class-wide resolution of the claim is not possible. However, there is nothing in the law that requires that an adjustment-of-status application be granted or denied within any set period of time. In summary, Plaintiffs have simply failed to show any basis for relief under 5 U.S.C § 706(1) for agency action unlawfully withheld or unreasonably delayed.[12]

## C.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PROCEDURAL DUE PROCESS CLAIM.

Summary judgment for Defendants on the Naturalization Class's procedural due process claim is warranted because Plaintiffs cannot raise a genuine issue that Defendants, through CARRP, systemically interfere intentionally with, or are deliberately indifferent to, naturalization adjudications.

### 1.  Plaintiffs' Constitutionally Protected Interest is Narrowly Circumscribed.

In denying dismissal, the Court ruled that the Naturalization Class' due process claim could proceed based on the allegation "that all the statutory requirements [for naturalization] have been

---

[12]  Plaintiffs move for summary judgment based on the APA, see MSJ 26-43, under which their Seventh through Tenth Claims are effectively subsumed; they do not distinguish among them. *See also* ECF 69 at 17-18. As Plaintiffs' motion under the APA should be denied, summary judgment on these claims should be granted to Defendants.

complied with, and the application of CARRP's extra-statutory requirements deprives Plaintiffs of the right to which they are entitled." Ex. 31 at 16-17. As the Court recognized, the claim depends upon Plaintiffs' "property interest *in seeing their applications adjudicated lawfully*." *Id.* at 16 (emphasis added); *accord Zhu v. DHS*, No. 2:18-cv-00489-RAJ, 2019 WL 4261167, at *4 (W.D. Wash. Sept. 9, 2019). This specific interest, as the Court stated, *see* ECF 69 at 16, was identified by the Ninth Circuit in *Brown v. Holder*, 763 F.3d 1141, 1147 (9th Cir. 2014).

The precise nature of the interest identified in *Brown* is important. First, the Ninth Circuit understood in *Brown* that, whatever protected interest may exist, it is *not* in naturalization itself. *See Tutun v. United States*, 270 U.S. 568, 578 (1926) ("the Constitution does not confer upon aliens the right to naturalization"). "An alien who seeks political rights as a member of this Nation can rightfully obtain them *only upon terms and conditions specified by Congress*." *INS v. Pangilinan*, 486 U.S. 875, 884 (1988) (internal marks and citation omitted; emphasis added). The courts can, under 8 U.S.C. § 1421(c), review agency naturalization procedures for statutory authority and compliance—but no reported decision appears to have assessed the adequacy of administrative naturalization procedures under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Thus, the Ninth Circuit in *Brown* ruled only that the petitioner had "a protected interest *in being able to apply* for citizenship." 763 F.3d at 1147.

Under this Court's ruling on the motion to dismiss and under *Brown*, Plaintiffs must support their procedural due process claim with evidence showing that USCIS' actions "are motivated by animus or malicious intent," or "arbitrarily and intentionally obstructed" naturalization application[s]," or were "deliberately indifferent to whether . . . application[s] w[ere] processed." 763 F.3d at 1149-50; *accord* Ex. 31 at 16-17. Furthermore, the showing must be a systemic one. The three individual Plaintiffs who allege claims regarding naturalization (Mssrs. Wagafe, Abraham, and Manzoor) have all been naturalized, *see supra* pt. II.B.1, and the claim on behalf of the Rule 23(b)(2) class must establish that the entire class is entitled to a common remedy, *see* pt. II.B.2, *supra*. Plaintiffs cannot raise a genuine issue that CARRP systemically interferes with naturalization applications intentionally or with deliberate indifference. As shown in Part V.A, *supra*, Plaintiffs cannot prove that CARRP unlawfully discriminates

or is motivated by animus or malicious intent. Furthermore, Plaintiffs have only alleged, but they have not begun to prove, that all Naturalization Class members are actually eligible for naturalization, which precludes them from showing that CARRP systemically interferes with pre-existing naturalization eligibility in a material way. *See Dent v. Sessions*, 900 F.3d 1075, 1083-84 (9th Cir. 2018) (prejudice required to prove a claim under *Brown*); *cf. United States v. Fior D'Italia*, 536 U.S. 238 (2002) ("we cannot find agency action unreasonable in all cases simply because of a general *possibility* of abuse").

Finally, Plaintiffs cannot show that CARRP creates non-statutory eligibility criteria for naturalization. The evidence shows that CARRP consistently has in mind, and is tethered to, statutory eligibility criteria for both adjustment of status and naturalization. The additional questions that CARRP prompts USCIS officials to ask, and in particular the "non-statutory indicators," are all reasonable inquiries based on USCIS' broad investigative powers. In sum, USCIS' actions under CARRP do not interfere with any pre-existing benefit eligibility, impose any extra-statutory eligibility requirement, or discriminate unlawfully. Plaintiffs' procedural due process claim under *Brown* therefore fails.

**2.      Even Under *Mathews*, Plaintiffs Cannot Prove Their Procedural Due Process Claim.**

Even assuming that Plaintiffs' "property interest in seeing their [naturalization] applications adjudicated lawfully," Ex. 31 at 16, requires an assessment of USCIS' naturalization procedures, Plaintiffs cannot raise a genuine issue of a constitutional violation. Procedural due process "is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (internal marks and citation omitted). The inquiry considers: (a) the nature of the private interest affected by the official action; (b) the risk of erroneous deprivation of that interest through existing procedures and the probable value of additional or substitute procedural safeguards; and (c) the government's interest, including the function involved and the financial and administrative burdens the proposed procedure would entail. *See id.* at 335. To make this inquiry, courts focus on "the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Id.* at 344.

Applying these factors here: First, as shown above, the nature of the private interest at issue is limited, concerning simply the lawful adjudication of naturalization applications, and not naturalization

1  itself. Plaintiffs attempt to revise the protected interest at stake by discussing the value of "timely" and

2  "prompt" adjudication, *see* MSJ at 44, but timeliness is not part of the constitutionally protected interest

3  identified either in *Brown* or by this Court. *See* ECF 69 at 16-17.

4          The second *Mathews* factor involves two elements: the current risk of erroneous deprivation, and

5  the probable value of other procedures. Neither can weigh in favor of Plaintiffs. Plaintiffs do not dispute

6  that they have multiple opportunities to respond to USCIS' stated grounds for denying naturalization. *See*

7  MSJ at 48 (citing 8 C.F.R. § 103.2(b)(16)). In addition, de novo district court review for denied

8  applications exists under 8 U.S.C. § 1421(c) within six years of USCIS' denial, *see Nagahi v. INS*, 219

9  F.3d 1166, 1171 (10th Cir. 2000). Meanwhile, Plaintiffs' efforts to show heightened risk of erroneous

10 deprivation fail. They again attempt to import timeliness into the analysis, *see* Pls' MSJ at 45, which is

11 misplaced. Furthermore, they refer to "pretextual denials." *Id.* Yet, as discussed in Pt. V.A.3, *supra*,

12 Plaintiffs do not define the term or show how they distinguish unlawfully pretextual denials from denials

13 that are legitimate under *Dep't of Com.*, 138 S. Ct. at 2573, even while the government also has unstated

14 reasons for them. Plaintiffs then analyze the referral of applications to CARRP on the mistaken

15 assumptions not only that "unreasonable delays and pretextual denials" automatically result, but also that

16 these constitute the erroneous deprivation of the protected interest identified by *Brown* and this Court,

17 lawful adjudication of applications. *See* Pls' MSJ at 45-46. At bottom, Plaintiffs are arguing only about

18 the risk of having more extensive agency inquiries made about their pending applications, yet

19 administrative investigations in themselves do not implicate the Due Process Clause. *See SEC v. Jerry T.

20 O'Brien, Inc.*, 467 U.S. 735, 742 (1984). The cases on which Plaintiffs rely regarding risk of error, *see*

21 MSJ at 46, are all distinguishable because they involve undisclosed information that either a final agency

22 decision relied upon or related to a seizure of property that had already occurred, whereas CARRP itself

23 is only a pre-decisional process involving no seizure of vested rights. *Cf. Zerezghi v. USCIS*, 955 F.3d

24 802, 809 (9th Cir. 2020); *Al Haramain Islamic Found. v. Dep't of Treasury*, 686 F.3d 965, 985 (9th Cir.

25 2012); *Kaur v. Holder*, 561 F.3d 957, 960 (9th Cir. 2009).

26

27

28

Plaintiffs nevertheless seek additional procedural safeguards before USCIS in the form of notice of derogatory information prompting their referral to CARRP and an opportunity to respond. *See* MSJ at 44, 46-47. The third *Mathews* factor considers the government's interest, including the function at issue and burdens related to proposed procedures. *See* 424 U.S. at 335. This factor weighs dispositively in favor of Defendants. Notice-and-opportunity regarding CARRP prior to the completion of USCIS' adjudication is untenable. Because "an administrative investigation adjudicates no legal rights," there are no due process rights attached to it. *See Jerry T. O'Brien, Inc.*, 467 U.S. at 742. And if Plaintiffs seek CARRP-related information with an adjudication that does not rely on such information, that would be an end-run on the principle that agency decisions are judged based on the express reasons given for them. *See Dep't of Com.*, 138 S. Ct. at 2573.

Furthermore, the government function at issue here is of the utmost importance, as it concerns assessing the extent to which NS concerns affect applicants' statutory eligibility for naturalization and lawful permanent residence, as well as avoiding interference with other law enforcement investigations. Similar inquiries, their targets, and the information gathered are routinely recognized as meriting confidentiality. *See Kentucky v. King*, 563 U.S. 452, 467 (2011); *Jerry T. O'Brien*, 467 U.S. at 740-41, 750-51; *Elhady*, 2021 WL 1181270, at *3. This Court has already come to an analogous conclusion about CARRP-related information when, after reviewing 50 random A-files of class members, it limited disclosure of class member identities to "Attorney Eyes Only" based on the potential national security threat posed by broader disclosure. *See* Ex. 51, ECF 183 Order Granting Defs' Mot. for AEO Protective Order, at 4; *see also* Ex. 52, ECF 162, Order Directing Production of 50 Random A-Files. Similarly, the Court shielded from discovery information provided to USCIS by Third Agencies, noting that disclosure "could cause harm to national security." Ex. 53, ECF 274 at Order on Pls' Mot. to Compel at 4-5.

## VII.    CONCLUSION

Based on the foregoing, the Court should grant Defendants' cross-motion for summary judgment motion, deny Plaintiffs' motion for summary judgment, and enter judgment for Defendants on all claims.

Defs.' Cross-Mot. For Summ. J. & Opp'n To Pls.'
Summ. J. Mot.; Case No. 2:17-cv-00094 - 70

U.S. Dep't Of Justice, OIL/A, 450 5th St. NW,
Washington DC 20001; 202-616-2186

1    Dated: May 3, 2021                          Respectfully submitted,

2

3    BRIAN M. BOYNTON                            LINDSAY M. MURPHY
     Acting Assistant Attorney General          Senior Counsel for National Security
4    Civil Division                             Office of Immigration Litigation
5    U.S. Department of Justice
                                                 /s/ *W. Manning Evans*
6    AUGUST FLENTJE                              W. MANNING EVANS
     Special Counsel                            Senior Litigation Counsel
7    Civil Division                             Office of Immigration Litigation

8
     ETHAN B. KANTER
9    Chief, National Security Unit              BRENDAN T. MOORE
     Office of Immigration Litigation          Trial Attorney
10   Civil Division                             Office of Immigration Litigation

11
     BRIAN T. MORAN                             JESSE L. BUSEN
12   United States Attorney                     Trial Attorney
                                                 Office of Immigration Litigation
13
     BRIAN C. KIPNIS
14   Assistant United States Attorney           VICTORIA M. BRAGA
     Western District of Washington             Trial Attorney
15                                               Office of Immigration Litigation

16   LEON B. TARANTO
     Trial Attorney                             ANNE P. DONOHUE
17   Torts Branch                               Trial Attorney
                                                 Office of Immigration Litigation
18

19                                               ANDREW C. BRINKMAN
                                                 Senior Counsel for National Security
20                                               Office of Immigration Litigation

21                                               *Counsel for Defendants*

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 3rd day of May 2021, I directed that the foregoing document be hand delivered to the Clerk of the Court, and electronically transmitted to Plaintiffs' counsel, in accordance with Western District of Washington General Order No. 03-21 (the "General Order"),.

*/s/ W. Manning Evans*
W. MANNING EVANS
Senior Litigation Counsel
Office of Immigration Litigation – Appellate Section